UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

VIRGINIA L. GIUFFRE,

    Plaintiff,

v.

GHISLAINE MAXWELL,

    Defendant.

15-cv-07433-RWS

------------------------------------------------------X

### DEFENDANT'S STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
303.831.7364

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, defendant Ghislaine Maxwell submits this statement of the material facts as to which she contends there is no genuine issues to be tried. Ms. Maxwell expressly preserves all of her objections to the admissibility of the evidence cited herein and in the accompanying memoranda of law and does not waive any objections by making this submission.

numbered.

1. **Ms. Maxwell's response to publications of plaintiff's false allegations: the March 2011 statement.** In early 2011 plaintiff in two British tabloid interviews made numerous false and defamatory allegations against Ms. Maxwell. In the articles, plaintiff made no direct allegations that Ms. Maxwell was involved in any improper conduct with Jeffrey Epstein, who had pleaded guilty in 2007 to procuring a minor for prostitution. Nonetheless, plaintiff suggested that Ms. Maxwell worked with Epstein and may have known about the crime for which he was convicted.

2. In the articles, plaintiff alleged she had sex with Prince Andrew, "a well-known businessman," a "world-renowned scientist," a "respected liberal politician," and a "foreign head of state."

3. In response to the allegations Ms. Maxwell's British attorney, working with Mr. Gow, issued a statement on March 9, 2011, denying "the various allegations about [Ms. Maxwell] that have appeared recently in the media. These allegations are all entirely false."

4. The statement read in full:

<u>Statement on Behalf of Ghislaine Maxwell</u>

By Devonshires Solicitors, PRNE
Wednesday, March 9, 2011

London, March 10, 2011 - Ghislaine Maxwell denies the various allegations about her that have appeared recently in the media. *These allegations are all entirely false.*

1

> It is unacceptable that letters sent by Ms Maxwell's legal representatives to certain newspapers pointing out the truth and asking for the allegations to be withdrawn have simply been ignored.
>
> In the circumstances, *Ms Maxwell is now proceeding to take legal action against those newspapers*.
>
> "I understand newspapers need stories to sell copies. It is well known that certain newspapers live by the adage, "why let the truth get in the way of a good story." However, *the allegations made against me are abhorrent and entirely untrue* and I ask that they stop," said Ghislaine Maxwell.
>
> "A number of newspapers have shown a complete lack of accuracy in their reporting of this story and a failure to carry out the most elementary investigation or any real due diligence. I am now taking action to clear my name," she said.
>
>> Media contact:
>>
>> Ross Gow
>> Acuity Reputation
>> Tel: +44-203-008-7790
>> Mob: +44-7778-755-251
>> Email: ross@acuityreputation.com
>
> Media contact: Ross Gow, Acuity Reputation, Tel: +44-203-008-7790, Mob: +44-7778-755-251, Email: ross at acuityreputation.com

5. **Plaintiff's gratuitous and "lurid" accusations in an unrelated action.** In 2008 two alleged victims of Epstein brought an action under the Crime Victims' Rights Act against the United States government purporting to challenge Epstein's plea agreement. They alleged the government violated their CVRA rights by entering into the agreement.

6. Seven years later, on December 30, 2014, Ms. Giuffre moved to join the CVRA action, claiming she, too, had her CVRA rights violated by the government. On January 1, 2015, Ms. Giuffre filed a "corrected" joinder motion.

7. The issue presented in her joinder motion was narrow: whether she should be permitted to join the CVRA action as a party under Federal Rule of Civil Procedure 21, specifically, whether she was a "known victim[] of Mr. Epstein and the Government owed them CVRA duties." Yet, "the bulk of the [motion] consists of copious factual details that [plaintiff] and [her co-movant] 'would prove . . . if allowed to join.'" Ms. Giuffre gratuitously included

2

provocative and "lurid details" of her alleged sexual activities as an alleged victim of sexual trafficking.

8. At the time they filed the motion, Ms. Giuffre and her lawyers knew that the media had been following the Epstein criminal case and the CVRA action. While they deliberately filed the motion without disclosing Ms. Giuffre's name, claiming the need for privacy and secrecy, they made no attempt to file the motion under seal. Quite the contrary, they filed the motion publicly.

9. As the district court noted in ruling on the joinder motion, Ms. Giuffre "name[d] several individuals, and she offers details about the type of sex acts performed and where they took place." The court ruled that "these lurid details are unnecessary": "The factual details regarding whom and where the Jane Does engaged in sexual activities are immaterial and impertinent . . ., especially considering that these details involve *non-parties* who are not related to the respondent Government." Accordingly, "[t]hese unnecessary details shall be stricken." *Id.* The court then struck all Ms. Giuffre's factual allegations relating to her alleged sexual activities and her allegations of misconduct by non-parties. The court said the striking of the "lurid details" was a sanction for Ms. Giuffre's improper inclusion of them in the motion.

10. The district court found not only that the "lurid details" were unnecessary but also that the entire joinder motion was "entirely unnecessary." Ms. Giuffre and her lawyers knew the motion with all its "lurid details" was unnecessary because the motion itself recognized that she would be able to participate as a fact witness to achieve the same result she sought as a party. The court denied plaintiff's joinder motion.

11. One of the non-parties Ms. Giuffre "named" repeatedly in the joinder motion was Ms. Maxwell. According to the "lurid details" of Ms. Giuffre included in the motion,

3

Ms. Maxwell personally was involved in a "sexual abuse and sex trafficking scheme" created by Epstein:

- Ms. Maxwell "approached" plaintiff in 1999 when plaintiff was "fifteen years old" to recruit her into the scheme.

- Ms. Maxwell was "one of the main women" Epstein used to "procure under-aged girls for sexual activities."

- Ms. Maxwell was a "primary co-conspirator" with Epstein in his scheme.

- She "persuaded" plaintiff to go to Epstein's mansion "in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children."

- At the mansion, when plaintiff began giving Epstein a massage, he and Ms. Maxwell "turned it into a sexual encounter."

- Epstein "with the assistance of" Ms. Maxwell "converted [plaintiff] into . . . a 'sex slave.'" *Id.* Plaintiff was a "sex slave" from "about 1999 through 2002."

- Ms. Maxwell also was a "co-conspirator in Epstein's sexual abuse."

- Ms. Maxwell "appreciated the immunity" she acquired under Epstein's plea agreement, because the immunity protected her from prosecution "for the crimes she committed in Florida."

- Ms. Maxwell "participat[ed] in the sexual abuse of [plaintiff] and others."

- Ms. Maxwell "took numerous sexually explicit pictures of underage girls involved in sexual activities, including [plaintiff]." *Id.* She shared the photos with Epstein.

- As part of her "role in Epstein's sexual abuse ring," Ms. Maxwell "connect[ed]" Epstein with "powerful individuals" so that Epstein could traffick plaintiff to these persons.

- Plaintiff was "forced to have sexual relations" with Prince Andrew in "[Ms. Maxwell's] apartment" in London. Ms. Maxwell "facilitated" plaintiff's sex with Prince Andrew "by acting as a 'madame' for Epstein."

- Ms. Maxwell "assist[ed] in internationally trafficking" plaintiff and "numerous other young girls for sexual purposes."

- Plaintiff was "forced" to watch Epstein, Ms. Maxwell and others "engage in illegal sexual acts with dozens of underage girls."

4

12. In the joinder motion, plaintiff also alleged she was "forced" to have sex with Harvard law professor Alan Dershowitz, "model scout" Jean Luc Brunel, and "many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders."

13. Plaintiff said after serving for four years as a "sex slave," she "managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years."

14. Plaintiff suggested the government was part of Epstein's "conspiracy" when it "secretly" negotiated a non-prosecution agreement with Eptstein precluding federal prosecution of Epstein and his "co-conspirators." The government's secrecy, plaintiff alleged, was motivated by its fear that plaintiff would raise "powerful objections" to the agreement that would have "shed tremendous public light on Epstein and other powerful individuals.

15. Notably, the other "Jane Doe" who joined plaintiff's motion who alleged she was sexually abused "many occasions" by Epstein was unable to corroborate any of plaintiff's allegations.

16. Also notably, in her multiple and lengthy consensual interviews with Ms. Churcher three years earlier, plaintiff told Ms. Churcher of virtually *none* of the details she described in the joinder motion.

17. **Ms. Maxwell's response to plaintiff's "lurid" accusations: the January 2015 statement.** As plaintiff and her lawyers expected, before District Judge Marra in the CVRA action could strike the "lurid details" of plaintiff's allegations in the joinder motion, members of the media obtained copies of the motion.

18. At Mr. Barden's direction, on January 3, 2015, Mr. Gow sent to numerous representatives of British media organizations an email containing "a quotable statement on

behalf of Ms Maxwell." The email was sent to more than 6 and probably less than 30 media representatives. It was not sent to non-media representatives.

19. Among the media representatives were Martin Robinson of the Daily Mail; P. Peachey of The Independent; Nick Sommerlad of The Mirror; David Brown of The Times; and Nick Always and Jo-Anne Pugh of the BBC; and David Mercer of the Press Association. These representatives were selected based on their request—after the joinder motion was filed—for a response from Ms. Maxwell to plaintiff's allegations in the motion.

20. The email to the media members read:

> To Whom It May Concern,
> Please find attached a quotable statement on behalf of Ms Maxwell.
>
> No further communication will be provided by her on this matter.
> Thanks for your understanding.
> Best
> Ross
>
> Ross Gow
> ACUITY Reputation
>
> Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.
>
> Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and now it is alleged by Ms Roberts [sic] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies.
>
> Ms Roberts claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory.
>
> Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

21. Mr. Barden, who prepared the January 2015 statement, did not intend it as a traditional press release solely to disseminate information to the media. So he intentionally did not pass it through a public relations firm, such as Mr. Gow's firm, Acuity Reputation.

6

22. The January 2015 statement served two purposes. First, Mr. Barden intended that it mitigate the harm to Ms. Maxwell's reputation from the press's republication of plaintiff's false allegations. He believed these ends could be accomplished by suggesting to the media that, among other things, they should subject plaintiff's allegations to inquiry and scrutiny. For example, he noted in the statement that plaintiff's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicised as news."

23. Second, Mr. Barden intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish plaintiff's allegations without conducting any inquiry of their own. Accordingly, in the statement he repeatedly noted that plaintiff's allegations were "defamatory." In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct.

24. Consistent with those two purposes, Mr. Gow's emails prefaced the statement with the following language: "Please find attached a *quotable statement* on behalf of Ms Maxwell" (emphasis supplied). The statement was intended to be a single, one-time-only, comprehensive response—quoted in full—to plaintiff's December 30, 2014, allegations that would give the media Ms. Maxwell's response. The purpose of the prefatory statement was to inform the media-recipients of this intent.

25. **Plaintiff's activities to bring light to the rights of victims of sexual abuse.** Plaintiff has engaged in numerous activities to bring attention to herself, to the prosecution and punishment of wealthy individuals such as Epstein, and to her claimed interest of bringing light to the rights of victims of sexual abuse.

7

26. Plaintiff created an organization, Victims Refuse Silence, Inc., a Florida corporation, directly related to her alleged experience as a victim of sexual abuse.

27. The "goal" of Victims Refuse Silence "was, and continues to be, to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse." Toward this end, plaintiff has "dedicated her professional life to helping victims of sex trafficking."

28. Plaintiff repeatedly has sought out media organizations to discuss her alleged experience as a victim of sexual abuse.

29. On December 30, 2014, plaintiff publicly filed an "entirely unnecessary" joinder motion laden with "unnecessary," "lurid details" about being "sexually abused" as a "minor victim[]" by wealthy and famous men and being "trafficked" all around the world as a "sex slave."

30. The plaintiff's alleged purpose in filing the joinder motion was to "vindicate" her rights under the CVRA, expose the government's "secretly negotiated" "non-prosecution agreement" with Epstein, "*shed tremendous public light*" on Epstein and "other powerful individuals" that would undermine the agreement, and support the CVRA plaintiffs' request for documents that would show how Epstein "used his powerful political and social connections to secure a favorable plea deal" and the government's "motive" to aid Epstein and his "co-conspirators."

31. Plaintiff has written the manuscript of a book she has been trying to publish detailing her alleged experience as a victim of sexual abuse and of sex trafficking in Epstein's alleged "sex scheme."

32. **Republication alleged by plaintiff.** Plaintiff was required by Interrogatory No. 6 to identify any false statements attributed to Ms. Maxwell that were "'published globally, including within the Southern District of New York,'" as plaintiff alleged in Paragraph 9 of Count I of her complaint. In response, plaintiff identified the January 2015 statement and nine instances in which various news media published portions of the January 2015 statement in news articles or broadcast stories.

33. In none of the nine instances was there any publication of the entire January 2015 statement.

34. Ms. Maxwell and her agents exercised no control or authority over any media organization, including the media identified in plaintiff's response to Interrogatory No. 6, in connection with the media's publication of portions of the January 2015 statement.

35. **Plaintiff's defamation action against Ms. Maxwell.** Eight years after Epstein's guilty plea, plaintiff brought this action, repeating many of the allegations she made in her CVRA joinder motion.

36. The complaint alleged that the January 2015 statement "contained the following deliberate falsehoods":

   (a) That Giuffre's sworn allegations "against Ghislaine Maxwell are untrue."

   (b) That the allegations have been "shown to be untrue."

   (c) That Giuffre's "claims are obvious lies."

37. **Plaintiff lived independently from her parents with her fiancé long before meeting Epstein or Ms. Maxwell.** After leaving the Growing Together drug rehabilitation facility in 1999, plaintiff moved in with the family of a fellow patient. There she met, and became engaged to, her friend's brother, James Michael Austrich. She and Austrich thereafter

rented an apartment in the Ft. Lauderdale area with another friend and both worked at various jobs in that area. Later, they stayed briefly with plaintiff's parents in the Palm Beach/Loxahatchee, Florida area before Austrich rented an apartment for the couple on Bent Oak Drive in Royal Palm Beach. Although plaintiff agreed to marry Austrich, she never had any intention of doing so.

38. **Plaintiff re-enrolled in high school from June 21, 2000 until March 7, 2002**. After finishing the 9th grade school year at Forest Hills High School on June 9, 1999, plaintiff re-enrolled at Wellington Adult High School on June 21, 2000, again on August 16, 2000 and on August 14, 2001. On September 20, 2001, Plaintiff then enrolled at Royal Palm Beach High School. A few weeks later, on October 12, 2001, she matriculated at Survivors Charter School. *Id.* Survivor's Charter School was an alternative school designed to assist students who had been unsuccessful at more traditional schools. Plaintiff remained enrolled at Survivor's Charter School until March 7, 2002. She was present 56 days and absent 13 days during her time there. *Id.* Plaintiff never received her high school diploma or GED. Plaintiff and Figueroa went "back to school" together at Survivor's Charter School. The school day there lasted from morning until early afternoon.

39. **During the year 2000, plaintiff worked at numerous jobs**. In 2000, while living with her fiancé, plaintiff held five different jobs: at Aviculture Breeding and Research Center, Southeast Employee Management Company, The Club at Mar-a-Lago, Oasis Outsourcing, and Neiman Marcus. Her taxable earnings that year totaled nearly $9,000. Plaintiff cannot now recall either the Southeast Employee Management Company or the Oasis Outsourcing jobs.

40. **Plaintiff's employment at the Mar-a-Lago spa began in fall 2000.** Plaintiff's father, Sky Roberts, was hired as a maintenance worker at the The Mar-a-Lago Club in Palm

10

Beach, Florida, beginning on April 11, 2000. Mr. Roberts worked there year-round for approximately 3 years. After working there for a period of time, Mr. Roberts became acquainted with the head of the spa area and recommended plaintiff for a job there. Mar-a-Lago closes every Mother's Day and reopens on November 1. Most of employees Mar-a-Lago, including all employees of the spa area such as "spa attendants," are "seasonal" and work only when the club is open, i.e., between November 1 and Mother's Day. Plaintiff was hired as a "seasonal" spa attendant to work at the Mar-a-Lago Club in the fall of 2000 after she had turned 17.

41. **Plaintiff represented herself as a masseuse for Jeffrey Epstein.** While working at the Mar-a-Lago spa and reading a library book about massage, plaintiff met Ms. Maxwell. Plaintiff thereafter told her father that she got a job working for Jeffrey Epstein as a masseuse. Plaintiff's father took her to Epstein's house on one occasion around that time, and Epstein came outside and introduced himself to Mr. Roberts. Plaintiff commenced employment as a traveling masseuse for Mr. Epstein. Plaintiff was excited about her job as a masseuse, about traveling with him and about meeting famous people. Plaintiff represented that she was employed as a masseuse beginning in January 2001. Plaintiff never mentioned Ms. Maxwell to her then-fiancé, Austrich. Plaintiff's father never met Ms. Maxwell.

42. **Plaintiff resumed her relationship with convicted felon Anthony Figueroa.** In spring 2001, while living with Austich, plaintiff lied to and cheated on him with her high school boyfriend, Anthony Figueroa. Plaintiff and Austrich thereafter broke up, and Figueroa moved into the Bent Oak apartment with plaintiff. When Austrich returned to the Bent Oak apartment to check on his pets and retrieve his belongings, Figueroa in Plaintiff's presence punched Austrich in the face. Figueroa and plaintiff fled the scene before police arrived. Figueroa was then a convicted felon and a drug abuser on probation for possession of a controlled substance.

11

43. **Plaintiff freely and voluntarily contacted the police to come to her aid in 2001 and 2002 but never reported to them that she was Epstein's "sex slave."** In August 2001 at age 17, while living in the same apartment, plaintiff and Figueroa hosted a party with a number of guests. During the party, according to plaintiff, someone entered plaintiff's room and stole $500 from her shirt pocket. Plaintiff contacted the police. She met and spoke with police officers regarding the incident and filed a report. She did not disclose to the officer that she was a "sex slave." A second time, in June 2002, plaintiff contacted the police to report that her former landlord had left her belongings by the roadside and had lit her mattress on fire. Again, plaintiff met and spoke with the law enforcement officers but did not complain that she was the victim of any sexual trafficking or abuse or that she was then being held as a "sex slave."

44. **From August 2001 until September 2002, Epstein and Maxwell were almost entirely absent from Florida on documented travel unaccompanied by Plaintiff.** Flight logs maintained by Epstein's private pilot Dave Rodgers evidence the substantial number of trips away from Florida that Epstein and Maxwell took, <u>unaccompanied by Plaintiff</u>, between August 2001 and September 2002. Rodgers maintained a log of all flights on which Epstein and Maxwell traveled with him. Epstein additionally traveled with another pilot who did not keep such logs and he also occasionally traveled via commercial flights. For substantially all of thirteen months of the twenty-two months (from November 2000 until September 2002) that Plaintiff lived in Palm Beach and knew Epstein, Epstein was traveling outside of Florida unaccompanied by Plaintiff. During this same period of time, Plaintiff was employed at various jobs, enrolled in school, and living with her boyfriend.

45. **Plaintiff and Figueroa shared a vehicle during 2001 and 2002.** Plaintiff and Figueroa shared a '93 white Pontiac in 2001 and 2002. Plaintiff freely traveled around the Palm

12

Beach area in that vehicle. In August 2002, Plaintiff acquired a Dodge Dakota pickup truck from her father. Figueroa used that vehicle in a series of crimes before and after Plaintiff left for Thailand.

46. **Plaintiff held a number of jobs in 2001 and 2002**. During 2001 and 2002, plaintiff was gainfully employed at several jobs. She worked as a waitress at Mannino's Restaurant, at TGIFriday's restaurant (aka CCI of Royal Palm Inc.), and at Roadhouse Grill. She also was employed at Courtyard Animal Hospital (aka Marc Pinkwasser DVM).

47. **In September 2002, Plaintiff traveled to Thailand to receive massage training and while there, met her future husband and eloped with him.** Plaintiff traveled to Thailand in September 2002 to receive formal training as a masseuse. Figueroa drove her to the airport. While there, she initially contacted Figueroa frequently, incurring a phone bill of $4,000. She met Robert Giuffre while in Thailand and decided to marry him. She thereafter ceased all contact with Figueroa from October 2002 until two days before Mr. Figueroa's deposition in this matter in May 2016.

48. **Detective Recarey's investigation of Epstein failed to uncover any evidence that Ms. Maxwell was involved in sexual abuse of minors, sexual trafficking or production or possession of child pornography.** Joseph Recarey served as the lead detective from the Palm Beach Police Department charged with investigating Jeffrey Epstein. That investigation commenced in 2005. Recarey worked only on the Epstein case for an entire year. He reviewed previous officers' reports and interviews, conducted numerous interviews of witnesses and alleged victims himself, reviewed surveillance footage of the Epstein home, participated in and had knowledge of the search warrant executed on the Epstein home, and testified regarding the case before the Florida state grand jury against Epstein. Detective Recarey's investigation

revealed that not one of the alleged Epstein victims ever mentioned Ms. Maxwell's name and she was never considered a suspect by the government. None of Epstein's alleged victims said they had seen Ms. Maxwell at Epstein's house, nor said they had been "recruited by her," nor paid any money by her, nor told what to wear or how to act by her. Indeed, none of Epstein's alleged victims ever reported to the government they had met or spoken to Ms. Maxwell. Maxwell was not seen coming or going from the house during the law enforcement surveillance of Epstein's home. The arrest warrant did not mention Ms. Maxwell and her name was never mentioned before the grand jury. No property belonging to Maxwell, including "sex toys" or "child pornography," was seized from Epstein's home during execution of the search warrant. Detective Recarey, when asked to describe "everything that you believe you know about Ghislaine Maxwell's sexual trafficking conduct," replied, "I don't." He confirmed he has no knowledge about Ms. Maxwell sexually trafficking anybody. Detective Recarey also has no knowledge of Plaintiff's conduct that is subject of this lawsuit.

49. **No nude photograph of Plaintiff was displayed in Epstein's home.** Epstein's housekeeper, Juan Alessi, "never saw any photographs of Virginia Roberts in Mr. Epstein's house." Detective Recarey entered Epstein's home in 2002 to install security cameras to catch a thief and did not observe any "child pornography" within the home, including on Epstein's desk in his office.

50. **Plaintiff intentionally destroyed her "journal" and "dream journal" regarding her "memories" of this case in 2013 while represented by counsel.** Plaintiff drafted a "journal" describing individuals to whom she claims she was sexually trafficked as well as her memories and thoughts about her experiences with Epstein. In 2013, she and her husband created a bonfire in her backyard in Florida and burned the journal together with other documents in her

14

possession. *Id.* Plaintiff also kept a "dream journal" regarding her thoughts and memories that she possessed in January 2016. To date, Plaintiff cannot locate the "dream journal."

51. **Plaintiff publicly peddled her story beginning in 2011.** Plaintiff granted journalist Sharon Churcher extensive interviews that resulted in seven (7) widely distributed articles from March 2011 through January 2015. Churcher regularly communicated with plaintiff and her "attorneys or other agents" from "early 2011" to "the present day." Plaintiff received approximately $160,000 for her stories and pictures that were published by many news organizations.

52. **Plaintiff drafted a 144-page purportedly autobiographical book manuscript in 2011 which she actively sought to publish.** In 2011, contemporaneous with her Churcher interviews, plaintiff drafted a book manuscript which purported to document plaintiff's experiences as a teenager in Florida, including her interactions with Epstein and Maxwell. Plaintiff communicated with literary agents, ghost writers and potential independent publishers in an effort to get her book published. She generated marketing materials and circulated those along with book chapters to numerous individuals associated with publishing and the media.

53. **Plaintiff's publicly filed "lurid" CVRA pleadings initiated a media frenzy and generated highly publicized litigation between her lawyers and Alan Dershowitz.** On December 30, 2014, plaintiff, through counsel, publicly filed a joinder motion that contained her "lurid allegations" about Ms. Maxwell and many others, including Alan Dershowitz, Prince Andrew, Jean-Luc Brunel. The joinder motion was followed by a "corrected" motion and two further declarations in January and February 2015, which repeated many of plaintiff's claims. These CVRA pleadings generated a media maelstrom and spawned highly publicized litigation between plaintiff's lawyers, Edwards and Cassell, and Alan Dershowitz. After plaintiff publicly

15

alleged Mr. Dershowitz of sexual misconduct, Mr. Dershowitz vigorously defended himself in the media. He called plaintiff a liar and accused her lawyers of unethical conduct. In response, attorneys Edwards and Cassell sued Dershowitz who counterclaimed. This litigation, in turn, caused additional media attention by national and international media organizations.

54. **Plaintiff formed non-profit Victims Refuse Silence to attract publicity and speak out on a public controversy.** In 2014, plaintiff, with the assistance of the same counsel, formed a non-profit organization, Victims Refuse Silence. According to plaintiff, the purpose of the organization is to promote plaintiff's professed cause against sex slavery. The stated goal of her organization is to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse. Plaintiff attempts to promote Victims Refuse Silence at every opportunity. For example, plaintiff participated in an interview in New York with ABC to promote the charity and to get her mission out to the public.

Dated: January 6, 2017

Respectfully submitted,

*/s/ Laura A. Menninger*
Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Ghislaine Maxwell*

# CERTIFICATE OF SERVICE

I certify that on January 6, 2017, I electronically served this *Defendant's Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1* via ECF on the following:

Sigrid S. McCawley
Meredith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
FARMER, JAFFE, WEISSING, EDWARDS,
FISTOS & LEHRMAN, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons