**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------X

VIRGINIA L. GIUFFRE,

       Plaintiff,

v.

GHISLAINE MAXWELL,

       Defendant.

           **15-cv-07433-RWS**

-------------------------------------------------X


# Memorandum of Law in Support of Defendant's
# Motion for Summary Judgment


Laura A. Menninger
Jeffrey S. Pagliuca
HADDON, MORGAN, AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
303.831.7364

# TABLE OF CONENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTS ................................................................................................................ 1

SUMMARY JUDGMENT STANDARD ............................................................... 10

ARGUMENT ....................................................................................................... 12

I.  Ms. Maxwell is not liable for republications of her January 2015 statement that she did not authorize or request and by entities she did not control. ...................................... 12

    A.  Summary judgment is warranted to the extent plaintiff seeks to impose liability on any media's republication of all or a portion of the January 2015 statement. ........ 12

    B.  Because plaintiff is a limited public figure, imposing liability upon Ms. Maxwell for republication of the January 2015 statement would violate the First Amendment. ......................................................................... 16

    C.  Plaintiff should be barred from introducing into evidence any republication of an excerpt from the January 2015 statement. .............................................. 17

II.  Summary judgment is warranted under the New York Constitution. .................................. 18

    A.  The January 2015 statement constitutes nonactionable opinion. ............................ 18

    B.  In this Rule 56 proceeding, this Court's Rule 12(b)(6) opinion does not control the question of law whether the January 2015 statement constitutes nonactionable opinion. ................................................................ 31

III.  The pre-litigation privilege bars this action. ................................................... 33

IV.  Ms. Maxwell's January 4, 2015, statement is nonactionable. ..................................... 38

V.  The defamation claim should be dismissed because the publication is substantially true. ... 39

VI.  Plaintiff cannot establish actual malice by clear and convincing evidence. ....................... 40

    A.  Facts. ................................................................................................ 40

    B.  Plaintiff carries the burden of proving actual malice by clear and convincing evidence. ................................................................ 48

    C.  Plaintiff is a public figure who must prove actual malice. ................................ 49

        1.  Plaintiff successfully invited public attention to influence others. ........... 51

i

2.     Plaintiff voluntarily injected herself into public controversies related to the subject of this litigation. .......................................................................... 53

3.     Plaintiff assumed a position of prominence in the public controversies. . 53

4.     Plaintiff has maintained regular and continuing access to the media. ...... 54

D.     Plaintiff must also prove actual malice to overcome the defenses of reply and pre-litigation privilege. ....................................................................................... 54

E.     The January 2015 statement was substantially true, and plaintiff cannot produce clear and convincing evidence of its falsity. .......................................................... 56

1.     The January 2015 statement accurately denied that Ms. Maxwell met Plaintiff when Plaintiff was 15 years old in 1999. .................................... 56

2.     The January 2015 statement accurately denied that Ms. Maxwell "regularly participate[d] in Epstein's sexual exploitation of minors" and that "the Government knows" such fact. .................................................. 58

3.     The January 2015 statement accurately denied that "with [Ms. Maxwell's] assistance, [Epstein] converted [Plaintiff] into what is commonly referred to as a 'sex slave.'" ................................................................................... 59

4.     The January 2015 statement accurately reported that Plaintiff alleged "sexual relations" with Professor Dershowitz which he denied. ............. 60

5.     The January 2015 statement accurately denied that Ms. Maxwell created and distributed child pornography and that the Government knows of and possesses such child pornography. .......................................................... 62

6.     January 2015 statement accurately denied Maxwell acted as "madame" for Epstein to traffic Plaintiff to the rich and famous. .................................... 63

CONCLUSION ................................................................................................................ 68

CERTIFICATE OF SERVICE ....................................................................................... 70

# TABLE OF AUTHORITIES

**Cases**

*Adelson v. Harris*, 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013) .......................................... 29

*Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 (2014) .............................. 48

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). ...................................... 11

*Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (1985) .................................................. 22,24

*Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001) ................................................................... 48

*Biro v. Condé Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) ...................................... 39

*Biro v. Condé Naste,* 963 F. Supp. 2d 255, 269 (S.D.N.Y. 2013)...................................... 49

*Black v. Green Harbour Homeowners' Ass'n*, 798 N.Y.S.2d 753 (App. Div. 2005), ...... 34

*Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176-77 (2d Cir. 2000)................... 51

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)........................................................... 12

*Chambers v. Wells Fargo Bank, N.A.*, No. 2016 WL 3533998, at *8 (D.N.J. June 28,
   2016) ................................................................................................................................ 33

*Chau v. Lewis*, 935 F. Supp. 2d 644, 665 (S.D.N.Y. 2013) .............................................. 23

*Collier v. Postum Cereal Co.*, 134 N.Y.S. 847, 853 (1st Dep't 1912) .............................. 55

*Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988).......... 50

*Curtis Publ'g Co. v. Butts,* 388 U.S. 130 (1967) ............................................................... 49

*Davis v. Boeheim*, 22 N.E.3d 999, 1006 (N.Y. 2014) .................................................. 22,31

*Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984) ................................ 12

*Dibella v. Hopkins*, No. 01 CIV. 11779 (DC), 2002 WL 31427362, at *2 (S.D.N.Y. Oct.
   30, 2002) .......................................................................................................................... 23

*Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 780 (S.D.N.Y. 1990) ................... 11

*Elias v. Rolling Stone LLC*, No. 15-CV-5953 (PKC), 2016 WL 3583080, at \*6 (S.D.N.Y. June 28, 2016) .................................................................................... 22

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, No. 16 CIV. 57 (PAE), 2016 WL 3773394, at \*11 (S.D.N.Y. July 8, 2016) ...................................... 19

*Faigin v. Kelly*, 978 F. Supp. 420, 426 (D. N.H. 1997 ....................................... 50

*Firestone v. Time, Inc.*, 271 So. 2d 745, 752 (Fla. 1972) .................................. 13

*Fleckenstein v. Friedman*, 193 N.E. 537, 538 (N.Y. 1934) ............................... 40

*Flomenhaft v. Finkelstein*, 8 N.Y.S.3d 161, 164 n.2 (1st Dep't 2015) ............... 33

*Folwell v. Miller*, 145 F. 495, 497 (2d Cir. 1906) ............................................ 13

*Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (App. Div. 2015) ............. 39

*Frechtman v. Gutterrnan*, 979 N.Y.S. 2d 58 (App. Div. 2014) ......................... 34

*Front, Inc. v. Khalil*, 28 N.E.3d 15, 16 (N.Y. 2015) ......................................... 33

*Geraci v. Probst*, 938 N.E.2d 917, 921 (N.Y. 2010) .................................... 13,18

*Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 534 (S.D.N.Y. 2015) .................... 19

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974 ................................... 16, 48, 49

*Goforth v. Avemco Life Ins. Co.*, 368 F.2d 25, 28 n.7 (4th Cir.1966). ............. 39

*Goldstein v. Cogswell*, No. 85 CIV. 9256 (KMW), 1992 WL 131723, at \*27 n.32 (S.D.N.Y. June 1, 1992) ................................................................................ 33

*Gross v. New York Times*, 623 N.E.2d 1163, 1169 (N.Y. 1993) ....................... 28

*Harte-Hanks Communic'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989) ........... 48

*Hawkins v. Harris*, 661 A.2d 284, 289-91 (N.J. 1995) ..................................... 33

*Horne v. Matthews*, No. 97 Civ. 3605(JSM), 1997 WL 598452 (S.D.N.Y. Sept. 25, 1997) ...................................................................................................... 23

*Huggins v. Moore*, 726 N.E.2d 456, 460 (N.Y. 1999) ...................................... 48

*Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1282 (N.Y. 1991) ..................... 11, 19

*Indep. Living Aids, Inc. v. Maxi-Aids, Inc.*, 981 F. Supp. 124, 128 (E.D.N.Y. 1997)....... 28

*International Publishing Concepts, LLC v. Locatelli* ......................................................... 37

*James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976) ................................... 14, 23, 49

*Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 366 (S.D.N.Y.1998) ......................... 40

*Kane v. Orange Cnty. Publ'ns*, 649 N.Y.S.2d 23, 26 (App. Div. 1996) .......................... 56

*Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 560 (1980)............................................. 18

*Kirk v. Heppt*, 532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008). ............................................. 33

*Klein v. McGauley*, 29. A.D.2d 418, 420 (2nd Dep't 1968) ............................................ 34

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
   No. 94 CIV. 8301(JFK), 1995 WL 380119, at \*6 n.2 (S.D.N.Y. June 26, 1995)........ 21

*Lerman v. Flynt Dist. Co., Inc.,* 745 F.3d 123, 136 (2d Cir. 1984) .................................. 49

*Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008) ....................................................... 29

*Martin v. City of Oceanside*, 205 F. Supp. 2d 1142, 1147 (S.D. Cal. 2002), *aff'd*, 360
   F.3d 1078 (9th Cir. 2004). ........................................................................................... 22

*Martirano v. Frost*, 255 N.E.2d 693 (1969) .................................................................... 34

*Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977)...................................................... 30

*Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) .................................. 54

*Maule v. Philadelphia Media Holdings, LLC*, No. CIV.A. 08-3357, 2010 WL 914926, at
   \*10 (E.D. Pa. Mar. 15, 2010) ..................................................................................... 22

*McGill v. Parker*, 582 N.Y.S.2d 91, 97 (App. Div. 1992) .............................................. 48

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)…………………………………….11

*Mencher v. Chesley*, 75 N.E.2d 257, 259 (N.Y. 1947)..................................................... 14

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ...................................................... 19

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ..........................................16,48,49

*People v. Kocsis*, 28 N.Y.S.3d 466, 471 (App. Div. 2016) ...............................................21

*Petrus v. Smith*, 91 A.D.2d 1190, 1191 (N.Y. App. App. Div. 1983)..............................34

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986)..........................48

*In Re Philadelphia Newspapers*, LLC, 690 F.3d 161, 175 (3d Cir. 2012), *as corrected* (Oct. 25, 2012)..................................................................................................................39

*Rand v. New York Times Co.*, 430 N.Y.S.2d 271, 275 (App. Div. 1980). .......................14

*Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-SE Joint Fire Dist.*, 178 F. Supp. 3d 118, 158 (S.D.N.Y. 2016)...............................................................................................29

*Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382 (N.Y. 1981).................................13

*Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) .............39

*Sexter v. Warmflash, P.C. v. Margrabe*, 828 N.Y.S. 2d 315 (App. Div. 2007))...............34

*Shenkman v. O'Malley*, 157 N.Y.S.2d 290, 294, 297 (App. Div. 1956)...........................54

*Soley v. Wasserman*, No. 8 CIV. 9262 KMW FM, 2013 WL 3185555, at *8 (S.D.N.Y. June 21, 2013)...................................................................................................................18

*Steinhilber v. Alphonse*, 501 N.E.2d 550, 550 (N.Y. 1986) .............................................19

*Time, Inc. v. Firestone*, 424 U.S. 448, 488 n.1 (1976) .....................................................13

*Waldbaum v. Fairchild Publ'ns, Inc.*, 626 F.2d 1287, 1298 (D.C. Cir. 1980 ...................51

**Rules**

Fed. R. Civ. P. 56........................................................................................................11, 12

Defendant Ghislaine Maxwell moves under Federal Rule of Civil Procedure 56 for summary judgment.

## PRELIMINARY STATEMENT

## FACTS

The following facts are undisputed. Additional undisputed facts are set forth in specific argument sections. All paragraphs containing undisputed facts will be sequentially numbered.

1. **Ms. Maxwell's response to publications of plaintiff's false allegations: the March 2011 statement.** In early 2011 plaintiff in two British tabloid interviews made numerous false and defamatory allegations against Ms. Maxwell. EXHIBITS A-B.[1] In the articles, plaintiff made no direct allegations that Ms. Maxwell was involved in any improper conduct with Jeffrey Epstein, who had pleaded guilty in 2007 to procuring a minor for prostitution.[2] Nonetheless, plaintiff suggested that Ms. Maxwell worked with Epstein and may have known about the crime for which he was convicted. *See generally* EXHIBITS A-B.

2. In the articles, plaintiff alleged she had sex with Prince Andrew, "a well-known businessman," a "world-renowned scientist," a "respected liberal politician," and a "foreign head of state." *Id.* at 5.

3. In response to the allegations Ms. Maxwell's British attorney, working with Mr. Gow, issued a statement on March 9, 2011, denying "the various allegations about [Ms. Maxwell] that have appeared recently in the media. These allegations are all entirely false." EXHIBIT C.

4. The statement read in full:

---

[1] The articles were attached as exhibits to the author Sharon Churcher's declaration in support of her motion to quash an SDT issued to her. *See* Doc.216-2 & 216-3.

[2] Doc.1 ¶¶ 11, 14.

Statement on Behalf of Ghislaine Maxwell

By Devonshires Solicitors, PRNE
Wednesday, March 9, 2011

London, March 10, 2011 - Ghislaine Maxwell denies the various allegations about her that have appeared recently in the media. *These allegations are all entirely false.*

It is unacceptable that letters sent by Ms Maxwell's legal representatives to certain newspapers pointing out the truth and asking for the allegations to be withdrawn have simply been ignored.

In the circumstances, *Ms Maxwell is now proceeding to take legal action against those newspapers*.

"I understand newspapers need stories to sell copies. It is well known that certain newspapers live by the adage, "why let the truth get in the way of a good story." However, *the allegations made against me are abhorrent and entirely untrue* and I ask that they stop," said Ghislaine Maxwell.

"A number of newspapers have shown a complete lack of accuracy in their reporting of this story and a failure to carry out the most elementary investigation or any real due diligence. I am now taking action to clear my name," she said.

> Media contact:
>
> Ross Gow
> Acuity Reputation
> Tel: +44-203-008-7790
> Mob: +44-7778-755-251
> Email: ross@acuityreputation.com

Media contact: Ross Gow, Acuity Reputation, Tel: +44-203-008-7790, Mob: +44-7778-755-251, Email: ross at acuityreputation.com

EXHIBIT C (emphasis supplied; capitalization altered). We refer to this as "the March 2011 statement."

5. **Plaintiff's gratuitous and "lurid" accusations in an unrelated action.** In 2008 two alleged victims of Epstein brought an action under the Crime Victims' Rights Act against the United States government purporting to challenge Epstein's plea agreement. They alleged the government violated their CVRA rights by entering into the agreement. *See* EXHIBIT D, at 2.

6.    Seven years later, on December 30, 2014, Ms. Giuffre moved to join the CVRA action, claiming she, too, had her CVRA rights violated by the government. On January 1, 2015, Ms. Giuffre filed a "corrected" joinder motion. Exhibit D, at 1, 9.

7.    The issue presented in her joinder motion was narrow: whether she should be permitted to join the CVRA action as a party under Federal Rule of Civil Procedure 21, specifically, whether she was a "known victim[] of Mr. Epstein and the Government owed them CVRA duties," Exhibit E, at 5. Yet, the court noted, "the bulk of the [motion] consists of copious factual details that [plaintiff] and [her co-movant] 'would prove . . . if allowed to join.'" *Id.* (brackets omitted). Ms. Giuffre gratuitously included provocative and "lurid details" of her alleged sexual activities as an alleged victim of sexual trafficking. *Id.*

8.    At the time they filed the motion, Ms. Giuffre and her lawyers knew that the media had been following the Epstein criminal case and the CVRA action. While they deliberately filed the motion without disclosing Ms. Giuffre's name, claiming the need for privacy and secrecy, they made no attempt to file the motion under seal. Quite the contrary, they filed the motion publicly. Exhibit D, at 1 & n.1.

9.    As the district court noted in ruling on the joinder motion, Ms. Giuffre "name[d] several individuals, and she offers details about the type of sex acts performed and where they took place." Exhibit E, at 5. The court ruled that "these lurid details are unnecessary": "The factual details regarding whom and where the Jane Does engaged in sexual activities are immaterial and impertinent . . ., especially considering that these details involve *non-parties* who are not related to the respondent Government." *Id.* Accordingly, "[t]hese unnecessary details shall be stricken." *Id.* The court then struck all Ms. Giuffre's factual allegations relating to her alleged sexual activities and her allegations of misconduct by non-parties. *Id.* at 5-6. The court

3

said the striking of the "lurid details" was a sanction for Ms. Giuffre's improper inclusion of them in the motion. *See id.* at 6-7.

10.    The district court found not only that the "lurid details" were unnecessary but also that the entire joinder motion was "entirely unnecessary," *id.* at 7. Ms. Giuffre and her lawyers knew the motion with all its "lurid details" was unnecessary because, as the court pointed out, the motion itself recognized that she would be able to participate as a fact witness to achieve the same result she sought as a party. *See id.* at 7-8; *see also id.* at 8 (noting that in the motion, Ms. Giuffre's lawyers said that "regardless of whether this Court grants the . . . Motion, 'they will call [her] as a witness at any trial'"). The court denied plaintiff's joinder motion. *Id.* at 10.

11.    One of the non-parties Ms. Giuffre "named" repeatedly in the joinder motion was Ms. Maxwell. EXHIBIT D, at 3-6. According to the "lurid details" of Ms. Giuffre included in the motion, Ms. Maxwell personally was involved in a "sexual abuse and sex trafficking scheme" created by Epstein:

- Ms. Maxwell "approached" plaintiff in 1999 when plaintiff was "fifteen years old" to recruit her into the scheme. *Id.* at 3.

- Ms. Maxwell was "one of the main women" Epstein used to "procure under-aged girls for sexual activities." *Id.*

- Ms. Maxwell was a "primary co-conspirator" with Epstein in his scheme. *Id.*

- She "persuaded" plaintiff to go to Epstein's mansion "in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children." *Id.*

- At the mansion, when plaintiff began giving Epstein a massage, he and Ms. Maxwell "turned it into a sexual encounter." *Id.*

- Epstein "with the assistance of" Ms. Maxwell "converted [plaintiff] into . . . a 'sex slave.'" *Id.* Plaintiff was a "sex slave" from "about 1999 through 2002." *Id.*

- Ms. Maxwell also was a "co-conspirator in Epstein's sexual abuse." *Id.* at 4.

4

- Ms. Maxwell "appreciated the immunity" she acquired under Epstein's plea agreement, because the immunity protected her from prosecution "for the crimes she committed in Florida." *Id.*

- Ms. Maxwell "participat[ed] in the sexual abuse of [plaintiff] and others." *Id.*

- Ms. Maxwell "took numerous sexually explicit pictures of underage girls involved in sexual activities, including [plaintiff]." *Id.* She shared the photos with Epstein. *Id.*

- As part of her "role in Epstein's sexual abuse ring," Ms. Maxwell "connect[ed]" Epstein with "powerful individuals" so that Epstein could traffick plaintiff to these persons. *Id.*

- Plaintiff was "forced to have sexual relations" with Prince Andrew in "[Ms. Maxwell's] apartment" in London. *Id.* Ms. Maxwell "facilitated" plaintiff's sex with Prince Andrew "by acting as a 'madame' for Epstein." *Id.*

- Ms. Maxwell "assist[ed] in internationally trafficking" plaintiff and "numerous other young girls for sexual purposes." *Id.*

- Plaintiff was "forced" to watch Epstein, Ms. Maxwell and others "engage in illegal sexual acts with dozens of underage girls." *Id.*

12.    In the joinder motion, plaintiff also alleged she was "forced" to have sex with Harvard law professor Alan Dershowitz, "model scout" Jean Luc Brunel, and "many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders." *Id.* at 4-6.

13.    Plaintiff said after serving for four years as a "sex slave," she "managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years." *Id.* at 3.

14.    Plaintiff suggested the government was part of Epstein's "conspiracy" when it "secretly" negotiated a non-prosecution agreement with Epstein precluding federal prosecution of Epstein and his "co-conspirators." *Id.* at 6. The government's secrecy, plaintiff alleged, was motivated by its fear that plaintiff would raise "powerful objections" to the agreement that would have "shed tremendous public light on Epstein and other powerful individuals. *Id.* at 6-7.

5

15.    Notably, the other "Jane Doe" who joined plaintiff's motion who alleged she was sexually abused "many occasions" by Epstein was unable to corroborate any of plaintiff's allegations. *See id.* at 7-8.

16.    Also notably, in her multiple and lengthy consensual interviews with Ms. Churcher three years earlier, plaintiff told Ms. Churcher virtually *none* of the details she described in the joinder motion. *See* EXHIBIT A-B.

17.    **Ms. Maxwell's response to plaintiff's "lurid" accusations: the January 2015 statement.** As plaintiff and her lawyers expected, before District Judge Marra in the CVRA action could strike the "lurid details" of plaintiff's allegations in the joinder motion, members of the media obtained copies of the motion. *See* EXHIBIT G, at 31:2-36:4 & Depo.Exs.3-4.

18.    At Mr. Barden's direction, on January 2, 2015, Mr. Gow sent to numerous representatives of British media organizations an email containing "a quotable statement on behalf of Ms Maxwell." EXHIBIT F; EXHIBIT G, at 33:8-23. The email was sent to more than 6 and probably less than 30 media representatives. *See* EXHIBIT G, at 33:8-34:3. It was not sent to non-media representatives. *See id.* at 31:2-35:21.

19.    Among the media representatives were Martin Robinson of the Daily Mail; P. Peachey of The Independent; Nick Sommerlad of The Mirror; David Brown of The Times; and Nick Always and Jo-Anne Pugh of the BBC; and David Mercer of the Press Association. *See, e.g.*, EXHIBIT F. These representatives were selected based on their request—after the joinder motion was filed—for a response from Ms. Maxwell to plaintiff's allegations in the motion. *See, e.g.*, EXHIBIT G, at 30:23-35:21 & Depo.Ex.3.

20.    The email to the media members read:

 To Whom It May Concern,
 Please find attached a quotable statement on behalf of Ms Maxwell.

6

No further communication will be provided by her on this matter.
Thanks for your understanding.
Best
Ross

Ross Gow
ACUITY Reputation

Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.

Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and now it is alleged by Ms Roberts [sic] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies.

Ms Roberts claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory.

Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

EXHIBIT F (emphasis supplied). We refer to this email as "the January 2015 statement."

21.    Mr. Barden, who prepared the January 2015 statement, did not intend it as a traditional press release solely to disseminate information to the media. So he intentionally did engage a public relations firm, such as Mr. Gow's firm Acuity Reputation, to prepare the statement. *See* EXHIBIT K ¶¶ 10,15.

22.    The January 2015 statement served two purposes. First, Mr. Barden intended that it mitigate the harm to Ms. Maxwell's reputation from the press's republication of plaintiff's false allegations. He believed this could be accomplished by suggesting to the media that, among other things, they should subject plaintiff's allegations to inquiry and scrutiny. For example, he noted in the statement that plaintiff's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicised as news." *Id.* ¶ 11.

23.    Second, Mr. Barden intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish plaintiff's allegations without conducting any inquiry of their own. Accordingly, in the statement he repeatedly noted that plaintiff's allegations were "defamatory." In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct. *Id.* ¶ 17.

24.    Consistent with those two purposes, Mr. Gow's emails prefaced the statement with the following language: "Please find attached a *quotable statement* on behalf of Ms Maxwell" (emphasis supplied). The statement was intended to be a single, one-time-only, comprehensive response—quoted in full—to plaintiff's December 30, 2014, allegations that would give the media Ms. Maxwell's response. *Id.* ¶ 19. The purpose of the prefatory statement was to inform the media-recipients of this intent. *Id.*

25.    **Plaintiff's activities to bring light to the rights of victims of sexual abuse.** Plaintiff has engaged in numerous activities to bring attention to herself, to the prosecution and punishment of wealthy individuals such as Epstein, and to her claimed interest of bringing light to the rights of victims of sexual abuse.

26.    Plaintiff created an organization, Victims Refuse Silence, Inc., a Florida corporation, directly related to her alleged experience as a victim of sexual abuse. Doc.1 ¶¶ 24-25.

27.    The "goal" of Victims Refuse Silence "was, and continues to be, to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse." *Id.* ¶ 25. Toward this end, plaintiff has "dedicated her professional life to helping victims of sex trafficking." *Id.*

8

28.   Plaintiff repeatedly has sought out media organizations to discuss her alleged experience as a victim of sexual abuse. *See* This Motion at ¶¶ 51-54.

29.   As discussed above, on December 30, 2014, plaintiff publicly filed an "entirely unnecessary"[3] joinder motion laden with what Judge Marra described as "unnecessary,"[4] "lurid details"[5] about being "sexually abused" as a "minor victim[]" by wealthy and famous men and being "trafficked" all around the world as a "sex slave." EXHIBIT D, at 1 n.1, 3-6.

30.   The plaintiff's alleged purpose in filing the joinder motion was to "vindicate" her rights under the CVRA, expose the government's "secretly negotiated" "non-prosecution agreement" with Epstein, "*shed tremendous public light*" on Epstein and "other powerful individuals" that would undermine the agreement, and support the CVRA plaintiffs' request for documents that would show how Epstein "used his powerful political and social connections to secure a favorable plea deal" and the government's "motive" to aid Epstein and his "co-conspirators." *See* EXHIBIT D, at 1, 6-7, 10 (emphasis supplied).

31.   Plaintiff has written the manuscript of a book she has been trying to publish detailing her alleged experience as a victim of sexual abuse and of sex trafficking in Epstein's alleged "sex scheme." EXHIBIT KK.

32.   **Republication alleged by plaintiff.** Plaintiff[6] was required by Interrogatory No. 6 to identify any false statements attributed to Ms. Maxwell that were "'published globally, including

---

[3] EXHIBIT E, at 7.

[4] *Id.* at 5.

[5] *Id.*

[6] The undisputed facts relevant to this Motion are contained in the Facts section, above, and within each argument as appropriate. The undisputed facts will be sequentially numbered throughout this Motion.

9

within the Southern District of New York,'" as plaintiff alleged in Paragraph 9 of Count I of her complaint. In response, plaintiff identified the January 2015 statement and nine instances in which various news media published portions of the January 2015 statement in news articles or broadcast stories. EXHIBIT H, at 7-8; EXHIBIT I, at 4.

33.    In none of the nine instances was there any publication of the entire January 2015 statement. *See* EXHIBIT H, at 7-8; EXHIBIT I, at 4.

34.    Ms. Maxwell and her agents exercised no control or authority over any media organization, including the media identified in plaintiff's response to Interrogatory No. 6, in connection with the media's publication of portions of the January 2015 statement. EXHIBIT J ¶ 24; EXHIBIT K ¶¶ 2-3..

35.    **Plaintiff's defamation action against Ms. Maxwell.** Eight years after Epstein's guilty plea, plaintiff brought this action, repeating many of the allegations she made in her CVRA joinder motion. *See* Doc.1 ¶ 9.

36.    The complaint alleged that the January 2015 statement "contained the following deliberate falsehoods":

   (a)   That Giuffre's sworn allegations "against Ghislaine Maxwell are untrue."

   (b)   That the allegations have been "shown to be untrue."

   (c)   That Giuffre's "claims are obvious lies."

Doc.1 ¶ 30 (boldface and underscoring omitted).

## SUMMARY JUDGMENT STANDARD

 "[C]ourts should not be reluctant to grant summary judgment in appropriate cases. 'One of the principal purposes of the summary judgment rule is to isolate and dispose of factually insupportable claims,' thereby permitting courts to avoid 'protracted, expensive and harassing trials.'" *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 778, 780 (S.D.N.Y. 1990) (quoting

10

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), and *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). Where summary judgment is sought under Article I, Section 8, of the New York Constitution, the New York Court of Appeals has declared, "we reaffirm our regard for the particular value of summary judgment, where appropriate, in libel cases," *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1282 (N.Y. 1991), particularly when as here a defendant is challenging a defamation claim under the "independent State law approach" articulated in *Immuno AG* that might make summary disposition more likely than under a federal approach, *see id.*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The substantive law determines what facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In the face of a properly supported summary judgment motion, the plaintiff may not "rest on [the] allegations" in her complaint. *Id.* at 249. The trial court's function is to determine

11

whether there is a genuine issue for trial, and "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 323; *see* Fed. R. Civ. P. 56 advisory committee's notes (2010 amendments) (restoration of "*shall* grant summary judgment" was intended to "express the direction to grant summary judgment, and "avoids the unintended consequences of any other word").

## ARGUMENT

### I. Ms. Maxwell is not liable for republications of her January 2015 statement that she did not authorize or request and by entities she did not control.

#### A. Summary judgment is warranted to the extent plaintiff seeks to impose liability on any media's republication of all or a portion of the January 2015 statement.

Messrs. Barden and Gow, acting on behalf of Ms. Maxwell, caused the January 2015 statement to be transmitted—published—to various individuals employed by media organizations. The question presented in this Argument I is whether Ms. Maxwell is liable for any republication of all or a portion of the January 2015 statement by the media. Under New York law, the answer is no.

Liability for a republication "must be based on *real authority to influence the final product*." *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984) (emphasis supplied).

12

"[W]here a defendant 'had no actual part in composing or publishing,' he cannot be held liable 'without disregarding the settled rule of law that no man is bound for the tortious act of another over whom he has not a master's power of control.'" *Id.* (quoting *Folwell v. Miller*, 145 F. 495, 497 (2d Cir. 1906)); *see Geraci v. Probst*, 938 N.E.2d 917, 921 (N.Y. 2010) (holding that defendant was not liable for republication, in part because "there is no indication that Probst had any control over whether or not Newsday published the article"). "Conclusive evidence of lack of actual authority [is] sufficiently dispositive that the [trial court] 'ha[s] no option but to dismiss the case . . . .'" *Id.* (quoting *Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382 (N.Y. 1981)).

As the New York Court of Appeals held in *Geraci*:

It is too well settled to be now questioned that one who . . . prints and publishes a libel[] is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured, and that such repetition cannot be considered in law a necessary, natural and probable consequence of the original slander or libel.

938 N.E.2d at 921 (internal quotations and citation omitted). The rationale behind this rule is that "each person who repeats the defamatory statement is responsible for the resulting damages." *Id.* (internal quotations omitted).

With the goal of garnering maximum publicity and defaming Ms. Maxwell, Ms. Giuffre filed an "entirely unnecessary"[7] joinder motion with "lurid details" about sexual acts for the purpose of attracting the attention of the public, which was "'curious, titillated or intrigued'"[8] about alleged sexual acts and relationships among the rich and famous. In defense of Ms. Maxwell's reputation, Messrs. Barden and Gow responded with the January 2015 statement.

---

[7] EXHIBIT E, at 7.

[8] *Time, Inc. v. Firestone*, 424 U.S. 448, 488 n.1 (1976) (Marshall, J., dissenting) (quoting *Firestone v. Time, Inc.*, 271 So. 2d 745, 752 (Fla. 1972)).

The email transmitting the statement explained it was "a *quotable statement* on behalf of Ms Maxwell" and "[n]o further communication will be provided by her on this matter." EXHIBIT F (emphasis supplied). The media representatives were notified that if they intended to use the statement, it was to be quoted in its entirety. *See* This Motion ¶ 24, at 8. Ms. Maxwell and Messrs. Barden and Gow had no ability to control whether or how the media-recipients would use the statement, and they made no effort to control whether or how they would use the statement. EXHIBIT K ¶¶ 2-3; EXHIBIT J ¶ 24.

Ms. Maxwell is not responsible for any republication of the January 2015 statement, whether it was republished in whole or in part,[9] since she had no authority or control over any media that published any portion of it. In the words of this Court, she had no "real authority to influence the final product," *Davis*, 580 F. Supp. at 1096.

The media's *selective*, *partial* republication of the statement is more problematic yet. An original publisher of a statement cannot be charged with a republisher's "editing and excerpting of her statement." *Rand v. New York Times Co.*, 430 N.Y.S.2d 271, 275 (App. Div. 1980). The rule applies with even greater force where as here a defamation claim is grounded on the expression of opinion: An individual "cannot be liable for the republication of a derogatory but constitutionally protected opinion when the foundation upon which that opinion is based is omitted. The defamatory remark should be 'read against the background of its issuance.'" *Id.* (quoting *Mencher v. Chesley*, 75 N.E.2d 257, 259 (N.Y. 1947), and citing *James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976)).

---

[9]Plaintiff has not disclosed under Fed. R. Civ. P. 26(a)(1)(A)(ii) any republication of the entirety of the January 2015 statement. In response to our discovery requests requiring her to identify republications of all or a portion of the statement, plaintiff identified no republication of the entirety of the statement.

14

The rationale for this rule is found in the New York Court of Appeals' explanation of how an original publisher's allegedly defamatory statement should be interpreted:

> The statement complained of will be read against the background of its issuance with respect to the circumstances of its publication. It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do. *The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as from the whole scope and apparent object of the writer*.

*James*, 353 N.E.2d at 838 (emphasis supplied; citations and internal quotations omitted).

The January 2015 statement was intended to be read *by the media-recipients* in its entirety. **One**, it was intended to be a comprehensive, one-time-only response to all of plaintiff's lurid and false allegations of sexual and other misconduct by Ms. Maxwell. *See* EXHIBIT J ¶ 13. **Two**, the statement was complex in that it could not be quoted partially and out of context and still convey the intended meaning. Among other things, the statement was intended to show *why* plaintiff could not be believed—why her allegations are "obvious lies"—by pointing out how her story changed each time she retold the story. As Mr. Barden explains:

> Selective and partial quotation and use of the statement would disserve my purposes. It was intended to address Plaintiff's behavior and allegations against Ms. Maxwell on a broad scale, that is to say, Plaintiff's history of making false allegations and innuendo to the media against Ms. Maxwell. This is why the statement references Plaintiff's "original allegations" and points out that her story "changes"—i.e. is embellished—over time including the allegations "now" that Professor Dershowitz allegedly had sexual relations with her. This is why I distinguished in the statement between Plaintiff's "original" allegations and her "new," joinder-motion allegations, which differed substantially from the original allegations. And this is why I wrote, "Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and now it is alleged by [Plaintiff] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies." (Emphasis supplied.) Having established the dramatic difference between Plaintiff's two sets of allegations, which suggested she was fabricating more and more-salacious allegations as she had more time to manufacture them, I added the third paragraph: "[Ms. Giuffre's] claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory." (Emphasis supplied.) I believed then, and believe now, that it was and remains a fair inference and conclusion that her claims were and are "obvious

lies." As noted, her claims not to have slept with Prince Andrew and to have slept with Prince Andrew are a classic example of an obvious lie. One or other account is on the face of it a lie.

EXHIBIT J ¶ 20. That Mr. Barden on behalf of Ms. Maxwell was expressing his *opinion*—in the form of a legal argument—as a lawyer would be lost if words and phrases are extracted from and used outside the context of the January 2015 statement. Yet, this is precisely what the media did in their articles on the statement and what plaintiff did in her complaint (*see* Doc.1 ¶ 30).

**Finally**, the statement was intended to be a "shot across the bow" of the media-recipients so that they understood the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct. *See id.* ¶ 17. Selectively excerpting from the statement would seriously undermine this purpose by changing the force of the message to the media-recipients.

Under these circumstances, selective, partial and out-of-context republication of Mr. Barden's deliberate and carefully crafted message to the media-representatives, as a matter of law, cannot result in defamation liability for Ms. Maxwell. Accordingly, the Court should enter partial summary judgment.

### B. Because plaintiff is a limited public figure, imposing liability upon Ms. Maxwell for republication of the January 2015 statement would violate the First Amendment.

As this Court recognized in *Davis*, *New York Times v. Sullivan*[10] and its progeny "preclude states from imposing liability without fault in actions for defamation, especially by public figures." 580 F. Supp. at 1097 (citing, *inter alia*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)). This principle precludes the imposition of liability for republication of an allegedly

---

[10]376 U.S. 254 (1964).

defamatory statement on a party who had no "actual . . . responsibility for the decision to republish" the statement. *Id.*

A public figure includes a person who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz*, 418 U.S. at 351; *see, e.g.*, *James*, 353 N.E.2d at 839 (public figure includes those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved")*.* The evidence that plaintiff is a public figure is overwhelming, particularly in connection with the subject matters and issues addressed by and underlying the January 2015 statement. *See* This Motion ¶¶ 51-54.

In the case at bar, Ms. Maxwell and her agents had no responsibility for any media organization's decision to republish the January 2015 statement, and they did not participate in any such decision. *See* EXHIBITS J ¶ 24 & K ¶¶ 2-3. Liability for republication by media organizations of the January 2015 statement therefore is precluded under the First Amendment.

   **C.  Plaintiff should be barred from introducing into evidence any republication of an excerpt from the January 2015 statement.**

In *Geraci*, the plaintiff suggested in a letter to the Long Island fire district where defendant was a commissioner that defendant had engaged in self-dealing in the district's purchase of fire trucks. At trial the plaintiff sought to introduce into evidence portions of a Newsday article that republished parts of the defendant's letter. Defense counsel objected, arguing it was inflammatory and prejudicial. Plaintiff's counsel later argued the article "was not being offered as a republication, but on the issue of damages to show how far the allegations had circulated." 938 N.E.2d at 920. Additionally, plaintiff's counsel argued that the defendant "should have reasonably anticipated" that his letter to the fire district "would be newsworthy." *Id.* The trial court admitted the article, and the Appellate Division affirmed.

17

The New York Court of Appeals reversed. The risk of admitting such evidence, the court held, is the jury may "charge against defendant a separate, distinct libel (not pleaded in [the] complaint) by someone else, contrary to the rule that [t]he original publisher of a libel is not responsible for its subsequent publication by others." *Geraci*, 938 N.E.2d at 921. Accordingly, the court held, "'[A]bsent a showing that [defendant] *approved or participated in some other manner in the activities of the third-party republisher*[,]' there is no basis for allowing the jury to consider the article containing the republished statement as a measure of plaintiff's damages attributable to defendants." *Id.* (emphasis supplied; quoting *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 560 (1980)).

Neither Ms. Maxwell nor her agents approved or participated in any activity of any media organization in its decision to publish or not to publish any part of the January 2015 statement. EXHIBIT J ¶ 2; K ¶¶ 2-3.. Accordingly, "there is no basis for allowing the jury to consider [any] article containing the republished statement as a measure of plaintiff's damages attributable to [Ms. Maxwell]," *id.* Plaintiff should be barred from introducing any evidence of any republication of the January 2015 statement by any non-party. *See, e.g.*, *Soley v. Wasserman*, No. 8 CIV. 9262 KMW FM, 2013 WL 3185555, at *8 (S.D.N.Y. June 21, 2013) (precluding plaintiff from adducing evidence intended to establish claim on which court had entered partial summary judgment).

## II.  Summary judgment is warranted under the New York Constitution.

### A.  The January 2015 statement constitutes nonactionable opinion.

 "'Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance.'" *Germain v. M & T Bank Corp.*, 111 F. Supp. 3d 506, 534 (S.D.N.Y. 2015) (brackets omitted; quoting *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163,

177 (2d Cir. 2000)); *accord, e.g.*, *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (N.Y. 1985). New York defamation law applies. Doc.37 at 6 n.2.

"It is a settled rule that expressions of an opinion false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions." *Steinhilber v. Alphonse*, 501 N.E.2d 550, 550 (N.Y. 1986) (internal quotations omitted). Whether a challenged statement is fact or opinion is a question of law to be decided by the Court. *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, No. 16 CIV. 57 (PAE), 2016 WL 3773394, at *11 (S.D.N.Y. July 8, 2016); *accord, e.g.*, *Steinhilber*, 501 N.E.2d at 553.

In *Immuno AG v. Moor-Jankowski*,[11] the New York Court of Appeals declared that the New York Constitution provides greater protection to opinion than the First Amendment of the United States Constitution. The court recognized that in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the United States Supreme Court reversed a state court decision dismissing a complaint on the ground that the allegedly defamatory statement was nonactionable opinion. The Supreme Court held there is no "wholesale defamation exemption" protecting opinion. The First Amendment analysis under *Milkovich*, the New York court observed, was one-dimensional: the trial court should look first to the allegedly defamatory statement's specific words as commonly understood and then determine whether the statements were "verifiable"; if the statements were verifiable, then they were actionable statements of fact. *See Immuno AG*, 567 N.E.2d at 1274-75. The Supreme Court's holding made it clear that it would not consider as part of the First Amendment analysis "the full context of the article in which the challenged statements appear, and the broader social context or setting surrounding the communication." *Id.* at 1274.

---

[11]567 N.E.2d 1270 (N.Y. 1991).

19

The *Immuno AG* Court of Appeals held that Article I, Section 8, of the New York Constitution required a multidimensional approach to the determination whether an allegedly defamatory statement constitutes constitutionally protected opinion. The court gave numerous reasons. New York's "expansive" constitutional guarantee of speech was formulated and adopted before the application of the First Amendment to the states; "[i]t has long been our standard in defamation actions" to consider factors beyond whether facts are "verifiable"; and the court was concerned that if "'type of speech' is to be construed narrowly[,] . . . insufficient protection may be accorded to central values protected by the law of this State." *Id.* at 1277-78. The *Immuno AG* court reaffirmed that where a defendant alleges that the subject statement is opinion, *Steinhilber* supplies the analytical framework. *Id.* at 1280.

*Steinhilber* held that whether an allegedly defamatory statement is fact or nonactionable opinion should be decided based on four factors: (1) an assessment of whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous; (2) a determination of whether the statement is capable of being objectively characterized as true or false; (3) an examination of the full context of the communication in which the statement appears; and (4) a consideration of the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might signal to readers or listeners that what is being read or heard is likely to be opinion, not fact. 501 N.E.2d at 554.

Application of these factors to the January 2015 statement compels the conclusion that the allegedly defamatory words, phrases and clauses are nonactionable opinion.

**Whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous.** The three sentences plaintiff alleges are

20

defamatory are indefinite and ambiguous. The first says plaintiff's "allegations" against

Ms. Maxwell are "untrue." But plaintiff has made many dozens of allegations against

Ms. Maxwell, and some are provably false. *See* This Motion, at ¶¶ 37-50. The statement does not

specify *which* of the allegations are untrue. The second statement is that the "original

allegations" have been "shown to be untrue." The "original allegations" were first revealed in the

2011 Churcher articles. Plaintiff made many dozens of allegations "originally." The statement

does not specify *which* of the "original" allegations were shown to be untrue. Some *have* been

shown to be untrue. *See* This Motion, at 53-65. The third statement is that plaintiff's "claims" are

"obvious lies." This too is indefinite and ambiguous. Plaintiff has made many dozens of claims.

The statement does not specify which ones are being referenced. More importantly, it does not

say how or why some of the claims are "obvious" lies. Regardless, some of plaintiff's claims are

"obvious lies." *See* This Motion, at 53-65.

**Whether the three sentences in the January 2015 statement are capable of being**

**objectively characterized as true or false.** Can the three sentences be characterized as true or

false? They cannot, because the statement does not specify which of the many dozens of

allegations plaintiff has made are "untrue" and "shown to be untrue," and which of plaintiff's

many dozens of "claims" are "obvious lies."

It is axiomatic that the plural form of a word, e.g., "allegations" and "claims," universally

denotes—only—"*more than one*," *People v. Kocsis*, 28 N.Y.S.3d 466, 471 (App. Div. 2016)

(emphasis supplied). *See, e.g.*, *Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous

Metals Trading Co.*, No. 94 CIV. 8301(JFK), 1995 WL 380119, at *6 n.2 (S.D.N.Y. June 26,

1995). So for *Steinhilber* purposes it is dispositive of the fact versus opinion question if we can

21

identify *two* instances in which plaintiff's allegations or claims[12] are incapable of being proved true or false. Such examples abound. It cannot be proven true or false whether Ms. Maxwell "appreciated the immunity granted"[13] under the Epstein plea agreement or whether she "act[ed] as a 'madame' for Epstein."[14] That is because these are plaintiff's counsel's arguments or opinions. The January 2015 statement asserts that these allegations/claims are "false" or "obvious lies." That assertion cannot be proven true or false under *Steinhilber*.

**The full context of the communication in which the statement appears.** This factor "is often the key consideration in categorizing a statement as fact or opinion." *Davis v. Boeheim*, 22 N.E.3d 999, 1006 (N.Y. 2014) (internal quotations omitted).

In deciding whether a statement is defamatory, "[t]he words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader." *Aronson v. Wiersma*, 483 N.E.2d 1138, 1139 (1985); *accord Elias v. Rolling Stone LLC*, No. 15-CV-5953 (PKC), 2016 WL 3583080, at *6 (S.D.N.Y. June 28, 2016). "It is the duty of the court, in an action for libel, to understand the publication in the same manner that others would naturally do. The construction which it behooves a court of justice to put on a publication which is alleged to be libelous is to be derived as well from the expressions used as

---

[12]In the context of the January 2015 statement, an "allegation" is synonymous with a "claim." *See, e.g.*, *Maule v. Philadelphia Media Holdings, LLC*, No. CIV.A. 08-3357, 2010 WL 914926, at *10 (E.D. Pa. Mar. 15, 2010); *see generally* Black's Law Dictionary 68 (5th ed. 1979) (defining "allegation" as "[t]he assertion, *claim*, declaration, or statement of a party to an action, made in a pleading, setting out what he expects to prove"), *quoted with approval in Martin v. City of Oceanside*, 205 F. Supp. 2d 1142, 1147 (S.D. Cal. 2002), *aff'd*, 360 F.3d 1078 (9th Cir. 2004).

[13]Exhibit D, at 4.

[14]*Id.*

22

from the whole scope and apparent object of the writer." *James v. Gannett Co.*, 353 N.E.2d 834,

838 (N.Y. 1976); *accord, e.g.*, *Chau v. Lewis*, 935 F. Supp. 2d 644, 665 (S.D.N.Y. 2013).

In general the trial court should view allegedly defamatory statements from the

perspective of the average member of the public. Statements directed to a specific audience,

however, are considered from the viewpoint of that audience. Instructive is this Court's analysis

of the perspective from which it should assess an allegedly defamatory article on boxing

published to sports readers:

> The issue of how the "average reader" would construe the statements is
> certainly a fair one, for the question of whether statements are defamatory turns
> on *how the audience to whom the statements are addressed* would interpret
> them. . . . As the New York State Court of Appeals has explained in [a] boxing-
> defamation case[]: . . . . "The words are to be construed not with the close
> precision expected from lawyers and judges but as they would be read and
> understood by the public to which they are addressed. . . ."

> Here, the statements in question were addressed to readers of an Internet
> boxing website and the sports pages of daily newspapers. The statements must be
> considered from their viewpoint. As Judge Martin . . . held [in *Horne v. Matthews*,
> No. 97 Civ. 3605(JSM), 1997 WL 598452 (S.D.N.Y. Sept. 25, 1997)]: "An article
> on the sports page of a newspaper should be viewed *from the perspective of the
> audience to whom it is addressed*, *i.e.*, *the understanding of "a sophisticated and
> sports-conscious reader.*"

*Dibella v. Hopkins*, No. 01 CIV. 11779 (DC), 2002 WL 31427362, at *2 (S.D.N.Y. Oct. 30,

2002) (emphasis supplied; citation omitted).

The entirety of the email containing the January 2015 statement from Mr. Gow sent to

various media representatives reads:

> To Whom It May Concern,
> Please find attached a quotable statement on behalf of Ms Maxwell.

> No further communication will be provided by her on this matter.
> Thanks for your understanding.
> Best
> Ross

> Ross Gow
> ACUITY Reputation

Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by Victoria Roberts [sic] <u>against Ghislaine Maxwell are untrue.</u> The original allegations are not new and have been fully responded to and <u>shown to be untrue</u>.

Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and *now* it is alleged by Ms Roberts [sic] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies.

Ms Roberts <u>claims are obvious lies</u> and should be treated as such and not publicised as news, as they are defamatory.

Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

EXHIBIT F (italics and underscoring supplied).

Plaintiff listed the underscored clauses/phrases in the Complaint as the "deliberate falsehoods," Doc.1 ¶ 30, and "false and defamatory statements," *id.* ¶ 32, plaintiff is suing on.[15] As discussed above, it is improper to remove from their context and isolate allegedly defamatory words, phrases and clauses of sentences from an allegedly defamatory publication. Instead, the allegedly defamatory words, phrases and clauses must be (a) "construed in the context of the entire statement or publication as a whole";[16] (b) considered "from the whole scope and apparent object of the writer";[17] and (c) "viewed from the perspective of the audience to whom it is addressed."[18]

The statement was directed at a discrete number of—some 30—members of the media in reply to their request for a response from Ms. Maxwell to Ms. Giuffre's CVRA joinder motion.

---

[15]Plaintiff also alleges that Ms. Maxwell slandered her on January 4, 2015, when responding to a question posed to her while she was on a Manhattan street. Doc.1 ¶ 37. This allegedly defamatory statement is addressed in Argument IV, below.

[16]*Aronson*, 483 N.E.2d at 1139.

[17]*James*, 353 N.E.2d at 838.

[18]*Dibella*, 2002 WL 31427362, at *2.

Mr. Barden, who prepared the January 2015 statement, did not intend the January 2015 statement to be a traditional press release solely to disseminate information to the media. EXHIBIT K ¶ 15. So he did not request that Mr. Gow or any other public relations specialist prepare the statement. *Id.* Instead, Mr. Gow served only as Mr. Barden's conduit to the media representatives who had requested a response to the joinder motion allegations and who Mr. Barden believed might republish those allegations. *Id.*

Mr. Barden intended the statement to mitigate the harm to Ms. Maxwell's reputation from the press's republication of plaintiff's false allegations. *Id.* ¶ 16. He believed this could be accomplished by suggesting to the media that, among other things, they should subject plaintiff's allegations to inquiry and scrutiny. *Id.* For example, he noted that plaintiff's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicised as news." *Id.*

Mr. Barden also intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish plaintiff's allegations without conducting any inquiry of their own. *Id.* ¶ 17. So Mr. Barden stated repeatedly that plaintiff's allegations were "defamatory." *Id.* In this sense, the statement was very much intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct. *Id.*

Consistent with Mr. Barden's purposes for the statement, Mr. Gow's emails prefaced the statement with the following language: "Please find attached a *quotable statement* on behalf of Ms Maxwell" (emphasis supplied). *Id.* ¶ 19. The statement was intended to be a single, one-time-only, comprehensive response—quoted in full—to plaintiff's December 30, 2014,

allegations that would give the media Ms. Maxwell's response. *Id.* The purpose of the prefatory statement was to inform the media-recipients of this intent. *Id.*

We note that plaintiff in her Complaint makes the same mistake as the *Steinhilber* plaintiff—extracting words and phrases from their opinion context so that she can claim the assertion of a "defamatory" fact. *See* Doc.1 ¶ 30. That is not permissible. *See Steinhilber*, 501 N.E.2d at 555 ("The sentence which plaintiff selects from the message and claims is "factually laden"—impugning her as lacking in "talent, ambition, and initiative"[5]—is preceded and followed by statements which are clearly part of the attempt at humor prevailing throughout . . . .").

**The broader social context or setting surrounding the communication, including the existence of any applicable customs or conventions which might signal to readers that what is being read is likely to be opinion, not fact.** This factor is concerned with "the factual background" leading up to the preparation of the statement. It is a critical factor here. In December 2014, plaintiff and her lawyers had timed for maximum effect—during the slow news cycle between Christmas and New Year's Day—the public filing of a superfluous motion filled with salacious and provocative allegations of "sexual abuse" and "sexual trafficking" involving wealthy and prominent Americans. Plaintiff deliberately placed Ms. Maxwell in the middle of the abuse and trafficking, alleging that she recruited plaintiff into the sexual abuse/trafficking scheme and engaged in numerous criminal acts.

Importantly, three years earlier when plaintiff was interviewed extensively by Churcher for two lengthy articles published in March 2011, plaintiff's allegations concerning Ms. Maxwell were very much different. In the articles discussing plaintiff's "shocking account"[19] of being

---

[19]EXHIBIT A, at 2.

sexually exploited by Epstein, Prince Andrew and Epstein's "male peers,"[20] plaintiff made virtually *none* of what Judge Marra found were "unnecessary"[21] and "lurid details"[22] about how Ms. Maxwell allegedly had subjected her to sexual abuse and trafficking.

After plaintiff filed the CVRA motion, some thirty reporters contacted Ms. Maxwell's press representative, Mr. Gow, for Ms. Maxwell's response. As Ms. Maxwell's lawyer, Mr. Barden undertook that task. Relying on his knowledge of the 2011 articles publishing plaintiff's allegations and drawing on his experience and training as a lawyer, Mr. Barden crafted a response with the goal of discrediting plaintiff and what the statement called plaintiff's "new" allegations. To that end Mr. Barden contrasted plaintiff's "old" allegations from 2011 with the "new" 2014 allegations. The second paragraph of the statement is indicative of this strategy: "*Each time the story is re told [sic] it changes* with *new salacious details* about public figures and world leaders and *now* it is alleged by [Ms. Giuffre] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies." EXHIBIT F (emphasis supplied). Having established the dramatic difference between these sets of allegations suggesting plaintiff was fabricating more and more-salacious allegations as she had more time to manufacture them, Mr. Barden added the third paragraph: "[Ms. Giuffre's] claims are *obvious lies* and should be treated as such and not publicised as news, as they are defamatory." *Id.* (emphasis supplied).

Mr. Barden's arguments constitute "pure opinion," *Steinhilber*, 501 N.E.2d at 552. They take established and revealed facts—plaintiff's modest 2011 allegations to a newspaper reporter and plaintiff's expansive, unnecessary and lurid 2014 allegations in a motion to open the door to

---

[20] *Id.*

[21] EXHIBIT E, at 5.

[22] *Id.*

27

criminal prosecutions of (and civil lawsuits against) wealthy and prominent men around the

world—to draw an obvious inference that plaintiff was (more) truthful in the 2011 articles and

engaged in massive manufacturing of fiction in the 2014 joinder motion. There is no limit to the

subject matters on which pure opinions may be expressed with constitutional immunity,

including whether a person believes another is "lying" or is a "liar." *See, e.g.*, *Indep. Living Aids,*

*Inc. v. Maxi-Aids, Inc.*, 981 F. Supp. 124, 128 (E.D.N.Y. 1997) (granting summary judgment:

"Read in the context of the entire article, Zaretsky's remarks, calling Sandler and others 'liars,'

can only be understood as a denial of their accusations. . . . Even the most careless reader must

have perceived that the words were no more than rhetorical hyperbole, a vigorous epithet used by

Zaretsky who considered himself unfairly treated and sought to bring what he alleged were the

true facts to the readers. The epithet 'liar' in this context, standing by itself, merely expressed the

opinion that anyone who persisted in accusing Zaretsky of improper business practices could not

be telling the truth. Since the basis for this opinion was fully set forth, the communication of

Zaretsky's views cannot be libelous.") (citations, ellipsis, brackets and internal quotations

omitted); *see Gross v. New York Times*, 623 N.E.2d 1163, 1169 (N.Y. 1993) ("[E]ven when

uttered or published in a . . . serious tone, accusations of criminality could be regarded as mere

hypothesis and therefore not actionable if the facts on which they are based are fully and

accurately set forth and it is clear to the reasonable reader . . . that the accusation is merely a

personal surmise built upon those facts. In all cases, whether the challenged remark concerns

criminality or some other defamatory category, the courts are obliged to consider the

communication as a whole, as well as its immediate and broader social contexts, to determine

whether the reasonable listener . . . is likely to understand the remark as an assertion of provable

fact.").

Mr. Barden's inference from disclosed facts qualifies as "pure opinion," *Steinhilber*, 501 N.E.2d at 552. Accordingly, that Mr. Barden characterized plaintiff's 2014 allegations harshly as "obvious lies" as opposed to "untruths" or some softer term is of no moment. "[U]nder New York law, pure opinion . . . is not actionable because expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Ratajack v. Brewster Fire Dep't, Inc. of the Brewster-SE Joint Fire Dist.*, 178 F. Supp. 3d 118, 158 (S.D.N.Y. 2016) (internal quotations and ellipsis omitted; brackets altered); *accord, e.g.*, *Mann v. Abel*, 885 N.E.2d 884, 885-86 (N.Y. 2008).

The drawing of such inferences would be constitutionally protected even under the standards of the First Amendment that are less protective of opinion than is Article I, Section 8, of the New York Constitution. *See Adelson v. Harris*, 973 F. Supp. 2d 467, 490 (S.D.N.Y. 2013) ("In determining whether a statement constitutes constitutionally protected opinion, courts also look to the specific context of the statement. When looking at a statement's specific context, of particular importance is the principle that when an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.") (internal quotations and brackets omitted).

The application of the four *Steinhilber* factors confirms that the three phrases and/or clauses plaintiff alleges are defamatory are in fact part of a statement that taken as a whole constitutes nonactionable opinion. The premise of plaintiff's Complaint is that once she is able to identify references in the January 2015 statement to any assertion of fact that potentially is subject to proof, e.g., the truth or falsity of her many dozens of allegations old and new, then she has a viable defamation claim. That ignores the teaching of *Steinhilber* and *Immuno AG*. As the

*Steinhilber* court held, "even apparent statements of fact may assume the character of statements of opinion, and thus be privileged, when made in public debate, heated labor dispute, or other circumstances in which an audience may anticipate the use of epithets, fiery rhetoric or hyperbole." *Id.* (internal quotations and brackets omitted); *see Gross*, 623 N.E.2d at 1169 ("we stress once again our commitment to avoiding the 'hypertechnical parsing' of written and spoken words for the purpose of identifying 'possible "fact[s]"' that might form the basis of sustainable libel action") (quoting *Immuno AG*, 567 N.E.2d at 1282).

To the same effect is this Court's citation to a Louisiana Supreme Court decision for the proposition that "'[w]ords which, taken by themselves, would appear to be a positive allegation of fact, *may be shown by the context to be a mere expression of opinion or <u>argumentative</u> influence*.'" *Adelson*, 973 F. Supp. 2d at 488 (emphasis supplied; quoting *Mashburn v. Collin*, 355 So. 2d 879, 885 (La. 1977)).

It also is important to take into account, as *Steinhilber* requires, that Mr. Barden was directing the January 2015 statement to a discrete number of media representatives who were aware of plaintiff's "original" and "new," joinder-motion allegations and who were requesting a response from Ms. Maxwell to the "new" allegations. These newspaper reporters and other media representatives would have the point Mr. Barden was making—the opinion he was expressing—namely, that there was good reason to believe plaintiff was fabricating allegations for her purposes. In the context of the media circus that ensued the public filing of the joinder motion and the media's repeated and insistent requests for an immediate response from Ms. Maxwell, it is highly unlikely any media-recipients of the January 2015 statement expected anything other than a statement equivalent to the March 2011 statement condemning the allegations; and it is highly likely all the media-recipients understood the statement to be a

forceful argument that plaintiff's shifting and inconsistent stories about what allegedly happened rendered her inherently unbelievable and proved her increasingly provocative and lurid allegations were "obvious lies." These are precisely the messages Mr. Barden sent to them.

The general nature of Mr. Barden's assertions ("allegations," "original allegations," "claims"), the distinction between plaintiff's "original" and "new" allegations, and the inferences he drew from comparing the "original" and "new" allegations—together—powerfully demonstrate that the January 2015 statement was nothing more than opinion.

### B. In this Rule 56 proceeding, this Court's Rule 12(b)(6) opinion does not control the question of law whether the January 2015 statement constitutes nonactionable opinion.

In its Rule 12(b)(6) opinion the Court, relying on *Davis v. Boeheim*, 22 N.E.3d 999 (2014), ruled that the three allegedly defamatory statements in the January 2015 statement (*see* Doc.1 ¶ 30(a)-(c)) have a specific and readily understood factual meaning, are capable of being proven true or false, and "clearly constitute fact to the reader." Doc.37 at 9. We respectfully suggest the Court's Rule 12(b)(6) decision does not control in this Rule 56 proceeding.

To begin with, the standards for deciding a Rule 12(b)(6) motion are substantially different from the standards for deciding a Rule 56 motion. As the Court noted, in deciding a 12(b)(6) motion the court must accept as true the factual allegations and draw all inferences in the plaintiff's favor; a plaintiff need only state a claim that is "plausible on its face." *Id.* at 3 (internal quotations omitted). In contrast, in deciding a Rule 56 motion the plaintiff defending the motion may *not* "rest on [the] allegations" in her complaint. *Anderson*, 477 U.S. at 249. The difference in the standards is crucial here.

As this Court recognized, "'[t]he dispositive inquiry'" for purposes of deciding whether an allegedly defamatory statement is fact or nonactionable opinion is whether "'a reasonable reader could have concluded that the statements were conveying facts about the plaintiff.'"

31

Doc.37 at 7 (quoting *Davis*, 22 N.E.3d at 1005). To answer that inquiry, the Court applied the three factors enumerated in *Davis*. *See id.* These three factors are the same as the four factors in *Immuno AG*; the difference is that the *Davis* court collapsed the *Immuno AG*'s third and fourth factors into one. *See Davis*, 22 N.E.3d at 1005.

As framed by the *Davis* court, the third factor is "whether either the *full context of the communication* in which the statement appears or the *broader social context and surrounding circumstances* are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* (internal quotations omitted; emphasis supplied), *quoted in* Doc.37 at 7. Although this Court did not note this in its opinion, this third factor "is often *the key consideration* in categorizing a statement as fact or opinion." *Id.* at 1006 (emphasis supplied).

As in *Davis*, which also was decided on a Rule 12(b)(6) motion,[23] this Court when considering the third factor did not have the benefit of any of the evidence presented in this motion. That is to say, the Court did not have the "full context of the" July 2015 statement or the "broader social context and surrounding circumstances" of the statement, since none of the evidence presented in this Motion was pleaded in the Complaint.

Nor, in the context of the 12(b)(6) motion, did the Court consider that the relevant "readers" of the July 2015 statement were not the "average reader"[24] in the general public, but a "cynical"[25] and "sophisticated"[26] group of about 30 reporters and journalists who were knowledgeable about plaintiff's allegations of being the victim of sexual abuse and sexual

---

[23]*Davis*, 22 N.E.3d at 1001.

[24]*Aronson*, 483 N.E.2d at 1139.

[25]Steven Shiffrin, *The Politics of the Mass Media and the Free Speech Principle*, 69 Ind. L.J. 689, 702 (1994).

[26]*Dibella*, 2002 WL 31427362, at *2.

trafficking. Viewing the July 2015 statement from the perspective of these reporters and journalists—the only persons who received the July 2015 statement—presents a different landscape in the "fact versus opinion" analysis.

Applying the third factor with the benefit of the Rule 56 records compels a conclusion different from the one this Court reached on the barren Rule 12(b)(6) record. For example, this Court did not consider that the media-recipients of the July 2015 statement would have understood the statement in precisely the way Mr. Barden intended: Based on a comparison of dramatic differences between her "original" and "new" allegations, Ms. Giuffre is a teller of falsehoods—is a liar—and cannot be trusted, and her new CVRA joint-motion allegations, which deviated so substantially from her originally allegations, are falsehoods—proven false by her increasingly provocative and lurid versions of her story of "victimhood." *See generally* Exhibit J.

### III. The pre-litigation privilege bars this action.

Statements pertinent to a good faith anticipated litigation made by attorneys (or their agents under their direction[27]) before the commencement of litigation are privileged and "no cause of action for defamation can be based on those statements," *Front, Inc. v. Khalil*, 28 N.E.3d 15, 16 (N.Y. 2015). So long as there was "a good faith basis to anticipate litigation," a statement concerning either "actual litigation or prelitigation matters" is subject to an "*absolute privilege*." *Flomenhaft v. Finkelstein*, 8 N.Y.S.3d 161, 164 n.2 (App. Div. 2015) (emphasis supplied); *accord Kirk v. Heppt*, 532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008).

The privilege covers statements made in connection with "pending or "*contemplated* litigation." *Goldstein v. Cogswell*, No. 85 CIV. 9256 (KMW), 1992 WL 131723, at *27 n.32 (S.D.N.Y. June 1, 1992) It covers statements made outside court, including in written

---

[27]*See Chambers v. Wells Fargo Bank, N.A.*, No. 2016 WL 3533998, at *8 (D.N.J. June 28, 2016); *see generally Hawkins v. Harris*, 661 A.2d 284, 289-91 (N.J. 1995).

communications "between litigating parties or their attorneys." *Klein v. McGauley*, 29. A.D.2d 418, 420 (N.Y. App. Div. 1968), *cited with approval in Petrus v. Smith*, 91 A.D.2d 1190, 1191 (N.Y. App. App. Div. 1983). It covers "cease and desist letters." *Khalil*, 28 N.E.3d at 19. And it covers "all pertinent communications among the parties, counsel, witnesses and the court," regardless "[w]hether a statement was made in or out of court, was on or off the record, or was made orally or in writing." *Frechtman v. Gutterrnan*, 979 N.Y.S. 2d 58 (App. Div. 2014) (quoting *Sexter v. Warmflash, P.C. v. Margrabe*, 828 N.Y.S. 2d 315 (App. Div. 2007)).

When the pre-litigation privilege is invoked in connection with an allegedly defamatory statement made during pending or contemplated litigation, "any doubts are to be resolved in favor of pertinence." *Flomenhaft*, 8 N.Y.S.3d at 164. "[T]he test to determine whether a statement is pertinent to litigation is '"extremely liberal,"' such that the offending statement, to be actionable, must have been '*outrageously out of context*.'" *Id.* at 164-65 (emphasis supplied; quoting *Black v. Green Harbour Homeowners' Ass'n*, 798 N.Y.S.2d 753 (App. Div. 2005), and *Martirano v. Frost*, 255 N.E.2d 693 (1969)); *Kirk*, 532 F. Supp. 2d at 593.

In denying Ms. Maxwell's motion to dismiss the Complaint based on the pre-litigation privilege, this Court limited its analysis of the privilege to whether under the Rule 12(b)(6) standard plaintiff had sufficiently pleaded that the January 2 and 4 statements were made with actual malice. Doc.37 at 18-19. The Court's Rule 12(b)(6) analysis does not bear on the question presented here, for two reasons.

Under the "substantive law"[28] actual malice is not relevant to the pre-litigation defense. The New York Court of Appeals in *Khalil* held that to prevail on the pre-litigation privilege the defendant need only establish <u>*one element*</u>: the allegedly defamatory statement at issue was

---

[28]*Anderson*, 477 U.S. at 248.

"pertinent to a good faith anticipated litigation." 28 N.E.3d at 16. Upon establishing that element, summary judgment for the defendant is required. *See id.* Additionally, this is a summary judgment proceeding. Plaintiff cannot rely on the allegations of her Complaint. Evidence is required.

The following evidence is not in dispute. By January 2015 Ms. Maxwell had retained British Solicitor Philip Barden to represent and advise her in connection with plaintiff's publication in the British press of salacious, defamatory allegations of criminal sexual abuse during the period 1999-2002. EXHIBIT K ¶¶ 8-10. Mr. Barden in turn engaged UK press agent Ross Gow. *Id.* ¶ 9. Mr. Barden prepared the January 2015 statement and instructed Mr. Gow to transmit it via email to members of the UK media who had made inquiry about the allegations in the joinder motion. *Id.* ¶ 10.

Mr. Barden did not intend the January 2015 statement as a traditional press release solely to disseminate information to the media. *Id.* ¶ 15. This is why he intentionally did not request that Mr. Gow or any other public relations specialist prepare the statement. *Id.* Instead, Mr. Gow served as his conduit to the media representatives who had requested a response to the joinder motion allegations and who Mr. Barden believed might republish those allegations. *Id.*

Mr. Barden had two purposes in preparing and causing the statement to be disseminated to those media representatives. First, he wanted to mitigate the harm to Ms. Maxwell's reputation from the press's republication of plaintiff's false allegations. *Id.* ¶ 16. He believed these ends could be accomplished by suggesting to the media that, among other things, they should subject plaintiff's allegations to inquiry and scrutiny. *Id.* For example, he noted in the January 2015 statement that plaintiff's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicised as news." *Id.*

35

Second, Mr. Barden intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish plaintiff's allegations without conducting any inquiry of their own. *Id.* ¶ 17. This was the purpose of repeatedly stating that plaintiff's allegations were "defamatory." *Id.* The statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of plaintiff's obviously false allegations and the legal indefensibility of their own conduct. *Id.*

At the time Mr. Barden directed the issuance of the statement, he was contemplating litigation against the media-recipients as an additional means to mitigate and prevent harm to Ms. Maxwell. *Id.* ¶ 28. Toward this end, he prepared the statement so that it made clear Ms. Maxwell "strongly denie[d] the allegations of an unsavoury nature," declared the republications of the allegations to be false, gave the press-recipients notice that the republications of the allegations "are defamatory," and informed them that Ms. Maxwell was "reserv[ing] her right to seek redress." *Id.* ¶ 30. In any such UK defamation, or other related, action Ms. Giuffre would be a defendant or a witness. *Id.* ¶ 29.

The question presented is whether Mr. Barden's statement, which he directed to be sent to various media representatives, is "pertinent to a good faith anticipated litigation," *Khalil*, 28 N.E.3d at 16.

The requirement of "good faith" anticipated litigation is intended to prevent attorneys (or their agents) from "bully[ing], harass[ing], or intimidat[ing] their client's adversaries by threatening baseless litigation or by asserting unmeritorious claims, unsupported in law and fact, in violation of counsel's ethical obligations," *id.* at 19. The statement Mr. Barden prepared and caused to be issued was not intended to bully, harass or intimidate the press-recipients, i.e., the

36

potential defendants in an action by Ms. Maxwell for defamation. *See* EXHIBIT K ¶¶ 26-30.

Nothing about the statement on its face suggested bullying, harassing or intimidating the press-

recipients (or anyone else). At the time Mr. Barden directed the issuance of the statement, he had

sufficient factual and legal grounds to pursue in good faith a defamation action against one or

more of the press-recipients for republishing plaintiff's allegations. *See generally id.* ¶¶ 8-30.

That the statement was directed at the press-recipients—which had republished plaintiff's

false allegations and was not directed at plaintiff—is irrelevant to the absolute privilege

protecting pre-litigation communications. In *International Publishing Concepts, LLC v.*

*Locatelli*, letters and emails detailing likely litigation and an intent to sue were extended the

same pre-litigation privilege although sent to two non-parties who were only potentially affected

by the litigation or witnesses to it. *See also Kirk*, 532 F. Supp. 2d at 593 ("The privilege is broad,

and embraces anything that may possibly or plausibly be relevant to the litigation.") (internal

quotations omitted).

The only issue remaining is whether the statement was pertinent to the contemplated

litigation. Applying the "extremely liberal" test of pertinence, in which "any doubts are to be

resolved in favor of pertinence,"[29] the court must decide whether the allegedly defamatory

statement is "outrageously out of context" in relation to the contemplated litigation. *Flomenhaft*,

8 N.Y.S.3d at 164-65 (internal quotations omitted). Nothing in the statement is "outrageously out

of context." Every statement was directly related to the press-recipients' republication of

plaintiff's false allegations against Ms. Maxwell.

The January 4 statement also is absolutely privileged. According to plaintiff,

Ms. Maxwell told a reporter on that date when asked to comment on plaintiff's joinder-motion

---

[29]*Flomenhaft*, 8 N.Y.S.3d at 164 (internal quotations omitted).

allegations: "I am referring to the statement that was made." Doc.1 ¶ 32. Assuming *arguendo* the statement is defamatory,[30] it is absolutely privileged since it simply refers to an absolutely privileged statement. *See, e.g., Klein*, 29 A.D.2d at 420 (privilege protects communications "between litigating parties"); *Frechtman*, 979 N.Y.S.2d at 63 (privilege protects communications "made in or out of court, … on or off the record, … orally or in writing") (internal quotations omitted).

Under these circumstances the pre-litigation privilege is absolute and "no cause of action for defamation can be based on those statements," *Khalil*, 28 N.E.3d at 16. The Court should enter summary judgment on plaintiff's defamation claim.

### IV. Ms. Maxwell's January 4, 2015, statement is nonactionable.

Plaintiff alleges that on January 4, 2015, a reporter approached Ms. Maxwell on a public street in Manhattan and "asked Maxwell about Giuffre's allegations against Maxwell." Doc.1 ¶ 37. Plaintiff alleges that Ms. Maxwell responded with a single sentence: "'I am referring to the statement that we made.'" *Id.* According to plaintiff, Ms. Maxwell's statement was defamatory. *See id.* ¶ 37 & Count I ¶ 5, at 8. Judgment should enter against plaintiff as to Ms. Maxwell's statement.

*Adelson* controls this portion of plaintiff's defamation claim. In *Adelson* a non-profit organization during the 2012 presidential campaign published a statement on its website critical of Sheldon Adelson, a wealthy Republican donor. The statement alleged Adelson had donated "tainted" and "dirty" money to Governor Romney. Eight days later the organization withdrew the statement from its website. On the same day it issued a press release explaining that although

---

[30]As discussed in Argument IV, the January 4 statement is nonactionable.

it took down the statement, "we stand by everything we said, which was sourced from current, credible news accounts." 973 F. Supp. 2d at 474.

Adelson sued. He alleged that the statement was defamatory and that the press release constituted a republication of the defamatory statement. This court held that the statement contained only constitutionally protected opinion and was nonactionable. The court then rejected the defamation claim based on republication: "'[A] mere reference to another writing that contains defamatory matter does not constitute an actionable repetition or republication." *Id.* (quoting *Goforth v. Avemco Life Ins. Co.*, 368 F.2d 25, 28 n.7 (4th Cir.1966)). This is the settled rule. *See In re Philadelphia Newspapers*, LLC, 690 F.3d 161, 175 (3d Cir. 2012), *as corrected* (Oct. 25, 2012) ("under traditional principles of republication, a mere reference to an article, regardless how favorable it is as long as it does not restate the defamatory material, does not republish the material"); *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) ("[T]he common thread of traditional republication is that it presents the material, in its entirety, before a new audience. A mere reference to a previously published article does not do that.").

Ms. Maxwell's one-sentence response that merely referenced an earlier statement is nonactionable. This Court should enter partial summary judgment on the defamation claim to the extent it is based on Ms. Maxwell's response.

**V.   The defamation claim should be dismissed because the publication is substantially true.**

"'[A] statement is substantially true if the statement would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced."'" *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (App. Div. 2015) (quoting *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012) (quoting *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348,

39

366 (S.D.N.Y.1998) (quoting *Fleckenstein v. Friedman*, 193 N.E. 537, 538 (1934)))). Indeed, it is well settled in New York "that an alleged libel is not actionable if the published statement could have produced no worse an effect on the mind of a reader than the truth pertinent to the allegation." *Id.* (internal quotations omitted). "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Fleckenstein*, 193 N.E. at 538.

For the reasons articulated in Argument VI, the January 2015 statement is substantially true as matter of law.

**VI.  Plaintiff cannot establish actual malice by clear and convincing evidence.**

**A.  Facts.**

The following numbered facts are not in dispute and are sequentially numbered following the undisputed facts cited earlier.  *See* This Motion at ¶¶ 1-36.

37.  **Plaintiff lived independently from her parents with her fiancé long before meeting Epstein or Ms. Maxwell.** After leaving the Growing Together drug rehabilitation facility in 1999, plaintiff moved in with the family of a fellow patient. EXHIBIT L at 7-8, 12-14. There she met, and became engaged to, her friend's brother, James Michael Austrich. *Id.* & at 19.  She and Austrich thereafter rented an apartment in the Ft. Lauderdale area with another friend and both worked at various jobs in that area. *Id.* at 11, 13-17.  Later, they stayed briefly with plaintiff's parents in the Palm Beach/Loxahatchee, Florida area before Austrich rented an apartment for the couple on Bent Oak Drive in Royal Palm Beach. *Id.* at 17, 19, 25-27; EXHIBIT M. Although plaintiff agreed to marry Austrich, she never had any intention of doing so. EXHIBIT N at 127-128.

38.  **Plaintiff re-enrolled in high school from June 21, 2000 until March 7, 2002**. After finishing the 9th grade school year at Forest Hills High School on June 9, 1999, plaintiff re-

40

enrolled at Wellington Adult High School on June 21, 2000, again on August 16, 2000 and on

August 14, 2001. EXHIBIT O. On September 20, 2001, Plaintiff then enrolled at Royal Palm

Beach High School. *Id.* A few weeks later, on October 12, 2001, she matriculated at Survivors

Charter School. *Id.* Survivor's Charter School was an alternative school designed to assist

students who had been unsuccessful at more traditional schools. EXHIBIT P at 23-24. Plaintiff

remained enrolled at Survivor's Charter School until March 7, 2002. EXHIBIT O. She was present

56 days and absent 13 days during her time there. *Id.* Plaintiff never received her high school

diploma or GED. EXHIBIT Q at 475, 483. Plaintiff and Figueroa went "back to school" together

at Survivor's Charter School. EXHIBIT P at 23-27.  The school day there lasted from morning

until early afternoon. *Id.* at 23-27, 144-46.

     **39.**  **During the year 2000, plaintiff worked at numerous jobs**. In 2000, while living

with her fiancé, plaintiff held five different jobs: at Aviculture Breeding and Research Center,

Southeast Employee Management Company, The Club at Mar-a-Lago, Oasis Outsourcing, and

Neiman Marcus. EXHIBIT R. Her taxable earnings that year totaled nearly $9,000. *Id.* Plaintiff

cannot now recall either the Southeast Employee Management Company or the Oasis

Outsourcing jobs. EXHIBIT Q at 470-471.

     **40.**  **Plaintiff's employment at the Mar-a-Lago spa began in fall 2000.** Plaintiff's

father, Sky Roberts, was hired as a maintenance worker at the The Mar-a-Lago Club in Palm

Beach, Florida, beginning on April 11, 2000. EXHIBIT S. Mr. Roberts worked there year-round

for approximately 3 years. *Id.*; EXHIBIT T at 72-73. After working there for a period of time, Mr.

Roberts became acquainted with the head of the spa area and recommended plaintiff for a job

there. *Id.* at 72. Mar-a-Lago closes every Mother's Day and reopens on November 1. EXHIBIT U

at Mar-a-Lago0212. Most of employees Mar-a-Lago, including all employees of the spa area

such as "spa attendants," are "seasonal" and work only when the club is open, i.e., between November 1 and Mother's Day. EXHIBIT T at 72-73; EXHIBIT U at MAR-A-LAGO 0212; EXHIBIT V. Plaintiff was hired as a "seasonal" spa attendant to work at the Mar-a-Lago Club in the fall of 2000 after she had turned 17.

41. **Plaintiff represented herself as a masseuse for Jeffrey Epstein.** While working at the Mar-a-Lago spa and reading a library book about massage, plaintiff met Ms. Maxwell. Plaintiff thereafter told her father that she got a job working for Jeffrey Epstein as a masseuse. EXHIBIT T at 79. Plaintiff's father took her to Epstein's house on one occasion around that time, and Epstein came outside and introduced himself to Mr. Roberts. *Id.* at 82-83. Plaintiff commenced employment as a traveling masseuse for Mr. Epstein. Plaintiff was excited about her job as a masseuse, about traveling with him and about meeting famous people. EXHIBIT L at 56; EXHIBIT P at 126. Plaintiff represented that she was employed as a masseuse beginning in January 2001. EXHIBIT M; EXHIBIT N. Plaintiff never mentioned Ms. Maxwell to her then-fiancé, Austrich. EXHIBIT L at 74. Plaintiff's father never met Ms. Maxwell. EXHIBIT T at 85.

42. **Plaintiff resumed her relationship with convicted felon Anthony Figueroa.** In spring 2001, while living with Austich, plaintiff lied to and cheated on him with her high school boyfriend, Anthony Figueroa. EXHIBIT L at 68, 72. Plaintiff and Austrich thereafter broke up, and Figueroa moved into the Bent Oak apartment with plaintiff. EXHIBIT L at 20; EXHIBIT P at 28. When Austrich returned to the Bent Oak apartment to check on his pets and retrieve his belongings, Figueroa in Plaintiff's presence punched Austrich in the face. EXHIBIT X; EXHIBIT L at 38-45. Figueroa and plaintiff fled the scene before police arrived. EXHIBIT X. Figueroa was then a convicted felon and a drug abuser on probation for possession of a controlled substance. EXHIBIT Y.

43.     **Plaintiff freely and voluntarily contacted the police to come to her aid in 2001**
**and 2002 but never reported to them that she was Epstein's "sex slave."** In August 2001 at
age 17, while living in the same apartment, plaintiff and Figueroa hosted a party with a number
of guests.  EXHIBIT Z.  During the party, according to plaintiff, someone entered plaintiff's room
and stole $500 from her shirt pocket.  *Id.*  Plaintiff contacted the police. She met and spoke with
police officers regarding the incident and filed a report.  She did not disclose to the officer that
she was a "sex slave."  A second time, in June 2002, plaintiff contacted the police to report that
her former landlord had left her belongings by the roadside and had lit her mattress on fire.
EXHIBIT AA. Again, plaintiff met and spoke with the law enforcement officers but did not
complain that she was the victim of any sexual trafficking or abuse or that she was then being
held as a "sex slave."  *Id.*

44.     **From August 2001 until September 2002, Epstein and Maxwell were almost**
**entirely absent from Florida on documented travel unaccompanied by Plaintiff.** Flight logs
maintained by Epstein's private pilot Dave Rodgers evidence the substantial number of trips
away from Florida that Epstein and Maxwell took, <u>unaccompanied by Plaintiff</u>, between August
2001 and September 2002. EXHIBIT BB. Rodgers maintained a log of all flights on which Epstein
and Maxwell traveled with him.  EXHIBIT CC at 6-15.  Epstein additionally traveled with another
pilot who did not keep such logs and he also occasionally traveled via commercial flights. *Id.* at
99-100, 103. For substantially all of thirteen months of the twenty-two months (from November
2000 until September 2002) that Plaintiff lived in Palm Beach and knew Epstein, Epstein was
traveling outside of Florida unaccompanied by Plaintiff. EXHIBIT BB. During this same period of
time, Plaintiff was employed at various jobs, enrolled in school, and living with her boyfriend.

45. **Plaintiff and Figueroa shared a vehicle during 2001 and 2002.** Plaintiff and Figueroa shared a '93 white Pontiac in 2001 and 2002. EXHIBIT P at 67; EXHIBIT EE. Plaintiff freely traveled around the Palm Beach area in that vehicle. *Id.* In August 2002, Plaintiff acquired a Dodge Dakota pickup truck from her father. EXHIBIT P at 67-68. Figueroa used that vehicle in a series of crimes before and after Plaintiff left for Thailand. *Id.;* EXHIBIT FF.

46. **Plaintiff held a number of jobs in 2001 and 2002**. During 2001 and 2002, plaintiff was gainfully employed at several jobs. She worked as a waitress at Mannino's Restaurant, at TGIFriday's restaurant (aka CCI of Royal Palm Inc.), and at Roadhouse Grill. EXHIBIT R. She also was employed at Courtyard Animal Hospital (aka Marc Pinkwasser DVM). *Id.*; EXHIBIT W.

47. **In September 2002, Plaintiff traveled to Thailand to receive massage training and while there, met her future husband and eloped with him.** Plaintiff traveled to Thailand in September 2002 to receive formal training as a masseuse. Figueroa drove her to the airport. While there, she initially contacted Figueroa frequently, incurring a phone bill of $4,000. EXHIBIT P at 35. She met Robert Giuffre while in Thailand and decided to marry him. She thereafter ceased all contact with Figueroa from October 2002 until two days before Mr. Figueroa's deposition in this matter in May 2016. *Id.* at 29, 37.

48. **Detective Recarey's investigation of Epstein failed to uncover any evidence that Ms. Maxwell was involved in sexual abuse of minors, sexual trafficking or production or possession of child pornography.** Joseph Recarey served as the lead detective from the Palm Beach Police Department charged with investigating Jeffrey Epstein. EXHIBIT GG at 10. That investigation commenced in 2005. *Id.* Recarey worked only on the Epstein case for an entire year. *Id.* at 274. He reviewed previous officers' reports and interviews, conducted numerous interviews of witnesses and alleged victims himself, reviewed surveillance footage of the Epstein

44

home, participated in and had knowledge of the search warrant executed on the Epstein home, and testified regarding the case before the Florida state grand jury against Epstein. *Id.* at 212-15. Detective Recarey's investigation revealed that not one of the alleged Epstein victims ever mentioned Ms. Maxwell's name and she was never considered a suspect by the government. *Id.* at 10-11, 177, 180-82, 187-96, 241-42, 278. None of Epstein's alleged victims said they had seen Ms. Maxwell at Epstein's house, nor said they had been "recruited by her," nor paid any money by her, nor told what to wear or how to act by her. *Id.* Indeed, none of Epstein's alleged victims ever reported to the government they had met or spoken to Ms. Maxwell. *Id.* Maxwell was not seen coming or going from the house during the law enforcement surveillance of Epstein's home. *Id.* at 214-215. The arrest warrant did not mention Ms. Maxwell and her name was never mentioned before the grand jury. *Id.* at 203, 211. No property belonging to Maxwell, including "sex toys" or "child pornography," was seized from Epstein's home during execution of the search warrant. *Id.* at 257. Detective Recarey, when asked to describe "everything that you believe you know about Ghislaine Maxwell's sexual trafficking conduct," replied, "I don't." *Id.* at 278. He confirmed he has no knowledge about Ms. Maxwell sexually trafficking anybody. *Id.* at 278-79. Detective Recarey also has no knowledge of Plaintiff's conduct that is subject of this lawsuit. *Id.* at 259-60.

49. **No nude photograph of Plaintiff was displayed in Epstein's home.** Epstein's housekeeper, Juan Alessi, "never saw any photographs of Virginia Roberts in Mr. Epstein's house." EXHIBIT HH at ¶ 17. Detective Recarey entered Epstein's home in 2002 to install security cameras to catch a thief and did not observe any "child pornography" within the home, including on Epstein's desk in his office. EXHIBIT GG at 289-90.

50.   **Plaintiff intentionally destroyed her "journal" and "dream journal" regarding her "memories" of this case in 2013 while represented by counsel.** Plaintiff drafted a "journal" describing individuals to whom she claims she was sexually trafficked as well as her memories and thoughts about her experiences with Epstein. EXHIBIT II at 64-65, 194; EXHIBIT N at 205-08.  In 2013, she and her husband created a bonfire in her backyard in Florida and burned the journal together with other documents in her possession. *Id.* Plaintiff also kept a "dream journal" regarding her thoughts and memories that she possessed in January 2016. EXHIBIT II at 194-96.  To date, Plaintiff cannot locate the "dream journal."  *Id.*[31]

51.   **Plaintiff publicly peddled her story beginning in 2011.**  Plaintiff granted journalist Sharon Churcher extensive interviews that resulted in seven (7) widely distributed articles from March 2011 through January 2015.  Churcher regularly communicated with plaintiff and her "attorneys or other agents" from "early 2011" to "the present day." *See* Doc.216 ¶¶ 2-11 and referenced exhibits; Doc.261-1 to 216-8, incorporated by reference. Plaintiff received approximately $160,000 for her stories and pictures that were published by many news organizations. EXHIBIT N at 247-48.

52.   **Plaintiff drafted a 144-page purportedly autobiographical book manuscript in 2011 which she actively sought to publish.**  In 2011, contemporaneous with her Churcher interviews, plaintiff drafted a book manuscript which purported to document plaintiff's experiences as a teenager in Florida, including her interactions with Epstein and Maxwell. EXHIBIT KK.  Plaintiff communicated with literary agents, ghost writers and potential independent publishers in an effort to get her book published.  She generated marketing materials

---

[31] Defendant has moved for sanctions against plaintiff premised on her admitted destruction of this evidence.  Doc.509-510.

and circulated those along with book chapters to numerous individuals associated with
publishing and the media.

53.  **Plaintiff's publicly filed "lurid" CVRA pleadings initiated a media frenzy and
generated highly publicized litigation between her lawyers and Alan Dershowitz.**  On
December 30, 2014, plaintiff, through counsel, publicly filed a joinder motion that contained her
"lurid allegations" about Ms. Maxwell and many others, including Alan Dershowitz, Prince
Andrew, Jean-Luc Brunel.  The joinder motion was followed by a "corrected" motion (EXHIBIT
D) and two further declarations in January and February 2015, which repeated many of
plaintiff's claims.  These CVRA pleadings generated a media maelstrom and spawned highly
publicized litigation between plaintiff's lawyers, Edwards and Cassell, and Alan Dershowitz.
After plaintiff publicly alleged Mr. Dershowitz of sexual misconduct, Mr. Dershowitz vigorously
defended himself in the media.  He called plaintiff a liar and accused her lawyers of unethical
conduct.  In response, attorneys Edwards and Cassell sued Dershowitz who counterclaimed.
This litigation, in turn, caused additional media attention by national and international media
organizations. *See* Doc.363 at 363-1 through 363-14.

54.  **Plaintiff formed non-profit Victims Refuse Silence to attract publicity and
speak out on a public controversy.**  In 2014, plaintiff, with the assistance of the same counsel,
formed a non-profit organization, Victims Refuse Silence.  According to plaintiff, the purpose of
the organization is to promote plaintiff's professed cause against sex slavery.  The stated goal of
her organization is to help survivors surmount the shame, silence, and intimidation typically
experienced by victims of sexual abuse. EXHIBIT LL. Plaintiff attempts to promote Victims
Refuse Silence at every opportunity.  EXHIBIT MM at 17-18. For example, plaintiff participated

47

in an interview in New York with ABC to promote the charity and to get her mission out to the public. *Id.* at 28.

### B. Plaintiff carries the burden of proving actual malice by clear and convincing evidence.

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), the Supreme Court recognized that our country has made a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." The overriding importance of that commitment led to the Court's holding that "neither factual error nor defamatory content, nor a combination of the two, sufficed to remove the First Amendment shield," *Bartnicki v. Vopper*, 532 U.S. 514, 535 (2001), from speech relating to public officials and public figures. *See, e.g.*, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974). Under the First Amendment of the Constitution and Article I, Section 8, of the New York Constitution, in defamation actions by public officials and public figures and in defamation actions concerning matters of public concern, the plaintiff must prove that the allegedly defamatory statement was made with "actual malice." *See, e.g.*, *id.*; *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776-77 (1986); *Huggins v. Moore*, 726 N.E.2d 456, 460 (N.Y. 1999); *McGill v. Parker*, 582 N.Y.S.2d 91, 97 (App. Div. 1992).

As the Supreme Court has noted, the term "actual malice" can be confusing because in the First Amendment context "it has nothing to do with bad motive or ill will." *Harte-Hanks Communic'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 n.7 (1989). Instead proof of actual malice requires evidence that the publication contains a "material"[32] false statement of fact that was made "with knowledge that the statement was false or with reckless disregard as to whether or

---

[32]*Air Wisconsin Airlines Corp. v. Hoeper*, 134 S. Ct. 852, 861 (2014) ("minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified") (internal quotations and brackets omitted).

not it was true." *Id.* at 667 (internal quotations omitted). Reckless disregard means the defendant made the false publication "with a high degree of awareness of probable falsity" or "entertained serious doubts as to the truth of [the] publication." *Id.* (internal quotations omitted).

In a defamation action, a plaintiff will be required to prove actual malice in two different and independent contexts: a defamation action in which the plaintiff is a public figure, and a defamation action in which the defendant asserts the privilege of reply.

The defamation plaintiff at trial and in summary judgment proceedings must prove her case by clear and convincing evidence.

### C. Plaintiff is a public figure who must prove actual malice.

Public figures include those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. . . . [T]hey invite attention and comment." *Gertz,* 418 U.S. at 345. The essential element for a finding that a person is a public figure is that she has "taken an affirmative step to attract public attention," has "strived to achieve a measure of public acclaim." *James v. Gannett Co.*, 353 N.E.2d 834, 876 (N.Y. 1976).

In *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), the United States Supreme Court held that, in cases involving public officials, the interests of an individual are trumped by society's interest in promoting free press discussion of matters of general concern. *Biro v. Condé Naste,* 963 F. Supp. 2d 255, 269 (S.D.N.Y. 2013). Thus, the Court held that a public official alleging defamation must establish that a falsehood has been published with "actual malice." *Sullivan*, 376 U.S. at 279-80; accord, *Lerman v. Flynt Dist. Co.*, *Inc.,* 745 F.3d 123, 136 (2d Cir. 1984); *Biro*, 963 F. Supp. 2d at 269. Subsequently, the Supreme Court extended this standard to all public figures*, Curtis Publ'g Co. v. Butts,* 388 U.S. 130 (1967), and decided in *Gertz v. Robert Welch, Inc*., 418 U.S. 323 (1974), that individuals that "are not public figures for all purposes

may still be public figures with respect to a particular controversy." *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988).

As the Second Circuit has observed, the reason for distinguishing between private and public figures in defamation claims flows from the recognition of two things: First, "that private figure are more vulnerable to injury from defamation, because public figures have greater access to the media and thus are in a better position to contradict a lie or correct an error." *Contemporary Mission, Inc.*, 842 F.2d at 619-20. Second, "**and more important,** public figures generally 'have voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Id.* at 620 (quoting *N.Y. Times,* 418 U.S. at 344-45) (emphasis added).

In the Second Circuit, to establish that a plaintiff is a limited purpose public figure, a defendant must prove that she:

1. successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation;
2. voluntarily injected [her]self into a public controversy related to the subject of the litigation;
3. assumed a position of prominence in the public controversy; and
4. maintained regular and continuing access to the media.

*Lerman,* 745 F.2d at 136-37; *accord*, *Contemporary Mission, Inc.*, 842 F.2d at 617; *Biro,* 963 F. Supp. 2d at 270. Statements regarding a limited purpose public figure are subject to enhanced protection only if relevant to the public figure's involvement in a given controversy. *Biro*, 963 F. Supp.2d at 270-71 (citing *Faigin v. Kelly*, 978 F. Supp. 420, 426 (D. N.H. 1997)). "Yet, once a plaintiff is deemed a limited purpose public figure, courts allow the heightened protections to sweep broadly, covering all statements by defendants that are not 'wholly unrelated to the controversy.'" *Biro,* 963 F. Supp. 2d at 271 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 626

50

F.2d 1287, 1298 (D.C. Cir. 1980)). The law requires only that "the statement need be no more than generally related to a dispute in issue to qualify for protection." Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* ("SACK ON DEFAMATION") § 5:3.3 (4th ed. 2015).

The question whether a plaintiff is a public figure is a question of law for the court to decide. *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176-77 (2d Cir. 2000); *accord Biro*, 963 F. Supp. 2d at 270.

### 1. Plaintiff successfully invited public attention to influence others.

The record amply demonstrates that plaintiff invited public attention to herself and her views regarding the Plaintiff's alleged desire to draw attention to the issue of her purported sex slavery.

Beginning in at least 2011, the Plaintiff met with Sharon Churcher to promote her cause and economic interests. According to Ms. Churcher, the Plaintiff granted Ms. Churcher extensive interviews that resulted in 7 widely distributed articles from March 2011 through January 2015. According to Ms. Churcher, she regularly communicated with the Plaintiff and her "attorneys or other agents" from "early 2011" to "the present day." *See* Doc.216 ¶¶ 2-11 and referenced exhibits; Docs.261-1 to 216-8, incorporated by reference. Plaintiff was amply compensated for this "public attention" and received approximately $160,000 for her stories. and pictures that were published by many news organizations. EXHIBIT N at 247-248. Plaintiff had a contract with the news organizations, The Mail on Sunday.

Plaintiff, in addition to selling this story to the media, again thrust herself into the public's attention when she sought to join the ongoing CVRA litigation against Jeffrey Epstein in the United States District Court in Florida. The Plaintiff, through the same lawyers in this matter, publicly filed a joinder motion that was the equivalent of a press release. The unnecessary and

51

lurid allegations were ultimately stricken by the Court but accomplished the desired result for the

Plaintiff, more public attention. The CVRA pleading created a media frenzy and spawned highly

publicized litigation between Plaintiff's lawyers, Edwards and Cassell, and Alan Dershowitz.

After the Plaintiff publicly alleged Mr. Dershowitz of sexual misconduct, Mr. Dershowitz

vigorously defended himself in the media. He called the Plaintiff a liar and accused her lawyers

of unethical conduct. In response, the lawyers, Edwards and Cassell, sued Dershowitz who

counterclaimed. This litigation, in turn, caused additional media attention by national and

international media organizations. *See* Doc.363 at 363-1 thorough 363-14 and accompanying

exhibits.

In addition, plaintiff claims to have established a non-profit organization, Victims Refuse

Silence, the purpose of which was to promote plaintiff's professed cause against sex slavery.

In paragraphs 23 through 26 of her complaint in this matter she makes the following

admissions on this issue:

- Ultimately, as a mother and one of Epstein's many victims, Giuffre believed that she should speak out about her sexual abuse experiences in hopes of helping others who had also suffered from sexual trafficking and abuse. *Id.* 23

- On December 23, 2014, Giuffre incorporated an organization called Victims Refuse Silence, Inc., a Florida not-for-profit corporation. *Id.* 24

- Giuffre intended Victims Refuse Silence to change and improve the fight against sexual abuse and human trafficking. The goal of her organization was, and continues to be, to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse. Giuffre has now dedicated her professional life to helping victims of sex trafficking. *Id.* 25

- On December 30, 2014, Giuffre moved to join the on-going litigation previously filed by Jane Doe 1 in the Southern District of Florida challenging Epstein's non-prosecution agreement by filing her own joinder motion. *Id.* 26

In sum, the record includes ample evidence of plaintiff's efforts to garner public attention in order to influence others and the success of those efforts.

### 2. Plaintiff voluntarily injected herself into public controversies related to the subject of this litigation.

The second prong of the *Lerman* test requires an examination of whether plaintiff voluntarily injected herself into a public controversy related to the subject of the litigation. The Second Circuit has held that the term should be defined broadly to mean "any topic upon which sizeable segments of society have different, strongly held views." *Lerman*, 745 F.2d at 138; *see also Biro,* 963 F. Supp. 2d at 272 ("A public controversy is simply 'any topic upon which sizeable segments of society have different, strongly held views,' even if the topic does 'not involve political debate or criticism of public officials.'") (quoting *Lerman*, 745 F.2d at 138) (alteration omitted). The public controversy requirement, however, is not necessarily limited to what would be considered "a classic debate." SACK ON DEFAMATION § 5:3.11[B]. "An investigation into alleged corruption or drug dealing, for example, could meet the test." *Id.*

As demonstrated by the Declaration of Ms. Churcher, the articles attached to the declaration, and the joinder motion filed by plaintiff in the CVRA litigation and the litigation initiated by her lawyers there can be no doubt that the plaintiff's actions were voluntary and that she injected herself into this "public controversy." Indeed, it is clear that plaintiff created this "public controversy."

### 3. Plaintiff assumed a position of prominence in the public controversies.

The third relevant factor focuses on whether plaintiff has voluntarily assumed a sufficient degree of prominence in the controversies at issue. Plaintiff sold and published her story. She publicly sought to join the CVRA litigation. She established a non-profit organization, the

mission of which is purportedly to "spread the word for victims of human trafficking". EXHIBIT MM at 17; *see also* EXHIBIT LL.

According to Brittany Henderson, the Rule 30(b)(6) designee of VRS, plaintiff has "continued to try to promote Victims Refuse Silence at every possible chance she gets …" EXHIBIT MM at 17-18. Plaintiff participated in an interview in New York with ABC in "the beginning of 2015," *id.* at 27, so that she could "promote the charity, so that she could start getting her mission out to the public." *Id.* at 28. Having affirmatively injected herself into the public spotlight in connection with these issues, plaintiff cannot now be heard to argue that this *Lerman* factor has not been satisfied. *Cf. Contemporary Mission*, 842 F.2d at 618-19 (finding the plaintiffs' assertion that they have assumed a private life was "belied by the fact that they continued to thrust themselves into the public eye" through their conduct on behalf of a non-for-profit organization).

### 4. Plaintiff has maintained regular and continuing access to the media.

Plaintiff has had substantial access to the media. Ms. Churcher has answered every call or email sent by plaintiff. Plaintiff's lawyers have regularly communicated with the media. Plaintiff and her lawyers have been interviewed by numerous major media organizations.

Accordingly, the First Amendment requires that public figures like plaintiff claiming defamation must establish actual malice—actual and material falsity or a high degree of awareness of probable falsity—by clear and convincing evidence. *E.g.*, *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991).

### D. Plaintiff must also prove actual malice to overcome the defenses of reply and pre-litigation privilege.

The qualified privilege of reply to a defamatory attack is a complete defense to a claim of defamation. *Shenkman v. O'Malley*, 157 N.Y.S.2d 290, 294, 297 (App. Div. 1956). The defense

is available to a person "who has been defamed in the first instance," here, Ms. Maxwell, and

"who, in response to the attack, responds in kind." *Id.* The privilege of the initially-attacked

person (Ms. Maxwell) includes in rebuttal of the initial attack the right to speak the truth, but the

right to rebut is not confined to the truth or to mere denial:

> This defense of reply is material, of course, only where the response in kind is defamatory. The injury, if any, to plaintiff is excused, because it is the plaintiff who started the altercation. . . .

> It is a contradiction in terms to say that the one attacked is a privileged only to speak the truth, and not to make a counter attack, or that legitimate self-defense consists only in a denial of the charge or a statement of what is claimed to be the truth respecting its subject-matter.

*Id.* (emphasis supplied; quoting *Collier v. Postum Cereal Co.*, 134 N.Y.S. 847, 853 (1st Dep't

1912)); *see generally Restatement of the Law of Torts* (Second) § 594 cmt. k (1977) (noting that

to protect her reputation from attack by another person, she is conditionally privileged to publish

defamatory matter about her attacker reasonably believed necessary to defend her reputation,

"including the statement that [her] accuser is an unmitigated liar").

A defendant asserting the defense of reply need only establish she has been attacked with

a defamatory statement. *See id.* at 297. Beginning no later than 2009 plaintiff attacked

Ms. Maxwell with defamatory statements. In 2014, plaintiff knew the press was giving extensive

coverage to, and scrutinizing all filings in, the Crime Victim's Rights Act case pending in the

United States District Court for the Southern District of Florida and in plaintiff's 2009 civil

action against Mr. Epstein. Knowing this, plaintiff repeatedly filed papers in court alleging that

Ms. Maxwell participated as a "recruiter" in a "sex trafficking" scheme operated by Mr. Epstein.

*E.g.,* Exhibit D. In 2011, plaintiff granted "exclusive" interviews to the British tabloid press

during which she repeated her false allegations against Ms. Maxwell and also alleged that as part

of the "sex trafficking" scheme she had sex with numerous prominent public figures, including

Prince Andrew and Harvard law professor Alan Dershowitz. Exhibit A. The false allegations against Ms. Maxwell constituted defamation *per se*.

A plaintiff may defeat a qualified privilege only by proving actual malice. *See, e.g.*, *Kane v. Orange Cnty. Publ'ns*, 649 N.Y.S.2d 23, 26 (App. Div. 1996) (qualified privilege of reply); *see generally Gertz*, 418 U.S. at 323; *Restatement (Second) of Torts*, *supra*, § 594 cmt. b.

### E. The January 2015 statement was substantially true, and plaintiff cannot produce clear and convincing evidence of its falsity.

The January 2015 statement accurately and properly denies the factual assertions regarding Ms. Maxwell contained within plaintiff's joinder motion that had been issued two days prior to which it responded. With respect to each claim in the joinder motion that concerns Ms. Maxwell, the evidence elicited through discovery undercuts any evidence – clear and convincing or otherwise – that plaintiff may proffer to buttress her false allegations.

### 1. The January 2015 statement accurately denied that Ms. Maxwell met Plaintiff when Plaintiff was 15 years old in 1999.

Plaintiff's relative youth at the time of her initial contact with Epstein and Maxwell forms the core of Plaintiff's story, in her joinder motion and in the press, that she was an underage victim of sexual slavery. Plaintiff has made a point of mentioning her age of 15, in the year 1999, as the starting point for her "four years" of "sex slavery" at every opportunity. The young age no doubt heightens the offensiveness of the claimed abusive conduct and also supplies enough time to allow for the "thousands" of times she was purportedly abused and the numerous opportunities for her to be trafficked to countless famous individuals. Reiterating this point in the joinder motion, plaintiff asserted again that she met Ms. Maxwell in the year 1999 when she was a mere 15 years old. Exhibit D at 3.

As she now admits and her employment records confirm, plaintiff did not actually meet Ms. Maxwell or Epstein until the year 2000. Plaintiff acknowledges that she did not meet Ms.

56

Maxwell until she worked at the Mar-A-Lago as a spa attendant, and she confirms that she

obtained that job with the assistance of her father who already was employed as a maintenance

worker at the club. Records subpoenaed from Mar-A-Lago reflect that plaintiff's father

commenced employment on April 11, 2000. EXHIBIT S. Additionally, they show that plaintiff

terminated in the year 2000. *Id.* Finally, plaintiff's social security report confirms plaintiff's

Mar-a-lago employment was confined to calendar year 2000. EXHIBIT R. Faced with

overwhelming proof that her claims of meeting Ms. Maxwell at the age of 15 in the year 1999

were false, plaintiff finally conceded as much at her deposition on May 3, 2016. EXHIBIT N at 25-

28. She also confessed that she did not spend her "sweet 16th" birthday with Ms. Maxwell, as

detailed in her book manuscript and in the press. *Compare* EXHIBIT N at 101-02 *with* EXHIBIT

KK at Giuffre04173 ("I spent my sweet 16th birthday on his island in the Caribbean next to 'St.

James Isle' he liked to call it 'Little St. Jeff's', his ego was as enormous as his appetite for

fornicating. I was given a birthday cake and a new collection of designer make-up from London.

Ghislaine made a joke after I blew out my array of candles and said, 'I'd be soon getting too old

for Jeffrey's taste, and soon they'd have to trade me in.'"); Paul Lewis, "Jeffrey Epstein:  Inside

the Decade of Scandal Entangling Prince Andrew," The Guardian (Jan. 10, 2015)[33].

Yet, even after conceding she was off by a year, plaintiff persists in suggesting that she

must have been a mere "16 year old" when she worked at Mar-a-Lago and met Ms. Maxwell. It

was, she testified, a "summer job" for which she had taken a break from school, and she did not

turn 17 until later that summer on August 9, 2000. EXHIBIT N at 25-28, 57,104, 113.  But the

Mar-a-Lago documents conclusively disprove this claim: the spa where plaintiff worked closes

every year from Mother's Day until November 1. EXHIBIT U at Mar-a-Lago0212 ("The club

---

[33] https://www.theguardian.com/world/2015/jan/10/jeffrey-epstein-decade-scandal-prince-andrew (last visited Jan. 6, 2017).

never shuts down from November 1 to Mother's Day."). Spa attendants such as plaintiff are "seasonal" employees. *Id.* Indeed, the spa advertises for its new employees in local newspapers in the fall of every year. EXHIBIT V. Even plaintiff's father – a long time employee of Mar-a-Lago -- described the seasonal nature of the club during his deposition: "[Plaintiff's employment] was probably for a season because Mar-a-Lago is seasonal. I mean, I was there year round but a lot of people are seasonal, you know, because it's like snowbirds, you know, summertime comes and nobody wants to be down in south Florida….[The season is] probably from September or October to, you know, maybe May, I guess." EXHIBIT T at 72. With the spa closed from Mother's Day to November 1, plaintiff could not have had a "summer job" and could not have worked at Mar-a-Lago until November 2000, at the earliest, when she was over 17 years old.

In sum, Plaintiff's claim in the Joinder Motion that she met Ghislaine Maxwell in 1999 when she was 15 years old is a false statement. Therefore, the January 2015 statement calls the allegations against her "untrue" was factually accurate.

### 2. The January 2015 statement accurately denied that Ms. Maxwell "regularly participate[d] in Epstein's sexual exploitation of minors" and that "the Government knows" such fact.

The January 2015 statement also accurately denied plaintiff's joinder motion allegation that "it became known to the government that Maxwell herself regularly participated in Epstein's sexual exploitation of minors, including Jane Doe #3." EXHIBIT D at 3. Ms. Maxwell did not "regularly participate in in Epstein's sexual exploitation of minors" as confirmed by the lead Palm Beach Detective, Joseph Recarey. Det. Recarey confirmed that none of the alleged Epstein victims ever mentioned Ms. Maxwell's name, either in reports he reviewed or in interviews he conducted. None of the alleged victims said they had been "recruited," paid or exploited by Ms. Maxwell. EXHIBIT GG at 10-11, 177, 180-82, 187-96, 241-42, 278. He verified that the twenty-

two page Palm Beach Police Department affidavit does not mention Ms. Maxwell's name once (*id.* at 177), and she was never considered a suspect and she was never mentioned in the grand jury testimony. *Id.* at 203. Ms. Maxwell was not seen coming or going from the house during any of the Palm Beach Police Department's surveillance of Epstein's home. *Id. at* 214-15. None of her property was seized from Epstein's home. *Id.* at 257. In sum, Det. Recarey denied that knowing anything "about Ghislaine Maxwell's sexual trafficking conduct." *Id.* at 278. He confirmed he has no knowledge that Ms. Maxwell sexually trafficking "anybody." *Id.* at 278-79. Likewise, he has no knowledge of Plaintiff's conduct that is subject of this lawsuit. *Id.* at 259-60. Plaintiff thus has uncovered no evidence that the "government" came to "know" that Maxwell participated in sexual exploitation of Jane Doe #3, i.e., Plaintiff. Plaintiff has not and cannot present clear and convincing evidence to demonstrate the falsity of Ms. Maxwell's denial.

### 3. The January 2015 statement accurately denied that "with [Ms. Maxwell's] assistance, [Epstein] converted [Plaintiff] into what is commonly referred to as a 'sex slave.'"

Plaintiff claimed in the joinder motion that Ms. Maxwell helped Epstein transform her into a "sex slave" as that term is "commonly" used, yet the incontrovertible evidence establishes the opposite. A "slave" as defined by Merriam-Webster is a "person held in servitude as the chattel of another." Oxford Dictionary defines "slave" as a "person who is the legal property of another and is forced to obey them." Common definitions of "sex slave" include a person who is underlined and is raped, sexually abused or prostituted. *See* "Sex Slave," Free Dictionary, located at http://www.thefreedictionary.com/sex+slave (last visited Jan. 5, 2017) (underlining supplied). Plaintiff, however, was far from confined or the legal property of another.

Throughout 2000, 2001 and 2002, Plaintiff enjoyed complete freedom of movement and choice. She had a car and then a pickup truck she shared with Figueroa. EXHIBIT P at 67.. She traveled freely to and from multiple jobs working as a waitress, bird aviaries, veterinarian

59

hospital, Neiman Marcus, Oasis Outsourcing and Southeast Employee Management Company.

EXHIBIT R. Plaintiff enrolled in school in June 2000 before she met Maxwell or Epstein and

continued her enrollment throughout 2000, 2001 and until March 2002. EXHIBIT O. She worked

at multiple restaurants and the animal hospital in 2002. EXHIBIT R. She came and went from her

apartment, moved to a new apartment and then moved in with Figueroa's family. She held

parties at her apartment with Figueroa and other friends. EXHIBIT Z. When something did not go

well, she called the police and filed police reports, without mentioning anything about captivity,

confinement or forced sexual exploitation or trafficking, much less "sex slavery." *Id.* and

EXHIBIT AA. She had her own money, paid her rent, and bought a vehicle. To Figueroa, she

seemed "excited" about meeting famous people and discussed it so much that he tuned it out.

EXHIBIT P at 125-26. By any commonly understood definition of sex slavery, Plaintiff did not

match the description.

　　Witness testimony and documentary evidence demonstrate the absence of substantial

truth to Plaintiff's claim that Maxwell assisted Epstein in converting her into what is commonly

referred to as a "sex slave." The January 2015 statement's denial of that claim cannot therefore

be defamatory.

### 4.　The January 2015 statement accurately reported that Plaintiff alleged "sexual relations" with Professor Dershowitz which he denied.

　　The January 2015 statement accurately reports that "now it is alleged that Alan

Derschowitz [sic] is involved in having sexual relations with [Plaintiff], which he denies." The

joinder motion made such a claim and Professor Dershowitz publicly and vehemently denied any

such sexual contact. *See, e.g.*, Dershowitz Denies Sex Charge, JTA (Jan. 2, 2015) ("Dershowitz

declared 'totally, unequivocally and completely false' allegations that he had sex with the former

staffer for investor Jeffrey Epstein.").[34]

Professor Dershowitz has gone beyond a simple denial: he has sworn, repeatedly and in

almost every conceivable forum, including the New York Times, the Wall Street Journal, and

Good Morning America, that he never had any sexual contact with Plaintiff and never met her.

As he set forth in this case in his Declaration in Support of Motion to Intervene, Plaintiff never

mentioned his name during her weeklong 2011 interview with journalist Sharon Churcher.

Doc.363. It was only after Churcher suggested to Plaintiff that she "must have" met Dershowitz

because "we all know he's a pedo, though we have no proof of that" that Plaintiff then included

Dershowitz in her book manuscript, not as a perpetrator of hers, but as someone she had "met"

while with Epstein. *Id.* The CVRA joinder motion more than three years later was the first time

plaintiff publicized her remarkable claim that she had been sexually trafficked to Dershowitz on

"numerous occasions" "while she was a minor," in Florida, private planes, in New York, New

Mexico, and the U.S. Virgin Islands. EXHIBIT D.

Dershowitz, in his own subsequent defamation action against plaintiff's attorneys

Edwards and Cassell, produced approximately 10,000 pages of documents capturing his travels

during the 1999-2002 timeframe, none of which coincided with Plaintiff's story. For example,

Dershowitz demonstrated that the only time he visited Epstein's home in the U.S. Virgin Islands

he was accompanied by his wife and his 12 year old daughter. Plaintiff, on the other hand,

produced no records demonstrating that any portion of her allegation against him is true. For

example, she claimed one sexual encounter occurred on a private plane on which she traveled

---

[34]http://www.jta.org/2015/01/02/news-opinion/united-states/dershowitz-denies-lawsuits-sex-charges?utm_source=twitterfeed&utm_medium=twitter&utm_campaign=jtafeed (last visited Jan. 5, 2017).

with Professor Dershowitz. EXHIBIT II at 85. None of the flight logs reveal a flight with the two

of them as passengers. EXHIBIT BB. Another time, plaintiff claims, she and Epstein flew together

to Boston and she engaged in sexual relations with Professor Dershowitz in the backseat of a

limousine between the airport and his home with another female and Epstein next to them.

EXHIBIT II at 110-15. No flight logs document any trip with Epstein and plaintiff to Boston and

plaintiff cannot recall the other female in the car. EXHIBIT II at 113.

Professor Dershowitz has signed affidavits, provided sworn deposition testimony and

sworn pleadings, offered to take a lie detector test, offered to waive the statute of limitations as

to himself, and given countless broadcast and news interviews disclaiming any sexual contact

with Plaintiff and calling her an outright "liar."[35] The January 2015 statement recounting the

allegation against him and his denial is substantially true.

5. **The January 2015 statement accurately denied that Ms. Maxwell created and distributed child pornography and that the Government knows of and possesses such child pornography.**

Plaintiff's next assertion regarding Maxwell in the joinder motion was that "Maxwell also

took numerous sexually explicit pictures of underage girls involved in sexual activities, including

Jane Doe #3," and that Maxwell "shared these photographs (which constituted child pornography

under applicable federal laws) with Epstein." EXHIBIT D at 4-5. Plaintiff continued: the

"Government is apparently aware of, and in certain instances possesses some of these

photographs." *Id.* Yet again, the evidence demonstrates the falsity of Plaintiff's claim.

Detective Recarey testified that none of Epstein's alleged victims even mentioned Ms.

Maxwell, much less claimed that she had taken naked photographs of them. EXHIBIT GG at 180-

82, 187-96, 241-42, 278. Recarey also denied that any evidence belonging to Ms. Maxwell was

---

[35]Perhaps most telling, Plaintiff and her phalanx of attorneys have never sued
Mr. Dershowitz for his many vociferous attacks on her credibility.

seized from Epstein's home during the execution of the search warrant, which would include any "child pornography" reportedly created by her. *Id.* at 257. Detective Recarey who had entered Epstein's home in 2002 to install security cameras to catch a thief did not observe any "child pornography" within the home, including on Epstein's desk where Plaintiff alleges he kept such a nude photograph of herself. *Id.* at 289-90. And Epstein's housekeeper, Juan Alessi, swore that he "never saw any photographs of Virginia Roberts in Mr. Epstein's house," EXHIBIT HH at ¶ 17, contradicting Plaintiff's claims that nude photographs of her were prominently displayed throughout all of Epstein's homes.

No sexually explicit photographs of Plaintiff were ever produced in discovery in this case or subpoenaed by Plaintiff from any governmental agency. Plaintiff has presented no evidence the government "possesses" any such photographs or indeed ever became "aware of" them.

### 6. January 2015 statement accurately denied Maxwell acted as "madame" for Epstein to traffic Plaintiff to the rich and famous.

Finally, in the joinder motion, Plaintiff asserted that Ms. Maxwell had "facilitated" sexual abuse "by acting as a 'madame' for Epstein, thereby assisting in internationally trafficking Jane Doe #3 (and numerous other young girls) for sexual purposes." Plaintiff has utterly failed to substantiate her allegation.

Not a single "other young girl" made a claim that Maxwell, or even Epstein for that matter, trafficked them to a third-person for commercial sexual acts. Detective Recarey confirmed that he had no knowledge of Ghislaine Maxwell sexually trafficking anyone. EXHIBIT GG at 278-79. He also confirmed that not a single one of the alleged victims of Epstein ever claimed to have any sexual contact with any man other than Epstein, or that they were sent to another location to have sex with another man or to give a massage to another man. *Id.* at 300-02. None of the other alleged victims of Epstein ever claimed to have gone on his plane with him

or to have had sexual acts with him on his plane. *Id.* at 302-04. None claimed they had gone to New York with him and stayed in his residence. *Id.* at 304-05. Plaintiff, it appears, is the only alleged victim of Epstein who claims she was the subject of such trafficking, yet even she has retracted, amended, and withdrawn many of her allegations, thus rendering (by her own admission) such claim substantially untrue.

**Foreign Presidents.** Upon questioning under oath, Plaintiff admitted that she had never even met a "foreign president," much less ever been sexually trafficked to one or to the multiple "foreign president<u>s</u>" referenced in the joinder motion.

Q: The reference there to foreign presidents, do you see that?

A: Yes.

Q: You were sexually trafficked to foreign presidents?

A: No.

Q: So that's not true, you were not sexually trafficked to foreign presidents?

A: I don't know what foreign presidents you're talking about.

Q: Have you ever been sexually trafficked to any foreign president?

[Objection interposed by Ms. McCawley; Special Master overruled]

A: I understand well-known prime ministers and other world leaders; as far as foreign presidents, I'm not too sure, I don't know.

Q: Have you ever met any foreign presidents?

A: Foreign presidents as in overseas?

Q: Sure, okay, overseas.

A: No.

Q: Have you ever met any foreign presidents from countries not overseas such as Canada or Mexico?

A: No.

Q: So you were not sexually trafficked to any foreign presidents, is that correct?

A: As far as I know right now, yes.

Q: It's correct that you were not sexually trafficked to them, right?

A: You've asked me this three times and I'm telling you.

EXHIBIT II at 10-12. Indeed, Plaintiff became frustrated by what she perceived as the third time she was asked the question, each time denying that she had met a foreign president or been sexually trafficked to one, clearly indicating that she understood the question, had answered it in the negative and did not want to be re-asked the question again.[36] Notably, not a single "foreign president" is listed as a witness with knowledge of Plaintiff's claims in her Rule 26 disclosures.

**"Well-known prime minister."** Plaintiff also has failed to establish any evidence to support her fantastical claim that she was sexually trafficked to a "well-known prime minister." When questioned, she refused to disclose the identity of the prime minister, even with the protection of a protective order. EXHIBIT II at 12. She has not produced photographs of her with any well-known prime minister, nor any flight log showing a well-known prime minister on Epstein's airplane. She has not identified herself as being in any location with a well-known prime minister, nor the date of any such encounter. The only evidence that Plaintiff has ever been even in the company of a well-known prime minister is her uncorroborated word.

**"World leaders."** Likewise, when asked about "world leaders" to whom she was trafficked, Plaintiff referred vaguely to someone she was introduced to as a "prince."

Q: Other world leaders, what other world leaders were you sexually trafficked to?
[Objection interposed and overruled by Special Master]
A: Okay. Prince Andrew for one.
Q: Other than Prince Andrew?

---

[36]Plaintiff and her counsel later devised a plan to just outright change these three answers through the errata sheet, claiming that Plaintiff had "misunderstood the question" and she had in fact been trafficked to such a president. EXHIBIT JJ. As her clear answers and frustration at the repeated nature of the questioning demonstrates, however, she had no trouble whatsoever understanding the question at the time.

A: There is another individual that I honestly do not know his name.

Q: What country is he from?

A: I'm not too sure, he spoke in a foreign—he did speak foreign tongue, he spoke English as well, but I'm not too sure where he was from?

Q: How do you know he is a world leader?

A: I was introduced to him as a prince.

…

Q: Did you – where were you when you met him?

A: On this occasion the South of France.

…

Q: Where in the South of France were you?

A: I don't know.

Q: Were you on a boat, were you in a house?

A: We were at a like a cabana, not cabana, like a resort, but it was a big party.

Q: Who was throwing the party?

A: I don't know. I was just brought there.

EXHIBIT II at 15-17. Indeed, this is almost the identical answer that Plaintiff later gave when

questioned about what which "powerful businessmen" she had been sent to have sex with:

Q: Where were you sent to have sex with the owner of a large hotel chain by Ghislaine Maxwell?

A: I believe that was one time in France.

Q: I believe it was around the same time that Naomi Campbell had a birthday party.

A: Where did you have sex with the owner of a large hotel chain in France around the time of Naomi Campbell's birthday party?

A: In his own cabana townhouse thing. It was part of a hotel, but I wouldn't call it a hotel. . . .

EXHIBIT N at 203. In fact, Naomi Campbell's birthday is May 22, 1970. [WIKIPEDIA]. The flight logs do not show plaintiff traveling to France in May 2001 or May 2002. EXHIBIT BB at DR_0046, DR_0056. On May 22, 2002, for example, Epstein was in Russia.

In her joinder motion, Plaintiff made the additional claim that Epstein (not Maxwell) sexually trafficked her to "model scout" Jean Luc Brunel on numerous occasions and in numerous places, including "the South of France." EXHIBIT D at 5-6. The flight logs, however, demonstrate that Plaintiff was never in the "south of France," much less on multiple occasions. The one and only trip reflecting travel by Plaintiff to France was a trip on March 6, 2001 from a fueling stop in Canada to Paris, followed by a departure from Paris on March 8, 2001 to Granada. EXHIBIT BB at DR_000043; EXHIBIT CC at 107. Although there are other flights in which Epstein went to Nice in the south of France, Plaintiff is not on any of them and none are near Naomi Campbell's birthday on May 22.

Plaintiff's claim in her joinder motion about having been trafficked to other "prominent American politicians" and other world leaders have gone unsubstantiated and are patently incredible. Because these men are publicized to have been in the company of Epstein on at least one occasion, such was apparently sufficient for Plaintiff to claim she had been trafficked to them. For example, Plaintiff claimed at her deposition that these powerful men to whom she was trafficked included Marvin Minsky. EXHIBIT N at 204. Dr. Minsky, a world-renowned scholar and long-time professor at MIT, passed away in January 2016 at the age of 88. [37] At the time of his passing, he had been married to his wife, pediatrician Dr. Gloria Rudisch, since 1952 and had three children and four grandchildren. His name appears on one of Epstein's flight logs as having traveled with a large group of individuals, including plaintiff, from New Jersey to Santa Fe on

---

[37] https://www.bostonglobe.com/metro/2016/01/25/marvin-minsky-dies-mit-professor-helped-found-field-artificial-intelligence/A8y6ey8S0QAaao463Z2ooO/story.html

March 29 and returning on March 31, 2001.[38] The other passengers included world-renowned philanthropist Dr. Henry Jarecki, now aged 83, also a long-time husband, famed academic and scholar, and famous philanthropist.[39]

Plaintiff produced no evidence substantiating any of her fantastical claims that she had been trafficked by Epstein, or by Maxwell, to any of these men or any others. No witnesses vouched for seeing plaintiff in the company of politicians George Mitchell or Bill Richardson to whom plaintiff claims she was sent. She produced no photographs of herself with them. She had a journal where she claims she documented their names, but she claims she burned that journal in 2013. In May 2011, plaintiff inquired by email to journalist Sharon Churcher to "remind" her of the famous people to whom she was trafficked. Plaintiff has not supported her claims with clear and convincing evidence and thus, Ms. Maxwell's denials and characterizations of these claims as "obvious lies" is not defamatory as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in favor of Ms. Maxwell.

---

[38] Plaintiff claims, however, that she was trafficked to Dr. Minsky in the U.S. Virgin Islands.

[39] https://en.wikipedia.org/wiki/Henry_Jarecki

68

January 6, 2017.

Respectfully submitted,


/s/ Laura A. Menninger
Laura A. Menninger (LM-1374)
Jeffrey S. Pagliuca (*pro hac vice*)
HADDON, MORGAN AND FOREMAN, P.C.
150 East 10th Avenue
Denver, CO 80203
Phone: 303.831.7364
Fax: 303.832.2628
lmenninger@hmflaw.com

*Attorneys for Defendant Ghislaine Maxwell*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2017, I electronically served this *Memorandum in Support of Defendant's Motion for Summary Judgment* via ECF on the following:

Sigrid S. McCawley
Meredith Schultz
BOIES, SCHILLER & FLEXNER, LLP
401 East Las Olas Boulevard, Ste. 1200
Ft. Lauderdale, FL 33301
smccawley@bsfllp.com
mschultz@bsfllp.com

Bradley J. Edwards
Farmer, Jaffe, Weissing, Edwards, Fistos &
Lehrman, P.L.
425 North Andrews Ave., Ste. 2
Ft. Lauderdale, FL 33301
brad@pathtojustice.com

Paul G. Cassell
383 S. University Street
Salt Lake City, UT 84112
cassellp@law.utah.edu

J. Stanley Pottinger
49 Twin Lakes Rd.
South Salem, NY 10590
StanPottinger@aol.com

*/s/ Nicole Simmons*
Nicole Simmons

70