# United States District Court
## Southern District of New York

Virginia L. Giuffre,

              Plaintiff,            Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

              Defendant.

_____/

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Sigrid McCawley
BOIES, SCHILLER & FLEXNER LLP
401 E. Las Olas Blvd., Suite 1200
Ft. Lauderdale, FL 33301
(954) 356-0011

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.  PRELIMINARY STATEMENT ...................................................................... 1

II. UNDISPUTED FACTS .............................................................................. 4

    A.    It is an Undisputed Fact That Multiple Witnesses Deposed in This Case Have Testified That Defendant Operated as Convicted Pedophile Jeffrey Epstein's Procurer of Underage Girls .............................................................. 4

         1.    It is an undisputed fact that Joanna Sjoberg testified Defendant lured her from her school to have sex with Epstein under the guise of hiring her for a job answering phones. ................................................................. 4

         2.    It is an undisputed fact that Tony Figueroa testified that Defendant would call him to bring over underage girls and that Defendant and Epstein would have threesomes with Ms. Giuffre. ..................................... 6

         3.    It is an undisputed fact that Rinaldo Rizzo testified that Defendant took the passport of a 15-year-old Swedish girl and threatened her when she refused to have sex with Epstein. ............................................. 8

         4.    It is an undisputed fact that Lyn Miller testified that she believed Defendant became Ms. Giuffre's "new mama" ....................................... 9

         5.    It is an undisputed Fact that Detective Joseph Recarey testified that he sought to investigate Defendant in relation to his investigation of Jeffrey Epstein. ........................................................................... 9

         6.    It is an undisputed fact that Pilot David Rodgers testified that he flew Defendant and Ms. Giuffre at least 23 times on Epstein's jet, the "Lolita Express" and that "GM" on the flight logs Stands for Ghislaine Maxwell. ............................................................................... 10

         7.    It is an undisputed fact that Sarah Kellen, Nadia Marcinkova, and Jeffrey Epstein invoked the fifth amendment when asked about Defendant trafficking girls for Jeffery Epstein. ....................................... 10

         8.    It is an undisputed fact that Juan Alessi testified that Defendant was one of the people who procured some of the over 100 girls he witnessed visit Epstein, and that he had to clean Defendant's sex toys. ... 11

         9.    It is an undisputed fact that Defendant is unable to garner a single witness throughout discovery who can testify that she did not act as the procurer of underage girls and young women for Jeffrey Epstein. ........... 12

B.    Documentary Evidence also Shows that Defendant Trafficked Ms. Giuffre and Procured her for Sex with Convicted Pedophile Jeffrey Epstein while She Was Underage...........................................................................................12

    1.    The Flight Logs ...........................................................................12

    2.    The Photographs .........................................................................13

    3.    The Victim Identification Letter .................................................15

    4.    New York Presbyterian Hospital Records...................................15

    5.    Judith Lightfoot Psychological Records.....................................16

    6.    Message Pads ..............................................................................17

    7.    The Black Book ...........................................................................22

    8.    Sex Slave Amazon.com Book Receipt ........................................23

    9.    Thailand Folder with Defendant's Phone Number......................24

    10.    It is undisputed fact that the FBI report and the Churcher emails reference Ms. Giuffre's accounts of sexual activity with Prince Andrew that she made in 2011, contrary to Defendant's argument that Ms. Giuffre never made such claims until 2014.........................................25

C.    Defendant Has Produced No Documents Whatsoever That Tend to Show That She Did Not Procure Underage Girls For Jeffrey Epstein....................................26

III.    LEGAL STANDARD .........................................................................................27

IV.    LEGAL ARGUMENT ........................................................................................27

A.    Defendant is Liable for the Publication of the Defamatory Statement and Damages for Its Publication ...........................................................................27

    1.    Under New York Law, Defendant is liable for the media's publication of her press release. ...............................................................28

    2.    Defendant is liable for the media's publication of the defamatory statement.........................................................................................32

B.    Material Issues of Fact Preclude Summary Judgment...........................................34

    1.    The Barden Declaration presents disputed issues of fact. .........................34

          a.     The Barden Declaration is a deceptive back-door attempt to inject Barden's advice without providing discovery of all attorney communications ................................................... 34

          b.     Defendant's summary judgment argument requires factual findings regarding Barden's intent, thereby precluding summary judgment. ...................................................... 35

          c.     There are factual disputes regarding Barden's Declaration ........... 36

    C.     Defendant's Defamatory Statement Was Not Opinion as a Matter of Law. ......... 38

    D.     The Pre-Litigation Privilege Does Not Apply to Defendant's Press Release ....... 40

        1.     Defendant fails to make a showing that the pre-litigation privilege applies. ....................................................... 40

        2.     Defendant is foreclosed from using the pre-litigation privilege because she acted with malice. ................................. 43

        3.     Defendant cannot invoke the pre-litigation privilege because she has no "meritorious claim" for "good faith" litigation. .................................. 46

V.     DEFENDANT HAS NOT - AND CANNOT - SHOW THAT HER DEFAMATORY STATEMENT IS SUBSTANTIALLY TRUE ................................................. 47

VI.    PLAINTIFF DOES NOT NEED TO ESTABLISH MALICE FOR HER DEFAMATION CLAIM, BUT IN THE EVENT THE COURT RULES OTHERWISE, THERE IS MORE THAN SUFFICIENT RECORD EVIDENCE FOR A REASONABLE JURY TO DETERMINE DEFENDANT ACTED WITH ACTUAL MALICE ................................................................. 49

VII.   THE COURT NEED NOT REACH THE ISSUE, AT THIS TIME, OF WHETHER MS. GIUFFRE IS A LIMITED PURPOSE PUBLIC FIGURE ...................................... 51

VIII.  THE JANUARY 2015 STATEMENT WAS NOT "SUBSTANTIALLY TRUE," AND MS. GIUFFRE HAS PRODUCED CLEAR AND CONVINCING EVIDENCE OF ITS FALSITY ................................................................... 55

    A.     When Ms. Giuffre Initially Described Her Encounters With Defendant and Epstein, She Mistakenly Believed the First Encounter Occurred During the Year 1999. ......................................................... 57

    B.     Defendant's January 2015 Statement Claiming as "Untrue" and an "Obvious Lie" the Allegation That She Regularly Participated in Epstein's Sexual Exploitation of Minors and That the Government Knows Such Fact is Not Substantially True But Instead Completely False. .................................. 58

C.    Defendant's January 2015 Statement Claiming as "Untrue" or an "Obvious Lie" That Maxwell and Epstein Converted Ms. Giuffre Into a Sexual Slave is Not Substantially True. .......................................................................... 60

D.    Any Statement of Misdirection Regarding Professor Alan Dershowitz is Nothing More Than an Irrelevant Distraction to The Facts of This Case and Matters Not on the Defense of Whether Defendant's Statement Was Substantially True. ................................................................................................. 61

E.    Contrary to Defendant's Position, There is a Genuine Issue of Material Fact as to Whether She Created or Distributed Child Pornography, or Whether the Government Was Aware of Same. ........................................................................ 62

F.    Defendant Did Act as a "Madame" For Epstein to Traffic Ms. Giuffre to The Rich and Famous. ................................................................................................. 63

IX.    CONCLUSION ................................................................................................................ 65

# TABLE OF AUTHORITIES

Page

## Cases

*Baiul v. Disson*,
  607 F. App'x 18 (2d Cir. 2015)................................................................50

*Black v. Green Harbour Homeowners' Ass'n, Inc.*,
  19 A.D.3d 962, 798 N.Y.S.2d 753 (2005)..............................................43

*Block v. First Blood Associates*,
  691 F. Supp. 685 (Sweet, J.) (S.D.N.Y. 1988) .........................41, 42, 43

*Brady v. Town of Colchester*,
  863 F.2d 205 (2d Cir. 1988) ..................................................................27

*Chambers v. TRM Copy Ctrs. Corp.*,
  43 F.3d 29 (2d Cir. 1994) ......................................................................50

*Contemporary Mission, Inc. v. N.Y. Times Co.*,
  842 F.2d 612 (2d Cir. 1988) ..................................................................51

*Da Silva v. Time Inc.*,
  908 F. Supp. 184 (S.D.N.Y. 1995) .........................................................47

*Davis v. Costa-Gavras*,
  580 F. Supp. 1082 (S.D.N.Y. 1984) .......................................................31

*De Sole v. Knoedler Gallery, LLC*,
  139 F. Supp. 3d 618 (S.D.N.Y. 2015) ....................................................50

*Eliah v. Ucatan Corp.*,
  433 F. Supp. 309 (W.D.N.Y. 1977).........................................................29

*Flomenhaft v. Finkelstein*,
  127 A.D.3d 634, 8 N.Y.S.3d 161 (N.Y. App. Div. 2015) ......................42

*Frechtman v. Gutterman*,
  115 A.D.3d 102, 979 N.Y.S.2d 58 (2014)..............................................42

*Friedman v. Meyers*,
  482 F.2d 435 (2d Cir. 1973) ..................................................................36

*Front v. Khalil*,
  24 N.Y.3d 713 (2015).....................................................................*passim*

*Gerts v. Robert Welch, Inc.*,
   418 U.S. 323 (1974) ..................................................................49, 54

*Giuffre v. Maxwell*,
   165 F. Supp. 3d 147 (S.D.N.Y. 2016) ...........................................*passim*

*Greenberg v. CBS Inc.*,
   69 A.D.2d 693, 419 N.Y.S.2d 988 (1979) ...........................................54

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
   491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989) .......................49

*HB v. Monroe Woodbury Cent. School Dist.*,
   2012 WL 4477552 (S.D.N.Y. Sept. 27, 2012) ....................................34

*Herbert v. Lando*,
   596 F. Supp. 1178 (S.D.N.Y. 1984) ...............................................51

*Hutchinson v. Proxmire*,
   443 U.S. 111, 99 S. Ct. 2675, 61 L.Ed.2d 411 (1979) ...........................53

*In re "Agent Orange" Prod. Liab. Litig.*,
   517 F.3d 76 (2d Cir. 2008) ........................................................27

*Karaduman v. Newsday, Inc.*,
   416 N.E.2d 557 (1980) ............................................................31

*Kirk v. Heppt*,
   532 F. Supp. 2d 586 (S.D.N.Y. 2008) .............................................42

*Lerman v. Flynt Distrib. Co.*,
   745 F.2d 123 (2d Cir. 1984) ....................................................51, 52

*Levy v. Smith*,
   18 N.Y.S 3d 438 (N.Y.A.D. 2 Dept. 2015) ........................................28

*Lopez v. Univision Communications, Inc.*,
   45 F. Supp.2d 348 (S.D.N.Y. 1999) ...............................................48

*Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*,
   22 F. Supp. 3d 240 (S.D.N.Y. 2014) .........................................3, 47, 53

*National Puerto Rican Day Parade, Inc. v. Casa Publications, Inc.*,
   914 N.Y.S.2d 120, 79 A.D.3d 592 (N.Y.A.D. 1 Dept. 2010) .......................29

*Nehls v. Hillsdale Coll.*,
   178 F. Supp. 2d 771 (E.D. Mich. 2001) ...........................................51

*Net Jets Aviation, Inc. v. LHC Commc'ns, LLC,*
    537 F.3d 168 (2d Cir. 2008) ...........................................................27

*New York Times Co. v. Sullivan,*
    376 U.S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) .................50

*Pacenza v. IBM Corp.,*
    363 F. App'x 128 (2d Cir. 2010)....................................................34

*Patrick v. Le Fevre,*
    745 F.2d 153 (2d Cir. 1984) ...........................................................36

*Petrus v Smith,*
    91 A.D.2d 1190 (N.Y.A.D.,1983) ................................................42

*Philadelphia Newspapers, Inc. v. Hepps,*
    475 U.S. 767 (1986) ........................................................................49

*Rand v. New York Times Co.,*
    430 N.Y.S.2d 271, 75 A.D.2d 417 (N.Y.A.D. 1980) .................32

*Rubens v. Mason,*
    387 F.3d 183 (2d Cir. 2004) ...........................................................35

*Sexter & Warmflash, P.C. v. Margrabe,*
    38 A.D.3d 163 (N.Y.A.D. 1 Dept. 2007) .....................................42

*Stern v. Cosby,*
    645 F. Supp. 2d 258 (S.D.N.Y. 2009) ....................................27, 47

*Swan Brewery Co. Ltd. v. U.S. Trust Co. of New York,*
    832 F. Supp. 714 (S.D.N.Y. 1993) ...............................................27

**Rules**

Fed. R. Civ. P. 56 .............................................................................27

**Other Authorities**

*Merriam-Webster* (11th ed. 2006)..............................................60, 64

RESTATEMENT (SECOND) OF TORTS § 576 (1977) .......................29

SACK ON DEFAMATION § 2.7.2 at 2-113 to 2-114 (4th ed. 2016) ...............28

## I. PRELIMINARY STATEMENT

There can be no question that disputed issues of material facts preclude granting summary judgment when, in a one-count defamation case, Defendant presents the Court with a 68-page memorandum of law, a 16-page statement of purported facts, and approximately 700 pages of exhibits. The sheer scope of Defendant's response, if anything, conclusively demonstrates that volumes of disputed facts surround the core question of whether Defendant abused Ms. Giuffre. Indeed, Defendant acknowledges a dispute between the parties as to whether she abused Ms. Giuffre. *See, e.g.*, Motion for Summary Judgment at 1; Motion to Dismiss at 1. This Court already said that this disputed factual question is central to this case:

> Either Plaintiff is telling the truth about her story and Defendant's involvement, or defendant is telling the truth and she was not involved in the trafficking and ultimate abuse of Plaintiff. The answer depends on facts. Defendant's statements are therefore actionable as defamation. Whether they ultimately prove to meet the standards of defamation (including but not limited to falsity) *is a matter for the fact-finder*.

Order Denying Defendant's Motion to Dismiss at 10. While this fact remains in dispute, summary judgment is foreclosed.

But even turning to Defendant's claims, the avalanche of aspersions she casts upon Ms. Giuffre and her counsel should not distract the Court from the fact that the instant motion cannot come within sight of meeting the standard for an award of summary judgment. The most glaring and emblematic example of the Defendant's far-fetched claims appears in her attempt to move away from her defamatory statement by arguing that it was her attorney and not her, who issued the defamatory statement for the press to publish, though she is forced to admit the statement was made on her behalf. This is an untenable position to take at trial, and an impossible argument to advance at the summary judgment stage, as both the testamentary and documentary evidence positively refute that argument. Defendant incorrectly asks this Court to make a factual

1

finding that her defamatory press release was actually a legal opinion, issued not by her, but by her lawyer, to the media, despite documentary evidence showing otherwise.

Defendant also argues that she has proven the truth of her statement calling Ms. Giuffre a liar with respect to the statements Ms. Giuffre made about Defendant. To the contrary, voluminous evidence, both documentary and testimonial from numerous witnesses, corroborate Ms. Giuffre's account of Defendant's involvement in the sexual abuse and trafficking of Ms. Giuffre. Just to briefly highlight a few, Johanna Sjoberg, testified that Defendant recruited her under the guise of a legitimate assistant position, but asked her to perform sexual massages for Epstein, and punished her when she didn't cause Epstein to orgasm.[1] Tony Figueroa testified that Defendant contacted him to recruit high school-aged girls for Epstein, and also testified that Maxwell and Epstein participated in multiple threesomes with Virginia Giuffre. Even more shockingly, the butler for Defendant's close friend witnessed, first-hand, a fifteen-year-old Swedish girl crying and shaking because Defendant was attempting to force her to have sex with Epstein and she refused. This is a fraction of the testimony that will be elicited at trial about Defendant's involvement in the sexual abuse and trafficking of Ms. Giuffre.

Defendant's primary argument in support of her contention that she did not abuse and traffic Ms. Giuffre as a minor child is that employment records show that Ms. Giuffre was either sixteen or seventeen when Defendant recruited her from her job at Mar-a-Lago for sex with Epstein, not fifteen-years-old as Plaintiff originally thought. Call this the "yes-I'm-a-sex-trafficker-but-only-of-sixteen-year-old-girls" defense. Defendant does not explain why sexual abuse of a fifteen year old differs in any material way from sexual abuse of a sixteen or seventeen year old. All instances involve a minor child, who cannot consent, and who is

---

[1] *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 8:5-10; 13:1-3; 12:17-14:3; 15:1-5; 32:9-16; 34:5-35:1; 36:2-1.

protected by federal and state laws. The fact remains that Defendant recruited Ms. Giuffre while she was a minor child for sexual purposes and then proceeded to take her all over the world on convicted pedophile Jeffrey Epstein's private jet, the "Lolita Express,"[2] as well as to his various residences, and even to her own London house. Flight logs even reveal twenty-three flights that Defendant shared with Ms. Giuffre – although Defendant claims she is unable to remember even a single one of those flights. Inconsequential details that Ms. Giuffre may have originally remembered incorrectly do not render her substantive claims of abuse by Defendant false, much less deliberate "lies." At most, these minor inaccuracies, in the context of a child suffering from a troubled childhood and sexual abuse, create nothing more than a fact question on whether Defendant's statement that Ms. Giuffre lied when she accused Defendant of abuse is "substantially true," thereby precluding summary judgment. *See Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) ("Because determining whether COI is substantially true would require this court to decide disputed facts ... summary judgment is not appropriate").

Defendant has tried to spin these inconsequential mistakes of memory into talismanic significance and evidence of some form of bad-faith litigation, but this claim fails under the weight of the evidence. As the Court knows, the clear weight of the evidence establishes Defendant's heavy and extensive involvement in both Jeffrey Epstein's sex trafficking ring and in recruiting Ms. Giuffre, living with her and Jeffrey Epstein in the same homes while Ms. Giuffre was a minor, and traveling with Ms. Giuffre and Jeffrey Epstein – including 23 documented flights. Even the house staff testified that Defendant and Ms. Giuffre were regularly

---

[2] *See, e.g.*: "All aboard the 'Lolita Express': Flight logs reveal the many trips Bill Clinton and Alan Dershowitz took on pedophile Jeffrey Epstein's private jet with anonymous women" at The Daily Mail, http://www.dailymail.co.uk/news/article-2922773/Newly-released-flight-logs-reveal-time-trips-Bill-Clinton-Harvard-law-professor-Alan-Dershowitz-took-pedophile-Jeffrey-Epstein-s-Lolita-Express-private-jet-anonymous-women.html.

together. *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 103:4-9 ("Q. After that day, do you recall that she started coming to the house more frequently. A. Yes, she did. Q. In fact, did she start coming to the house approximately three times a week? A. Yes, probably."). It is also undisputed that witnesses deposed in this case have testified about Defendant's role as a procurer of underage girls and young women for Jeffrey Epstein. At the very least, a trier of fact should determine whether the evidence establishes whether or not Ms. Giuffre's claims of Defendant being involved in her trafficking and abuse are true. Defendant's summary judgment motion should be denied in its entirety.

## II.    UNDISPUTED FACTS

The record evidence in this case shows that Defendant shared a household with convicted pedophile Jeffrey Epstein for many years. While there, she actively took part in recruiting underage girls and young women for sex with Epstein, as well as scheduling the girls to come over, and maintaining a list of the girls and their phone numbers. Ms. Giuffre was indisputably a minor when Defendant recruited her to have sex with convicted pedophile Jeffrey Epstein. Thereafter, Ms. Giuffre flew on Epstein's private jets – the – Lolita Express" – with Defendant at least 23 times.

**A.    It is an Undisputed Fact That Multiple Witnesses Deposed in This Case Have Testified That Defendant Operated as Convicted Pedophile Jeffrey Epstein's Procurer of Underage Girls.**

**1.    <u>It is an undisputed fact that Joanna Sjoberg testified Defendant lured her from her school to have sex with Epstein under the guise of hiring her for a job answering phones.</u>**

Ms. Sjoberg's account of her experiences with Defendant are chillingly similar. As with Ms. Giuffre, Defendant, a perfect stranger, approached Ms. Sjoberg while trolling Ms. Sjoberg's school grounds. She lured Ms. Sjoberg into her and Epstein's home under the guise of a legitimate job of answering phones, a pretext that lasted only a day. A young college student,

4

nearly 2,000 miles from home, Defendant soon instructed Ms. Sjoberg to massage Epstein, and made it clear that Sjoberg's purpose was to bring Epstein to orgasm during these massages so that Defendant did not have to do it.

Q. And when did you first meet Ms. Maxwell?
A. 2001. March probably. End of February/beginning of March.
Q. And how did you meet her?
A. She approached me while I was on campus at Palm Beach Atlantic College.

\*\*\*

Q. And how long did you work in that position answering phones and doing --
A. Just that one day.

\*\*\*

Q. And what happened that second time you came to the house?
A. At that point, I met Emmy Taylor, and she took me up to Jeffrey's bathroom and he was present. And her and I both massaged Jeffrey. She was showing me how to massage. And then she -- he took -- he got off the table, she got on the table. She took off her clothes, got on the table, and then he was showing me moves that he liked. And then I took my clothes off. They asked me to get on the table so I could feel it. Then they both massaged me.

\*\*\*

Q. Who did Emmy work for?
2 A. Ghislaine.
3 Q. Did Maxwell ever refer to Emmy by any particular term?
5 A. She called her her slave.

\*\*\*

Q. Did Jeffrey ever tell you why he received so many massages from so many different girls?
A. He explained to me that, in his opinion, he needed to have three orgasms a day. It was biological, like eating.

\*\*\*

Q. Was there anything you were supposed to do in order to get the camera?
THE WITNESS: I did not know that there were expectations of me to get the camera until after. She [Defendant] had purchased the camera for me, and I was over there giving Jeffrey a massage. I did not know that she was in possession of the camera until later. She told me -- called me after I had left and said, I have the camera for you, but you cannot receive it yet because **you came here and didn't finish your job and I had to finish it for you.**
**Q. And did you -- what did you understand her to mean?**
**A. She was implying that I did not get Jeffrey off, and so she had to do it.**
**Q. And when you say "get Jeffrey off," do you mean bring him to orgasm?**
**A. Yes.**

\*\*\*

Q. Based on what you knew, did Maxwell know that the type of massages Jeffrey was getting typically involved sexual acts?
THE WITNESS: Yes.
Q. **What was Maxwell's main job with respect to Jeffrey?**

5

THE WITNESS: **Well, beyond companionship, her job, as it related to me, was to find other girls that would perform massages for him and herself**.[3]

Ms. Sjoberg also testified about sexual acts that occurred with her, Prince Andrew, and Ms. Giuffre, when she and Defendant were staying at Epstein's Manhattan mansion:

Q. Tell me how it came to be that there was a picture taken.
THE WITNESS: I just remember someone suggesting a photo, and they told us to go get on the couch. And so Andrew and Virginia sat on the couch, and they put the puppet, the puppet on her lap. And so then I sat on Andrew's lap, and I believe on my own volition, and they took the puppet's hands and put it on Virginia's breast, and so Andrew put his on mine.[4]

Ms. Sjoberg's testimony corroborates Ms. Giuffre's account of how Defendant recruited her (and others) under a ruse of a legitimate job in order to bring them into the household to have sex with Epstein. Ms. Sjoberg's testimony also corroborates Ms. Giuffre's account of being lent out to Prince Andrew by Defendant, as even the interaction Ms. Sjoberg witnessed included a sexual act: Prince Andrew using a puppet to touch Ms. Giuffre's breast while using a hand to touch Ms. Sjoberg's breast.

> **2.**      **It is an undisputed fact that Tony Figueroa testified that Defendant would call him to bring over underage girls and that Defendant and Epstein would have threesomes with Ms. Giuffre.[5]**

Tony Figueroa testified that Plaintiff told him about threesomes Ms. Giuffre had with Defendant and Epstein which included the use of strap-ons:

Q. Okay. And tell me everything that you remember about what Ms. Roberts said about being intimate with Ms. Maxwell and Mr. Epstein at the same time.
A. I remember her talking about, like, strap-ons and stuff like that. But, I mean, like I  said, all the details are not really that clear. But I remember her talking about, like, how      they would always be using and stuff like that.
 Q. She and Ms. Maxwell and Mr. Epstein would use strap-ons?
 A. Uh-huh (affirmative).
                                            ***

---

[3] *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 8:5-10; 13:1-3; 12:17-14:3; 15:1-5; 32:9-16; 34:5-35:1; 36:2-15.
[4] *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 82:23-83:9.
[5] Defendant attempts to discredit Figueroa's damaging testimony by repeatedly mentioning that he has been convicted for a drug-related offense. Unsurprisingly, in this attack, Defendant does not mention that she has a DUI conviction. *See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. at 390:13-15. (April 22, 2016).

Q. Other than sex with the Prince, is there anyone else that Jeffrey wanted Ms. Roberts to have sex with that she relayed to you?
A. Mainly, like I said, just Ms. Maxwell and all the other girls.
Q. Ms. Maxwell wanted -- Jeffrey wanted Virginia to have sex with Ms. Maxwell?
A. And him, yeah.
Q. And did she tell you whether she had ever done that?
A. Yeah. She said that she did.

*** 

Q. And what did she describe having happened?
A. I believe I already told you that. With the strap-ons and dildos and everything.[6]



[7]

Figueroa also testified that Defendant called him to ask if he had found any other girls for

Epstein, thereby acting as procurer of girls for Epstein:

Q. [W]hen Ghislaine Maxwell would call you during the time that you were living with Virginia, she would ask you what, specifically?
A. Just if I had found any other girls just to bring to Jeffrey.
Q. Okay.
A. Pretty much every time there was a conversation with any of them, it was either asking Virginia where she was at, or asking her to get girls, or asking me to get girls.

*** 

Q. Okay. Well, tell me. When did Ms. Maxwell ask you to bring a girl?
A. Never in person. It was, like, literally, like, on the phone maybe, like, once or twice.
Q All right. Did Ms. Maxwell call you frequently?
A. No.
Q. All right. How many times do you think Ms. Maxwell called you, at all?
A. I'd just say that probably a just a few, a couple of times. Maybe once or twice.
Q. One or two --
A. The majority of the time it was pretty much his assistant.
Q. How do you know Ms. Maxwell's voice?
A. Because she sounds British.
Q. So someone with a British accent called you once or twice and asked for --
A. Well, she told me who she was.
Q. Okay. And what did she say when she called you and asked you to bring girls?
A. She just said, "Hi. This is Ghislaine. Jeffrey was wondering if you had anybody that could come over."[8]

---

[6] *See* McCawley Dec. at Exhibit 4, Figueroa June 24, 2016 Dep. Tr. Vol. 1 at 96-97 and 103.
[7] *See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. at 55:19-58:23 (July 22, 2016).
[8] *See* McCawley Dec. at Exhibit 4, Figueroa Dep. Tr. at 200:6-18; 228:23-229:21.

**3.** **It is an undisputed fact that Rinaldo Rizzo testified that Defendant took the passport of a 15-year-old Swedish girl and threatened her when she refused to have sex with Epstein.**

Rinaldo Rizzo was the house manager for one of Defendant's close friends, Eva Dubin.

Mr. Rizzo testified - through tears – how, while working at Dubin's house, he observed

Defendant bring a 15 year old Swedish girl to Dubin's house. In distress, the 15 year old girl

tearfully explained to him that Defendant tried to force her to have sex with Epstein through

threats and stealing her passport:

Q. How old was this girl?
A. 15 years old.
***
Q. Describe for me what the girl looked like, including her demeanor and anything else you remember about her when she walks into the kitchen.
A. Very attractive, beautiful young girl. Makeup, very put together, casual dress. But she seemed to be upset, maybe distraught, and she was shaking, and as she sat down, she sat down and sat in the stool exactly the way the girls that I mentioned to you sat at Jeffrey's house, with no expression and with their head down. But we could tell that she was very nervous.
Q. What do you mean by distraught and shaking, what do you mean by that?
A. Shaking, I mean literally quivering.
***
Q. What did she say?
A. She proceeds to tell my wife and I that, and this is not -- this is blurting out, not a conversation like I'm having a casual conversation. That quickly, I was on an island, I was on the island and there was Ghislaine, there was Sarah, she said they asked me for sex, I said no. And she is just rambling, and I'm like what, and she said -- I asked her, I said what? And she says yes, I was on the island, I don't know how I got from the island to here. Last afternoon or in the afternoon I was on the island and now I'm here. And I said do you have a -- this is not making any sense to me, and I said this is nuts, do you have a passport, do you have a phone? And she says no, and she says Ghislaine took my passport. And I said what, and she says Sarah took her passport and her phone and gave it to Ghislaine Maxwell, and at that point she said that she was threatened. And I said threatened, she says yes, I was threatened by Ghislaine not to discuss this. And I'm just shocked. So the conversation, and she is just rambling on and on, again, like I said, how she got here, she doesn't know how she got here. Again, I asked her, did you contact your parents and she says no. At that point, she says I'm not supposed to talk about this. I said, but I said: How did you get here. I don't understand. We were totally lost for words. And she said that before she got there, she was threatened again by Jeffrey and Ghislaine not to talk about what I had mentioned earlier, about -- again, the word she used was sex.
Q. And during this time that you're saying she is rambling, is her demeanor continues to be what you described it?

A. Yes.
Q. Was she in fear?
A. Yes.
Q. You could tell?
A. Yes.
A. She was shaking uncontrollably.[9]

### 4. It is an undisputed fact that Lyn Miller testified that she believed Defendant became Ms. Giuffre's "new mama".

Lyn Miller is Ms. Giuffre's mother. She testified that when Ms. Giuffre started living

with Defendant, Defendant became Ms. Giuffre's "new momma."[10] Incredulously, Defendant

testified that she barely remembered Ms. Giuffre.[11]

### 5. It is an undisputed Fact that Detective Joseph Recarey testified that he sought to investigate Defendant in relation to his investigation of Jeffrey Epstein.

Detective Recarey led the Palm Beach Police's investigation of Epstein. He testified that

Defendant procured girls for Epstein, and that he sought to question her in relation to his

investigation, but could not contact her due to the interference of Epstein's lawyer:

Q. A cross-reference of Jeffrey Epstein's residence revealed which affiliated names?
A. It revealed Nadia Marcinkova, Ghislane Maxwell, Mark Epstein. Also, the cross-reference, any previous reports from the residence as well.
Q. During your investigation, did you learn of any involvement that Nadia Marcinkova had with any of the activities you were investigating?
⁂
Q. The other name that is on here as a cross-reference is Ghislane Maxwell. Did you speak with Ghislane Maxwell?
A. I did not.
Q. Did you ever attempt to speak with Ghislane Maxwell?
A. I wanted to speak with everyone related to this home, including Ms. Maxwell. My contact was through Gus, Attorney Gus Fronstin, at the time, who initially had told me that he would make everyone available for an interview. And subsequent conversations later, no one was available for interview and everybody had an attorney, and I was not going to be able to speak with them.
Q. Okay. During your investigation, what did you learn in terms of Ghislane Maxwell's involvement, if any?

---

[9] *See* McCawley Dec. at Exhibit 14, Rinaldo Rizzo's June 10, 2016 Dep. Tr. at 52:6-7; 52:25-53:17; 55:23-58:5
[10] *See* McCawley Dec. at Exhibit 12, Lynn Miller's May 24, 2016 Dep. Tr. at 115.
[11] *See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. at 77:25-78:15 (April 22, 2016).

THE WITNESS: Ms. Maxwell, during her research, was found to be Epstein's long-time friend. During the interviews, Ms. Maxwell was involved in seeking girls to perform massages and work at Epstein's home.[12]

> **6.**   **It is an undisputed fact that Pilot David Rodgers testified that he flew Defendant and Ms. Giuffre at least 23 times on Epstein's jet, the "Lolita Express" and that "GM" on the flight logs Stands for Ghislaine Maxwell.**

Notably, at Defendant's deposition, Defendant refused to admit that she flew with Ms. Giuffre, and denied that she appeared on Epstein's pilot's flight logs.[13] However, David Rodgers, Epstein pilot, testified that the passenger listed on his flight logs bearing the initials – GM – was, in fact, Ghislaine Maxwell, and that he was the pilot on at least 23 flights in which Defendant flew with Plaintiff.[14] The dates of those flights show that Ms. Giuffre was an underage child on many of them when she flew with Defendant.[15]

> **7.**   **It is an undisputed fact that Sarah Kellen, Nadia Marcinkova, and Jeffrey Epstein invoked the Fifth Amendment when asked about Defendant trafficking girls for Jeffery Epstein.**

Both Sarah Kellen and Nadia Marcinkova lived with Jeffrey Epstein for many years. They both invoked the Fifth Amendment when asked about Defendant's participation in recruiting underage girls for sex with Epstein. Marcinkova testified as follows:

> Q. Did Ghislaine Maxwell work as a recruiter of young girls for Jeffrey Epstein when you met her?
> A. Same answer. [Invocation of Fifth Amendment]
>      ***
> Q. Have you observed Ghislaine Maxwell and Jeffrey Epstein convert what started as a massage with these young girls into something sexual?
> A. Same answer.[16]

---

[12] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 27:10-17; 28:21-29:20.

[13] *See* McCawley Dec. at Exhibit 11, Maxwell's April 22, 2016 Dep. Tr. at 78-79, 144.

[14] *See* McCawley Decl. at Exhibit 41, Rodgers Dep. Ex. 1, GIUFFRE 007055-007161 (flight records evidencing Defendant (GM) flying with Ms. Giuffre).

[15] *See* McCawley Dec. at Exhibit 15, David Rodgers' June 3, 2016 Dep. Tr. at 18, 34-36; *see also* Exhibit 41, Rodgers Dep. Ex. 1 at flight #s 1433-1434, 1444-1446, 1464-1470, 1478-1480, 1490-1491, 1506, 1525-1526, 1528, 1570 and 1589.

[16] *See* McCawley Dec. at Exhibit 10, Marcinkova Dep. Tr. at 10:18-21; 12:11-15.

Kellen testified as follows:

> Q. Did Ghislaine Maxwell work as a recruiter for young girls for Jeffrey Epstein when you
> met her?
> A. On advice of my counsel I must invoke my Fifth and Sixth Amendment privilege . . .
> ***
> Q. Isn't it true that Ghislaine Maxwell would recruit underage girls for sex and sex acts with
> Jeffrey Epstein?
> A. On advice of my counsel I must invoke my Fifth and Sixth Amendment privilege . . .[17]

Similarly, Jeffrey Epstein invoked the Fifth Amendment when asked about Defendant's

involvement in procuring underage girls for sex with him.

> Q. Maxwell was one of the main women whom you used to procure underage girls for sexual
> activities, true?
> THE WITNESS: Fifth.
> ***
> Q. Maxwell was a primary co-conspirator in your sexual abuse scheme, true?
> THE WITNESS: Fifth.
> Q. Maxwell was a primary co-conspirator in your sex trafficking scheme, true?
> THE WITNESS: Fifth.
> Q. Maxwell herself regularly participated in your sexual exploitation of minors, true?
> THE WITNESS: Fifth.[18]

> **8.** **It is an undisputed fact that Juan Alessi testified that Defendant was**
> **one of the people who procured some of the over 100 girls he**
> **witnessed visit Epstein, and that he had to clean Defendant's sex toys.**

Juan Alessi was Epstein's house manager. He testified as follows:

> Q. And over the course of that 10-year period of time while Ms. Maxwell was at the house,
> do you have an approximation as to the number of different females – females that you were
> told were massage therapists that came to house?
> A. I cannot give you a number, but I would say probably over 100 in my stay there.
> ***
> Q. I don't think I asked the right – the question that I was looking to ask, so let me go back.
> Did you go out looking for the girls –
> A. No.
> Q. – to bring –
> A. Never
> Q. – as the massage therapists?
> A. Never.
> Q. Who did?

---

[17] *See* McCawley Dec. at Exhibit 8, Kellen Dep. Tr. at 15:13-18; 20:12-16.
[18] *See* McCawley Dec. at Exhibit 3, Epstein Dep. Tr. at 116:10-15; 117:18-118:10.

A. Ms. Maxwell, Mr. Epstein and their friends, because their friend relay to other friends they knew a massage therapist and they would send to the house. So it was referrals.

***

Q. Did you have occasion to clean up after the massages?

A. Yes.

Q. Okay. And that is after both a massage for Jeffrey Epstein, as well as clean up after a massage that Ghislaine Maxwell may have received?

A. Yes.

Q. And on occasion, after -- in cleaning up after a massage of Jeffrey Epstein or Ghislaine Maxwell, did you have occasion to find vibrators or sex toys that would be left out?

A. yes, I did.[19]

> **9.      It is an undisputed fact that Defendant was unable to garner a single witness throughout discovery who can testify that she did not act as the procurer of underage girls and young women for Jeffrey Epstein.**

Defendant has not been able to procure a single witness - not one – to testify that Defendant did not procure girls for sex with Epstein or participate in the sex. Even one of her own witnesses, Tony Figueroa, testified that she both procured girls and participated in the sex. Another one of Defendant's witnesses, Ms. Giuffre's mother, named Defendant as Ms. Giuffre's "new mamma." Indeed, those who knew her well, who spent considerable time with her in Epstein's shared household, like Juan Alessi, Alfredo Rodriguez and Joanna Sjoberg, have testified that she was Epstein's procuress. Others who lived with her – Jeffrey Epstein, Nadia Marcinkova, and Sarah Kellen – invoked the Fifth Amendment so as not to answer questions on the same. No one has testified to the contrary.

> **B.      Documentary Evidence also Shows that Defendant Trafficked Ms. Giuffre and Procured her for Sex with Convicted Pedophile Jeffrey Epstein while She Was Underage.**

> **1.      The Flight Logs**

Defendant has never offered a legal explanation for what she was doing with, and why she was traveling with, a minor child on 21 flights while she was a child, including 6 international flights, aboard a convicted pedophile's private jet all over the world. Her motion for

---

[19] *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 28:6-15; 30:51-25; 52:9-22.

summary judgment – as well as all previous briefing papers – are absolutely silent on those damning documents.

## 2.  The Photographs

Throughout a mountain of briefing and, and even in her own deposition testimony, Defendant never offered an explanation regarding Ms. Giuffre's photographs of her, Defendant, and Epstein. She never offered a legal explanation for why Prince Andrew was photographed with his hand around Ms. Giuffre's bare waist while she was a minor child, while posing with Defendant, inside Defendant's house in London. This particular photograph corroborates Ms. Giuffre's claims, and there is no other reasonable explanation why an American child should be in the company of adults not her kin, in the London house owned by the girlfriend of a now-convicted sex offender.[20]



Ms. Giuffre also produced pictures of herself taken when she was in New York with Defendant and Epstein, and from a trip to Europe with Defendant and Epstein:[21]

---

[20] *See* McCawley Dec at Exhibit 42, GIUFFRE007167, Prince Andrew and Defendant Photo.
[21] *See* McCawley Dec at Exhibit 42, GIUFFRE007182 - 007166.




And, Ms. Giuffre has produced a number of pictures of herself taken at the Zorro Ranch, Epstein's New Mexico Ranch, two of which are below.[22]




Finally, among other nude photos, which included full nudes of Defendant, Ms. Giuffre produced images of females that the Palm Beach Police confiscated during the execution of the

---

[22] *See* McCawley Dec at Exhibit 42, GIUFFRE007175; 007173.

warrant, including one photograph revealing the bare bottom of a girl who appears to be pre-pubescent (Ms. Giuffre will only submit its redacted form):[23]



### 3. The Victim Identification Letter

In 2008, the United States Attorney's office for the Southern District of Florida identified Ms. Giuffre as a protected "victim" of Jeffrey Epstein's sex abuse. The U.S. Attorney mailed Ms. Giuffre a notice of her rights as a crime victim under the CVRA.[24]

> Re:  Jeffrey Epstein/ _____  **NOTIFICATION OF**
> **IDENTIFIED VICTIM**
>
> Dear  :
>
> By virtue of this letter, the United States Attorney's Office for the Southern District of Florida provides you with the following notice because you are an identified victim of a federal offense.

### 4. New York Presbyterian Hospital Records

Ms. Giuffre has provided extensive medical records in this case, including medical records from the time when Defendant was sexually abusing and trafficking her. Ms. Giuffre produced records supporting her claim of being sexually abused in New York resulting in both

---

[23] *See* McCawley Dec at Exhibit 44, GIUFFRE007584.
[24] *See* McCawley Dec. at Exhibit 30, GIUFFRE 002216-002218, Victim Notification Letter.

15

Defendant and Epstein taking Plaintiff to New York Presbyterian Hospital in New York while she was a minor.[25] The dates on the hospital records show she was seventeen years old.

### 5. Judith Lightfoot Psychological Records

As the Court is aware, Defendant propounded wildly overbroad requests for production concerning the past eighteen years of Ms. Giuffre's medical history. Defendant repeatedly and vehemently argued to the Court that it was essential to procure every page of these records in a fanfare of unnecessary motion practice. *See, e.g.*, Defendant's Motion to Compel (DE 75); Defendant's Motion for Sanctions at 10 ("Ms. Maxwell has been severely prejudiced by Plaintiff's failure to provide the required identifying information and documents from her health care providers."). Ms. Giuffre and her counsel took on the considerable burden and significant expense of retrieving and producing over 250 pages of medical records from over 20 providers, spanning two continents and nearly two decades.

Now that those records have been collected, Defendant's 68 page motion makes no reference to a single medical record produced by Ms. Giuffre, nor a single provider, nor a single treatment, nor or a single medication prescribed. After Defendant's repeated motion practice stressing the essentiality of these records, this may surprise the Court. But not Ms. Giuffre. Defendant's requests unearthed documents that are highly unfavorable to Defendant that corroborate Ms. Giuffre's claims against her.

Years before this cause of action arose, Ms. Giuffre sought counseling from a psychologist for the trauma she continued to experience after being abused by Defendant and Epstein. A 2011 psychological treatment record, written by her treating psychologist, unambiguously describes Defendant as Ms. Giuffre's abuser:

---

[25] *See* McCawley Dec at Exhibit 33, GIUFFRE003259-003290.

16

. . . [Ms. Giuffre] was approached by Ghislaine Maxwell who said she could help her get a job as a massage therapist . . . seemed respectable . . . was shown how to massage, etc., Geoff [sic] Epstein. Told to undress and perform sexual acts on person. Miss Maxwell promised her $200 a job.[26]

Therefore, years before Defendant defamed her, Ms. Giuffre confided in her treating psychologist that Maxwell recruited her for sex with Epstein.

### 6.    **Message Pads**

Detective Recarey, the lead investigator of the criminal investigation into Epstein and his associates' sex crimes, recovered carbon copies of hand-written messages taken by various staff, including Defendant, at Epstein's Palm Beach residence.[27] These were collected both from trash pulls from the residence and during the execution of the search warrant where the pads were found laying out in the open in the residence.[28] The search warrant was executed in 2005 and the message pads collected include messages recorded in 2004 and 2005. Numerous witnesses have described that these copies of collected messages accurately reflect those taken by various staff at the Palm Beach Epstein mansion between 2004 and 2005.[29]

The messages raise a question of fact as to Maxwell's involvement in the sexual abuse of minors and are relevant to refute Maxwell's denial of any involvement with Epstein during relevant time periods, and, accordingly her denial of knowledge of certain events.

While there were hundreds of these messages recovered during the investigation, this small sample demonstrates the undeniable reality that there exists a genuine issue of material fact with respect to Defendant's involvement in and knowledge of the activities described by Giuffre which Maxwell has said we "untrue" and "obvious lies."

---

[26] *See* McCawley Dec. at Exhibit 38, Lightfoot Records, GIUFFRE005437.

[27] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 45:13-25; 97:9-98:8.

[28] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 25:12-21; 40:5-15; 41:16-23; 42:14-43:10; 45:13-25; *see also* search warrant video showing the pads openly displayed on the desk.

[29] *See* McCawley Dec. at Exhibit 21, 1, 16, 11, Rodriguez Dep. Tr. at 73:19-74:12; Alessi Dep. Tr. at 141:18-21; Sjoberg Dep. Tr. at 64:1-6; Maxwell Dep. Tr. at 147:23-148:3; 148:19-149:14.

This sampling reveals that Maxwell, "GM," took messages at the residence, including from underage girls who were calling to schedule a time to come over to see Epstein. This demonstrates that Maxwell was at Epstein's Palm Beach mansion in 2004 and 2005, incidentally a time period she has denied being around the house in her deposition. *See supra* GIUFFRE001412; 001435; 001449. The messages also reveal that multiple "girls" were leaving messages that were being taken and memorialized and left out in the open for anyone to see. Certain messages also make clear that a number of these "girls" were in school. In addition to taking messages herself (and the staff working under her direction taking these relevant messages), staff employees were taking and leaving messages for Defendant. This is evidence that Maxwell was in the house at relevant times, including times that she has now testified under oath that she was not there. Other messages demonstrate Epstein and Maxwell's friends, including Jean Luc Brunel, leaving messages relating to underage females. The following is a small sampling of such messages:



GIUFFRE001412 (SAO01092)



GIUFFRE001427 (SAO01456)



GIUFFRE001388 (SAO01067)



GIUFFRE001432 (SAO01461)



GIUFFRE001448 (SAO01476)



GIUFFRE001452 (SAO02828)

GIUFFRE001456 (SAO2832)

GIUFFRE001563 (SAO3008)

GIUFFRE001454 (SAO02830)



GIUFFRE001426 (SAO01455)



GIUFFRE001423 (SAO01452)

The following are descriptions of a sampling of messages pads[30] that create a genuine dispute of material fact:

- One message pad reflects , who is identified in the Palm Beach Police Report as a minor, contacting Jeffrey Epstein for "work" explaining that she does not have any money. The term "work" was often used by members of Jeffrey Epstein's sexual trafficking ring to refer to sexual massages. (*See* GIUFFRE05660 ("She stated she was called by Sara for her to return to work for Epstein. ▮▮▮ stated 'work' is the term used by Sarah to provide the massage in underwear."). **Giuffre 001462: July 5th no year to JE from ▮▮▮ "I need work. I mean I don't have money. Do you have some work for me?"**

- Other message pads reflect ▮▮▮ who was a minor, calling and leaving a message at the Palm Beach mansion that she has recruited another girl for Jeffrey Epstein. The second message demonstrates that Jeffrey Epstein required different girls to be scheduled every day of the week. The third shows an offer to have two minor girls come to the home at the same time to provide sexual massages. These type of messages indicate the lack of secrecy of the fact that multiple young females were visiting every day and at least raises a question of fact whether Maxwell was knowledgeable and involved as Giuffre has said, or whether Giuffre was lying and Maxwell was not at all involved or aware of this activity, as Defendant would attempt to have the world believe. **Giuffre 001428 – undated Jeffrey From ▮▮▮ – "Has girl for tonight" ;Giuffre 001432 (pictured above)– 7/9/04 – Mr. Epstein From ▮▮▮ – "▮▮▮ is available on Tuesday no one for tomorrow"; GIUFFRE 001433 /1/17/04 – Mr. Epstein from ▮▮▮ – "Me and _____ can come tomorrow any time or ▮▮▮ alone" ; Giuffre – 001452 – undated Jeffrey from ▮▮▮ "Has girl for tonight."**

- Other message pads demonstrate that there was a pattern and practice of using young females to recruit additional young females to provide sexual massages on a daily basis. **Giuffre 001413 (pictured above)– JE from "N" – "▮▮▮ hasn't confirmed ▮▮▮ for 11:00 yet, so she is keeping ▮▮▮ on hold in case ▮▮▮ doesn't call back; Giuffre 001448 -8/20/05 JE from ▮▮▮- confirmed ___ at 4 pm. Who is scheduled for morning? I believe ▮▮▮ wants to work."**



This message pad reflects that a friend of Jeffrey Epstein is sending him a sixteen year old Russian girl for purposes of sex. **Giuffre 001563 (pictured above)- 6/1/05 For Jeffrey From Jean Luc "He has a teacher for you to teach you how to speak Russian. She is 2X8 years old not blonde. Lessons are free and you can have your 1st today if you call."**

- This message pad directly refutes Maxwell's sworn testimony that she was not present during the year 2005 at Jeffrey Epstein's Palm Beach mansion because this shows ▮▮▮ leaving a message for Jeffrey at the Palm Beach home that she was going to work out

---

[30] *See* McCawley Dec. at Exhibit 28.

with the Defendant on September 10, 2005. The police were only able to retrieve a fraction of these message pads during their trash pull but even in the few they recovered, it shows Maxwell was regularly at the Palm Beach home during the time period she claimed she was not.  To the contrary, she was both sending and receiving messages and messages, like this one, reflect her presence at the mansion. **Giuffre 001412 – 9/10/05 (during the year Maxwell says she was never around) JE from ▮▮▮ – "I went to Sarah and made her water bottle and I went to work out with GM."**

- These message pads further corroborate that Defendant lied in her testimony and she was in fact in regular contact with Jeffrey Epstein during the years 2004 and 2005. For example, the message from "Larry" demonstrates that Defendant is at the Palm Beach mansion so frequently that people, including Epstein's main pilot Larry Visoski, are leaving messages for Maxwell at the Palm Beach house. **Giuffre 001435 7/25/04 – Mr. Epstein from Ms. Maxwell – "tell him to call me"; Giuffre – 001449 – 8/22/05 – JE from GM; Giuffre – 001453 – 4/25/04 for Ms. Maxwell From Larry "returning your call";**

- This message pad shows that Defendant was clearly actively involved in Jeffrey Epstein's life and the activities at his Palm Beach mansion. **Giuffre – 001454 – undated Jeffrey From Ghislaine – "Would be helpful to have _____ come to Palm Beach today to stay here and help train new staff with Ghislaine."**

- This message pad clearly reflects an underage female (noted by the police redaction of the name) leaving a message asking if she can come to the house at a later time because she needs to "stay in school." **Giuffre 001417 (pictured above)– Jeffrey 2/28/05 Redacted name "She is wondering if 2:30 is o.k. She needs to stay in school."**

- This message pad reflects a message from ▮▮▮ who was under the age of eighteen at the time she was going over to Jeffrey Epstein's home to provide sexual massages according to the Palm Beach Investigative Report. **Giuffre 001421 3/4/05 to Jeffrey from ▮▮▮ "It is o.k. for ▮▮▮ to stop by and drop something?"**

- These message pads reflect the pattern of underage girls (noted by the police redaction of the name on the message pad) calling the Palm Beach mansion to leave a message about sending a "female" over to provide a sexual massage. **Giuffre 001423 11/08/04 To Mr. JE – redacted from – "I have a female for him" Giuffre 001426 (pictured above) – 1/09/05 JE To JE from Redacted – "I have a female for him."**

- This message pad reflects the pattern and practice of having young girls bring other young girls to the house to perform sexual massages. Indeed the "▮▮▮" reflected in this message pad corresponds in name to the "▮▮▮" that Tony Figueroa testified he initially brought to Jeffrey Epstein during the time period that the Defendant was requesting that Tony find some young females to bring to Jeffrey Epstein's home. *See* Figueroa at 184-185. The Palm Beach Police Report reflects that "▮▮▮" and "▮▮▮" also brought seventeen year old ▮▮▮▮▮ to the home to perform sexual massages. *See* GIUFFRE 05641. ▮▮▮ thereafter recruited a number of other young girls to perform sexual

massages as reflected in the Palm Beach Police Report. **Giuffre 001427 (pictured above) – 1/2/03 – JE from** ███████ **"Wants to know if she should bring her friend** ███ **with tonight."**

- This message pad reflects multiple sexual massages being scheduled for the same day which corroborates Virginia GIUFFRE, ██████████ and Johanna Sjorberg's testimony that Jeffrey Epstein required that he have multiple orgasms in a day which occurred during these sexual massages. **Giuffre 001449 (pictured above) – 9/03/05 JE from** ███████ **– "I left message for** ███████ **to confirm for 11:00 a.m. and** ███████ **for 4:30 p.m."**

- This message pad shows a friend of Jeffrey Epstein's discussing with him how he had sex with an 18 year old who had also been with Jeffrey Epstein. **Giuffre – 001456 (pictured above)– undated JE from Jean Luc – "He just did a good one – 18 years – she spoke to me and said "I love Jeffrey."**

Law enforcement was able to confirm identities of underage victims through the use of

the names and telephone numbers in these message pads:

Q. The next line down is what I wanted to focus on, April 5th, 2005. This trash pull, what evidence is yielded from this particular trash pull?
THE WITNESS: The trash pull indicated that there were several messages with written items on it. There was a message from HR indicating that there would be an 11:00 appointment. There were other individuals that had called during that day.
Q. And when you would -- when you would see females' names and telephone numbers, would you take those telephone numbers and match it to -- to a person?
THE WITNESS: We would do our best to identify who that person was.
Q. And is that one way in which you discovered the identities of some of the other what soon came to be known as victims?
THE WITNESS: Correct.
***
Q. Did you find names of other witnesses and people that you knew to have been associated with the house in those message pads?
THE WITNESS: Yes.
Q. And so what was the evidentiary value to you of the message pads collected from Jeffrey Epstein's home in the search warrant?
THE WITNESS: It was very important to corroborate what the victims had already told me as to calling in and for work.[31]

### 7. The Black Book

Palm Beach Police confiscated an extensive lists of contacts with their phone numbers

form Defendant and Epstein's residence.[32] Ghislaine Maxwell maintained a contact list in an

---

[31] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 42:14-43:17; 78:25:-79:15.

22

approximately 100-page-long hard copy, which was openly available to other house employees. It consisted primarily of telephone numbers, addresses, or email addresses for various personal friends, associates, employees, or personal or business connections of Epstein or Defendant. Prior to being terminated by Defendant, the Palm Beach house butler Alfredo Rodriguez printed a copy of this document and ultimately provided it to the FBI. This document reflects the numerous phone numbers of Defendant, Epstein as well as staff phone numbers. Additionally, and importantly, there are several sections entitled "Massage" alongside a geographical designation with names of females and corresponding telephone numbers. These numbers included those of underage females (with no training in massage therapy ) – including ███████ ████████████████████████████ – identified during the criminal investigation of Epstein. This document is an authentic reflection of the people who were associated with Epstein, Defendant, and the management of their properties, and the knowledge each had of the contents of the document.

**8.    Sex Slave Amazon.com Book Receipt**

Detective Recarey authenticated an Amazon.com receipt that the Palm Beach Police collected from Jeffrey Epstein's trash. The books he ordered are titled:

(1) SM 101: A Realistic Introduction, Wiseman, Jay;

(2) SlaveCraft: Roadmaps for Erotic Servitude – Principles, Skills and Tools by Guy Baldwin; and

(3) Training with Miss Abernathy: A Workbook for Erotic Slaves and Their Owners, by Christina Abernathy, as shown below:

---

[32] *See* McCawley Dec. at Exhibit 45, Phone List, Public Records Request No.: 16-268 at 2282 – 2288.



This disturbing 2005 purchase corroborate Ms. Giuffre's account of being sexually exploited by Defendant and Epstein – not to mention the dozens of underage girls in the Palm Beach Police Report. Additionally, Defendant testified that she was not with Jeffrey Epstein in 2005 and 2006 when he was ordering books on how to use sex slaves; however, record evidence contradicts that testimony.

### 9.    Thailand Folder with Defendant's Phone Number

Defendant also was integral in arranging to have Virginia go to Thailand. While Epstein had paid for a massage therapy session in Thailand, there was a catch. Defendant told Virginia she had to meet young girls in Thailand and bring her back to the U.S. for Epstein and Defendant. Indeed, on the travel records and tickets Defendant gave to Virginia, Defendant wrote on the back the name of the girl Virginia was supposed to meet, and she was also instructed to check in frequently with Defendant as it was further signified by the words "Call Ms. Maxwell (917) ████!" on Virginia's travel documents. In this case, Virginia also produced the hard copy records from her hotel stay in Thailand paid for by Epstein. *See* McCawley Dec. at Exhibit 32, 43, GIUFFRE 003191-003192; GIUFFRE 007411-007432.



10.     **It is undisputed fact that the FBI report and the Churcher emails reference Ms. Giuffre's accounts of sexual activity with Prince Andrew that she made in 2011, contrary to Defendant's argument that Ms. Giuffre never made such claims until 2014.**

Based on the FBI's Interview of Ms. Giuffre in 2011, they wrote a report reflecting Ms.

Giuffre's claims concerning her sexual encounters with Prince Andrew:[33]

```
        GIUFFRE and          went shopping and purchased makeup, clothing, and a
Burberry bag.  The items were purchased with                            GIUFFRE
and         returned
instructed GIUFFRE to get ready.  When GIUFFRE came down after getting
ready, she was introduced to




                    GIUFFRE traveled to CLUB TRAMP                         GIUFFRE
danced                    at CLUB TRAMP
                                                    stayed at CLUB TRAMP
for an hour or hour and a half and drank a couple of cocktails before
returning to                          GIUFFRE had not received any direction
from
              After returning to
requested         to take a photograph of her                         GIUFFRE
advised that she still had the original photograph in her possession and
would provide it to the interviewing agents.  GIUFFRE proceeded with




        Approximately two months later, GIUFFRE met            at


                            GIUFFRE recalled
                    LNU,


        GIUFFRE recalled         joking about trading GIUFFRE in because
she was getting too old.
```

---

[33] *See* McCawley Dec. at Exhibit 31, GIUFFRE001235-1246, FBI Redacted 302.

25

Additionally, 2011 correspondence with Sharon Churcher shows that Ms. Giuffre disclosed her sexual encounters with Prince Andrew, but Churcher had to check with the publisher's lawyers "on how much can be published,"

> -----Original Message-----
> From: Sharon.Churcher@mailonsunday.co.uk
> Sent: Friday, 18 February 2011 7:25 AM
> To: Virginia Giuffre
>
>
> Hi there
> Have been up all night writing. Won't have an opinion from our lawyer on
> how much can be published until London wakes up. The lawyers wanted
> internal FBI documents but I think the Justice Dept letter is all you have
> from the feds??? Anyway can I give you a call early afternoon? Maybe have a
> late lunch?
> S

*See* McCawley Dec. at Exhibit 34, GIUFFRE003678. Accordingly, there is documentary evidence that refutes Defendant's meritless argument that Ms. Giuffre did not allege she had sex with Prince Andrew until 2014. To the contrary, two sources, including the FBI, show Ms. Giuffre made these claims in 2011.

### C. Defendant Has Produced No Documents Whatsoever That Tend to Show That She Did Not Procure Underage Girls For Jeffrey Epstein.

Defendant has produced no documents that even tend to show that she did not procure underage girls for sex with Epstein, and no documents that tend to show that she did not participate in the abuse. Indeed, Defendant refused to produce *any* documents dated prior to 2009, which includes the 2000-2002 period during which she abused Ms. Giuffre.

Against this backdrop of an avalanche of evidence showing the Defendant sexually trafficked Ms. Giuffre, summary judgment on any of the issues advanced by Defendant is inappropriate. While we discuss the particulars of the individual claims below, the larger picture is important too. Ms. Giuffre will prove at trial that Epstein and Defendant sexually trafficked her. And yet, when Ms. Giuffre had the courage to come forward and expose what Defendant had done to world – in a Court pleading trying to hold Epstein accountable – Defendant

26

responded by calling her a liar in a press release intended for worldwide publication. Such

heinous conduct is not a mere "opinion," but rather is defamation executed deliberately and with

actual malice. The jury should hear all of the evidence and then render its verdict on Ms.

Giuffre's complaint.

## III.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary

judgment may be granted only when "there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly

held that "all ambiguities and inferences to be drawn from the underlying facts should be

resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine

issue for trial should be resolved against the moving party." *Swan Brewery Co. Ltd. v. U.S. Trust

Co. of New York*, 832 F. Supp. 714, 717 (S.D.N.Y. 1993) (Sweet, J.), citing *Brady v. Town of

Colchester*, 863 F.2d 205, 210 (2d Cir. 1988) (internal quotations omitted). In other words, in

deciding a motion for summary judgment, the court must construe the evidence in the light most

favorable to the non-moving party and draw all reasonable inferences in the non-moving party's

favor. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 87 (2d Cir. 2008). *Stern v. Cosby*,

645 F. Supp. 2d 258, 269 (S.D.N.Y.2009). Summary judgment should be denied "if the evidence

is such that a reasonable jury could return a verdict" in favor of the non-moving party. *See Net

Jets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 178–79 (2d Cir. 2008).

## IV.   LEGAL ARGUMENT

### A.   Defendant is Liable for the Publication of the Defamatory Statement and Damages for Its Publication

Defendant's lead argument is that, when she issued a press release attacking Ms. Giuffre

to members of the media, she somehow is not responsible when the media quickly published her

attacks. If accepted, this remarkable claim would eviscerate defamation law, as it would permit a defamer to send defamatory statements to the media and then stand back and watch – immune from liability – when (as in this case) the defamatory statements are published around the world. This absurd position is not the law, particularly given that the Defendant released a statement to media asking them to "[p]lease find attached a ***quotable statement*** on behalf of Ms. Maxwell."

To make her claim seem plausible, Defendant cites older cases, some dating back as far as 1906. This presents a distorted picture of the case law on these issues. As a leading authority on defamation explains with regard to liability for republication by another of statement by a defendant: "Two standards have evolved. The older one is that the person making the defamatory statement is liable for republication only if it occurs with his or her express or implied authorization of consent. The more modern formulation adds responsibility for all republication that can reasonably be anticipated or that is the 'natural and probable consequence' of the publication." SACK ON DEFAMATION § 2.7.2 at 2-113 to 2-114 (4th ed. 2016). In this case, however, the nuances of the applicable legal standards make little difference because Defendant so clearly authorized – indeed, desired and did everything possible to obtain – publication of her defamatory statements attacking Ms. Giuffre.

### 1. Under New York Law, Defendant is liable for the media's publication of her press release.

Given the obvious purposes of defamation law, New York law unsurprisingly assigns liability to individuals for the media's publication of press releases. Indeed, New York appellate courts have repeatedly held that an individual is liable for the media publishing that individual's defamatory press release. *See Levy v. Smith*, 18 N.Y.S.3d 438, 439, 132 A.D.3sd 961, 962–63 (N.Y.A.D. 2 Dept. 2015) ("Generally, [o]ne who makes a defamatory statement is not responsible for its recommunication without his authority or request by another over whom he

has no control . . . Here, however . . . the appellant intended and authorized the republication of

the allegedly defamatory content of the press releases in the news articles"); *National Puerto*

*Rican Day Parade, Inc. v. Casa Publications, Inc.*, 914 N.Y.S.2d 120, 123, 79 A.D.3d 592, 595

(N.Y.A.D. 1 Dept. 2010) (affirming the refusal to dismiss defamation counts against a defendant

who "submitted an open letter that was published in [a] newspaper, and that [the defendant] paid

to have the open letter published," and finding that the defendant "authorized [the newspaper] to

recommunicate his statements.") *See also* RESTATEMENT (SECOND) OF TORTS § 576 (1977) ("The

publication of a libel or slander is a legal cause of any special harm resulting from its repetition

by a third person if . . . the repetition was authorized or intended by the original defamer, or . . .

the repetition was reasonably to be expected.")[34]

Defendant deliberately sent her defamatory statement to major news media publishers for

worldwide circulation because Defendant wanted the public at large to believe that Ms. Giuffre

was lying about her abuse. Defendant even hired a public relations media specialist to ensure the

media would publish her statement. Her efforts succeeded: her public relations agent instructed

dozens of media outlets to publish her "quotable" defamatory statement and they did.

Despite this deliberate campaign to widely publicize her defamatory statement,

Defendant now disclaims any responsibility for the media publishing her press release. If we

understand Defendant's position correctly, because she somehow lacked "control" over what

major newspapers and other media finally put in their stories, she escapes liability for

defamation. This nonsensical position would let a defamer send a false and defamatory letter to

major media, and then, when they published the accusation, escape any liability. Such an

---

[34]*Cf., Eliah v. Ucatan Corp.*, 433 F. Supp. 309, 312–13 (W.D.N.Y. 1977) ("The alleged multistate publication of plaintiff's photograph without her consent thus gives rise to a single cause of action. … However, evidence of the multistate publication of the magazine and the number of copies sold would be competent and pertinent to a showing of damages, if any, suffered by plaintiff.")

argument is not only an affront to logic, but it is contrary to prevailing New York case law, cited above. Perhaps even more important, in the context of the pending summary judgment motion, it would require Defendant to convince the jury that she did not "authorize or intend" for the major media to publish her press release. Obviously the disputed facts on this point are legion, and summary judgment is accordingly inappropriate.

Even the cases Defendant cites contradict her argument. She first cites *Geraci v. Probst*, in which a defendant sent a letter to the Board of Fire Commissioners, and, years later, a newspaper published the letter. The court held that the defendant was not liable for that belated publication, "made years later without his knowledge or participation." *Id*., at 340. By contrast, Defendant not only authorized the defamatory statement, but paid money to her publicist to convince media outlets to publish it promptly – actions taken with both her knowledge and consent. Defendant's statement was thus not published "without [her] authority or request," as in *Geraci*, but by her express authority and by her express request. Defendant's publicist's testimony and the documents produced by Defendant's publicist unambiguously establish that the media published her press release with Defendant's authority and by her request:

> Q. When you sent that email were you acting pursuant to Ms. Maxwell's retention of your services?
> A. Yes, I was
>
> ***
>
> Q. The subject line does have "FW" which to me indicates it's a forward. Do you know where the rest of this email chain is?
> A. My understanding of this is: It was a holiday in the UK, but Mr. Barden was not necessarily accessible at some point in time, so this had been sent to him originally by Ms. Maxwell, and because he was unavailable, she forwarded it to me for immediate action. I therefore respond, "Okay, Ghislaine, I'll go with this."
>
> It is my understanding that this is the agreed statement because the subject of the second one is "Urgent, this is the statement" so ***I take that as an instruction to send it out, as a positive command***: "This is the statement."[35]

---

[35] *See* McCawley Dec. at Exhibit 6, Ross Gow Dep. Tr. at 14:15-17; 44:6-45:13 (emphasis added).

Similarly, another case cited by Defendant, *Davis v. Costa-Gavras*, involved a libel claim against a book author who wrote an account of the 1972 military coup in Chile. Years later, the plaintiff attempted to ascribe defamation liability to a third-party publishing house's decision to republish the book in paperback form and a third-party filmmaker who released a movie based on the book. The Court held that a "party who is 'innocent of all complicity' in the publication of a libel cannot be held accountable . . . [but that] a deliberate decision to republish or active participation in implementing the republication resurrects the liability." 580 F. Supp. 1082, 1094 (S.D.N.Y. 1984). Here, Defendant made a deliberate decision to publish her press release, and actively participated in that process. At the very least, the jury must make a determination of whether Defendant was "innocent of all complicity" for a libelous statement contained in her press release.

Finally, Defendant cites *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557 (1980), which held that reporters of a series of articles on narcotics trade "cannot be held personally liable for injuries arising from its subsequent republication in book form absent a showing that they approved or participated in some other manner in the activities of the third-party republisher." *Id.*, 416 N.E.2d at 559-560. Again, the jury could reasonably find that Defendant both approved of, and even participated in, the media's publication of her press release. Indeed, it is hard to understand how any jury could find anything else. Defendant was obviously "active" in influencing the media to publish her defamatory press release, she both "approved" of and pushed for the publication of the press release. Accordingly, she is liable for its publication.[36]

---

[36] On page 14 of her motion, Defendant makes wholly contradictory statements. In back-to-back sentences, she tells the Court that (1) she has no control over whether the media published the statement she sent to the media (with instructions to publish it by an influential publicist); (2) her public relations representative gave instructions to the media on how to publish it (in full); and (3) her public relations representative "made no effort to control" how the media would publish it. Indeed, the best evidence of Defendant's control over the press is the fact dozens of media outlets obeyed her directive to publish her defamatory statement.

Therefore, disclaiming responsibility for the media's publication of a statement (for which she hired a publicist for the purpose of influencing the media to publish that statement) is contrary to both prevailing case law, and the cases cited by Defendant.

**2.    Defendant is liable for the media's publication of the defamatory statement.**

After arguing, contrary to New York law, that she is not liable for the media's publication of her own press release, Defendant next argues that she is not liable for the media's publications of the ***defamatory statement*** contained within her press release if the media chose to make even the tiniest of editorial changes. If we understand Defendant's argument correctly, any omission of any language from a press release is somehow a "selective, partial" publication for which she escapes liability. Mot. at 14. Once again, this claim is absurd on its face. It would mean that a defamer could send to the media a long attack on a victim with one irrelevant sentence and, when the media quite predictably cut that sentence, escape liability for the attack. Moreover, even on its face, the claim presents a jury question of what changes would be, in context, viewed as "selective" or "partial" publications – something that only a jury could determine after hearing all of the evidence.

In support of this meritless argument, Defendant cites *Rand v. New York Times Co.*, for the proposition that a defendant cannot be liable for a publisher's "editing and excerpting of her statement." 430 N.Y.S.2d 271, 274, 75 A.D.2d 417, 422 (N.Y.A.D. 1980). This argument fails for several reasons. First, there is no "republication" by the media as a matter of law. Defendant issued a defamatory statement to the press, and its publication (as Defendant intended) is not a "republication" under the law, as discussed above. Second, there was no "editing" or paraphrasing or taking the quote out of context of the core defamatory statement in the press release: that Ms. Giuffre is a liar. The "obvious lies" passage is the heart of the message

32

Defendant sent to the press: that Ms. Giuffre was lying about her past sexual abuse. Even in isolation, Defendant's quote stating that Ms. Giuffre's claims are "obvious lies" does not distort or misrepresent the message Defendant intended to convey to the public that Ms. Giuffre was lying about her claims. As this Court explained in denying Defendant's Motion to Dismiss, this case "involves statements that explicitly claim the sexual assault allegations are false." *Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016).

Furthermore, the facts at issue here make the *Rand* holding inapposite. In *Rand*, a newspaper paraphrased and "sanitized" defendant's words. No such changing, sanitizing, or paraphrasing occurred in the instant case: the media **quoted** Defendant's statement accurately. Further, the phrase at issue in Rand was that certain people "screwed" another person. The speaker/newspaper used the term "screwed" in reference to a record label's dealings with a performing artist, and not did not mean "screwed" in the literal sense, but as "rhetorical hyperbole, and as such, is not to be taken literally." *Id*. By contrast, there is no hyperbole in Defendant's defamatory statement, and it was never distorted or paraphrased by any publication known to Ms. Giuffre. A jury could reasonable conclude that Defendant's statement that Ms. Giuffre's claims of child sexual abuse are "obvious lies" is not a rhetorical device, nor hyperbole, but a literal and particular affirmation that Ms. Giuffre lied.

Accordingly, there is no support in the factual record that the media reporting that Defendant stated that Ms. Giuffre's claims of childhood sexual abuse are "obvious lies" is a distortion of Defendant's message or hyperbole. Even a cursory review of the press release would lead to that conclusion. Moreover, to the extent that there is any dispute that Defendant's statement had a different meaning outside of the context of the remainder of the press release,

such a determination of meaning and interpretation is a question of fact for the jury to decide, and is inappropriate for a determination upon summary judgment.

### B.     Material Issues of Fact Preclude Summary Judgment.

### 1.     The Barden Declaration presents disputed issues of fact.

The primary basis of Defendant's motion for summary judgment is her attorney's self-serving, *post hoc* affidavit wherein he sets forth his alleged "intent" with regard Defendant's defamatory statement.[37] Ms. Giuffre disputes Defendant's attorney's alleged and unproven "intent" (not to mention Defendant's "intent"), not only because Defendant refuses to turn over her attorney's communications, but also because questions of intent are questions of fact to be determined by a trier of fact. Furthermore, ample record evidence contradicts the claimed "intent."

a.     The Barden Declaration is a deceptive back-door attempt to inject Barden's advice without providing discovery of all attorney communications.

In her brief, Defendant discloses her attorney's alleged legal strategy and alleged legal advice; however, she deliberately states that her attorney "intended," instead of her attorney "advised," when discussing her attorney's legal strategy and advice, using that phrase ***at least 37 times***,[38] and using phrases such as Barden's "beliefs,"[39] "purposes,"[40] "goals,"[41] and

---

[37] The Barden declaration is problematic for other reasons as well. In addition to Defendant's over-length, 68-page motion and among Defendant's 654 pages of exhibits lies an eight-page attorney affidavit that proffers legal conclusions and arguments. This exhibit is yet another improper attempt to circumvent this Court's rules on page limits. *See Pacenza v. IBM Corp.*, 363 F. App'x 128, 130 (2d Cir. 2010) (affirming lower court decision to strike "documents submitted . . . in support of his summary judgment motion [that] included legal conclusions and arguments" because those "extraneous arguments constituted an attempt . . . to circumvent page-limit requirements submitted to the court."); *cf. HB v. Monroe Woodbury Cent. School Dist.*, 2012 WL 4477552, at *6 (S.D.N.Y. Sept. 27, 2012) ("The device of incorporating an affirmation into a brief by reference, as Plaintiffs have done here, in order to evade the twenty-five page limit, rather obviously defeats the purpose of the rule"). The court should disregard the Barden Declaration for that reason alone

[38] MSJ at 7 (three times), 8 (three), 15 (four), 16, 25 (five), 26, 33, 35 (two), 36 (three); Statement of Facts at 6 (two), 7 (five); Decl. of Philip Barden at 4 (four), 5 (three).

[39] MSJ at 25, 35; Statement of Facts at 7 (two); Decl. of Philip Barden at 3, 4 (three), 5 (two).

[40] MSJ at 8, 25, 35; Statement of Facts at 7 (three); Decl. of Philip Barden at 4 (two), 5 (three).

"contemplations" 25 other times. All the while Defendant has claimed a privilege as to her communications with Barden. Defendant attempts to convince the Court that she only granted Gow permission to publish the defamatory statement as part of "Mr. Barden's deliberated and carefully crafted" (MSJ at 16) legal strategy and advice. Yet, she still refused to turn over her communications with Barden under the auspices of attorney-client privilege.[42] Such gamesmanship should not be permitted.

If the Court were to consider the Barden Declaration (which it shouldn't), it would be ruling on a less than complete record because, based on this Declaration, it is necessary that Defendant disclose all communications with him and possibly others. Ms. Giuffre doesn't have those communications, the court doesn't have those communications; therefore, Defendant is asking for summary judgment on an incomplete record.

The Court should also not consider the Barden Declaration because it will be inadmissible as unduly prejudicial. It is a self-serving declaration by a non-deposed witness made without turning over the documents that are relevant to the declaration. *See, e.g.*, *Rubens v. Mason*, 387 F.3d 183, 185 (2d Cir. 2004) ("We find that the District Court predicated its grant of summary judgment as to liability on an affidavit from the arbitrator who presided over the underlying arbitration, the probative value of which was substantially outweighed by the danger of unfair prejudice. The affidavit, therefore should not have been admitted. We therefore vacate the grant of summary judgment to the defendants on liability and remand to the District Court.").

> b. <u>Defendant's summary judgment argument requires factual findings regarding Barden's intent, thereby precluding summary judgment.</u>

Even were the Court to consider this Declaration and representations therein – which it should not – the declaration itself demonstrates that the Court would have to make factual

---

[41] MSJ at 27.
[42] *See* McCawley Dec. at Exhibit 22, Defendant's Privilege Log.

finding as to what Mr. Barden's intent really was. Finding about intent are inappropriate at the summary judgment stage, as this Court and the Second Circuit have recognized. This Court has explained, "***if it is necessary to resolve inferences regarding intent, summary judgment is not appropriate***." *Id*. (Sweet, J.) (emphasis added), citing *Patrick v. Le Fevre*, 745 F.2d 153, 159 (2d Cir. 1984); *Friedman v. Meyers*, 482 F.2d 435, 439 (2d Cir. 1973) (other citations omitted).

c.    <u>There are factual disputes regarding Barden's Declaration.</u>

Finally, there are material disputes over the statements in the Barden Declaration because they are directly refuted by record evidence. For example, the instant motion and the Barden Declaration describe the press release merely as a document expressing "his [Mr. Bardent's] *opinion – in the form of a legal argument* –as a lawyer would be," as opposed to a press release for dissemination by the media to the public. Record evidence refutes this claim, as (1) the press release was sent to journalists, not media publishers or in-house counsel; (2) the press release instructed the journalists to publish the defamatory statement ("Please find attached a ***quotable statement*** on behalf of Ms. Maxwell"); (3) it was issued by a publicist on Defendant's behalf and not by an attorney, without any reference to attorneys or laws – indeed, Gow testified that Barden was unavailable to approve the statement; and (4) Gow testified that he issued the statement only after he understood Defendant to have "signed off" it, an understanding he formed based on Defendant's "positive command" to him: "This is the agreed statement."

Q.  When you sent that email were you acting pursuant to Ms. Maxwell's retention of your services?
A.  Yes, I was.

***

Q. When you say "agreed statement" can you tell me more about what you mean? **Who agreed to the statement?**
A. I need to give you some context, if I may, about that statement. So, this is on New Year's Day. I was in France so the email time here of 21:46, in French time was 22:46, and I was getting up early the next morning to drive my family back from the south of France to England, which is a 14-hour journey, door to door. So on the morning of th[e] 2nd of January,

36

bearing in mind that Ms. Maxwell, I think was in New York then, she was five hours behind, so there was quite a lot of, sort of time difference between the various countries here, I sent her an email, I believe, saying - parsing this-- forwarding this email to her saying "How do you wish to proceed?" And then I was on the telephone-- I had two telephones in the car, I received in excess of 30 phone calls from various media outlets on th$^e$ 2nd of January, all asking for information about how Ms. Maxwell was looking to respond to the latest court filings, which were filed on the 30th of December as I understand.

And by close-- towards close of play on the 2nd, **I received an email forwarded by Ms. Maxwell, containing a draft statement** which my understanding was the majority of which had been drafted by Mr. Barden **with a header along the lines of "This is the agreed statement."** At close of play on th$^e$ 2nd. So–I was–I had gone under the Channel Tunnel and I was sitting on the other side and that email, which **my understanding was that it had been signed off by the client, effectively**, was then sent out to a number of media, including Mr. Ball and various other UK newspapers.

Q. Mr. Gow, when you say "end of play" and "close of play," are you referring to sending the email that is Exhibit 2?

A. Yes, I am

*** 

Q. The subject line does have "FW" which to me indicates it's a forward. Do you know where the rest of this email chain is?

A. My understanding of this is: It was a holiday in the UK, but Mr. Barden was not necessarily accessible at some point in time, so **this had been sent to him originally by Ms. Maxwell, and because he was unavailable, she forwarded it to me for immediate action. I therefore respond, "Okay, Ghislaine, I'll go with this."**

**It is my understanding that this is the agreed statement because the subject of the second one is "Urgent, this is the statement" so I take that as an instruction to send it out, as _a positive command_: "This is the statement."**[43]

Accordingly, record evidence shows that the press release was intended as press release, and not as a "legal argument." Record evidence also establishes that Defendant circulated the press release to Barden and Gow, and then gave a "positive command" to Gow to publish it. Additionally, there is no indicia that the press release is a legal opinion. To the contrary, it was issued by, and specifically attributed to, a woman who has personal knowledge of whether Ms. Giuffre's claims of sexual abuse are true, and she states that Ms. Giuffre is a liar.[44] At the very least, all of these factual issues must be considered by a jury.

---

[43] *See* McCawley Dec. at Exhibit 6, Ross Gow Dep. Tr. at 14:15-17; 31:19-33:7; 44:6-45:13 (emphasis added).

[44] Unsurprisingly, Defendant cites no case law to support her argument that her attorney's alleged influence in preparing the statement Defendant issued to the media somehow shields her from liability.

Another example is that Defendant states that "Gow served only as Mr. Barden's conduit to the media" (MTD at 25), and "Mr. Barden was directing the January 2-15 statement to a discrete number of media representatives." Barden wasn't directing anything – he wasn't even in the loop when Defendant decided to publish the statement - and the documents prove it. Indeed, the press release itself states that it is "on behalf of Ms. Maxwell," not Barden, and it was Defendant who gave the "positive command" to Gow to publish it. These are just a couple of examples, among many, of the purported facts asserted in Defendant's motion and Barden's Declaration that are directly refuted by facts in the record.

Finally, neither the media nor the general public could have known that the statement should be attributed to Barden. His name was nowhere in it, nor is there any reference to counsel. Defendant's argument that the "context" is the media knowing Barden's intent or involvement is unsupported by the record. The significant factual disputes about Barden, alone, prevent summary judgment.

### C.    Defendant's Defamatory Statement Was Not Opinion as a Matter of Law.

As this Court previously held, correctly, Defendant stating that Ms. Giuffre's claims of sexual assault are lies is not an expression of opinion:

> "First, statements that Giuffre's claims 'against [Defendant] are untrue,' have been 'shown to be untrue,' and are 'obvious lies' have a specific and readily understood factual meaning: that Giuffre is not telling the truth about her history of sexual abuse and Defendant's role, and that some verifiable investigation has occurred and come to a definitive conclusion proving that fact. Second, these statements (as they themselves allege), are capable of being proven true or false, and therefore constitute actionable fact and not opinion. Third, in their full context, while Defendant's statements have the effect of generally denying Plaintiff's story, they also clearly constitute fact to the reader."

*Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016). This Court further explained:

> "Plaintiff cannot be making claims shown to be untrue that are obvious lies without being a liar. Furthermore, to suggest an individual is not telling the truth

38

about her history of having been sexually assaulted as a minor constitutes more than a general denial, it alleges something deeply disturbing about the character of an individual willing to be publicly dishonest about such a reprehensible crime. Defendant's statements clearly imply that the denials are based on facts separate and contradictory to those that Plaintiff has alleged." *Id.*

Defendant argues that somehow the "context" of the entire statement "tested against the understanding of the average reader" should be the press release as a whole being read only by journalists. This is an unreasonable construct because the ultimate audience for a press release is the public. Indeed, the purpose of a press release is to reach readers. Unsurprisingly, Defendant cites no case that holds that journalists might somehow believe statements of fact are opinion while others do not.

This Court has previously covered this ground when it clearly stated:

Sexual assault of a minor is a clear-cut issue; either transgression occurred or it did not. Either Maxwell was involved or she was not. The issue is not a matter of opinion, and there cannot be differing understandings of the same facts that justify diametrically opposed opinion as to whether Defendant was involved in Plaintiff's abuse as Plaintiff has claimed. Either Plaintiff is telling the truth about her story and Defendant's involvement, or Defendant is telling the truth and she was not involved in the trafficking and ultimate abuse of Plaintiff.

*Giuffre v. Maxwell*, 165 F. Supp.at 152 (S.D.N.Y. 2016). The same conclusion applies now. At the motion to dismiss stage, Defendant had not yet produced the statement she issued to the press. That statement is now in evidence, so there is no ambiguity as to what defendant released to the press.

The absurdity of Defendant characterizing his statements calling Ms. Giuffre a liar as mere "opinion" is revealed by the fact that Defendant was the one who was sexually trafficking and otherwise abusing Ms. Giuffre. No reasonable person in any context would construe that as Defendant's mere "opinion" on the subject, since Defendant knew she was abusing Ms. Giuffre. Indeed, this argument is contradicted by Defendant's own deposition testimony:

Q. Do you believe Jeffrey Epstein sexually abused minors?

A. I can only testify to what I know. **I know that Virginia is a liar and I know what she testified is a lie.** So I can only testify to what I know to be a falsehood and half those falsehoods are enormous and so **I can only categorically deny everything she has said** and that is the only thing I can talk about because I have no knowledge of anything else.

*See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. (April 17, 2016) at 174:6-19.

Defendant slyly contends in her motion that "Mr. Barden's "arguments" in the press release constitute 'pure opinion,'" attempting to disclaim any involvement in making the defamatory statement. However, it is not Mr. Barden's statement, nor his opinion, that it at issue here. At issue here is Defendant's statement – a statement attributable to her, that she approved, whose publication she "command[ed]," and for which she hired a public relations representative to disseminate to at least 30 journalists for publication. While Mr. Barden could possibly have had his own opinion as to whether or not his client abused Ms. Giuffre, Defendant cannot express an opinion on a binary, yes/no subject where she knows the truth. As this Court previously articulated, "statements that Giuffre's claims 'against [defendant] are untrue,' have been 'shown to be untrue,' and are 'obvious lies' have a specific and readily understood factual meaning." *Giuffre v. Maxwell*, 165 F. Supp. 3d at 152. Again, at the very least, the jury must pass on such issues.

### D. The Pre-Litigation Privilege Does Not Apply to Defendant's Press Release

#### 1. Defendant fails to make a showing that the pre-litigation privilege applies.

Defendant's next argument seeks refuge in the pre-litigation privilege. If we understand the argument correctly, Defendant seems to be saying that because she was contemplating an (unspecified and never-filed) lawsuit involving the British Press, she somehow had a "green light" to make whatever defamatory statements she wanted about Ms. Giuffre. To prove such a

remarkably claim, Defendant relies on caselaw involving such mundane topics as "cease and desist" letters sent to opposing parties and the like. Obviously such arguments have no application to the press release that Defendant sent out, worldwide, attacking Ms. Giuffre's veracity.

The problems with the Defendant's argument are legion. For starters, there is no record evidence – not even Defendant's own testimony – suggesting that she was contemplating litigation against Ms. Giuffre, or that her press release was related to contemplated litigation against Ms. Giuffre. Tellingly, the only "evidence" Defendant cites of any alleged contemplated litigation is the self-serving, *post hoc,* partial waiver of attorney-client privilege found in the Barden Declaration. As discussed above, that Declaration fails to establish that there was good faith anticipated litigation between her and Ms. Giuffre, particularly when evidence in the record contradicts such assertions. At the very least, it is a matter of fact for the jury to decide.

In another case in which a defendant attempted to claim pre-litigation privilege applied to statements made to the press, this Court denied summary judgment, and held, "[t]o prevail on a qualified privilege defense [defendant] must show that his claim of privilege does not raise triable issues of fact that would defeat it." *Block v. First Blood Associates*, 691 F. Supp. 685, 699-700 (Sweet, J.) (S.D.N.Y. 1988) (denying summary judgment on the pre-litigation qualified privilege affirmative defense because there was "a genuine issue as to malice and appropriate purpose"). Defendant's claim here likewise fails.

First, Defendant's testimony makes no mention of any contemplated lawsuit – much less any contemplated lawsuit against Ms. Giuffre. Second, Defendant has offered no witnesses who will testify that she intended to bring any law suit. Third, she did not, in fact, bring any such lawsuit. The only "evidence" is a *post hoc* Declaration written by her attorney. Finally, it must be

41

remembered, as explained at length above, the Defendant had sexually trafficking Defendant and was attempting to continue to conceal her criminal acts. Whether her statements had an "appropriate purpose," *Block* 691 F. Supp. at 699-700 (Sweet, J.) – or were, rather, efforts by a criminal organization to silence its victims – is obviously contested. Accordingly, obvious issues of fact exist as to whether or not Defendant contemplated litigation.

Distorting reality, Defendant further argues: "Statements pertinent to a good faith anticipated litigation made by attorneys (or their agents under their direction) before the commencement of litigation are privileged." (MSJ at 33). The record evidence shows that Defendant's attorney did not make the defamatory statement. Further, Defendant's attorney's agents did not make the defamatory statement. Defendant did. And, there was no statement made by anyone "before the commencement of litigation" because *litigation never commenced*. Accordingly, the cases Defendant cites where attorneys are making statements (or where clients are making statements to their attorneys regarding judicial proceedings including malpractice) are wholly inapposite as detailed below.[45]

---

[45]

- *Front v. Khalil*, 24 N.Y.3d 713, 720 (2015) - statement made by attorney.
- *Flomenhaft v. Finkelstein*, 127 A.D.3d 634, 637 n.2, 8 N.Y.S.3d 161 (N.Y. App. Div. 2015) - did not even address pre-litigation privilege, and said that Front, Inc. was not relevant to the case.
- *Kirk v. Heppt*, 532 F. Supp. 2d 586, 593 (S.D.N.Y. 2008) - the communication at issue was made by an attorney's client to the attorney's malpractice carrier concerning the client's justiciable controversy against the attorney over which the clients actually sued.
- *Petrus v Smith*, 91 A.D.2d 1190 (N.Y.A.D.,1983) - the court held: "[r]emarks of attorney to Surrogate are cloaked with absolute immunity as statements made in course of judicial proceedings – Attorney's gratuitous opinion outside courthouse calling plaintiff liar . . . is not similarly immune." (This case undermines the false argument Defendant tries to make).
- *Klien* - contrary to dicta quoted by Defendant from the Klein case, there were no communications made "between litigating parties or their attorneys," just a press release Defendant instructed her press agent to disseminate to the media.
- *Frechtman v. Gutterman*, 115 A.D.3d 102, 103, 979 N.Y.S.2d 58, 61 (2014) - the communication at issue was a letter sent by a client to his attorney terminating the representation for malpractice.
- *Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D.3d 163 (N.Y.A.D. 1 Dept. 2007) - privilege applied to letter client sent discharging law firm as the client's attorneys as statements relating to a judicial proceeding and law firm sued for defamation.

Similarly, in *Black v. Green Harbour Homeowners' Ass'n, Inc.*, 19 A.D.3d 962, 963, 798 N.Y.S.2d 753, 754 (2005), cited by Defendant, the Court held a privilege applied to a letter sent by a home owner's association board of directors to the association's members informing them of the status of litigation to which the association was a party, and to the association's letter to the state attorney general sent to discharge it's duties to the association. In this case, litigation was actually pending, the communication was sent by a party to that litigation as part of its duties, and the communication itself concerned the litigation. Defendant's press release fits none of those descriptions.

Unsurprisingly, Defendant cites to no case in which a Court has held that this or any qualified privilege extends to internationally disseminated press releases defaming a non-party to the purported "anticipated" litigation. Regardless of whether or not Barden had a hand in drafting the statement (another disputed issue of fact for the jury), Defendant issued the statement, instructed that it be published, and the statement she issued was attributed to her, and not to her attorney (or his agents). Accordingly, all the case law Defendant cites about an ***attorney*** making a statement (or a client making a statement to their attorney or malpractice carrier) is inapposite.

## 2. Defendant is foreclosed from using the pre-litigation privilege because she acted with malice.

In any event, because Defendant acted with malice, she cannot avail herself of the pre-litigation privilege. As this Court has explained denying Defendant's motion to dismiss, "'There is no qualified privilege under New York law when such statements are spoken with malice, knowledge of their falsity, or reckless disregard for their truth.'" *Giuffre v. Maxwell*, 165 F. Supp. 3d at 155 (citing *Block*, 691 F. Supp. at 699 (Sweet, J.) (S.D.N.Y. 1988). There is ample record evidence that Defendant acted with malice in issuing the press release, thereby making the litigation privilege inapplicable. *See Block*, 691 F. Supp. at 700 (Sweet, J.) ("Here, sufficient

evidence has been adduced to support the inference that [defendant] acted with malice, and may

not, therefore, claim a qualified privilege under New York law . . . a genuine issue as to malice

and appropriate purpose has properly been raised and is sufficient to preclude summary

judgment."). For example, Ms. Sjoberg testified that Defendant recruited her for sex with

Epstein, thus corroborating Ms. Giuffre's own account of Defendant's involvement in abusing

her with Epstein. For another example, Jeffrey Epstein's pilot testified that Defendant flew with

Ms. Giuffre on at least 23 flights, thus corroborating Ms. Giuffre's claims against Defendant. *See*

McCawley Dec. at Exhibit 15, Rodgers Dep. Tr., at 34:3-10. For another example, Tony

Figueroa testified that Defendant asked him for assistance in recruiting girls for Epstein – more

testimony that corroborates Ms. Giuffre's claims against Defendant.

Defendant's statements that Ms. Giuffre was lying and her claims of sexual abuse were

"obvious lies" were not pertinent to a good faith anticipated litigation but, instead, they were

made for an inappropriate purpose – i.e., to bully, harass, intimidate, and ultimately silence Ms.

Giuffre. As the record evidence shows, Defendant knew the statements were false because

Defendant engaged in and facilitated the sexual abuse of this minor child, therefore, they were

made for the inappropriate purpose of "bullying," "harassment," and "intimidation." *See Front v.*

*Khalil*, 24 N.Y.3d 713, 720 (2015). Simply put, Defendant sexually trafficked Ms. Giuffre – and

then tried to silence Ms. Giuffre to keep her crimes secret – circumstances that prevent her from

using privileges designed to shield legitimate legal disputes from court interference.

New York case law fully confirms that pre-litigation qualified privilege does not apply to

this case. Historically, statements made in the course of litigation were entitled to privilege from

defamations claims "so that those discharging a public function may speak freely to zealously

represent their clients without fear of reprisal or financial hazard." *Id.* at 718. A 2015 New York

Court of Appeals case somewhat extended this privilege by holding that statements made by attorneys prior to the commencement of the litigation are protected by a qualified privilege if those statements are pertinent to a good faith anticipated litigation. *Id.* at 718. ("Although it is well settled that statements made in the course of litigation are entitled to absolute privilege, the Court has not directly addressed whether statements made by an attorney on behalf of his or her client in connection with prospective litigation are privileged" . . . "to advance the goals of encouraging communication prior to the commencement of litigation" . . . "we hold that statements made prior to the commencement of an anticipated litigation are privileged, and that the privilege is lost where a defendant proves that the statements were not pertinent to a good faith anticipated litigation.").

The Court of Appeals' reason for allowing this qualified privilege could not be more clear: "When litigation is anticipated, attorneys and parties should be free to communicate in order to reduce or avoid the need to actually commence litigation. Attorneys often send cease and desist letters to avoid litigation. Applying privilege to such preliminary communication encourages potential defendants to negotiate with potential plaintiffs in order to prevent costly and time consuming judicial intervention." *Id.* at 719-20. Under this rationale, the *Khalil* court found that an attorney's letters to the potential defendant were privileged because they were sent "in an attempt to avoid litigation by requesting, among other things, that Khalil return the alleged stolen proprietary information and cease and desist his use of that information." *Id.* at 720.

Here, quite unlike *Khalil*, the Defendant's statements were (1) made by a non-attorney (Defendant through Gow); (2) concerning a non-party to any alleged anticipated litigation; (3) knowingly false statements; and (4) contained in a press release directed at, and disseminated to,

45

the public at large. Defendant's statements cannot be considered "pertinent to a good faith anticipated litigation," such that the qualified privilege should apply.

Finally, though it strains credulity to even entertain the prospect, if Defendant could make even colorable showings on these basic issues, it would remain an issue of fact for the jury to determine whether or not Defendant's press release, calling Ms. Giuffre's sex abuse claims "obvious lies," was any type of "cease-and-desist" statement or a statement that acted to "reduce or avoid" or resolve any "anticipated" litigation. Summary judgment is obviously inappropriate here as well.

### 3. Defendant cannot invoke the pre-litigation privilege because she has no "meritorious claim" for "good faith" litigation.

Finally, Defendant cannot prevail in asserting this qualified privilege because, in order to invoke this privilege, she must have "meritorious claims" for "good faith anticipated litigation." *Khalil* specifically states that for the qualified privilege to apply, the statements must be made "pertinent to a good faith anticipated litigation," and it does not protect attorneys . . . asserting wholly ***unmeritorious claims***, unsupported in law and fact, in violation of counsel's ethical obligations." *Khalil*, 24 N.Y.3d at 718, 720 (emphasis added). Defendant has neither "meritorious claims" nor "good faith anticipated litigation." Defendant cannot have a "meritorious claim" for "good faith anticipated litigation" against the press (or Ms. Giuffre) because Ms. Giuffre's reports of her sexual abuse are true, Defendant knows that they are true, and Defendant made a knowingly false statement when she called Ms. Giuffre a liar. Under these circumstances, Defendant has no "meritorious" claim to make in "good faith" relating to either Ms. Giuffre's statements or their coverage in the press, thereby making her defamatory statements wholly outside the protection of this qualified privilege. At the very least, the issue of

whether Defendant has meritorious claims against the press on the grounds that she did not abuse

Ms. Giuffre is a question of fact for the jury to decide.

## V. DEFENDANT HAS NOT - AND CANNOT - SHOW THAT HER DEFAMATORY STATEMENT IS SUBSTANTIALLY TRUE

Defendant next claims that her press release calling Ms. Giuffre a liar about her past sex

abuse was somehow "substantially true." Here again, this is a highly disputed claim. On its face,

to determine what is "substantially" true or not requires extensive fact finding, such as whether

Defendant recruited Ms. Giuffre as a minor child for sex with Defendant's live-in boyfriend and

convicted pedophile, Jeffrey Epstein. Accordingly, summary judgment is not appropriate. *See*

*Mitre Sports Intern. Ltd. v. Home Box Office, Inc*., 22 F. Supp. 3d 240, 255 (S.D.N.Y.2014)

(denying summary judgment because it would require the Court to decide disputed facts to

determine whether the statement at issue was substantially true); *Da Silva v. Time Inc*., 908 F.

Supp. 184, 187 (S.D.N.Y. 1995) (denying motion for summary judgment because there was a

genuine issue of material act as to whether defamatory photo and caption were not true, stating

"[i]n the instant case Da Silva's contention that she was a reformed prostitute at the time of

photography and publication provides a rational basis upon which a fact-finder could conclude

that the photograph was not substantially true").

Additionally, Defendant has remarkably not submitted any evidence that she did not

recruit Ms. Giuffre for sex with Epstein. Nor has Defendant offered any evidence that her role in

Epstein's household was not to recruit girls and young women for Jeffrey Epstein. Accordingly,

summary judgment is inappropriate. *See Stern v. Cosby*, 645 F. Supp. 2d 258, 277 (S.D.N.Y.

2009) (because defendant had "not submitted any evidence to show that Statement 11 is

substantially true, her motion for summary judgment as to Statement 11 is denied").

Further, much of the purported evidence upon which Defendant relies to allege the truth of her defamatory statement is merely hearsay, including inadmissible hearsay statements made by Alan Dershowitz, who Defendant did not depose in this case (and whom Ms. Giuffre has not had an opportunity to cross examine). Hearsay cannot establish the truth of a defamatory statement as a matter of law at summary judgment. *Lopez v. Univision Communications, Inc.*, 45 F. Supp.2d 348, 359 (S.D.N.Y.1999) (denying summary judgment and holding "defendants' evidence as to what they were told by representatives of NYU and Kean College, to the extent offered for the truth of the matters asserted, is inadmissible hearsay and an insufficient basis upon which to grant summary judgment of dismissal on the ground that the statements were substantially true.").

Finally, many of the facts upon which Defendant bases her argument that her defamatory statement was true are wholly tangential to the claims against her by Ms. Giuffre and the defamatory statement. For example, Defendant supports her contention that she did not recruit Ms. Giuffre for sex with Epstein based on the fact that Ms. Giuffre lived independently of her parents before meeting Epstein and Ms. Maxwell. (Of course, a child outside the supervision of her parents makes it much more likely she would be recruited by Defendant into sex trafficking, but that is for the jury to decide.) That fact does not go to whether or not Defendant's statement calling Ms. Giuffre a liar is true, because Ms. Giuffre never made any claims relating to where she lived prior to meeting Defendant**.** Moreover, it is immaterial with whom she was living: the fundamental and overarching fact remains that Defendant recruited Ms. Giuffre for sex with Epstein when she was a minor child.

Defendant next proffers Ms. Giuffre's limited high school enrollment and short-term jobs that she held as evidence that she and Epstein did not abuse her. The logic of this position is

48

unclear. The fact that Ms. Giuffre worked at Taco Bell for a few days hardly establishes she was

not abused by Defendant and Epstein. Indeed, if anything its shows the vulnerability of Ms.

Giuffre to enticements that a billionaire and his wealthy and powerful girlfriend could offer. In

any event, what to make of such fact is something for the jury to consider. They are irrelevant for

the same reason as above: Ms. Giuffre never made any claims about her studies or her prior

employment. Indeed, neither Ms. Giuffre's statement about being recruited by Defendant as a

child, nor Defendant's refutation even mentions Ms. Giuffre's lack of schooling or lack of a

stable home as a child. Purported facts that have nothing to do with Ms. Giuffre's claims of

sexual abuse against Defendant, and nothing to do with Defendant calling Ms. Giuffre a liar for

such claims, do not establish the "*substantial* truth" of Defendant's statement. Tellingly,

Defendant cites to no analogous case in any jurisdiction that even suggests otherwise.

## VI. PLAINTIFF DOES NOT NEED TO ESTABLISH MALICE FOR HER DEFAMATION CLAIM, BUT IN THE EVENT THE COURT RULES OTHERWISE, THERE IS MORE THAN SUFFICIENT RECORD EVIDENCE FOR A REASONABLE JURY TO DETERMINE DEFENDANT ACTED WITH ACTUAL MALICE

Defendant's next (and, again, quite remarkable) argument is that Ms. Giuffre somehow

will be unable to establish actual malice in this case. One would think that a sex trafficker calling

one of her victims a liar would be a quintessential example of actual malice. Defendant's

spurious case citations and misplaced argument do not detract from this core fact.

Though Defendant does not mention the legal standard for actual malice until she is 48

pages into her 68-page brief,[46] the legal definition of actual malice, as defined by the United

---

[46] Though perhaps a scrivener's error, Defendant errantly cites to two Supreme Court cases – *Gerts v. Robert Welch, Inc.*, 418 U.S. 323 (1974) and *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) – that arose out of the laws of Illinois and Pennsylvania, respectively, to support a proposition concerning New York law. Defendant also cites to *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989), wherein the ruling was not at summary judgment, and the plaintiff in the defamation case was a judicial candidate in a public election.

States Supreme Court, and reiterated by the Second Circuit, should be the light by which all of Defendant's purported "facts" and argument should be viewed. "Actual malice" means that the statement was published with "knowledge that the statement was 'false or with reckless disregard of whether it was false or not.'" *Baiul v. Disson*, 607 F. App'x 18, 20 (2d Cir. 2015), quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964).

Defendant argues that Ms. Giuffre is a limited purpose public figure. While Ms. Giuffre disputes that claim, the issue is entirely irrelevant here because Ms. Giuffre will prove at trial, with overwhelming evidence, that Defendant made her statement calling Ms. Giuffre a liar with malice, fully knowing – as a sex trafficker – that it was false. Put another way, Defendant knew that Ms. Giuffre was telling the truth when she described how Defendant recruited her for sex as an underage girl and then sexually trafficked her with her boyfriend Jeffrey Epstein.

The Second Circuit instructs that, "[o]n a motion for summary judgment, a court cannot try issues of fact; it can only determine whether there are issues to be tried. If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp*., 43 F.3d 29, 37 (2d Cir. 1994) (internal citations and quotations omitted). "As the moving party, Defendants have the burden of demonstrating an absence of clear and convincing evidence substantiating Plaintiffs' claims." *De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 640 (S.D.N.Y. 2015) (citing *Chambers*).

Defendant fails to meet her burden of demonstrating an absence of clear and convincing evidence substantiating Ms. Giuffre's claims that Defendant acted with actual malice. Ms. Giuffre will easily be able to meet any trial burden of clear and convincing evidence of actual

malice. Tellingly, Defendant does not even attempt to address the documentary evidence, nor the testimonial evidence showing she was a recruiter of girls for Epstein.

As shown above, far beyond showing that a reasonable inference could be drawn in her favor, which is all that is required at this point to defeat Defendant's motion, Ms. Giuffre will easily be able to meet her trial burden of clear and convincing evidence of actual malice.

Of course, a plaintiff need only show "actual malice" on the part of a defendant if that plaintiff is a public figure or a limited public figure, which Ms. Giuffre is not, as explained *infra*.

## VII. THE COURT NEED NOT REACH THE ISSUE, AT THIS TIME, OF WHETHER MS. GIUFFRE IS A LIMITED PURPOSE PUBLIC FIGURE

For the reasons just explained, Ms. Giuffre will easily be able to prove actual malice at the trial in this case. Defendant argues that Ms. Giuffre "is a public figure who must prove actual malice." MSJ at 49. Given the overwhelming proof of the second part of that statement, the Court need not spend its time considering the first.

If the Court wishes to nonetheless consider the issue at this time, it is not appropriate for disposition at the summary judgment stage of this case. The defendant bears the burden of demonstrating that the plaintiff is a limited purpose public figure. *See Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir. 1984). Defendant correctly articulates the legal test for a finding that a plaintiff is a limited purpose public figure, but glosses over the fact that all prongs of the test must be met in order for a court to make that finding. *See, e.g.*, *Contemporary Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 617 (2d Cir. 1988) ("[T]his court set forth a ***four part test*** for determining whether someone is a limited purpose public figure" (emphasis added)); *Herbert v. Lando*, 596 F. Supp. 1178, 1186 (S.D.N.Y. 1984) ("The Second Circuit recently summarized the ***criteria***" (emphasis added)), *aff'd in part, rev'd in part*, 781 F.2d 298 (2d Cir. 1986); *cf. Nehls v. Hillsdale Coll.*, 178 F. Supp. 2d 771, 778 (E.D. Mich. 2001) (finding plaintiff

51

was not a limited public figure for failing one element of the *Lerman* test and thus denying

defendant's motion for summary judgment) ("The defendant has proven all of the elements but

the third …"), *aff'd*, 65 F. App'x 984 (6th Cir. 2003). Of course, proof that Ms. Giuffre (or

anyone else) is a limited purpose public figure requires proof of a set of facts from which Ms.

Giuffre believes Defendant has not shown in satisfaction of the four-part test.

Significantly –this Court should pause here to note that the details of Jane Doe 3's sexual

exploitation and abuse, as anonymously set forth in her CVRA joinder motion, ***caused the***

***Defendant to identify, with certainty, Jane Doe 3 as Ms. Giuffre***. Yet, at her deposition,

Defendant claimed to "barely remember her at all."[47] Defendant's ability to immediately and

positively identify the anonymous individual making claims of sexual abuse, if anything, shows

that Defendant was intimately aware of Ms. Giuffre's sexual exploitation.

And, to be sure, Ms. Giuffre never asked to be sexually abused or trafficked by

Defendant or convicted pedophile Jeffrey Epstein when she was a child – legally, she did not

even have the capacity to consent. Defendant cannot recruit a minor child for sexual exploitation

and then, afterwards, argue that her victim injected herself into the public controversy when

coming forward about the abuse she suffered.

Moreover, Defendant has not made a sufficient showing that Ms. Giuffre has "regular"

and "continuing" access to the news media.  The policy rationale behind this prong is that public

figures generally enjoy significant access to the media. One reporter wrote some articles on Ms.

Giuffre in 2011. Thereafter, it was not until 2015, that Ms. Giuffre spoke to someone in the news

media about these issues, and that interview was granted *after* Defendant's defamatory remarks.

Such limited contacts precludes a finding that Ms. Giuffre is a limited public figure. *See*

---

[47] *See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. at 44:23-45:4 (July 22, 2016) ("Q. You do remember
Virginia, about that time back in the 2000s, giving Mr. Epstein massages? A. I barely remember her at all.").

*Hutchinson v. Proxmire*, 443 U.S. 111, 99 S. Ct. 2675, 61 L.Ed.2d 411 (1979) (finding plaintiff maintained no regular and continuing access to the media and thus was not a public figure).

It is also unclear how Defendant plans to show that Ms. Giuffre "successfully invited public attention to her views." To be sure, Ms. Giuffre decided to start "Victims Refuse Silence," a not-for-profit organization whose mission is "to change the landscape of the war on sexual abuse and human trafficking. Our goal is to undertake an instrumental role in helping survivors break the silence associated with sexual abuse. To fulfill this mission, we aim to enhance the lives of women who have been victimized."[48] The website lists the National Trafficking Hotline, and provides a state-by-state resources for local organizations where victims can seek help. Unsurprisingly, Defendant cites no cases that hold that maintaining a website makes one a public figure. *See Mitre Sports Int'l Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 252 (S.D.N.Y. 2014) (finding plaintiff was not a limited public figure and denying defendant's motion for summary judgment) ("corporate policy denouncing child labor on its website … do[es] not show that Mitre … aimed to influence the public's views on the controversy"). More important, Defendant does not explain how Ms. Giuffre was using the website to influence public views on whether she had been abused by Defendant – the subject at issue in this lawsuit.

Interestingly, Defendant has spent $ 17,875[49] on an expert witness to tell the Court and the jury that hardly anyone searches on the internet using search terms such as "victims refuse silence sex slave." One of Defendant's six briefs raising *Daubert* issues specifically argues that Dr. Anderson's estimates on the cost of remediating Ms. Giuffre's online reputation are improper because Dr. Anderson included nearly unused search phrases when evaluating internet content. Kent's rebuttal report states: ". . . there seems no reason to believe that such a person would use

---

[48]http://www.victimsrefusesilence.org/our-mission.
[49] *See* McCawley Dec. at Exhibit 9, Kent Dep. Tr. at 25:16-26:6.

this term . . . Indeed, these are terms unlikely to be used by anyone unfamiliar with this litigation. . . . Why, for instance, would it be necessary to push down offending Web pages in the results that the search engines provide for the term victim's refuse silence sex slave, when this term is likely never used . . ." *See* McCawley Dec. at Exhibit 25, Kent Report at 10, 33.

Defendant cannot argue to the Court that Ms. Giuffre has "successfully" invited public attention to her views through her VRS website while simultaneously filing a *Daubert* motion that argues that search terms such as "victims refuse silence sex slave" are "likely never used," thus making the website unsuccessful in inviting public attention. In any event, Defendant has failed to set forth with precision the allegedly undisputed fact – and supporting evidence – she uses to support her argument.

Moreover, "[i]t is preferable to reduce the public figure question to a more meaningful context by looking to the nature and extent of *an individual's participation in the particular controversy giving rise to the defamation*." *Greenberg v. CBS Inc.*, 69 A.D.2d 693, 704, 419 N.Y.S.2d 988, 995 (1979) (emphasis added), citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 352, 94 S. Ct. 2997, 41 L.Ed.2d 789. The context here is highly significant. Ms. Giuffre never chose to participate in Defendant and Epstein's underage sex ring, a "controversy" that gave rise to Defendant's defamation. In arguing that Ms. Giuffre thrust herself into the public spotlight, Defendant conveniently leaves out the fact that it is by her doing that Ms. Giuffre is in this controversy in the first place. No minor child willingly becomes a participant in sexual abuse, and it is perverse for the abuser to argue that her victim deliberately became a subject of public attention when speaking out about that abuse for the purpose of advancing justice and helping other victims.

For all these reasons, the Court should simply decline to decide the public figure issue at this juncture. But if it chooses to reach the issue, it should reject Defendant's unsupported argument.

## VIII. THE JANUARY 2015 STATEMENT WAS NOT "SUBSTANTIALLY TRUE," AND MS. GIUFFRE HAS PRODUCED CLEAR AND CONVINCING EVIDENCE OF ITS FALSITY

As a final argument, Defendant argues that her January 2015 statement was "substantially true." Given that the statement argues that Ms. Giuffre lied when she said she was sexually trafficked by Defendant, the reader of Defendant's motion might reasonably expect to see some evidence presented showing that Defendant was not a sex trafficker. Instead, the reader is treated to technical quibbles. For example, the lead argument to show the "substantial" truth of Defendant's statement is the argument that Ms. Giuffre was not fifteen years old, but all of sixteen or seventeen years old when she was trafficked. As the Court knows (and can take judicial notice of), Florida law makes age eighteen the age of consent. Accordingly, it is no moment that Ms. Giuffre may have been mistaken about the exact year the sex trafficking started. Call this the "yes-I'm-a-sex-trafficker-but-only-of-sixteen-year-old-girls" defense. To even describe the defense is to show how meritless it is.

More broadly, at issue are the statements Ms. Giuffre made regarding Defendant's involvement in, and knowledge of, the sexual abuse and sex trafficking of Ms. Giuffre (and other minor girls) through a recruitment scheme executed by Defendant and Jeffrey Epstein. In response to those various statements, Defendant publicly claimed that, "the allegations made by (Ms. Giuffre) *against* Ghislaine Maxwell are untrue." Defendant continued that Ms. Giuffre's "claims are obvious lies and should be treated as such...." Defendant, through her statement

55

intended to convey that Ms. Giuffre was lying about everything she had said against Defendant –

"the allegations."

In sum and essence, those statements made by Ms. Giuffre about which Defendant

released a public statement to exclaim were "untrue" and "obvious lies" were:

(1) That Defendant approached Ms. Giuffre while Ms. Giuffre was an underage minor working at the Mar-a-Lago Country Club, and recruited the then-minor Ms. Giuffre to go to the house of Jeffrey Epstein under the pretense of providing a massage to Jeffrey Epstein for money;

(2) That Ms. Giuffre followed Defendant's instructions, and was driven to Jeffrey Epstein's house, where she was greeted by Defendant and later introduced to Jeffrey Epstein;

(3) That Ms. Giuffre was lead upstairs to be introduced to Jeffrey Epstein in his bedroom, and that while there Defendant demonstrated how Ms. Giuffre should provide a massage to Jeffrey Epstein;

(4) That Defendant and Epstein converted the massage into a sexual experience, requesting that Ms. Giuffre remove her clothing, after which time a sexual encounter was had;

(5) That Defendant and Epstein expressed approval for Ms. Giuffre, and offered her money in exchange for this erotic massage turned full sexual encounter;

(6) That Defendant and Epstein offered Ms. Giuffre the promise of money and a better life in exchange for Ms. Giuffre acting sexually compliant and subservient to their demands;

(7) That Ms. Giuffre, after that first encounter, was repeatedly requested to service Epstein and/or Defendant sexually and/or others;

(8) That Ms. Giuffre was taken on Epstein's private planes on numerous occasions and trafficked nationally and internationally for the purpose of servicing Epstein and others, including Defendant, sexually;

(9) That Defendant was Epstein's primary manager of the recruitment and training of females who Epstein paid for sexual purposes;

(10) That Defendant participated in sexual encounters with females, including Ms. Giuffre; and

(11) That Ms. Giuffre and other recruited females were encouraged by Defendant and Epstein to bring other young females to Epstein for the purpose of servicing him sexually.

Defendant, by way of her January 2015 statement, declared that Ms. Giuffre lied about each and every one of these allegations regarding Defendant. In fact, Defendant clarified further this position in her deposition when she said repeatedly that everything Ms. Giuffre said about Defendant was totally false.[50] The clarification in her deposition is identical in intention to the reasonable interpretation of her statement that Defendant made publicly, which has formed the basis of this defamation action—that Ms. Giuffre was lying about everything she said about Defendant, and that Defendant was not at all involved in the activity she was accused of engaging in.

While her public statement could not have been more clear, as her deposition testimony further underscored, Defendant intended the world to believe that nothing Ms. Giuffre said about Defendant was true, and that Defendant was not at all involved with any of the things she was accused of, Defendant has decided in this motion to minutely dissect the nuance of Ms. Giuffre's various statements to cause the Court to reach a far-fetched conclusion that Defendant's insidiously false statement was somehow "substantially true." Ironically, this repositioning amounts to nothing more than an admission by Defendant of the defamatory nature of her statement.

A.     **When Ms. Giuffre Initially Described Her Encounters With Defendant and Epstein, She Mistakenly Believed the First Encounter Occurred During the Year 1999.**

Discovery has resulted in the production of records, including Ms. Giuffre's employment records from Mar-a-Lago, which she did not possess at the time she was recounting her interactions with Defendant. Those records establish that the initial encounter wherein Defendant recruited Ms. Giuffre occurred during the year 2000 and not during 1999. Ms. Giuffre was

---

[50] *See* McCawley Dec. at Exhibit 11, Maxwell 4-22-2016 Dep. Tr. at 135:3-4; 178:15-178:24; 179:20-180:7; 228:7-229:10.

sixteen years old before August 9, 2000, and turned seventeen on that date. It is unclear from the limited records available whether Defendant approached and recruited Ms. Giuffre before or just after Ms. Giuffre's 17th birthday. However, what has now been established through numerous witnesses is that Defendant approached and recruited a minor child for the purposes of enticing that minor over to the house of Jeffrey Epstein, a currently-registered sex offender.[51] The exact lure of Ms. Giuffre by Defendant - enticement of being paid money to give a billionaire a massage at his mansion - was used by Epstein and his many associates and employees to recruit dozens and dozens of other underage girls. There is no doubt that the crux of Ms. Giuffre's statement on this point is that Defendant recruited her when she was only a minor child unable to consent to sex, not precisely how far under the age of consent she was. Defendant's public claim that Ms. Giuffre's account of this approach, and recruiting element, was "untrue" and "obvious lies" is not "substantially true," but is itself an obvious lie – as Ms. Giuffre will prove to the jury at trial.

**B.  Defendant's January 2015 Statement Claiming as "Untrue" and an "Obvious Lie" the Allegation That She Regularly Participated in Epstein's Sexual Exploitation of Minors and That the Government Knows Such Fact is Not Substantially True But Instead Completely False.**

Defendant next argues that she "accurately denied that [she] 'regularly participate[d] in Epstein's sexual exploitation on minors' and that 'the Government knows such fact.'" MSJ at 58. It is not clear whether Defendant is nitpicking this statement by contesting whether she "regularly" participated in Epstein's sexual exploitation or whether she did participate, but the Government was unaware of the extent of her involvement. Call this the "yes-I'm-a-sex-trafficker-but-only-on-Tuesdays-and-Thursdays" defense – here again, to simply recount the claim is to see its absurdity.

---

[51] *See* McCawley Dec. at Exhibit 1, 5, Alessi Dep. Tr. at 94:24-95:2; Giuffre Dep. Tr. at 111:12-111:21; 116:19-117:12.

Contrary to Defendant's misleading, cherry-picked fragments of information she has chosen to use to support her point, there is an abundance of evidence clearly linking Defendant to Epstein's sexual exploitation of minors. As the Court is aware, numerous message pads were recovered from Epstein's home indicating Defendant's involvement in and knowledge of Epstein's illegal exploitation.[52] Additionally, numerous employees and others have testified about Defendant's high-ranking position in the hierarchal structure of the sexual exploitation scheme.[53] In fact, multiple individuals, in addition to the Ms. Giuffre, have testified about Maxwell's involvement in the exploitation of minors, including Ms. Giuffre.[54]

Defendant also argues that one government investigator, Palm Beach, Florida, Detective Recarey, may not have been aware of her involvement in the sex trafficking. Defendant fails to cite another passage in Detective Recarey's deposition, where he noted that he was aware of Defendant's involvement with Epstein and the sexual exploitation of children.[55] But even assuming Recarey was unaware (which Ms. Giuffre strongly disputes), Defendant would have, at most, a "yes-I'm-a-sex-trafficker-but-I-successfully-hid-it-from-one-of-the-cops" defense – again, not a likely claim.

More broadly, Ms. Giuffre's statement about what the "Government" knew about sex trafficking was made in pleadings filed in a *federal* Court case attacking the decision of the U.S. Attorney's Office for the Southern District of Florida to offer Jeffrey Epstein immunity from prosecution for *federal* sex trafficking crimes. Accordingly, to present an even arguable claim for summary judgment, Defendant would have to show that the U.S. Attorney's Office (and its

---

[52]*See, e.g.*, McCawley Dec at Exhibit 28 (message pad excerpts), GIUFFRE 001412, 001418, 001435, 001446, 001449, 001453, 001454.
[53]*See* McCawley Dec. at Exhibit 21, 1, Rodriguez Dep. Tr. at 169:1-169:4; Alessi Dep. Tr. at 23:11-23:20; 34:19-35:3; 98:5-98:12; 104:15-104:23.
[54] *See* McCawley Dec. at Exhibit 16, 4, Sjoberg Dep. Tr. at 13; Figueroa Dep. Tr. at 96-97; 103; 200:6-18; 228:23-229:21.
[55] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 29:16-29:20; 45:13-25; 83:3-83:15.

investigators from the FBI) did not know about Defendant's sex trafficking. This proof would need to include, for example, evidence that the FBI did not learn about Defendant's sex trafficking when (among other things) Ms. Giuffre told FBI agents about it when she met with them in Australia in 2011. Here again, Defendant has no evidence to even begin making such a showing.

### C. Defendant's January 2015 Statement Claiming as "Untrue" or an "Obvious Lie" That Maxwell and Epstein Converted Ms. Giuffre Into a Sexual Slave is Not Substantially True.

Defendant next argues that she accurately disputed Ms. Giuffre's statement that Defendant held her as a "sex slave." Relying on dictionary definitions of "slave" that define the term to refer to a "confined" person who is the "legal property" of another (MSJ at 59, citing *Merriam-Webster*, etc.), Defendant claims Ms. Giuffre was not confined or the property of Defendant. Call this the "yes-I'm-a-sex-trafficker-but-I-didn't-use-chains" defense. And, once again, to even describe the defense is to refute it.

Defendant does not explain why the jury would be required to use the held-in-chains definition of "slave" in evaluating her statement. *Merriam-Webster* (11th ed. 2006) also defines "slave" as "one that is completely subservient to a dominating influence" – a definition that fits Ms. Giuffre's circumstances to a tee. As Ms. Giuffre has explained in detail, she was recruited as a minor child by Defendant, who then dominated her and used for sexual purposes. That testimony alone creates a genuine issue of fact on this point.

From the context of all of Ms. Giuffre's statements about Defendant, Ms. Giuffre has never said or implied that she was physically placed in a cage. Instead, she has described the vast disparity of power and the influence of Defendant and Epstein, the fear of disobedience, the typical locations of the abuse being in a private plane, in huge mansion manned with Epstein employed servants, a private island, or some inescapable place abroad in the presence of

Defendant, in addition to the continued – and fraudulent – promise of a better future, as those things that kept her retained in a situation of sexual servitude. While not physical chained, Ms. Giuffre was groomed as minor and trained, and these factors became her invisible chains.

Indeed, as Ms. Giuffre's expert on sex trafficking, Professor Coonan, has explained:

> Popular understandings of the term "sex slave" might still connote images of violent pimps, white slavery, or of victims chained to a bed in a brothel in the minds of some people. To call Ms. Giuffre a victim of sex trafficking would however very accurately convey the reality that she along with a great many other victims of contemporary forms of slavery are often exploited by the "invisible chains" of fraud and psychological coercion.

*See* McCawley Dec. at Exhibit 23, Coonan Expert Report at 20.

If the Court takes as true, which it must for the purpose of this motion, that Ms. Giuffre was trafficked and used exclusively for sexual purposes by Defendant and Epstein, then the Court must also reach the conclusion at this stage that Maxwell's assertion – that Ms. Giuffre's description of being a sex slave is "untrue" or "obvious lies" – is not substantially true. There undoubtedly remains a genuine issue of material fact on this point, and in fact, Defendant's position taken in this motion is tantamount to an admission of the truth of Plaintiff's statement about Defendant on this point.

**D.    Any Statement of Misdirection Regarding Professor Alan Dershowitz is Nothing More Than an Irrelevant Distraction to The Facts of This Case and Matters Not on the Defense of Whether Defendant's Statement Was Substantially True.**

Defendant next contends that she accurately recounted that Alan Dershowitz had denied having sex with Ms. Giuffre. MSJ at 60. Call this the "yes-I'm-a-sex-trafficker-but-she-was-not-trafficked-to-the-professor" defense. While it is accurate that Ms. Giuffre made allegations against Professor Dershowitz, those allegations are not at issue in this case. Defendant, in her defamatory statement, claimed that "the allegations made by [Ms. Giuffre] against Ghislaine Maxwell are untrue." *See* McCawley Dec. at Exhibit 26, GM_00068. In her deposition,

Defendant maintained the position that she "cannot speculate on what anybody else did or didn't do." *See* McCawley Dec. at Exhibit 11, Maxwell 4-22-2016 Dep. Tr. at 180:3-180:4. In fact, regarding Ms. Giuffre's claims about others, Defendant unequivocally stated, "I can only testify to what she said about me, which was 1000 percent false." *See* McCawley Dec. at Exhibit 11, Maxwell 4-22-2016 Dep. Tr. at 228:10-228:12.

Defendant Maxwell makes additional misstatements about Dershowitz's production in a defamation action filed against him in her desperate attempt to have Dershowitz to jump aboard and help bail out her sinking canoe. While Ms. Giuffre can – and, if necessary, will – refute Dershowitz's claim he was not a beneficiary of Epstein and Defendant's sex trafficking, that is not relevant at this stage. Whatever may or may not have happened with Dershowitz (and Ms. Giuffre's sworn statements that he sexually abused her is alone enough to create disputed facts on the issue of whether Defendant's statements about him were "substantially true") has no bearing whatsoever on the truth or falsity of the statements Ms. Giuffre made about Defendant.

This case is not about whether Ms. Giuffre has ever made untruthful allegations against anyone, which she contends she has not, but  about whether her allegations about Defendant were true, or whether those specific allegations were "untrue," "obvious lies" as Defendant publicly proclaimed. These issues are disputed and must go to the jury.

**E.      Contrary to Defendant's Position, There is a Genuine Issue of Material Fact as to Whether She Created or Distributed Child Pornography, or Whether the Government Was Aware of Same.**

Defendant next argues that she did not create child pornography and that the Government knew this. Call this the "until-you-find-the-photos-I'm-innocent" defense. Of course, as noted earlier, Defendant's claim requires that she show that "the Government" – in context, the FBI and the U.S. Attorney's Office for the Southern District of Florida – "knew" that she had no

child pornography. Yet Defendant has offered no such evidence – much less evidence so powerful as to warrant summary judgment on this point.

This point is disputed from the simple fact that Ms. Giuffre herself testified that Defendant took many photograph of her naked. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 232:3-9; 233:7-9. This is consistent with the Palm Beach butler's, Alfredo Rodriguez's, testimony that he personally saw photos of naked children on Defendant's computer. *See* McCawley Dec. at Exhibit 21, Rodriguez Dep. Tr. at 150:10-17; 306:1-306:24. Another housekeeper, Juan Alessi also saw photos of young nude females on Defendant's computer, although he wasn't sure whether to consider it pornography. *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 175:5-175:24. Finally, Detective Recarey found a collage of nude photos of young females in Epstein's closet, and turned the photos over to the FBI and U.S. Attorney's office.[56] While the U.S. Attorney's office will not share the photos obtained from Recarey's investigation, it is thus undisputed that the government possesses photos of nude, young females confiscated from Epstein's Palm Beach mansion. Indeed, the police video disclosed through a FOIA request shows naked images of women throughout the house, including a full nude of the Defendant.[57] At a minimum, there is a clear genuine issue of material fact in this regard.

### F. Defendant Did Act as a "Madame" For Epstein to Traffic Ms. Giuffre to The Rich and Famous.

Defendant next argues that she did not act as a "Madame" for Epstein. MSJ at 63. The gist of the argument seems to be that Defendant believes trafficking one girl to Epstein does not a Madame make. Call this the "yes-I-was-Virginia's-Madame-but-no-one-else's" defense. This argument fails linguistically on the very dictionary definitions that Defendant cites elsewhere –

---

[56] *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 73:19-73:24; 74:2-74:7.
[57] *See* McCawley Dec. at Exhibit 44, FOIA CD GIUFFRE 007584.

but not here. *See Merriam-Webster* (11th ed. 2006) (defining "madam" as "the female head of a house of prostitution").

Once again, Defendant conceals the relevant facts on this issue. First, multiple witnesses have testified to Defendant's recruiting, maintaining, harboring, and trafficking girls for Epstein.[58] In fact, Defendant herself was unable to deny procuring Ms. Giuffre for Epstein.[59] While Defendant has attempted to fumble her way through explaining some plausible reason for bringing a sixteen or seventeen year old to Epstein, her explanations are, to put it blandly, unpersuasive. As with other issues, the jury will have to decide who to believe.

One of the individuals Ms. Giuffre was trafficked to was Prince Andrew – trafficking that took place in Defendant's own townhouse in London. There exist flight logs evidencing Ms. Giuffre flying to London alongside Defendant and Epstein on Epstein's private plane, and a photo of Ms. Giuffre, Defendant, and the Prince, without Defendant ever offering a legal reasonable explanation for that photo being taken, or for traveling with a year old girl overseas.

Defendant begins to meander somewhat aimlessly on this point, shifting Plaintiff's burden to substantiate Plaintiff's claim that Defendant was Epstein's Madame, which is a point at issue, into whether or not Plaintiff has conclusively proven the identities and accurate job titles of the other men to whom Plaintiff was lent for sex by Epstein. No matter how hard Defendant tries to reframe this case, drag other people in, or split hairs, she is unable to contest the facts – facts showing she was more than a Madame but a full-fledged sex trafficker. Ms. Giuffre told the truth when she said that Defendant recruited her as a minor, under the pretense of giving a

---

[58] *See* McCawley Dec. at Exhibit 16, 1, 18, 2, Sjoberg Dep. Tr. at 13; Alessi Dep. Tr. at 34; GIUFFRE000105 at 57-58; GIUFFRE000241-242 at p. 212-213; Austrich Dep. Tr. at 34-35, 100-101, 127-128; Alessi Dep. Tr. at 34:19-35:3; 98:5-98:12; 104:15-104:23.
[59] *See* McCawley Dec. at Exhibit 11, Maxwell Dep. Tr. at 214:14-215:3.

massage, and converted her into a traveling sex slave, consistent with Defendant and Epstein's pattern and practice.

As the Court astutely acknowledged early on, "at the center of this case is the veracity of a contextual world of facts more broad than the allegedly defamatory statements . . . either transgression occurred or it did not. Either Maxwell was involved or she was not." If Defendant was involved, then her January 2015 statement was defamatory. Ms. Giuffre will prove to the jury, through overwhelming evidence, her prior allegations about Defendant's involvement. The Court should give Ms. Giuffre that opportunity, and deny Defendant's motion for summary judgment.

## IX.    CONCLUSION

For the foregoing reasons, this Court should deny Defendant's motion for summary judgment in all respects.

Dated:  January 31, 2017

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Sigrid McCawley
    Sigrid McCawley (Pro Hac Vice)
    Meredith Schultz (Pro Hac Vice)
    Boies Schiller & Flexner LLP
    401 E. Las Olas Blvd., Suite 1200
    Ft. Lauderdale, FL 33301
    (954) 356-0011

    David Boies
    Boies Schiller & Flexner LLP
    333 Main Street
    Armonk, NY 10504

65

Bradley J. Edwards (Pro Hac Vice)
FARMER, JAFFE, WEISSING,
EDWARDS, FISTOS & LEHRMAN, P.L.
425 North Andrews Avenue, Suite 2
Fort Lauderdale, Florida 33301
(954) 524-2820

Paul G. Cassell (Pro Hac Vice)
S.J. Quinney College of Law
University of Utah
383 University St.
Salt Lake City, UT 84112
(801) 585-5202[60]

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 31, 2017, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on the individuals identified below via transmission of Notices of Electronic Filing generated by CM/ECF.

Laura A. Menninger, Esq.
Jeffrey Pagliuca, Esq.
HADDON, MORGAN & FOREMAN, P.C.
150 East 10th Avenue
Denver, Colorado 80203
Tel: (303) 831-7364
Fax: (303) 832-2628
Email: lmenninger@hmflaw.com
         jpagliuca@hmflaw.com

/s/ Sigrid S. McCawley
Sigrid S. McCawley

---

[60] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

66