**United States District Court**
**Southern District of New York**

Virginia L. Giuffre,

          Plaintiff,                Case No.: 15-cv-07433-RWS

v.

Ghislaine Maxwell,

          Defendant.

_____/


### SOUTHERN DISTRICT OF NEW YORK LOCAL RULE 56.1 PLAINTIFF'S STATEMENT OF CONTESTED FACTS AND PLAINTIFF'S UNDISPUTED FACTS


**DEFENDANT'S PURPORTED FACTS**


1.    **Ms. Maxwell's response to publications of Ms. Giuffre's false allegations: the March 2011 statement**.  In early 2011 Ms. Giuffre in two British tabloid interviews made numerous false and defamatory allegations against Ms. Maxwell. In the articles, Ms. Giuffre made no direct allegations that Ms. Maxwell was involved in any improper conduct with Jeffrey Epstein, who had pleaded guilty in 2007 to procuring a minor for prostitution.  Nonetheless, Ms. Giuffre suggested that Ms. Maxwell worked with Epstein and may have known about the crime for which he was convicted.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

   Ms. Giuffre denies that the allegations she made against Ms. Maxwell are false. Furthermore, Ms. Giuffre did give an interview to journalist, Sharon Churcher, in which Ms. Giuffre accurately and truthfully described Defendant Maxwell's role as someone who recruited or facilitated the recruitment of young females for Jeffrey Epstein.  *See* McCawley Dec. at Exhibit 34, GIUFFRE003678. Ms. Giuffre was also interviewed by the FBI in 2011 and she discussed Defendant's involvement in the sexual abuse. *See* McCawley Dec. at Exhibit 31, FBI Redacted 302, FIUFFRE001235-1246. Those statements were not "false and defamatory," but instead truthful and accurate.

**DEFENDANT'S PURPORTED FACTS**

2.      In the articles, Ms. Giuffre alleged she had sex with Prince Andrew, "a well-known businessman," a "world-renowned scientist," a "respected liberal politician," and a "foreign head of state."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre does not contest this fact, but believes that it is irrelevant.

**DEFENDANT'S PURPORTED FACTS**

3.      In response to the allegations Ms. Maxwell's British attorney, working with Mr. Gow, issued a statement on March 9, 2011, denying "the various allegations about [Ms. Maxwell] that have appeared recently in the media. These allegations are all entirely false."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre denies that Mr. Barden, "issued a statement." Instead it appears to have the

contact as Ross Gow and a reference to Devonshire Solicitors.

**DEFENDANT'S PURPORTED FACTS**

4.      The statement read in full:

Statement on Behalf of Ghislaine Maxwell

By Devonshires Solicitors, PRNE Wednesday, March 9, 2011

London, March 10, 2011 - Ghislaine Maxwell denies the various allegations about her that have appeared recently in the media. *These allegations are all entirely false*.

It is unacceptable that letters sent by Ms. Maxwell's legal representatives to certain newspapers pointing out the truth and asking for the allegations to be withdrawn have simply been ignored.

In the circumstances, *Ms. Maxwell is now proceeding to take legal action against those newspapers*.

"I understand newspapers need stories to sell copies. It is well known that certain newspapers live by the adage, "why let the truth get in the way of a good story." However, *the allegations made against me are abhorrent and entirely untrue* and I ask that they stop," said Ghislaine Maxwell.

"A number of newspapers have shown a complete lack of accuracy in their reporting of this story and a failure to carry out the most elementary investigation or any real due diligence. I am now taking action to clear my name," she said.

Media contact:

Ross Gow
Acuity Reputation
Tel: +44-203-008-7790
Mob: +44-7778-755-251
Email: ross@acuityreputation.com
Media contact: Ross Gow, Acuity Reputation, Tel: +44-203-008-7790,
Mob: +44-7778-755-251, Email: ross at acuityreputation.com

GIUFFRE001067-68

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

The document speaks for itself although it is unclear if the original included the italics

that are inserted by the Defendant above.

## DEFENDANT'S PURPORTED FACTS

5.   **Ms. Giuffre's gratuitous and "lurid" accusations in an unrelated action.**  In 2008 two
     alleged victims of Epstein brought an action under the Crime Victims' Rights Act against
     the United States government purporting to challenge Epstein's plea agreement.  They
     alleged the government violated their CVRA rights by entering into the agreement.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

While we would stipulate to the statement in this paragraph starting with the words "In

2008", we do not stipulate to the opening sentence fragment Maxwell places in bold.

## DEFENDANT'S PURPORTED FACTS

6.   Seven years later, on December 30, 2014, Ms. Giuffre moved to join the CVRA action,
     claiming she, too, had her CVRA rights violated by the government.  On January 1, 2015,
     Ms. Giuffre filed a "corrected" joinder motion.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Agreed.

## DEFENDANT'S PURPORTED FACTS

7.   The issue presented in her joinder motion was narrow: whether she should be permitted
     to join the CVRA action as a party under Federal Rule of Civil Procedure 21,
     specifically, whether she was a "known victim[] of Mr. Epstein and the Government
     owed them CVRA duties."  Yet, "the bulk of the [motion] consists of copious factual
     details that [Ms. Giuffre] and [her co-movant] 'would prove . . . if allowed to join.'"  Ms.

Giuffre gratuitously included provocative and "lurid details" of her alleged sexual activities as an alleged victim of sexual trafficking.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre denies that the issues presented in here joinder motion were narrow. The issues presented by the joinder motion and related pleadings were multiple and complex, requiring numerous details about Ms. Giuffre's sexual abuse and the perpetrators of her abuse. In a pleading explaining why the motion was filed, Ms. Giuffre's lawyers specifically listed nine separate reasons why Jane Doe 3's allegations that Dershowitz had sexually abused her were relevant to the case and appropriately included in the relevant filings:

> 1. To establish that Jane Doe 3 had been sexually abused by Jeffrey Epstein and his co-conspirators (including co-conspirator Alan Dershowitz), which would make her a "victim" of a broad sex trafficking conspiracy covered by the federal Crime Victims' Rights Act, 18 U.S.C. § 3771, and therefore entitled to participate in the case;

> 2. To support then-pending discovery requests that asked specifically for information related to contacts by Dershowitz with the Government on behalf of Jeffrey Epstein;

> 3. To support the victims' allegation that the Government had a motive for failing to afford victims with their rights in the criminal process – specifically, pressure from Dershowitz and other members of Epstein's legal defense team to keep the parameters of the non-prosecution agreement (NPA) secret to prevent Jane Doe 3 and other victims from objecting to and blocking judicial approval of the agreement;

> 4. To establish the breadth of the NPA's provision extending immunity to "any potential co-conspirators of Epstein" and the scope of the remedy that the victims (including not only Jane Doe 3 but also other similarly-situated minor victims who had been sexually abused by Dershowitz) might be able to obtain for violations of their rights;

> 5. To provide part of the factual context for the scope of the "interface" between the victims, the Government, and Epstein's defense team – an interface that was relevant under Judge Marra's previous ruling that the Government was entitled to raise "a fact-sensitive equitable defense which must be considered in the factual context of the entire interface between Epstein, the relevant prosecutorial authorities and the federal offense victims . . .";

6. To prove the applicability of the "crime/fraud/misconduct" exception to the attorney-client privilege that was being raised by the Government in opposition to the victims' motion for production of numerous documents;

7. To bolster the victims' argument that their right "to be treated with fairness," 18 U.S.C. § 3771(a)(8), had been violated through the Government's secret negotiations with one of their abusers;

8. To provide notice and lay out the parameters of potential witness testimony for any subsequent proceedings or trial – i.e., the scope of the testimony that Jane Doe 3 was expected to provide in support of Jane Doe 1 and Jane Doe 2, the already-recognized Ms. Giuffre in the action; and

9. To support Jane Doe 3's argument for equitable estoppel to toll the six-year statute of limitations being raised by the Government in opposition to her motion to join – i.e., that the statute was tolled while she was in hiding in Australia due to the danger posed by Epstein and his powerful friends, including prominent lawyer Alan Dershowitz.

*Jane Does #1 and #2 v. United States*, No. 9:08-cv-80736, DE 291 at 18-26 & n.17 (S.D. Fla. 2015). Ms. Giuffre's lawyers had attempted to obtain a stipulation from the Government on point #1 above ("victim" status), but the Government had declined. Judge Marra's ruling concluded that certain allegations were not necessary "at this juncture in the proceedings." DE 324 at 5. Judge Marra specifically added, however, that "Jane Doe 3 is free to reassert these factual details through proper evidentiary proof, should Petitioners demonstrate a good faith basis for believing that such details are pertinent to a matter presented for the Court's consideration." DE 324 at 6. The CVRA litigation continues and no trial has been held as of the filing of this brief. As such, the extent to which these factual details will be used at trial has not yet been determined. *See* Docket Sheet, *Jane Does #1 and #2 v. U.S.*, No. 9:08-cv-80736.

## DEFENDANT'S PURPORTED FACTS

8. At the time they filed the motion, Ms. Giuffre and her lawyers knew that the media had been following the Epstein criminal case and the CVRA action. While they deliberately filed the motion without disclosing Ms. Giuffre's name, claiming the need for privacy and secrecy, they made no attempt to file the motion under seal. Quite the contrary, they filed the motion publicly.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Response to Point #7, above.

**DEFENDANT'S PURPORTED FACTS**

9.     As the district court noted in ruling on the joinder motion, Ms. Giuffre "name[d] several individuals, and she offers details about the type of sex acts performed and where they took place." The court ruled that "these lurid details are unnecessary": "The factual details regarding whom and where the Jane Does engaged in sexual activities are immaterial and impertinent . . ., especially considering that these details involve non-parties who are not related to the respondent Government." Accordingly, "[t]hese unnecessary details shall be stricken." *Id.* The court then struck all Ms. Giuffre's factual allegations relating to her alleged sexual activities and her allegations of misconduct by non-parties. The court said the striking of the "lurid details" was a sanction for Ms. Giuffre's improper inclusion of them in the motion.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Response to Point #7, above.

**DEFENDANT'S PURPORTED FACTS**

10.     The district court found not only that the "lurid details" were unnecessary but also that the entire joinder motion was "entirely unnecessary." Ms. Giuffre and her lawyers knew the motion with all its "lurid details" was unnecessary because the motion itself recognized that she would be able to participate as a fact witness to achieve the same result she sought as a party. The court denied Ms. Giuffre's joinder motion.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Response to Point #7, above.

**DEFENDANT'S PURPORTED FACTS**

11.     One of the non-parties Ms. Giuffre "named" repeatedly in the joinder motion was Ms. Maxwell. According to the "lurid details" of Ms. Giuffre included in the motion, Ms. Maxwell personally was involved in a "sexual abuse and sex trafficking scheme" created by Epstein:

- Ms. Maxwell "approached" Ms. Giuffre in 1999 when Ms. Giuffre was "fifteen years old" to recruit her into the scheme.
- Ms. Maxwell was "one of the main women" Epstein used to "procure under-aged girls for sexual activities."
- Ms. Maxwell was a "primary co-conspirator" with Epstein in his scheme.

- She "persuaded" Ms. Giuffre to go to Epstein's mansion "in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children."
- At the mansion, when Ms. Giuffre began giving Epstein a massage, he and Ms. Maxwell "turned it into a sexual encounter."
- Epstein "with the assistance of" Ms. Maxwell "converted [Ms. Giuffre] into . . . a 'sex slave.'" *Id*. Ms. Giuffre was a "sex slave" from "about 1999 through 2002."
- Ms. Maxwell also was a "co-conspirator in Epstein's sexual abuse."
- Ms. Maxwell "appreciated the immunity" she acquired under Epstein's plea agreement, because the immunity protected her from prosecution "for the crimes she committed in Florida."
- Ms. Maxwell "participat[ed] in the sexual abuse of [Ms. Giuffre] and others."
- Ms. Maxwell "took numerous sexually explicit pictures of underage girls involved in sexual activities, including [Ms. Giuffre]." *Id*. She shared the photos with Epstein.
- As part of her "role in Epstein's sexual abuse ring," Ms. Maxwell "connect[ed]" Epstein with "powerful individuals" so that Epstein could traffic Ms. Giuffre to these persons.
- Ms. Giuffre was "forced to have sexual relations" with Prince Andrew in
- "[Ms. Maxwell's] apartment" in London. Ms. Maxwell "facilitated" Ms. Giuffre's sex with Prince Andrew "by acting as a 'madame' for Epstein."
- Ms. Maxwell "assist[ed] in internationally trafficking" Ms. Giuffre and "numerous other young girls for sexual purposes."
- Ms. Giuffre was "forced" to watch Epstein, Ms. Maxwell and others "engage in illegal sexual acts with dozens of underage girls."

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

*See* Ms. Giuffre's Response to Point #7, above. Ms. Giuffre contests the reference to "lurid details". Moreover, the testimony from numerous witnesses corroborates the statements Ms. Giuffre made in her joinder motion. *See* below.

- *See* McCawley Dec. at Exhibit 16, Sjoberg's May 18, 2016 Dep. Tr. at 8-9, 13, 33-35, 142-143

- *See* McCawley Dec. at Exhibit 4, Figueroa June 24, 2016 Dep. Tr. Vol. 1 at 96-97 and 103

- *See* McCawley Dec. at Exhibit 14, Rinaldo Rizzo's June 10, 2016 Dep. Tr. at 52-60

- *See* McCawley Dec. at Exhibit 12, Lynn Miller's May 24, 2016 Dep. Tr. at 115

- *See* McCawley Dec. at Exhibit 13, Joseph Recarey's June 21, 2016 Dep. Tr. at 29-30

- *See* McCawley Dec. at Exhibit 15, David Rodgers' June 3, 2016 Dep. Tr. at 18, 34-36

- Exhibit 2 Excerpted Rodgers Dep. Ex. 1 at flight #s 1433-1434, 1444-1446, 1464-1470, 1478-1480, 1490-1491, 1506, 1525-1526, 1528, 1570 and 1589

- *See* McCawley Dec. at Exhibit 10, Marcinkova Dep. Tr. at 10:18-21; 12:11-15; etc.

- *See* McCawley Dec. at Exhibit 8, Kellen Dep. Tr. at 15:13-18; 20:12-16; etc. Epstein Dep. Tr. at 116:10-15; 117:18-118:10; etc.

- *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 28, 52-54

- *See* McCawley Dec. at Exhibit 30, U.S. Attorney Victim Notification Letter GIUFFRE002216-002218

- *See* McCawley Dec. at Exhibit 33, July 2001 New York Presbyterian Hospital Records GIUFFRE003258-003290

- J *See* McCawley Dec. at Exhibit 38, Judith Lightfoot psychological records GIUFFRE005431-005438

- *See* McCawley Dec. at Exhibit 28, Message Pad evidencing Defendant arranging to have underage girls and young women come to Epstein's home GIUFFRE001386-001571

- *See* McCawley Dec. at Exhibit 29, Black Book in which Defendant and other household staff maintained a roster of underage girls including ███████████████████ ██████████, who were minors at the time the Palm Beach Police's Investigation of Jeffrey Epstein GIUFFRE001573-00669

- *See* McCawley Dec. at Exhibit 40, Sex Slave books Epstein ordered from Amazon.com at GIUFFRE006581

- *See* McCawley Dec. at Exhibit 32, the folder Defendant sent to Thailand with Ms. Giuffre bearing Defendant's phone number GIUFFRE003191-003192

- *See* McCawley Dec. at Exhibit 39, the Palm Beach Police Report showing that Epstein used women and girls to collect underage girls for his abuse GIUFFRE005614-005700

- *See* McCawley Dec. at Exhibit 41, Epstein's Flight Logs showing that Defendant flew with Ms. Giuffre 23 times GIUFFRE007055-007161

**DEFENDANT'S PURPORTED FACTS**

12. In the joinder motion, Ms. Giuffre also alleged she was "forced" to have sex with Harvard law professor Alan Dershowitz, "model scout" Jean Luc Brunel, and "many other powerful men, including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Response to Point #7 and 11, above.

**DEFENDANT'S PURPORTED FACTS**

13. Ms. Giuffre said after serving for four years as a "sex slave," she "managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Agreed that Ms. Giuffre made this statement and has since discovered evidence that indicates she was mistaken on the exact timeframe of her abuse and was with Defendant and Jeffrey Epstein from the years 2000 – 2002.

**DEFENDANT'S PURPORTED FACTS**

14. Ms. Giuffre suggested the government was part of Epstein's "conspiracy" when it "secretly" negotiated a non-prosecution agreement with Epstein precluding federal prosecution of Epstein and his "co-conspirators." The government's secrecy, Ms. Giuffre alleged, was motivated by its fear that Ms. Giuffre would raise "powerful objections" to the agreement that would have "shed tremendous public light on Epstein and other powerful individuals.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre did not suggest that the Government was part of Epstein's conspiracy to commit sex offenses. The CVRA case deals with whether the Government failed in their responsibilities to the victims to inform the victims that the Government was working out a NPA,

and it is Ms. Giuffre's belief that the Government did fail to so inform the victims, and

intentionally did not inform the victims because the expected serious objection from many of the

victims might prevent the Government from finalizing a NPA with Epstein. *See* McCawley Dec.

at Exhibit 50, Joinder Motion (GIUFFRE00319-00333).

**DEFENDANT'S PURPORTED FACTS**

15.    Notably, the other "Jane Doe" who joined Ms. Giuffre's motion who alleged she was
       sexually abused "many occasions" by Epstein was unable to corroborate any of Ms.
       Giuffre's allegations.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This is untrue.  The other Jane Doe could corroborate many of Ms. Giuffre's allegations

based on a similar pattern of abuse that she suffered by Epstein.  She did not know Ms. Giuffre

though. ▮▮▮▮▮▮▮▮, who was deposed in this case, and who was a minor, corroborates the

same pattern of abuse. *See* McCawley Dec. at Exhibit 7, ▮▮ Dep. Tr. at 54:25-57:5.

**DEFENDANT'S PURPORTED FACTS**

16.    Also notably, in her multiple and lengthy consensual interviews with Ms. Churcher three
       years earlier, Ms. Giuffre told Ms. Churcher of virtually none of the details she described
       in the joinder motion.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This is untrue.  Furthermore, Defendant does not offer any citation or evidence on this

point.  Defendant's statement here is knowingly false.  Having read the articles and taken Ms.

Giuffre's deposition, Defendant knows that Ms. Giuffre did reveal details in 2011 consistent with

those in the joinder motion. *See* McCawley Dec. at Exhibit 31, GIUFFRE003678, FBI Redacted

302, GIUFFRE001235-1246.

**DEFENDANT'S PURPORTED FACTS**

17.    **Ms. Maxwell's response to Ms. Giuffre's "lurid" accusations: the January 2015
       statement**.  As Ms. Giuffre and her lawyers expected, before District Judge Marra in the

CVRA action could strike the "lurid details" of Ms. Giuffre's allegations in the joinder motion, members of the media obtained copies of the motion.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Response to Point #7, above.

**DEFENDANT'S PURPORTED FACTS**

18.     At Mr. Barden's direction, on January 3, 2015, Mr. Gow sent to numerous representatives of British media organizations an email containing "a quotable statement on behalf of Ms. Maxwell." The email was sent to more than 6 and probably less than 30 media representatives. It was not sent to non-media representatives.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Defendant falsely claims that "[a]t Mr. Barden's direction, on January 3, 2015, Mr. Gow sent to numerous representatives of British media organizations an email containing 'a quotable statement on behalf of Ms. Maxwell.'" This is a blatant falsehood about the document that is at the heart of this litigation. Record evidence shows that Gow sent that email at Defendant's direction, not at Mr. Barden's direction. Indeed, on the evening before his deposition, Mr. Gow produced an email exchange he had with Defendant in which Defendant directs Mr. Gow to send the press statement. It is as follows:

From: G Maxwell <GMax1@ellmax.com>
Date: Fri, 2 Jan 2015 20:14:53 +0000
To: Ross Gow<ross@acuityreputation.com>
Cc: Philip Barden<philip.barden@devonshires.co.uk>
Subject: FW: URGENT - this is the statement

Jane Doe 3 is Virginia Roberts so not a new individual.

The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue.

The original allegations are not new and have been fully responded to and shown to be untrue

Each time the story is re told it changes with new salacious details about public figures and world leaders and now it is alleged by Ms Roberts that Alan Derschwitz is involved in having sexual relations with her, which he denies

Ms Roberts claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory.

Chronologically, this email comes at the end of various other email exchanges between Defendant and Gow that discuss issuing a press release. The subject line of this email that Defendant wrote to Gow states "URGENT – this is the statement," thereby instructing Gow to release this statement to the press. Shortly after Defendant sent this email to Gow directing him to release the statement, Gow distributed the statement to multiple media outlets. Neither Defendant nor Gow have produced any email in which Barden directed Gow to issue this press release (nor can they).

Despite sending it herself, and despite it being responsive to six court-ordered search terms, Defendant failed to produce this email. Her press agent, Gow, produced this the evening before his deposition on November 17, 2016. At the deposition, Mr. Gow authenticated this email and confirmed that Defendant authorized the statement:

> Q. When you sent that email were you acting pursuant to Ms. Maxwell's retention of your services?
> A. Yes, I was.
> ***
> (Exhibit 9 was marked for identification.)
> Q. This also appears to be an email chain with you and Ms. Maxwell; is that correct?
> A. It does appear to be so.
> Q. Did you send the top email of the chain that says "Okay, G, going with this"?
> A. I did.
> Q. And did you receive from Ms. Maxwell, the bottom email of that chain?
> A. I believe so.  Well, I believe -- yes, yeah, it was forwarded from Ms. Maxwell, yes.
> MR. DYER: Sorry, I don't quite understand that answer.
> THE WITNESS: I misspoke that. I did receive it from Ms. Maxwell.
> MR. DYER: Okay.
> Q. The subject line does have "FW" which to me indicates it's a forward. Do you know where the rest of this email chain is?
> A. My understanding of this is: It was a holiday in the UK, but Mr. Barden was not necessarily accessible at some point in time, so this had been sent to him originally by Ms. Maxwell, and because he was unavailable, she forwarded it to me for immediate action. I therefore respond, "Okay, Ghislaine, I'll go with this."
>
>     It is my understanding that this is the agreed statement because the subject of the second one is "Urgent, this is the statement" so I take that as an instruction to send it out, as a positive command: "This is the statement."

*See* McCawley Decl. at Exhibit 6, November 18, 2016, Ross Gow Dep. Tr. at 14:15-17; 44:6-45:13.

Together, the email and Gow's testimony unequivocally establish that Defendant – not Barden – directed and "command[ed]" Gow to publish the defamatory statement. Accordingly, the first sentence of Defendant's Paragraph 18 is false.

The second sentence – "This email was sent to more than 6 and probably less than 30 media representatives" – omits the fact that not only did Gow admit to emailing the statement to the press, but he also read it to over 30 media representatives over the phone:

> Q. Do you recall ever reading the statement to the press or the media over the phone?
> A. It's very possible that I would have done so, yes.

*See* McCawley Decl. at Exhibit 6, Gow Dep. Tr. at 66:2-25.

> Q. Do you -- do you remember discussing that with The Guardian?
> A. No, I don't. I'm not saying I didn't but I can't recall. You have to bear in mind, if you'd be so kind, that I've been speaking to **over 30 journalists** and media outlets about this, and I can't recall every single -- the detail of every single conversation.

*See* McCawley Decl. at Exhibit 6, Gow Dep. Tr. at 64:8-14 (emphasis added). Thus, the second sentence of Defendant's Paragraph 18 is also false.

## DEFENDANT'S PURPORTED FACTS

19. Among the media representatives were Martin Robinson of the Daily Mail; P. Peachey of The Independent; Nick Sommerlad of The Mirror; David Brown of The Times; and Nick Always and Jo-Anne Pugh of the BBC; and David Mercer of the Press Association. These representatives were selected based on their request—after the joinder motion was filed—for a response from Ms. Maxwell to Ms. Giuffre's allegations in the motion.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre agrees to the first sentence. The second sentence is a false. Accordingly, there is no record evidence that Gow (or anyone else) "selected" journalists "for a response," or that there was any selection process whatsoever. To the contrary, Gow testified that anyone who inquired received a reference to the January 2015 defamatory response:

Q. To the extent you can recall or could estimate, how many other emails do you believe you sent bearing that statement that's in Exhibit 2?

A. I really can't remember but certainly more than six and probably less than 30, somewhere in between. Any time there was an incoming query it was either dealt with on the telephone by referring them back to the two statements of March 2011 and January 2015 or someone would email them the statement. So ***no one was left unanswered***, broadly, is the -- is where we were. But I can't remember every single person we reached out to.

*See* McCawley Dec at Exhibit 6 Gow Dep. Tr. at 67:15-68:1 (emphasis added).

## **DEFENDANT'S PURPORTED FACTS**

20.     The email to the media members read:

> To Whom It May Concern,
>
> Please find attached a quotable statement on behalf of Ms. Maxwell.
>
> No further communication will be provided by her on this matter.
>
> Thanks for your understanding.
>
> Best Ross
>
> Ross Gow
> ACUITY Reputation
>
> Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.
>
> Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts [sic] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies.
>
> Ms. Roberts claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory.
>
> Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

## **MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

While Defendant cropped the body text of the email that was sent to news media representatives, she completely omitted the headings and metadata. Ms. Giuffre has put an image of the email below in Ms. Giuffre's Paragraph. *See* GM_00068.

From: <ross@acuityreputation.com>
Date: 2 January 2015 at 20:38
Subject: Ghislaine Maxwell
To: Rossacuity Gow <ross@acuityreputation.com>
bcc: martin.robinson@mailonline.co.uk,
P.Peachey@independent.co.uk,
nick.sommerlad@mirror.co.uk,
david.brown@thetimes.co.uk,
nick.alway@bbc.co.uk,
jo-anne.pugh@bbc.co.uk

To Whom It May Concern,
Please find attached a quotable statement on behalf of Ms Maxwell.

No further communication will be provided by her on this matter.
Thanks for your understanding.
Best
Ross

Ross Gow
ACUITY Reputation

Jane Doe 3 is Virginia Roberts - so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.

Each time the story is re told it changes with new salacious details about public figures and world leaders and now it is alleged by Ms Roberts that Alan Derschowitz is involved in having sexual relations with her, which he denies.

Ms Roberts claims are obvious lies and should be treated as such and not publicised as news, as they are defamatory.

Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

Sent from my BlackBerry® wireless device

**DEFENDANT'S PURPORTED FACTS**

21.    Mr. Barden, who prepared the January 2015 statement, did not intend it as a traditional press release solely to disseminate information to the media. So he intentionally did not pass it through a public relations firm, such as Mr. Gow's firm, Acuity Reputation.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Defendant states: "Mr. Barden, who prepared the statement, did not intend it as a traditional press release solely to dissemination information to the media." Ms. Giuffre contests this statement, and all statements regarding Mr. Barden's beliefs and purposes, and the like.

Further, as stated in detail in Ms. Giuffre's Opposition Defendant's Motion for Summary Judgment, this Court should not even consider the Barden Declaration. Additionally, there is absolutely no record evidence of Barden's intent and the Court should not consider it.

The next sentence states, "So he intentionally did not pass it [the press release] through a public relations firm, such as Mr. Gow's firm, Acuity Reputation." Again, there is zero record evidence to support any assertion of Barden's intent. To the extent that this sentence claims that Barden did not give the statement to Gow, Ms. Giuffre does not dispute it; as described above, Defendant gave the statement to Gow with instructions to publish it. *See* McCawley Dec. at Exhibit 48, RG(UK)_000009, imaged in full at paragraph 81, *supra*. To the extent that this sentence claims that the statement did not pass "through a public relations firm, such as Mr. Gow's firm, Acuity Reputation," Ms. Giuffre disputes that statement. Record documentary evidence and testimony establish that this statement was disseminated through a public relations firm, namely, Ross Gow's firm, Acuity Reputation. *See* McCawley Dec. at Exhibit 6, Gow Dep. Tr. at 109:4-6 ("Q. Approximately how long have you been providing such services? A. Acuity was set up in 2010.").

## DEFENDANT'S PURPORTED FACTS

16

22.     The January 2015 statement served two purposes.  First, Mr. Barden intended that it mitigate the harm to Ms. Maxwell's reputation from the press's republication of Ms. Giuffre's false allegations.  He believed these ends could be accomplished by suggesting to the media that, among other things, they should subject Ms. Giuffre's allegations to inquiry and scrutiny.  For example, he noted in the statement that Ms. Giuffre's allegations changed dramatically over time, suggesting that they are "obvious lies" and therefore should not be "publicized as news."

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre objects to this paragraph in its entirety. She disputes that the January 2015 statement "served two purposes," as this statement is wholly unsupported by the record, which Defendant again neglects to cite. Ms. Giuffre also contests the second sentence in which Defendant claims that "Mr. Barden intended that it mitigate the harm to Ms. Maxwell's reputation from the press's republication of Ms. Giuffre's false allegations." First, Ms. Giuffre disputes any statement of Barden's intent as explained above. Second, Ms. Giuffre disputes that there was any "republication" by the press as a matter of law, as explained in her memorandum of law opposing summary judgment, as the press did not "republish" the press statement under New York law. Third, Ms. Giuffre disputes that her allegations are "false," and cites to the following non-exhaustive sampling of evidence to corroborate her allegations against Defendant:

- *See* McCawley Dec. at Exhibit 16, Sjoberg's May 18, 2016 Dep. Tr. at 8-9, 13, 33-35, 142-143

- *See* McCawley Dec. at Exhibit 4, Figueroa June 24, 2016 Dep. Tr. Vol. 1 at 96-97 and 103

- *See* McCawley Dec. at Exhibit 14, Rinaldo Rizzo's June 10, 2016 Dep. Tr. at 52-60

- *See* McCawley Dec. at Exhibit 12, Lynn Miller's May 24, 2016 Dep. Tr. at 115

- *See* McCawley Dec. at Exhibit 13, Joseph Recarey's June 21, 2016 Dep. Tr. at 29-30

- *See* McCawley Dec. at Exhibit 15, David Rodgers' June 3, 2016 Dep. Tr. at 18, 34-36

- Exhibit 2 Excerpted Rodgers Dep. Ex. 1 at flight #s 1433-1434, 1444-1446, 1464-1470, 1478-1480, 1490-1491, 1506, 1525-1526, 1528, 1570 and 1589

- *See* McCawley Dec. at Exhibit 10, Marcinkova Dep. Tr. at 10:18-21; 12:11-15; etc.

- *See* McCawley Dec. at Exhibit 8, Kellen Dep. Tr. at 15:13-18; 20:12-16; etc. Epstein Dep. Tr. at 116:10-15; 117:18-118:10; etc.

- *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 28, 52-54

- *See* McCawley Dec. at Exhibit 42, Photographs including GIUFFRE007162-007182.

- *See* McCawley Dec. at Exhibit 30, U.S. Attorney Victim Notification Letter GIUFFRE002216-002218

- *See* McCawley Dec. at Exhibit 33, July 2001 New York Presbyterian Hospital Records GIUFFRE003258-003290

- *See* McCawley Dec. at Exhibit 38, Judith Lightfoot psychological records GIUFFRE005431-005438

- *See* McCawley Dec. at Exhibit 28, Message Pad evidencing Defendant arranging to have underage girls and young women come to Epstein's home GIUFFRE001386-001571

- *See* McCawley Dec. at Exhibit 29, Black Book in which Defendant and other household staff maintained a roster of underage girls including ██████████████████ ██████████, who were minors at the time the Palm Beach Police's Investigation of Jeffrey Epstein GIUFFRE001573-00669

- *See* McCawley Dec. at Exhibit 40, Sex Slave books Epstein ordered from Amazon.com at GIUFFRE006581

- *See* McCawley Dec. at Exhibit 32, the folder Defendant sent to Thailand with Ms. Giuffre bearing Defendant's phone number GIUFFRE003191-003192

- *See* McCawley Dec. at Exhibit 39, the Palm Beach Police Report showing that Epstein used women and girls to collect underage girls for his abuse GIUFFRE005614-005700

- *See* McCawley Dec. at Exhibit 41, Epstein's Flight Logs showing that Defendant flew with Ms. Giuffre 23 times GIUFFRE007055-007161

Next, Defendant states, "He [Barden] believed these ends could be accomplished by suggesting to the media that, among other things, they should subject Ms. Giuffre's allegations to inquiry and scrutiny." Ms. Giuffre disputes any statement as to Barden's "belief" (*supra*). Ms. Giuffre disputes that the harm to Defendant's reputation could be mitigated by the media's inquiry into and scrutiny of Ms. Giuffre's allegations, because a deeper inquiry would only reveal additional evidence corroborating Ms. Giuffre's allegations, such as the evidence put forth in Ms. Giuffre's opposition memorandum of law and detailed in the bulleted citations, *supra*.

Defendant then states, "For example, he [Barden] noted in the statement that Ms. Giuffre's allegations changed dramatically over time, suggesting that they are 'obvious lies' and therefore should not be 'publicized as news.'" First, Ms. Giuffre disputes that Barden noted anything in the statement, as that is unsubstantiated by the record evidence. Not to do Defendant's work for her, but the closest evidence Defendant has for such a statement is testimony from the Gow deposition wherein Gow speculates that Barden "had a hand in" drafting the press statement, an opinion which may or may not be based on first-hand knowledge. *See* McCawley Dec. at Exhibit 6, Gow Dep. Tr. at 45:14-17 (Q. Okay. A. And I say, "Thanks, Philip" because I'm aware of the fact that he had a hand, a considerable hand in the drafting.") This is wholly insufficient to show who drafted the passages quoted by Defendant above. Regardless of those passages' original author, it is ultimately Defendant who "noted" anything because it is her statement and she directed that it be sent to the media and public.

Second, Ms. Giuffre disputes that her allegations have changed over time, "dramatically" or otherwise. Third, Ms. Giuffre disputes that the press release "suggest[ed]" that her allegations are "obvious lies," because Defendant's press release affirmatively, unambiguously stated that her allegations are "obvious lies" – there is no subtlety, suggestion, or statement of opinion here. *See Giuffre v. Maxwell*, 165 F. Supp.3d 147, 152 (S.D.N.Y. 2016) (". . . these statements (as they themselves allege), are capable of being proven true or false, and therefore constitute actionable fact and not opinion."

**DEFENDANT'S PURPORTED FACTS**

23.     Second, Mr. Barden intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish Ms. Giuffre's allegations without conducting any inquiry of their own. Accordingly, in the statement he repeatedly noted that Ms. Giuffre's allegations were "defamatory." In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of Ms. Giuffre's obviously false allegations and the legal indefensibility of their own conduct.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This paragraph is another purported statement of Defendant's counsel's "intent." Defendant states: "Second, Mr. Barden intended the January 2015 statement to be a 'shot across the bow' of the media, which he believed had been unduly eager to publish Ms. Giuffre's' allegations without conducting any inquiry of their own." Not only does Defendant once again refer to Mr. Barden's intent, but she also mischaracterizes the statement as a "shot across the bow" of the media. The press release did not threaten or give warning to the media in any way whatsoever. *See* McCawley Dec. at Exhibit 26, GM_00068, full image copied in Ms. Giuffre's Paragraph 18, *supra*.

Next, Ms. Giuffre disputes the sentence, "Accordingly, in the statement he repeatedly noted that Ms. Giuffre's allegations were 'defamatory.'" Barden did not "note" anything in the statement, nor does Defendant cite to any record evidence that he does. Furthermore, Ms. Giuffre

denies that any of her allegations are defamatory in the slightest, as they are all true and substantiated by record evidence (*supra*).

Ms. Giuffre also disputes the sentence, "In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Ms. Maxwell considered the publication of Ms. Giuffre's obviously false allegations and the legal indefensibility of their own conduct." First, Ms. Giuffre objects to any statement of Barden's intent, as articulated above. Second, Defendant's conventional press release was in no way any type of "cease and desist letter." There is no record evidence in support of this claim, and Defendant unsurprisingly cites to none. Third, Ms. Giuffre disputes that any media-recipients would be given to understand "the seriousness with which Ms. Maxwell considered the publication of Ms. Giuffre's obviously false allegations and the legal indefensibility of their own conduct" by Defendant's self-serving press release, as that is unsupported by the record. Finally, Ms. Giuffre rejects that her allegations are "obviously false," a claim which is completely unsupported by record evidence.

## DEFENDANT'S PURPORTED FACTS

24. Consistent with those two purposes, Mr. Gow's emails prefaced the statement with the following language: "Please find attached a quotable statement on behalf of Ms. Maxwell" (emphasis supplied). The statement was intended to be a single, one-time-only, comprehensive response—quoted in full—to Ms. Giuffre's December 30, 2014, allegations that would give the media Ms. Maxwell's response. The purpose of the prefatory statement was to inform the media-recipients of this intent.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre disputes that any part of Defendant's press release is "consistent with those two [of Barden's] purposes." Indeed, Ms. Giuffre disputes this and any statement relating to Barden's "purposes," as explained above.

Next, Ms. Giuffre disputes that, "The statement was intended to be a single, one-time-only, comprehensive response – quoted in full – to Ms. Giuffre's December 30, 2014, allegations that would give the media Ms. Maxwell's response." First, Ms. Giuffre disputes this and any statement relating to Barden's "intent" as explained above. Second, Ms. Giuffre disputes that anyone intended the press release to be a one-time-only, comprehensive response. The record evidence says otherwise: Gow repeatedly issued this statement via email and over the phone for months on end.

Next, Defendant states, "The purpose of the prefatory statement was to inform the media-recipients of this intent." First, Ms. Giuffre disputes this and any statement relating to Barden's purpose as explained above. Second, Ms. Giuffre disputes that the press release was to inform the media of *anything*. Defendant issued a press release, instructed them to publish it (by telling them it was "quotable"), *see* McCawley Dec. at Exhibit 48, RG(UK)_000009 (*supra*), and hired a press agent to feed it to the press:

> Q. Did Ms. Maxwell retain the services of you or your firm?
> A. Yes, she did.
> ***
> Q. Is it your belief that that agreement was in effect on January 2nd, 2015?
> A. Yes.
> Q. Do you recall the terms of that agreement?
> A. Well, it was a re-establishment of an existing agreement so if we go back to the original agreement, it was to provide public relations services to Ms. Maxwell in the matter of Giuffre and her activities.

*See* McCawley Dec. at Exhibit 6 Gow Dep. Tr. at 12:19-21; 13:9-16. The record evidence shows

that Defendant's intent was for the press to publish her press release: any other interpretation is

not only contrary to logic, but unsupported by the record.

**DEFENDANT'S PURPORTED FACTS**

25. **Ms. Giuffre's activities to bring light to the rights of victims of sexual abuse.** Ms.
Giuffre has engaged in numerous activities to bring attention to herself, to the prosecution
and punishment of wealthy individuals such as Epstein, and to her claimed interest of
bringing light to the rights of victims of sexual abuse.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Agreed to the portion of Defendant's assertion in bold font. Ms. Giuffre has not engaged

in activities to bring attention to herself, rather she has taken action to aid in the prosecution of

her abusers, and she seeks to bring light to the rights of victims of sexual abuse.

**DEFENDANT'S PURPORTED FACTS**

26. Ms. Giuffre created an organization, Victims Refuse Silence, Inc., a Florida corporation,
directly related to her alleged experience as a victim of sexual abuse.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre created Victims Refuse Silence, Inc., in order to help other sexually

trafficked victims find the resources they need to recover and heal. *See*

**www.victimsrefusesilence.org.**

**DEFENDANT'S PURPORTED FACTS**

27. The "goal" of Victims Refuse Silence "was, and continues to be, to help survivors
surmount the shame, silence, and intimidation typically experienced by victims of sexual
abuse." Toward this end, Ms. Giuffre has "dedicated her professional life to helping
victims of sex trafficking."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Agreed.

**DEFENDANT'S PURPORTED FACTS**

28.  Ms. Giuffre repeatedly has sought out media organizations to discuss her alleged experience as a victim of sexual abuse.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Denied.  Ms. Giuffre was approached by numerous media outlets and refused to speak to most of them.  Media organizations sought her out; she did not seek them out. *See* McCawley Dec. at Exhibit 35, GIUFFRE003690, email from Sharon Churcher seeking to interview Ms. Giuffre.

**DEFENDANT'S PURPORTED FACTS**

29.  On December 30, 2014, Ms. Giuffre publicly filed an "entirely unnecessary" joinder motion laden with "unnecessary," "lurid details" about being "sexually abused" as a "minor victim[]" by wealthy and famous men and being "trafficked" all around the world as a "sex slave."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Paragraph 7, *supra*, listing multiple reasons why details were, in fact, necessary.

**DEFENDANT'S PURPORTED FACTS**

30.  The Ms. Giuffre's alleged purpose in filing the joinder motion was to "vindicate" her rights under the CVRA, expose the government's "secretly negotiated" "non-prosecution agreement" with Epstein, "shed tremendous public light" on Epstein and "other powerful individuals" that would undermine the agreement, and support the CVRA Ms. Giuffre's request for documents that would show how Epstein "used his powerful political and social connections to secure a favorable plea deal" and the government's "motive" to aid Epstein and his "co-conspirators."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

*See* Ms. Giuffre's Paragraph 7, *supra*, listing multiple purposes of Ms. Giuffre's lawyers' filing of the motion.

## DEFENDANT'S PURPORTED FACTS

31.    Ms. Giuffre has written the manuscript of a book she has been trying to publish detailing her alleged experience as a victim of sexual abuse and of sex trafficking in Epstein's alleged "sex scheme."

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

*See* Ms. Giuffre's Paragraph 52, *infra*, explaining that the context of this statement is

misleading.

## DEFENDANT'S PURPORTED FACTS

32.    **Republication alleged by Ms. Giuffre.** Ms. Giuffre was required by Interrogatory No. 6 to identify any false statements attributed to Ms. Maxwell that were "'published globally, including within the Southern District of New York,'" as Ms. Giuffre alleged in Paragraph 9 of Count I of her complaint.  In response, Ms. Giuffre identified the January 2015 statement and nine instances in which various news media published portions of the January 2015 statement in news articles or broadcast stories.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre objects to this paragraph in its entirety, starting with the bolded heading

("Republication alleged by Ms. Giuffre"). There is no "republication" as a matter of law in this

case, as explained in Ms. Giuffre's memorandum of law. Accordingly, Ms. Giuffre is not and has

not alleged republication. As noted in her objection that, it is Defendant who possesses the

knowledge as to where the defamatory statements were published; unsurprisingly, Defendant

failed to comply with Ms. Giuffre's discovery requests on the same.

As Defendant already knows, Ms. Giuffre provided a sampling of Defendant's

defamatory statements published by the news media, as "identification of an exhaustive

responsive list would be unduly burdensome." This, of course, is because Defendant caused her

statement to be published in an enormous number of media outlets. Ms. Giuffre's full response to

Interrogatory No. 6 is below. As the Court can see, these nine instances were a good-faith effort

to provide some samples (as it would be virtually impossible to provide all of them), below. Ms.

Giuffre has also put forth an exhaustive expert report and expert testimony from Jim Jansen regarding the dissemination of Defendant's defamatory press release.

Ms. Giuffre objects because the information interrogatory above is in the possession of Defendant who has failed to comply with her production obligations in this matter, and has failed to comply with her production obligations with this very subject matter. See Document Request No. 17 from Ms. Giuffre's Second Request for Production of Documents to Defendant Ghislaine Maxwell. Maxwell has not produced all "URL or Internet addresses for any internet version of such publication" that she directed her agent, Ross Gow, to send.

Ms. Giuffre further objects because the information requested above is in the possession of Defendant's agent, who caused the false statements to be issued to various media outlets. Ms. Giuffre has not had the opportunity to depose Maxwell's agent Ross Gow; therefore, this answer remains incomplete.

Consequently, Ms. Giuffre reserves the right to modify and/or supplement her responses, as information is largely in the possession of the Defendant and her agent. Ms. Giuffre objects to this interrogatory in that it violates Rule 33 as its subparts, in combination with the other interrogatories, exceed the allowable twenty-five interrogatories. Ms. Giuffre objects to this request because it is in the public domain. Ms. Giuffre also objects in that it seeks information protected by the attorney-client/work product privilege, and any other applicable privilege stated in the General Objections.

Notwithstanding such objections, Ms. Giuffre has already produced documents supplements such responsive documents with the following list of publications. While the identification of an exhaustive responsive list would be unduly burdensome, in an effort to make a good faith effort towards compliance, Ms. Giuffre provides the following examples, which are incomplete based on the aforementioned reasons:

| Date | Nature | Publishing Entity | Statement/URL |
|---|---|---|---|
| January 2, 2015 | Internet | Ross Gow | Jane Doe 3 is Virginia Roberts - so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.<br><br>Each time the story is re told it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts that Alan Dershowitz is involved in having sexual relations with her, which he denies.<br><br>Ms. Roberts's claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory.<br><br>Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims. |
| January 2, 2015 | Internet | Bolton News | http://www.theboltonnews.co.uk/news/national/11700192.Palace_denies_Andrew_sex_case_claim/ |
| January 3, 2015 | Internet | Telegraph | http://www.telegraph.co.uk/news/uknews/theroyalfamily/11323872/Prince-Andrew-denies-having-relations-with-sex-slave-girl.html |
| January 3, 2015 | Internet | Daily Mail | http://www.dailymail.co.uk/news/article-2895366/Prince-Andrew-lobbied-government-easy-Jeffrey-Epstein-Palace-denies-claims-royal-tried-use-influence-help-billionaire-paedophile-2008-police-probe.html |
| January 3, 2015 | Internet | Huffington Post | http://www.huffingtonpost.co.uk/2015/01/03/duke-of-york-sex-abuse-claims_n_6409508.html |

| January 4, 2015 | Internet | Express | http://www.express.co.uk/news/world/550085/Ghislaine-Maxwell-Jeffrey-Epstein-not-madam-paedophile-Florida-court-case-Prince-Andrew |
|---|---|---|---|
| January 4, 2015 | Internet | Jewish News Online | http://www.jewishnews.co.uk/dershowitz-nothing-prince-andrews-sex-scandal/ |
| January 5, 2015 | Internet/ Broadcast | NY Daily News | http://www.nydailynews.com/news/world/alleged-madame-accused-supplying-prince-andrew-article-1.2065505 |
| January 5, 2015 | Internet/ Broadcast | AOL UK | http://www.aol.co.uk/video/ghislaine-maxwell-declines-to-comment-on-prince-andrew-allegations-518587500/ |

**Two newest articles**

[1] https://www.thesun.co.uk/archives/news/6754/prince-andrews-pal-ghislaine-groped-teen-girls/
[2] http://www.mirror.co.uk/news/uk-news/prince-andrews-pal-ghislaine-maxwell-5081971

**DEFENDANT'S PURPORTED FACTS**

33.   In none of the nine instances was there any publication of the entire January 2015 statement.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

While there may be certain publications who did not print every word of Defendant's lengthy press release, most publications quoted the most salient, to-the-point parts of Defendant's statement that call Ms. Giuffre a liar. In each of the nine articles listed above, the defamatory statement, as articulated by the Complaint and *as identified by the Court as actionable*, is published. *See Giuffre v. Maxwell*, 165 F. Supp.3d 147, 152 (S.D.N.Y. 2016) ("statements that Giuffre's claims 'against [Defendant] are untrue,' have been 'shown to be untrue,' and are 'obvious lies' have a specific and readily understood factual meaning: that Giuffre is not telling the truth about her history of sexual abuse and Defendant's role, and that some verifiable investigation has occurred and come to a definitive conclusion proving that fact. Second, these statements (as they themselves allege), are capable of being proven true or false, and therefore constitute actionable fact and not opinion"). Ms. Giuffre also put forth extensive evidence of the mass distribution of Defendant's defamatory statement to over 66 million viewers through her expert witness Jim Jansen. *See* McCawley Dec. at Exhibit 24, Expert Report of Jim Jansen.

**DEFENDANT'S PURPORTED FACTS**

34.   Ms. Maxwell and her agents exercised no control or authority over any media organization, including the media identified in Ms. Giuffre's response to Interrogatory No. 6, in connection with the media's publication of portions of the January 2015 statement.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre disputes this statement in its entirety, as it is completely devoid of record evidence. In fact, the record establishes the contrary. First, Defendant hired Gow because his

position allowed him to influence the press to publish her defamatory statement. A sampling of

Gow's testimony establishes just that:

> Q.      Did Ms. Maxwell retain the services of you or your firm?
> A.      Yes, she did.
>
> ***
>
> Q.      Is it your belief that that agreement was in effect on January 2nd, 2015?
> A.      Yes.
> Q.      Do you recall the terms of that agreement?
> A.      Well, it was a re-establishment of an existing agreement so if we go back to the original agreement, it was to provide public relations services to Ms. Maxwell in the matter of Giuffre and her activities.
>
> ***
>
> Q.      You can answer -- to the extent that anything you testify to is not protected by a privilege.
>
> A.      Ms. Roberts first came to my attention on or around March 2011 when I was called into a meeting with Philip Barden and Ms. Maxwell at Devonshires law office, that she had made -- Ms. Giuffre had made extremely unpleasant allegations about Ms. Maxwell's private life. We were -- Acuity Reputation, my firm was called in to protect Ms. Maxwell's reputation, and to set the record straight. That was -- and that work commenced on or around March of 2011.
>
> ***
>
> Q.      Does this document fairly depict pages from your -- from Acuity Reputation's website?
> A.      It does.
> Q.      Do you see where it says "We manage reputation and forge opinion through public relations, strategic communications and high level networking"?
> A.      I do.
> Q.      Is that a true statement?
> A.      Say it again. Sorry.
> Q.      Is that a true statement?
> A.      It is, yes. I wrote that statement.
>
> ***
>
> Q.      Okay.  Do you see where your website claims that your company has "excellent relationships with the media"?
> A.      I do.
> Q.      Is that a true statement?

A.     That is true, yeah.

\*\*\*

Q.     Is it correct that you advertise your "excellent relationships with the media" because your services often include giving communications to the media on behalf of your clients?

A.     Yes.

*See* McCawley Dec. at Exhibit 6 Gow Dep. Tr. at 13:9-16; 15:18-16:3; 109:12-22; 110:16-21;

111:3-7. In addition to testimonial evidence, the proof is also in the result. By using Gow to issue

her press release, Defendant caused her statement to be published by numerous major news

organizations with wide readership all over the globe. Accordingly, the record evidence shows

that Ms. Maxwell, through her agent, had immense control and authority over the media,

convincing major news outlets to publish her words based on nothing more than a single email

from Gow.

## DEFENDANT'S PURPORTED FACTS

35.    Ms. Giuffre's defamation action against Ms. Maxwell.  Eight years after Epstein's guilty plea, Ms. Giuffre brought this action, repeating many of the allegations she made in her CVRA joinder motion.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Agreed, but noting that the defamation cause of action against Defendant did not accrue

until Defendant defamed her in January of 2015, the same year Ms. Giuffre filed suit against

Defendant for defamation.

## DEFENDANT'S PURPORTED FACTS

36.    The complaint alleged that the January 2015 statement "contained the following deliberate falsehoods":

(a)    That Giuffre's sworn allegations "against Ghislaine Maxwell are untrue."
(b)    That the allegations have been "shown to be untrue."
(c)    That Giuffre's "claims are obvious lies."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Agreed. However, in discovery, Defendant was finally forced to produce the complete

press release she issued. *See* McCawley Dec. at Exhibit 26, GIUFFRE00068.

**DEFENDANT'S PURPORTED FACTS**

37.     Ms. Giuffre lived independently from her parents with her fiancé long before meeting Epstein
        or Ms. Maxwell.  After leaving the Growing Together drug rehabilitation facility in 1999,
        Ms. Giuffre moved in with the family of a fellow patient.  There she met, and became
        engaged to, her friend's brother, James Michael Austrich.  She and Austrich thereafter rented
        an apartment in the Ft. Lauderdale area with another friend and both worked at various jobs
        in that area. Later, they stayed briefly with Ms. Giuffre's parents in the Palm Beach/
        Loxahatchee, Florida area before Austrich rented an apartment for the couple on Bent Oak
        Drive in Royal Palm Beach.  Although Ms. Giuffre agreed to marry Austrich, she never had
        any intention of doing so.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre did not voluntarily live independently from her parents with her fiancé, rather

Ms. Giuffre was a troubled minor child who was not truly engaged prior to meeting Defendant and

Epstein.  Where Ms. Giuffre lived, and who she lived with, are not relevant to the issues being

decided in this action.  Again, this is merely a transparent distraction from the case that is

actually at issue, and is being used for the sole purpose of inserting conjecture in an effort to

distract the Court and ultimately the jury.

Although Austrich testified that he proposed to Ms. Giuffre on Valentine's Day, *see*

Austrich at p. 19, Ms. Giuffre was a troubled teen who could not realistically be considered a

fiancé in the true sense of the word, nor was she of legal age to marry.  In fact, as accurately

described by Defendant, Ms. Giuffre never had any intention of marrying Austrich.  Giuffre Dep. Tr.

at 127:22-128:21.  Given that Ms. Giuffre was a child with limited legal capacity at this point, and

that she did not have any intention of marrying Austrich, a reasonable person could not assert that

Ms. Giuffre was engaged.

**DEFENDANT'S PURPORTED FACTS**

38.     Ms. Giuffre re-enrolled in high school from June 21, 2000 until March 7, 2002.  After finishing the 9th grade school year at Forest Hills High School on June 9, 1999, Ms. Giuffre re-enrolled at Wellington Adult High School on June 21, 2000, again on August 16, 2000 and on August 14, 2001.  On September 20, 2001, Ms. Giuffre then enrolled at Royal Palm Beach High School.  A few weeks later, on October 12, 2001, she matriculated at Survivors Charter School.  Id. Survivor's Charter School was an alternative school designed to assist students who had been unsuccessful at more traditional schools.  Ms. Giuffre remained enrolled at Survivor's Charter School until March 7, 2002.  She was present 56 days and absent 13 days during her time there.  Id. Ms. Giuffre never received her high school diploma or GED.  Ms. Giuffre and Figueroa went "back to school" together at Survivor's Charter School.  The school day there lasted from morning until early afternoon.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre denies this statement. Either Defendant is blatantly misleading this Court or

Defendant simply does not understand how to interpret Ms. Giuffre's school records.  The record

produced by Defendant (GM0888) is specifically titled "A07. Assignment History," which

reflects semester start and end dates per each 180 day school year, ***not*** dates that Ms. Giuffre

physically enrolled or withdrew from school. *See* McCawley Dec. at Exhibit 27, GM0888.

```
PANEL:  ___                  A07. ASSIGNMENT HISTORY              YEAR: 16
  T234                       Monday May 23, 2016 9:04 am
STDT: 12870606   ROBERTS, VIRGINIA L              SCHL: 3390  GR: 10  ST: I

A    ENTRY          WITHDRAWAL P                                          E
C CD    DATE   OD CD    DATE   R PF SY CL DS SCHL      DESC       GR PRS ABS UNX Y

_  R02 101201 ___ W26 030702 N _  02 01 __ 3390 SURVIVORS       10  56  31 ___ Y
_  R02 092001 ___ W02 101101 N _  02 01 __ 2331 ROYAL PALM HIG  10  13   1 ___ _
_  EA1 081401 ___ W32 092001 Z _  02 A1 __ 2192 WLLNGTN HS ADL  30 ___ ___ ___ _
_  EA1 081600 ___ W47 081301 Z _  01 A1 __ 2192 WLLNGTN HS ADL  30 ___ ___ ___ Y
_  EA1 062100 ___ W47 081500 Z _  00 A1 __ 2192 WLLNGTN HS ADL  30 ___ ___ ___ Y
_  E01 081699 ___ W03 081699 N _  00 01 __ 2331 ROYAL PALM HIG  10 ___ ___ ___ _
_  E01 081998 ___ W02 060999 P _  99 01 __ 0581 FOREST HILL HI  09 155  25 ___ Y
_  E01 082097 ___ W01 061098 R _  98 01 __ 2331 ROYAL PALM HIG  09 147  33 ___ Y
_  E01 082097 ___ W22 082097 N _  98 01 __ 2191 WELLINGTON HIG  09 ___ ___ ___ _
_  R03 040797 ___ W02 061197 P _  97 01 __ 1691 CRESTWOOD MID   08  40   5 ___ _
_  E01 082294 ___ DNE 082294 N _  95 01 __ 1703 ROYAL PINES SC  06 ___ ___ ___ _
_  E01 082393 ___ W02 061094 P _  94 01 __ 1901 LOXAHATCHEE EL  05 167  13 ___ Y
_  E01 082592 ___ W01 061193 P _  93 01 __ 1901 LOXAHATCHEE EL  04 176   4 ___ Y
```

While "Grade 30" indicates adult education, Ms. Giuffre's attendance records indicate that she

was __*not*__ present in school between 6/21/00-09/20/01 (*see* withdrawal codes W32 and W47).

### WITHDRAWAL CODES: ADULT STUDENTS

- **W26** - Any student who withdraws from school to enter the adult education program prior to completion of graduation requirements.

- **W32** - Any adult student who left the class/program to enter another training program.

- **W47** - Any adult student who is procedurally withdrawn at the end of the term or school year who will continue in the class/program the next term or school year.

http://www.fldoe.org/core/fileparse.php/8861/urlt/0094063-appendb.pdf

More importantly, Ms. Giuffre's school transcripts clearly indicate "NO COURSES

TAKEN" for the 1999-2000 and 2000-2001 school years. (*See* McCawley Dec. at Exhibit 27,

GM_00893.)  Ms. Giuffre's attempt to work and resume school at Survivor's Charter School as a

10th grader in the 2001-2002 school year was limited to a portion of the school year (10/20/01-

03/07/02), and further substantiates Ms. Giuffre's testimony that she attempted to get away from

Epstein's abuse, along with the following testimony by Figueroa:

Q:     Was there a period of time between 2001 and when she left in 2002 here she was
       not working for Jeffrey?
A:     Yes.
Q:     What period of time was that?
A:     It was pretty much, like, when she was actually working as a server.  Like,
       basically because we were trying to not have her go back there.  Like, she did not
       want to go back there. And we were trying to just work without needing his
       money, you know."

*See* McCawley Dec. at Exhibit 4, Figueroa Dep. Tr. at 92-93

Q:     So the thing that Virginia was tired of …What was it that Virginia was trying to
       get away from and stop with respect to working at Jeffrey Epstein's house?
A:     To stop being used and abused.

*See* McCawley Dec. at Exhibit 4, Figueroa Dep. Tr. at 248

Even still, if the records are correct, which Ms. Giuffre does not concede, the records indicate that Ms. Giuffre's attendance was poor, with 69 days present and 32 days absent out of a required 180 day school year and that she was **not enrolled at the end of the school year** (emphasis added).

```
DISTRICT: 50 SCHOOL: 3390 NO COURSES TAKEN
      YEAR: 1999-2000  GRADE LEVEL: NA

                      GPA QTY PTS            GPA QTY PTS
    DISTRICT-TERM: 1.4286     5.00   CUM: 1.5429    27.00
        STATE-TERM: 1.4286    5.00   CUM: 1.5429    27.00

 1999-2000 ANNUAL DAYS-PRESENT:    0   ABSENT:    0
 SUMMER TERMS DAYS-PRESENT:        0   ABSENT:    0
 PROMOTION STATUS NOT APPLICABLE


 DISTRICT: 50 SCHOOL: 3390 NO COURSES TAKEN
      YEAR: 2000-2001  GRADE LEVEL: NA

                      GPA QTY PTS            GPA QTY PTS
    DISTRICT-TERM: 1.4286     5.00   CUM: 1.5429    27.00
        STATE-TERM: 1.4286    5.00   CUM: 1.5429    27.00

 2000-2001 ANNUAL DAYS-PRESENT:    0   ABSENT:    0
 SUMMER TERMS DAYS-PRESENT:        0   ABSENT:    0
 PROMOTION STATUS NOT APPLICABLE

 DISTRICT: 50 SCHOOL: 3390 SURVIVORS CHARTER SCHOOL
      YEAR: 2001-2002  GRADE LEVEL: 10
                            SUBJECT CRSE G   A O    CREDIT
 T COURSE# COURSE TITLE       AREA  FLAG R   C N ATT./EARN
 1 0500530 PERS,CAR,SCH DEV 4  EL        C   Z N 0.50 0.50
 1 1001440 BUS ENG I           EN   J    B   Z N 0.50 0.50
 1 1205370 CONSUMER MATH       MA   C    C   Z N 0.50 0.50
 1 8300310 WORKPLACE ESSENTIAL VO        B   Z N 0.50 0.50
 1 8301610 WORK EXP 1          VO        F   Z N 0.50 0.00
 1 8301650 WORK EXP-OJT        VO        F   Z N 1.00 0.00
                        CREDIT, TERM:         3.50  2.00


                      GPA QTY PTS            GPA QTY PTS
    DISTRICT-TERM: 1.4286     5.00   CUM: 1.5429    27.00
        STATE-TERM: 1.4286    5.00   CUM: 1.5429    27.00

 2001-2002 ANNUAL DAYS-PRESENT:   69   ABSENT:   32
 SUMMER TERMS DAYS-PRESENT:        0   ABSENT:    0
 NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR
```

*See* McCawley Dec. at Exhibit 27, GM_00893.

Ms. Giuffre's obvious gap in her school attendance, her presence verified by Epstein's pilot on flight logs, and an abundance of witness testimony all corroborate her story that she was that Ms. Giuffre was flying domestic and internationally with Epstein at least 32 times between 12/11/00-07/28/01 and 06/21/02-08/21/02 (Defendant traveling with Ms. Giuffre on 23 of the flights). *See* McCawley Dec. at Exhibits 15 and 41, Pilot, David Rodgers' Dep. Tr. 96:12-166; Rodger's Dep. Ex. 1 (Ms. Giuffre flight dates: 12/11/00; 12/14/00 (GIUFFRE007095); 01/26/01; 01/27/01; 01/30/01 (GIUFFRE007096); 03/05/01: 03/06/01; 03/08/01 x's 2; 03/09/01; 03/11/01 x's 2 (GIUFFRE007097); 03/27/01; 03/29/01; 03/31/01 (GIUFFRE007098); 04/09/01 x's 2; 04/11/01; 04/16/01; 05/03/01; 05/05/01 (GIUFFRE007099); 05/14/01(GIUFFRE007100); 06/03/01 06/05/01; 07/04/01; 07/08/01; 07/11/01 (GIUFFRE007101); 07/16/01; 07/28/01; (GIUFFRE007102); 06/21/02 (GIUFFRE007111); 08/18/02; 08/21/02 (GIUFFRE007112); *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 104: 9-14 (Q: Do you know how long Virginia had been coming over to the house before she started traveling on an airplane with Ghislaine and Jeffrey? THE WITNESS: Not too long. I don't think it was too long after that); *See* McCawley Dec. at Exhibit 37, GIUFFRE004721 (passport application).

**DEFENDANT'S PURPORTED FACTS**

39. During the year 2000, Ms. Giuffre worked at numerous jobs.  In 2000, while living with her fiancé, Ms. Giuffre held five different jobs: at Aviculture Breeding and Research Center, Southeast Employee Management Company,  The Club at Mar-a-Lago, Oasis Outsourcing, and Neiman Marcus. Her taxable earnings that year totaled nearly $9,000. Ms. Giuffre cannot now recall either the Southeast Employee Management Company or the Oasis Outsourcing jobs.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre disputes this statement. During 2000, Ms. Giuffre shared an apartment with her then boyfriend, James Michael Austrich and his friend, Mario. *See* McCawley Dec. at Exhibit 2, Austrich Dep. Tr. at p. 92. Although Austrich testified that he proposed to Ms. Giuffre on Valentine's Day, *see* Austrich at p. 19, Ms. Giuffre was a troubled teen who could not realistically be considered a fiancé in the true sense of the word nor was she of legal age to marry. While Ms. Giuffre held various jobs in 2000, "[SSA] records do not show the exact date of employment (month and day) because [they] do not need this information to figure Social Security benefits." *See* McCawley Dec. at Exhibit 46, GIUFFRE009176).

The reason that Ms. Giuffre cannot recall two companies listed on her SSA records (Southeast Employee Management Company or Oasis Outsourcing) is simply because they were not her employers. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 470-472. Had Defendant bothered to run a simple google search, she could have ruled them out as being payroll and benefit administration companies. *See* http://www.oasisadvantage.com/west-palm-beach-peo; http://www.progressiveemployer.com/; http://www.businesswire.com/news/home/20060501006151/en/Progressive-Employer-Services-Purchases-Southeast-Employee-Management.

Ms. Giuffre has testified that she believes she worked at Taco Bell, at an aviary, then Mar-a-Lago (*See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at p. 53, 470). Austrich also testified that Ms. Giuffre worked with him at Taco Bell, as well as a pet store for "over a month" before working at Mar-a-Lago (*See* McCawley Dec. at Exhibit 5, Austrich Dep. Tr. at p. 16, 30, 98). Neither Taco Bell nor the pet store are listed on Ms. Giuffre's SSA records because they were most likely paid through payroll companies. *See* McCawley Dec. at Exhibit 46, GIUFFRE009178. Ms. Giuffre also testified that she volunteered at an aviary where they

eventually put her on their payroll, but paid her very little. Giuffre Dep. Tr. at p. 52; Aviculture Breeding and Research Center taxable earnings for 2000 is $99.48, *See* McCawley Dec. at Exhibit 46, GIUFFRE009178.

**DEFENDANT'S PURPORTED FACTS**

40.    Ms. Giuffre's employment at the Mar-a-Lago spa began in fall 2000. Ms. Giuffre's father, Sky Roberts, was hired as a maintenance worker at the The Mar-a-Lago Club in Palm Beach, Florida, beginning on April 11, 2000. Mr. Roberts worked there year-round for approximately 3 years. After working there for a period of time, Mr. Roberts became acquainted with the head of the spa area and recommended Ms. Giuffre for a job there. Mar-a-Lago closes every Mother's Day and reopens on November 1. Most of employees Mar-a-Lago, including all employees of the spa area such as "spa attendants," are "seasonal" and work only when the club is open, i.e., between November 1 and Mother's Day. Ms. Giuffre was hired as a "seasonal" spa attendant to work at the Mar-a-Lago Club in the fall of 2000 after she had turned 17.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre disputes this statement. Defendant cannot simply infer Ms. Giuffre's employment history and claim it to be undisputed. The Mar-a-Lago Club produced 177 pages of records in response to Defendant's subpoena. However, not one page indicated Ms. Giuffre's actual dates of employment, nor whether she was a full-time or seasonal employee. In fact, the only significant record produced was a single, vague chart entry indicating that Ms. Giuffre was terminated in 2000. MAR-A-LAGO 0173, 0176.

TERMINATIONS

| LAST NAME | FIRST NAME | |
|---|---|---|
| Rinker | Ross | Box #7 |
| Rivera | Pablo | Box #3 |
| Rivera | Eduardo | Box #2 |
| Rivero | Alicia | Box #7 |
| Robbins | Jody | Box #4 |
| Roberts | Virginia | Box #4 |

**MAR-A-LAGO 0173**

| | |
|---|---|
| Box #1 | 1998 terms |
| Box #2 | 1998 & 1999 terms |
| Box #3 | 1999 terms |
| Box #4 | 2000 terms |
| Box #5 | 2000 terms |
| Box #6 | 2001 terms |

**MAR-A-LAGO 0176**

Job postings and job descriptions produced by Mar-a-Lago from 2002 and later are irrelevant to Ms. Giuffre's employment because they are from after she worked there. Ms. Giuffre testified that Mar-a-Lago was a summer job. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. 56, 550. In fact, her father, Sky Roberts, testified that he referred his daughter for employment, and she did not get the job through a posting (*See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. at 72); he drove his daughter to and from work consistent with his full time schedule (*See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. at 74); he believes the spa – like the kitchen/dining room - was open to local guests in the summer (*See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. 138-139); and that his daughter was not attending school when she worked at Mar-a-Lago (*See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. 134). In addition, Juan Alessi testified that it was "Summer" when Defendant approached Ms. Giuffre at Mar-a-Lago because he specifically remembered "that day I was sweating like hell in the -- in the car, waiting for Ms. Maxwell to come out of the massage." *See* McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 94:24-95:2.

## DEFENDANT'S PURPORTED FACTS

41. **Ms. Giuffre represented herself as a masseuse for Jeffrey Epstein.** While working at the Mar-a-Lago spa and reading a library book about massage, Ms. Giuffre met Ms. Maxwell. Ms. Giuffre thereafter told her father that she got a job working for Jeffrey Epstein as a masseuse. Ms. Giuffre's father took her to Epstein's house on one occasion around that time, and Epstein came outside and introduced himself to Mr. Roberts. Ms. Giuffre commenced employment as a traveling masseuse for Mr. Epstein. Ms. Giuffre was excited about her job as a masseuse, about traveling with him and about meeting famous people. Ms. Giuffre represented that she was employed as a masseuse beginning in January 2001. Ms. Giuffre never mentioned Ms. Maxwell to her then-fiancé, Austrich. Ms. Giuffre's father never met Ms. Maxwell.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre denies Defendant's false and factually unsupported narrative. In Florida, a person cannot work as a masseuse unless she is "at least 18 years of age or has received a high

school diploma or high school equivalency diploma." Fla. Stat. § 480.041. Ms. Giuffre was a minor child, under the age of 18, when she was working at Mar-a-Lago as a spa attendant. Giuffre Dep. Tr. at 61:9-61:24. She was approached by Defendant, who told her she could make money as a masseuse, a profession in which Ms. Giuffre had no experience. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 111:12-111:21; 116:19-117:12. (Sky Roberts, Ms. Giuffre father, verified Ms. Giuffre's account that Defendant recruited his daughter to "learn massage therapy." *See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. at 80:7-19; 84:18 - 85:1).

 Ms. Giuffre's father drove her to Jeffrey Epstein's house, the address of which was given to her by Defendant. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 117:20-118:1. Ms. Giuffre was lead into the house, and was instructed by Defendant on how to give a massage, during which Epstein and Defendant turned the massage into a sexual encounter, and offered Ms. Giuffre money and a better life to be compliant in the sexual demands of Defendant and Epstein. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 198:20-199:3; 199:15-199:18. The minor Ms. Giuffre then began travelling with Defendant and Epstein on private planes and servicing people sexually for money—working not as a legitimate masseuse, but in a position of sexual servitude. *See* McCawley Dec. at Exhibits 5, 1, Giuffre Dep. Tr. at 193:22-194:16; 201:24; 204:24:205:5; Alessi Dep. Tr. at 104:9-104:14.

Epstein's house manager, Juan Alessi, described Defendant's methodical routine of how she prepared a list of places ahead of time, then drove to each place for the purpose of recruiting girls to massage Epstein. *See* McCawley Dec. at Exhibit 18, Alessi Dep. Tr. at 34; GIUFFRE000105 at 57-58; GIUFFRE000241-242 at p. 212-213. Alessi also stated that on multiple occasions he drove Defendant to pre-planned places while she recruited girls for

massage. *Id.* He furthered testified that he witnessed Ms. Giuffre at Epstein's house on the very same day that he witnessed Defendant recruit Ms. Giuffre from Mar-a-Lago. *See* McCawley Dec. at Exhibit 18, Alessi Dep. Tr. at 96-98; GIUFFRE000102-103 at p. 48-49.

Johanna Sjoberg, through her sworn testimony, demonstrated that Defendant recruited her in a similar fashion by driving to the college campus where she attended school and approached her to work at Epstein's home answering phones. *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 8-9. Sjoberg testified that she answered phones for one day before Defendant propositioned her to rub feet for $100.00 an hour. *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 13. The following day, Sjoberg was paired with Defendant's assistant, Emmy Taylor, who provided her with massage training on Epstein. Sjoberg at 13-15. Ms. Giuffre's then-boyfriend, Austrich, testified that he could not recall the name of the person who recruited Ms. Giuffre. However, he did say that she was recruited by someone to work for Epstein as a massage therapist, but that Ms. Giuffre did not have any experience. *See* McCawley Dec. at Exhibit 2, Austrich Dep. Tr. at 34-35, 100-101, 127-128. Neither Ms. Giuffre nor Sjoberg were licensed or trained in massage, but were invited soon after being recruited to travel with Epstein on his private plane to massage him. *See* McCawley Dec. at Exhibit 16, Giuffre Dep. Tr. at 16-17; Sjoberg Dep. Tr. at 13-15; Austrich Dep. Tr. at 109-110; Alessi Dep. Tr. at 104.

**DEFENDANT'S PURPORTED FACTS**

42. **Ms. Giuffre resumed her relationship with convicted felon Anthony Figueroa**. In spring 2001, while living with Austrich, Ms. Giuffre lied to and cheated on him with her high school boyfriend, Anthony Figueroa. Ms. Giuffre and Austrich thereafter broke up, and Figueroa moved into the Bent Oak apartment with Ms. Giuffre. When Austrich returned to the Bent Oak apartment to check on his pets and retrieve his belongings, Figueroa in Ms. Giuffre's presence punched Austrich in the face. Figueroa and Ms. Giuffre fled the scene before police arrived. Figueroa was then a convicted felon and a drug abuser on probation for possession of a controlled substance.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This entire statement is wholly irrelevant to the case being tried, and is improperly being inserted to tarnish the record. Ms. Giuffre's dating history as a young teen bears no relation to the allegations made within Ms. Giuffre's complaint against Defendant. As previously stated, Defendant is attempting to muddy the record with nonsensical teen drama in an effort to detract from her salacious sexual abuse of a minor child. Such statements bear no relation to the issues presented through her motion for summary judgment, and should be given weight reflecting the same. As specifically set forth in Ms. Giuffre's objections to designated testimony, the alleged information would be excluded by multiple rules of evidence, and contested by Ms. Giuffre. *See* McCawley Dec. at Exhibit 5, Virginia Dep. Tr., *passim*. Moreover, it was the Defendant who solicited Anthony Figueroa to recruit high school aged girls for Epstein. *See* McCawley Dec. at Exhibit 4 Figueroa Tr. at 200 and 228-229.

**DEFENDANT'S PURPORTED FACTS**

43. **Ms. Giuffre freely and voluntarily contacted the police to come to her aid in 2001 and 2002 but never reported to them that she was Epstein's "sex slave."** In August 2001 at age 17, while living in the same apartment, Ms. Giuffre and Figueroa hosted a party with a number of guests. During the party, according to Ms. Giuffre, someone entered Ms. Giuffre's room and stole $500 from her shirt pocket. Ms. Giuffre contacted the police. She met and spoke with police officers regarding the incident and filed a report. She did not disclose to the officer that she was a "sex slave." A second time, in June 2002, Ms. Giuffre contacted the police to report that her former landlord had left her belongings by the roadside and had lit her mattress on fire. Again, Ms. Giuffre met and spoke with the law enforcement officers but did not complain that she was the victim of any sexual trafficking or abuse or that she was then being held as a "sex slave."

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This statement is misleading in several respects and irrelevant. The fact that Ms. Giuffre did contact police on two occasions for two specific purposes and did not take that opportunity to also inform the police of everything else that was going on in her life at the time is immaterial. Defendant implies that anytime someone calls the police for one thing they should tell the police

about every other crime regardless of the relevance to the crime to which the police responded

and regardless to the threat to herself should she report on these powerful people.  Moreover, as

Professor Coonan explained:

> Popular understandings of the term "sex slave" might still connote images of violent pimps, white slavery, or of victims chained to a bed in a brothel in the minds of some people. To call Ms. Giuffre a victim of sex trafficking would however very accurately convey the reality that she along with a great many other victims of contemporary forms of slavery are often exploited by the "invisible chains" of fraud and psychological coercion.

*See* McCawley Dec. at Exhibit 23, Coonan Expert Report at 20. Ms. Giuffre specifically testified

that she was fearful of Defendant and Epstein, and, accordingly, she would not have reporter her

abusers. She also knew that Epstein had control over the Palm Beach Police. *See* McCawley Dec.

at Exhibit 5, Giuffre Dep. Tr. at 240:3-241:2.

## DEFENDANT'S PURPORTED FACTS

44.     **From August 2001 until September 2002, Epstein and Maxwell were almost entirely absent from Florida on documented travel unaccompanied by Ms. Giuffre**.  Flight logs maintained by Epstein's private pilot Dave Rodgers evidence the substantial number of trips away from Florida that Epstein and Maxwell took, unaccompanied by Ms. Giuffre, between August 2001 and September 2002.  Rodgers maintained a log of all flights on which Epstein and Maxwell traveled with him.  Epstein additionally traveled with another pilot who did not keep such logs and he also occasionally traveled via commercial flights. For substantially all of thirteen months of the twenty-two months (from November 2000 until September 2002) that Ms. Giuffre lived in Palm Beach and knew Epstein, Epstein was traveling outside of Florida unaccompanied by Ms. Giuffre. During this same period of time, Ms. Giuffre was employed at various jobs, enrolled in school, and living with her boyfriend.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

The flight logs produced in this matter provide substantive evidence of Ms. Giuffre's

travel while in the control of Defendant and Epstein, but are clearly incomplete.  Moreover, Ms.

Giuffre also was flown by Defendant on commercial flights. *See* McCawley Dec. at Exhibit 5,

Giuffre Dep. Tr. at 155:5-11. Ms. Giuffre disputes Defendant's statement to the contrary, as

reliance upon incomplete records to prove that Ms. Giuffre was not in fact in the presence of

Defendant and Epstein is insufficient.  Ms. Giuffre incorporates additional details contained in Response #38 and #46 herein.

Ms. Giuffre's obvious gap in her school records, her presence verified by Epstein's pilot on flight logs, and witness testimony, corroborate her story that she was traveling with Defendant and Epstein.  In fact, flight logs and pilot testimony clearly prove that Ms. Giuffre was flying domestic and internationally with Epstein at least 32 times between 12/11/00-07/28/01 and 06/21/02-08/21/02 (Defendant traveling with Ms. Giuffre on 23 of the flights).

As Defendant acknowledges in her own statement #44, flight records are incomplete. There were several pilots and co-pilots that flew Epstein and Maxwell (Lawrence "Larry" Visoski, David (Dave) Rodgers, Bill Hammond, Pete Rathgeb, Gary Roxburgh, and Bill Murphy) in multiple aircrafts (JEGE, Inc. Aircraft # N908JE – Type B-727-31, and Hyperion Air, Inc. Aircraft # N909JE – Type G-1159B).  Yet, only one pilot, David Rodger's produced flight records.  See McCawley Dec. at Exhibit 41, David Rodger's Flight Log, GIUFFRE007055- GIUFFRE007161.  In addition, many of the girls recruited by Defendant routinely traveled on commercial flights for the purposes of providing massages to Epstein or guests at Epstein's New York, New Mexico, or U.S. Virgin Island homes.  *See* McCawley Dec. at Exhibit 16, Sjoberg Dep. Tr. at 27.

As thoroughly depicted below, Ms. Giuffre's passport application, travel records and witness testimony clearly demonstrate flight logs are incomplete because only one pilot kept a log, and Ms. Giuffre also flew commercially while she worked for Defendant and Epstein.  For example, on December 11, 2000, while underage, Ms. Giuffre  appears on Rodger's flight log (flight #1433) traveling with Epstein, Maxwell and Emmy Taylor from PBI (Palm Beach, FL) to TEB (Teterboro, NJ) then on December 14, 2001 (#1434) continues traveling with Epstein and

Maxwell to TIST (U.S. Virgin Islands); however, there is no flight records of Ms. Giuffre's

return to Palm Beach. *See* McCawley Dec. at Exhibit 15, *see* McCawley Dec. at Exhibit 41,

Rodger's Dep. Ex. 1 at GIUFFRE007095; see also Rodger's Dep. Tr. 96-98 ("Q: And do you

know how Jeffrey Epstein, Ghislaine Maxwell, Adam Perry Lang, and Virginia get off of St.

Thomas or leave the island? A: No. I do not. Probably a charter, I'm guessing.").



On January 12, 2001, at Defendant's directive, Ms. Giuffre applied for a Passport to

travel with them internationally. *See* McCawley Dec. at Exhibit 37, GIUFFRE004721, passport

application listing travel plans to London; flight logs subsequently lists Ms. Giuffre traveling to

London with Defendant, Epstein and others).

On January 26, 2001, while underage, Ms. Giuffre appears on Rodger's flight log (flight

#1444) traveling with Epstein, Maxwell and Emmy Taylor from TEB (Teterboro, NJ) to PBI

(Palm Beach, FL); however, there is no flight record indicating how Ms. Giuffre got to New

York. On January 27, 2001 (#1445) continues traveling with Epstein, Maxwell and Emmy

Taylor from PBI (Palm Beach) to TIST (U.S. Virgin Islands) returning from TIST (U.S. Virgin

Islands) four days later on January 30, 2001.  *See* McCawley Dec. at Exhibit 15, Rodger's Dep.

Ex. 1 at GIUFFRE007096; Rodger's Dep. Tr. at 100-102.

| 26 | " | " | TGB | PBI | 1444 | JG, GM, GJ, VIRGINIA ROBERTS |
| 18 | C172 | N1446V | PBI^LNA | PBI LNA | | C172 VOUT PETE SORENSON |
| 18 | " | " | LNA | LCQ | | B727 CLOSING N505LS |
| 19 | " | " | LCQ | MCO | | JONATHAN MAND - INSTRUMENT COMPETENCY CHECK - SATIS CENTURY |
| 19 | " | " | MCO | LNA | | → |
| 29 | G1159B | N908JG | PBI | TIST | 1445 | JG, GM, GJ, VIRGINIA ROBERTS |
| 30 | " | " | TIST | PBI | 1446 | JG, GM, GJ, VIRGINIA ROBERTS |

On March 5, 2001 Ms. Giuffre, Maxwell, Epstein, Emmy Taylor traveled together

internationally (flight #1464) leaving PBI (West Palm Beach) to CYJT (Stephenville, Canada);

then on March 6, 2001 (#1465) they continued on to LFPB (Paris, France) with a layover for

three days.  On March 8, 2001, other passengers, including one unidentified female, joined them

on flights # 1466-1467 (from LFPB (Paris, France) - LGGR (Granada, Spain) eventually landing

in  EGGW (London, England) on March 11, 2001, where she was then introduced to and lent out

to Prince Andrew.  *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007097;

Rodger's Dep. Tr. at 104-114.

| 2001 | | | From | To | Flown | No. | Maneuvers, Endorsements |
| 21 | B-727-200 | N3PM908JG | DFW | DFW | | | RUNAWAY STAB-120% MANUAL GEARGEAR FUEL DUMPING, R TO BRAKE, POWER, BATTERYS |
| 22 | " | SIMULATOR | MGM | MGM | | | FUEL TRANS, STALLS, SINGLE ENG FAIL, GO AROUN 1472 ENGINE APPROACHES, R TO STARTING |
| 23 | " | " | | | | | B727 CHECK RIDE |
| 23 | C-421B | N908GM | DFW | ADS | | | JONATHAN MAND - HIGH DENSITY AIRPORTS OPERATIONS, ✗✗ |
| 23 | " | " | ADS | PNS | | | JONATHAN MAND - STD, ICING OPERATIONS, FUEL MANAGEMENT, PERFORMANCE CHARTS |
| 23 MAR | " | " | PNS | PBI | | | JONATHAN MAND - LOST COMMUNICATIONS PROCEDURES, W/EIGHT 7 DISTANCE |
| 3 | " | " | PBI | LCQ | | | KRISTY RODGERS - CLIMBS, DESCENTS, STRAIGHT 7 LEVEL FLIGHT |
| 3 | " | " | LCQ | LAL | | | KRISTY RODGERS, - TURNS, STRAIGHT 7 LVL |
| 3 | " | " | LAL | PBI | | | KRISTY RODGERS - DESCENTS, S.H |
| 5 | G-1159B | N909JG | PBI | CYJT | 1464 | | JG, GM, GJ, VIRGINIA ROBERTS CORY REINHARDT |
| 6 | " | " | CYJT | LFPB | 1465 | | JG, GM, GJ, VR CORY RODGERS |
| 8 | " | " | LFPB | LGGR | 1466 | | JG, GM, GJ, VR, ALBERTO + LYNDA POND, PLOMINE, R RODGERS LGGR CYTD FC? |
| 8 | " | " | LGGR | GMTT | 1467 | | JG, GM, GJ, VR, ALBERTO + LYNDA POND LGGR MUY |
| 9 | " | " | GMTT | EGGW | 1468 | | JG, GM, GJ, VR RGR |
| 11 | " | " | EGGW | BGR | 1469 | | JG, GM, GJ, VR RGR |
| 11 | " | " | BGR | TGB | 1470 | | JG, GM, GJ, VR RGR |

*See also* photo of Ms. Giuffre, Maxwell and Prince Andrew in London. GIUFFRE007167; *see also* Figueroa Dep. Tr. at 251.



Ms. Giuffre, Epstein, Maxwell, and Taylor remained in London for three days until departing on March 11, 2001 (#1469), stopping in BGR (Bangor, Maine) before departing (#1470) back to TEB (Teterboro, NJ); however, there is no flight record of Ms. Giuffre's return to Palm Beach. *See* Rodger's Dep. Ex. 1 at GIUFFRE007097; Rodger's Dep. Tr. at 104-114.

| 27 | G-1159B | N909JE | PBI | TEB | 1478 | JG,GM,ET,VR, 2 F.GMALES,OAW RGR RUL1/RKVLV |
| 29 | " | " | TEB | SAF | 1479 | JG,GM,AP,VR, BK, MARVEN MENSKY HENRY JARECKI |
| 31 | " | " | SAF | PBI | 1480 | JG,GM,AP,VR, NADEA BJORLEN, HENRY JARECKI, MARVEN MENSKY |
| APR 1 | " | " | PBI | LCQ | 1481 | JG,GM,AP |

On March 27, 2001, while underage, Ms. Giuffre, Maxwell, Epstein, Emmy Taylor, two underlined unidentified females and others traveled together (#1478) from PBI (Palm Beach) to TEB (Teterboro, NJ); then three days later, on March 29, 2001, continued on (#1479) to SAF (Santa Fe, NM), returning to PBI (Palm Beach, FL) with Nadia Bjorlin (#1480) on March 31, 2001. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007098; Rodger's Dep. Tr. at 119-125.

A few glaring examples of how Ms. Giuffre's travel records are incomplete is that Ms. Giuffre traveled from ADS (Addison, Texas) on May 3, 2001 (#1501) to SAT (San Antonio, Texas); then departs SAT (San Antonio, Texas) on May 5, 2001 (#1502) to PBF (Pine Bluff, AR) but there is no record produced that explains how Ms. Giuffre arrived in Addison, Texas or how she returned to Palm Beach from Pine Bluff, AR. Although Epstein's plane appears to have to originated from Palm Beach on April 23, 2001, Ms. Giuffre's name doesn't not appear on the log. *See* Rodger's Dep. Ex. 1 at GIUFFRE007099; Rodger's Dep. Tr. at 130-132 ("Q: Do you know how Virginia Roberts got to Addison, Texas? A: No. … Q: Went to Addison and picked up Virginia Roberts? A: It looks like it.").

Another prime example of how incomplete Ms. Giuffre's travel records are is on on May 14, 2001. While Ms. Giuffre appears on flight #1506 with Epstein, Maxwell, Emmy Taylor and others (including one unidentified female) from TIST (U.S. Virgin Islands) to TEB (Teterboro, NJ), there is no record produced explaining how Ms. Giuffre arrived to the U.S. Virgin Islands or where she stayed when she landed in New York. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007100; Rodger's Dep. Tr. at 132-133 ("Q: What were the other possible avenues back in those days for Jeffrey Epstein, Ghislaine Maxwell to travel to the Virgin Islands? A: They could have done a charter, possibly.") (*Id.* at 134-135 "Q: All right. So at some point in time, between May 7th and May 14th – A: Uh-huh.  Q: -- somebody flies the Gulfstream to the Virgin Islands. A: Correct. Q: And who would that be? A: Larry Visoski and I don't know who the other person would have been."); *Id.* at 136 ("Q. Do you know where Virginia Roberts went during that time after she landed in Teterboro on the 14th? A. I do not.")

| 14 | 5/1/159B | N909JG | TIST | TEB | | 1586 | JG, GM, ET, BK, VR 1 FEMALE |

On June 3, 2001, Ms. Giuffre travels from PBI (Palm Beach) to TIST (U.S. Virgin Islands) on flight #1510 for three days; then, on June 5, 2001, continues on flight #1511 to TEB (Teterboro, NJ); however, there is no record of Ms. Giuffre returning to Palm Beach. *See* Rodger's Dep. Ex. 1 at GIUFFRE007101; Rodger's Dep. Tr. at 136-137.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 64 | G-11590 | N909JG | TEB | PBI | 1509 | JG, GM, ET, AP, BANU KUCUK KOYLU | 1/1 |
| 3 | " | " | PBI | TIST | 1510 | JG, VIRGINIA ROBERTS, BAN KUCUKKOYU | |
| 5 | " | " | TIST | TEB | 1511 | JG, VR, BK | |
| 8 | " | " | TEB | CYUL | 1512 | JG,GM, NAOMI CAMPBELL, REBECCA WHITE, ANDRA' LAVALLEE, ANNA MOLOVA, DAVID CONELO | |
| 12 | " | " | CYUL | TEB | 1513 | REPOSITION (AP) BLEDD ADR DOLT) | 1/1 |
| 12 | " | " | TEB | PBI | 1814 | JG | 1/1 |
| 13 | " | " | PBI | TEB | 1515 | JG, CAROL | 1/1 |
| 15 | " | " | TEB | PBI | 1516 | JG,GM, SHERIDAN, CAROLYN, 1 FEMALE | |
| 18 | " | " | PBI | TEB | 1517 | JG, GM, 1 FEMALE | 1/1 |
| 22 | " | " | TEB | LFPO | 1518 | JG,RGY, GM, CRISTALLG WASCHG, EXOISGREND GRINGVA | |
| 23 | " | " | LFPO | LFMN | 1519 | JG,GM, 1 FEMALE | |
| 25 | " | " | LFMN | LIML | 1520 | JG,GM, 1 FEMALE | |
| 26 | " | " | LFML | LFPB | 1521 | JG,GM | 1/1 |
| 28 | " | " | LFPB | LPA2 | 1522 | JG,GM, ET, ED TUTTLE | 1/1 |
| 28 | " | " | LPA2 | TIST | 1523 | JG,GM, ET, ED TUTTLE | |
| July 4 | " | " | TIST | PBI | 1524 | JG, AP, VR, 1 FEMALE | 1/1 |
| 8 | " | " | PBI | TEB | 1525 | JG,GM, ET,AP, VR, SHERIDAN GEBSON PUTE GARY ROXBURGH | |
| 11 | " | " | TEB | CPS | 1526 | JG,GM,ET, VR GARY ROXBURGH | |

Then, on July 4, 2001, Ms. Giuffre reappears on flight #1524 with Epstein and an unidentified female leaving TIST (U.S. Virgin Islands) to return to PBI (Palm Beach); however, there is no flight record that reflects how Ms. Giuffre got to the U.S. Virgin Islands. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007101; Rodger's Dep. Tr. at 138-139 ("Q. And do you know how Virginia Roberts got to the Virgin Islands? A: No. Q. Is there any -- is it possible that the Cessna took her or the Boeing took her? Or any other aircraft that is owned by Jeffrey? A: No, I would -- if I had to guess, I would guess the airlines.")

Again, on July 8, 2001, Ms. Giuffre appears on flight #1525 with Epstein, Maxwell, Emmy Taylor and others including an unidentified female departing PBI (Palm Beach) to TEB

(Teteboro, NJ). Four days later, on July 11, 2001, Ms. Giuffre, Epstein and Maxwell continue on (#1526) to CPS (Cahokia-St. Louis, Illinois) which was a stop due to a mechanical delay on the way to Sante Fe, NM; however, there is no flight record that reflects how Ms. Giuffre returned home to Palm Beach. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007101; Rodger's Dep. Tr. 139-141 ("Q: And then three days later, you leave out of Teterboro to CPS? A: Yes. Q: Where is that? A: That is St. Louis, actually it is Cahokia, Illinois, across the river from St. Louis. Q. Who are your passengers? A. Jeffrey Epstein, Ghislaine Maxwell, Emmy Tayler, Virginia Roberts. We were actually en route to Santa Fe. We had a mechanical problem. We had to go into there for maintenance.")

On July 16, 2001, Ms. Giuffre appears on flight #1528 with Epstein, Maxwell and Emmy Taylor from SAF (Santa Fe, NM) to TEB (Teteboro, NJ); however, Ms. Giuffre's flight to Santa Fe, NM is missing from the records. In addition, on July 28, 2001, Ms. Giuffre reappears on the flight log (#1531) returning with Epstein from TIST (U.S. Virgin Islands) to PBI (Palm Beach); however, there is no record of Ms. Giuffre's flight to the U.S. Virgin Islands. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007102; Rodger's Dep. Tr.142.

| 2001 | | | From | To | | |
|------|-----------|---------|------|-----|------|------------------------------------|
| JUL 16 | G-1159B | N909JE | CPS | SAF | 1527 | REPOSITION-PILOT STATIC LEAK GARY ROBERSON |
| 16 | " | " | SAF | TEB | 1528 | JE, ET, GM, VR GARY ROBERSON |
| 23 | " | " | PBI | TIST | 1530 | JE, SHELLEY LEWIS |
| 28 | " | " | TIST | PBI | 1531 | JE, VIRGINIA ROBERTS |

On June 21, 2002, Ms. Giuffre appears on flight #1570 with Epstein, Maxwell, Sarah Kellen, Cindy Lopez and Jean Luc Brunel from PBI (Palm Beach, FL) to MYEF (George Town, Bahamas); however, there is no record of Ms. Giuffre returning to Palm Beach. *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007111; Rodger's Dep. Tr. 161-162 ("Q:

Virginia Roberts was taken to the Bahamas.  Do you know where she went from there?  A. I do not.")

Case 18-2868, Document 281, 08/09/2019, 2628234, Page50 of 66

| 2002 | | | From | To | FLGHT No. | Maneuvers, Endorsements | |
|---|---|---|---|---|---|---|---|
| JUN 8 | B-727-31H | N908JE | ESDW | JFK | 111 | JE,GM,SK | |
| 8 | " | " | JFK | PBI | 112 | JE,SK | |
| 12 | G-1159B | N909JE | PBI | PBI | 1567 | GMU FLIGHTS-SEAN RILEY, GREG CARPORR | |
| 14 | B-727-31H | N908JE | PBI | BOS | 113 | REPOSITION | |
| 14 | " | " | BOS | TIST | 114 | JE,SK,CINDY LOPEZ, LAURA HAYNES | |
| 16 | " | " | TIST | JFK | 115 | JE,GM,SK, CINDY LOPEZ, LAROWBAND | |
| 19 | G-1159B | N909JE | PBI | TEB | 1568 | REPOSITION PETE RATHGEB | |
| 19 | " | " | TEB | PBI | 1569 | JE,GM,SK, CINDY LOPEZ PETE RATHGEB | |
| 21 | " | " | PBI | N469 | 1570 | JE,GM,SK,CL,JEAN LUC BRUNEL VIRGINIA ROBERTS PETE RATHGEB | |
| 21 | " | " | MYGF | PBI | 1571 | REPOSITION RF4660 | |
| 23 | " | " | PBI | MYGF | 1572 | REPOSITION PETE RATHGEB | |
| 23 | " | " | MYGF | TEB | 1573 | JE,GM,SK,CL, JULEPH ... PETE RATHGEB | |
| 22 | " | " | TEB | PBI | 1574 | REPOSITION PETE RATHGEB | |
| AUG 4 | G-1159B | N909JE | PBI | MVY | 1583 | JE, 1 FEMALE | |
| 4 | " | " | MVY | BED | 1584 | JE, 1 FEMALE | |
| 4 | " | " | BED | TEB | 1585 | JE, 1 FEMALE | |
| 5 | " | " | TEB | SAF | 1586 | JE, SK, 2 FEMALE | 1 |
| 6 | C-172XP | N739SP | AEG | AEG | | 172 CHECK OUT | 3 |
| 6 | 20GL3 | N474AW | ZORRO | AEG | | | |
| 15 | B-727-31H | N908JE | JAX | JAX | 126 | C-CHECK FLIGHT TEST PETE RATHGEB | 1. |
| 16 | " | " | JAX | PBI | 127 | RETURN FROM C-CHECK PETE RATHGEB | |
| 17 | G-1159-B | N909JE | SAF | TEB | 1589 | JE,GM,SK, CINDY LOPEZ, VIRGINIA ROBERTS, EDWARDS, ALFRED, MARGARITA, NICK SIMMONS | |
| 18 | " | " | TEB | PBI | 1590 | JE VIRGINIA ROBERTS, 1 FEMALE | |

On August 17, 2002, Ms. Giuffre appears on flight #1589 with Epstein, Maxwell, Sarah Kellen, Cindy Lopez and others from SAF (Santa Fe, NM) to TEB (Teterboro, NJ); Ms. Giuffre returns to PBI (Palm Beach, FL) on August 18, 2002 with Epstein and one unidentified female (#1590).  *See* McCawley Dec. at Exhibit 15, Rodger's Dep. Ex. 1 at GIUFFRE007112; Rodger's Dep. Tr. 165 ("Q: Do you know how Virginia Roberts got to Santa Fe?  A: No.")

From September 29, 2002 through October 19, 2002, Defendant and Epstein sent Ms.

Giuffre on a commercial flight to Thailand for massage training and provided her with all

accommodations.  *See* McCawley Dec. at Exhibit 43, Giuffre007411-Giuffre007432.

**DEFENDANT'S PURPORTED FACTS**

45.   **Ms. Giuffre and Figueroa shared a vehicle during 2001 and 2002**.  Ms. Giuffre and
      Figueroa shared a '93 white Pontiac in 2001 and 2002. Ms. Giuffre freely traveled around
      the Palm Beach area in that vehicle.  In August 2002, Ms. Giuffre acquired a Dodge
      Dakota pickup truck from her father.  Figueroa used that vehicle in a series of crimes
      before and after Ms. Giuffre left for Thailand.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre and Tony Figueroa did not share a vehicle during 2001 and 2002.  Instead,

Figueroa borrowed Ms. Giuffre's car while she was traveling with Defendant and Epstein.

Figueroa testified that he "got to take the car, because she was going somewhere else in the

world and did not need it, so…"  Figueroa Dep. Tr. At 89-90.

In fact, Ms. Giuffre was frequently traveling with Defendant and Epstein.  *See* McCawley

Dec. at Exhibit 1, Alessi Dep. Tr. at 9-14 (stating that Virginia started traveling on an airplane

with Ghislaine and Jeffrey "not too long" after she started going over to the house).  Figueroa

further testified that Virginia "would normally go about two weeks out of every month" with

Epstein.  Figueroa Dep. Tr. at 90.   He further stated, "Pretty much every time I took her there, it

was always to his mansion.  I picked her up one time -- maybe it was a couple of times --from

the jet stream place.  But pretty much every single time it was at the hou- -- at the mansion."  *Id.*

Moreover, Ms. Giuffre testified she purchased a car from the $10,000 payment she received from

Epstein after she was forced to have sex with Prince Andres in London at Defendant's home

when Ms. Giuffre was a minor. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 120:1-20.

**DEFENDANT'S PURPORTED FACTS**

46. **Ms. Giuffre held a number of jobs in 2001 and 2002**.  During 2001 and 2002, Ms. Giuffre was gainfully employed at several jobs.  She worked as a waitress at Mannino's Restaurant, at TGIFriday's restaurant (aka CCI of Royal Palm Inc.), and at Roadhouse Grill.  She also was employed at Courtyard Animal Hospital (aka Marc Pinkwasser DVM).

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

This statement is laughable.  Ms. Giuffre was hardly gainfully employed during a time period in which she was trying to escape from the grip Epstein and Maxwell had on Ms. Giuffre. While Social Security provides that she earned nominal amounts of earning statements for 2001 and 2002, the records do not indicate the month or quarter of the year's work.  *See* McCawley Dec. at Exhibit 46, GIUFFRE009176.  For a brief period, Ms. Giuffre attempted to go back to school to earn her GED, and tried unsuccessfully to hold down waitressing jobs.  *See* McCawley Dec. at Exhibit 27, GIUFFRE009179.

For example, in 2001, Ms. Giuffre earned $212.00 as a waitress working "briefly" at Mannino's Restaurant. (*See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 472).  In 2002, Ms. Giuffre earned $403.64 at CCI of Royal Palm Beach working there (TGI Fridays) for a "short time period." (*See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 473). Then, Ms. Giuffre worked at Roadhouse grill until about March 2002 earning $1,247.90 (*See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 474).

```
EMPLOYER NUMBER:  65-0241353
MANNINOS INC
MANNINOS RESTAURANT
12793 B W FOREST HILL BLVD
WEST PALM BEACH  FL 33414-4749

YEAR     1ST QTR     2ND QTR     3RD QTR     4TH QTR          TOTAL
2001                                                         $212.00
```

```
EMPLOYER NUMBER:  06-1587035
CCI OF ROYAL PALM INC
% ROBERT FURR TTEE
2255 GLADES RD STE 337-W
BOCA RATON  FL 33431-7379

YEAR      1ST QTR     2ND QTR     3RD QTR     4TH QTR            TOTAL
2002                                                          $403.64


EMPLOYER NUMBER:  65-0367604
ROADHOUSE GRILL INC
ROBERT C FURR TTEE IN BANKRUPTCY
2255 GLADES RD STE 337W
BOCA RATON  FL 33431-7379

YEAR      1ST QTR     2ND QTR     3RD QTR     4TH QTR            TOTAL
2002                                                        $1,247.90


EMPLOYER NUMBER:  65-0915938
MARC PINKWASSER DVM PA
13860 WELLINGTON TRCE STE 31
WELLINGTON  FL 33414-8541

YEAR      1ST QTR     2ND QTR     3RD QTR     4TH QTR            TOTAL
2002                                                        $1,561.75
```

GIUFFRE009179.¶

According to Dr. Pinkwasser's records, Ms. Giuffre's also received payroll checks for

weeks ending 04/22/02-06/04/02 earning a total of $1,561.75. (*See* McCawley Dec. at Exhibit

47, GIUFFRE009203).

```
                    4/22/02 Courtyard Animal Hospital
                     5/6/02 Courtyard Animal Hospital
                     5/6/02 Courtyard Animal Hospital
                    5/20/02 Courtyard Animal Hospital
                     6/4/02 Courtyard Animal Hospital
```

Not long after Ms. Giuffre losing her job at Courtyard Animal Hospital,

GIUFFRE00009211, flight records show that Ms. Giuffre was soon back under Epstein's control

traveling with Maxwell to the Bahamas, Santa Fe, New Mexico then New York, *see* McCawley

Dec. at Exhibit 47, GIUFFRE007111-GIUFFRE007112.

## DEFENDANT'S PURPORTED FACTS

47.     **In September 2002, Ms. Giuffre traveled to Thailand to receive massage training
        and while there, met her future husband and eloped with him**.  Ms. Giuffre traveled

to Thailand in September 2002 to receive formal training as a masseuse. Figueroa drove her to the airport. While there, she initially contacted Figueroa frequently, incurring a phone bill of $4,000. She met Robert Giuffre while in Thailand and decided to marry him. She thereafter ceased all contact with Figueroa from October 2002 until two days before Mr. Figueroa's deposition in this matter in May 2016.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Ms. Giuffre did travel to Thailand to receive massage training in September 2002.

However, Defendant has inaccurately told only part of the story. Defendant has conveniently left

out certain key facts, which includes the fact that Ms. Giuffre was given an assignment from

Defendant and Epstein that she had to recruit another underage girl from Thailand, and bring that

young girl back to Epstein. *See* McCawley Dec. at Exhibit 43, GIUFFRE 003191. The

document Ms. Giuffre was give directs her to "call Ms. Maxwell." *See* McCawley Dec. at

Exhibit 32, GIUFFRE003191. It is not disputed by Defendant or Epstein, that Ms. Giuffre was

expected to return to Epstein and Maxwell upon completion of her massage training and

assignment. It is undisputed by Ms. Giuffre that she did not return to Defendant and Epstein, but

instead escaped clear across the world to Australia where she remained in hiding from Defendant

and Epstein for several years.

## DEFENDANT'S PURPORTED FACTS

48.   **Detective Recarey's investigation of Epstein failed to uncover any evidence that Ms. Maxwell was involved in sexual abuse of minors, sexual trafficking or production or possession of child pornography**. Joseph Recarey served as the lead detective from the Palm Beach Police Department charged with investigating Jeffrey Epstein. That investigation commenced in 2005. Recarey worked only on the Epstein case for an entire year. He reviewed previous officers' reports and interviews, conducted numerous interviews of witnesses and alleged victims himself, reviewed surveillance footage of the Epstein home, participated in and had knowledge of the search warrant executed on the Epstein home, and testified regarding the case before the Florida state grand jury against Epstein. Detective Recarey's investigation revealed that not one of the alleged Epstein victims ever mentioned Ms. Maxwell's name and she was never considered a suspect by the government. None of Epstein's alleged victims said they had seen Ms. Maxwell at Epstein's house, nor said they had been "recruited by her," nor paid any money by her, nor told what to wear or how to act by her. Indeed, none of Epstein's alleged victims ever reported to the government they had met or spoken to Ms. Maxwell. Maxwell was not

seen coming or going from the house during the law enforcement surveillance of Epstein's home. The arrest warrant did not mention Ms. Maxwell and her name was never mentioned before the grand jury. No property belonging to Maxwell, including "sex toys" or "child pornography," was seized from Epstein's home during execution of the search warrant. Detective Recarey, when asked to describe "everything that you believe you know about Ghislaine Maxwell's sexual trafficking conduct," replied, "I don't." He confirmed he has no knowledge about Ms. Maxwell sexually trafficking anybody. Detective Recarey also has no knowledge of Ms. Giuffre's conduct that is subject of this lawsuit.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

This statement is false. Detective Recarey knew that Maxwell was involved in the illegal sexual activities at Epstein's house. He wanted to speak to her, but Maxwell did not return his calls. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 28:23-29:10. Detective Recarey concluded that Defendant's role was to procure girls for Epstein. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 29:16-29:20. In the execution of the search warrant, stationary was found in the home bearing Maxwell's name, and notes were written by house staff to Maxwell. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 45:13-25; *Id.* at 83:3-83:15; see also Message Pads, GIUFFRE 001412, 001418, 001435, 001446, 001449, 001453, 001454. A key piece of evidence in the investigation were message pads uncovered in trash pulls, and from inside the residence during the search warrant. Those message pads revealed numerous calls left at the house for Maxwell, indicating she was staying in the house during the days when Epstein was engaging in illegal sex acts with minors.

Additionally, a walk through video taken during the execution of the search warrant revealed photos of topless females at the home, and there was even a photograph of Maxwell naked hanging in the home. The house staff who were deposed in the civil cases each testified to Maxwell being the boss in charge of everyone in the house. *See* McCawley Dec. at Exhibits 1,

19, 21, Banasiak Dep. Tr. at 8:21-9:16; 14:20-15:6; Alessi Dep. Tr. at 23:11-23:20; Rodriguez Dep. Tr. at 169:1-169:4.

Rodriguez, the house butler from 2004 through 2005, a time period that revealed daily sexual abuse of underage females, testified that Maxwell kept a list of the local girls who were giving massages at her desk, and that Maxwell kept nude photos of girls on her computer. *See* McCawley Dec. at Exhibit 21, Rodriguez Dep. Tr. at 238:4-238:22; 302:19-303:10; 306:1-306:24. Recarey testified that when the search warrant was executed, the house had been sanitized and the computers removed from the home. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 72:25-73:15. Banaziak testified that the computers were removed by Adriana Ross, another employee who answered to Maxwell. *See* McCawley Dec. at Exhibit 19, Banaziak Dep. Tr. at 54:7-22.

The record is replete with testimony demonstrating that Maxwell recruited Virginia, and recruited other females, who in turn recruited other females, all who were sexually abuse by Epstein; meaning, it is undisputed that Maxwell started the top of the pyramid of local Palm Beach girls who were all eventually identified as victims. *See, e.g.*, McCawley Dec. at Exhibit 1, Alessi Dep. Tr. at 34:19-35:3; 98:5-98:12; 104:15-104:23. The co-conspirator who maintained direct contact with the many underage victims was Sarah Kellen, whose sole responsibility was to schedule underage girls to visit Epstein for sex. Sarah reported directly to Maxwell. *See* McCawley Dec. at Exhibit 21, Rodriguez Dep. Tr. at 26:10-26:20. On the day when the search warrant was executed, the house maid, Ruboyo was scheduled to report to the house that day at 8 am; however, she received a call from Maxwell telling her not to go. *See* McCawley Dec. at Exhibit 20, Rabuyo Dep. Tr. at 81:20-82:25. Maxwell orchestrated and ran the entire sex

trafficking scheme from a high level, and insulated herself from most of the underage girls who were being paid for sex.

Tony Figueroa, Ms. Giuffre's ex-boyfriend, did testify that Maxwell personally requested that he find and bring girls to Epstein for sex once Ms. Giuffre had escaped, and that when he brought the girls Maxwell interacted with them. *See* McCawley Dec. at Exhibit 4, Figueroa Dep. Tr. at 200:6-18; 228:23-229:21. Rodriguez testified unequivocally that Maxwell was "the boss" and that she knew everything that was going on. *See* McCawley Dec. at Exhibit 21, Rodriguez Dep. Tr. 169:1-169:4.

## DEFENDANT'S PURPORTED FACTS

49. **No nude photograph of Ms. Giuffre was displayed in Epstein's home**. Epstein's housekeeper, Juan Alessi, "never saw any photographs of Virginia Roberts in Mr. Epstein's house." Detective Recarey entered Epstein's home in 2002 to install security cameras to catch a thief and did not observe any "child pornography" within the home, including on Epstein's desk in his office.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

This is false. Nude photographs were displayed throughout Epstein's home. Furthermore, Alfredo Rodriguez testified to Maxwell having pornography on her computer. Rodriguez Dep. Tr. 150:10-17; 306:1-306:24. He also testified to there being a collage of nude photos in Epstein's closet. *Id.* 253:14-254:18. That collage was eventually taken into evidence by Detective Recarey, who testified to that fact in his deposition. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 73:19-73:24. And those photos are still in the possession of the FBI or US Attorney's Office. *See* McCawley Dec. at Exhibit 13, Recarey Dep. Tr. at 74:2-74:7.

Numerous other people have testified about nude photographs being on display in the home including Ronaldo Rizzo, who visited the home on numerous occasions and who was reprimanded by Maxwell herself for looking at the nude photos. *See* McCawley Dec. at Exhibit 14, Rizzo Dep. Tr. at 25:19-26:20. Additionally, the search warrant video, taken at a time when

the house had already been sanitized, revealed photographs of nudity displayed, including a photograph of Maxwell herself in the nude. *See* McCawley Dec. at Exhibit 44, Search Warrant Video attached to the Deposition of Recarey.

Johanna Sjorberg testified that the Defendant bought her a camera for the specific purpose of her taking nude photos of herself. *See* McCawley Dec. at Exhibit 16 Sjoberg Tr. at 150. Finally, Virginia Giuffre testified that there was a nude photograph of her at the house. *See* McCawley Dec. at Exhibit 5 Virginia Giuffre Tr. at 232 and 333.

## DEFENDANT'S PURPORTED FACTS

50. **Ms. Giuffre intentionally destroyed her "journal" and "dream journal" regarding her "memories" of this case in 2013 while represented by counsel**. Ms. Giuffre drafted a "journal" describing individuals to whom she claims she was sexually trafficked as well as her memories and thoughts about her experiences with Epstein. In 2013, she and her husband created a bonfire in her backyard in Florida and burned the journal together with other documents in her possession. *Id*. Ms. Giuffre also kept a "dream journal" regarding her thoughts and memories that she possessed in January 2016. To date, Ms. Giuffre cannot locate the "dream journal."

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

The dream journal contained memories of Ms. Giuffre's dreams. While Ms. Giuffre has looked for this journal, which is wholly irrelevant to this case, she has been unable to locate it. Ms. Giuffre also wrote in a personal journal some of her experiences with Maxwell and Epstein, which were harmful and painful. In an effort to relieve herself of those past painful experiences, Ms. Giuffre followed the advice of a therapist, and burned the journal as a form of cathartic release at a time when she was under no obligation to maintain the personal memorialization of personal and painful experiences. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 205:13-206:10.

**DEFENDANT'S PURPORTED FACTS**

51. **Ms. Giuffre publicly peddled her story beginning in 2011**. Ms. Giuffre granted journalist Sharon Churcher extensive interviews that resulted in seven (7) widely distributed articles from March 2011 through January 2015. Churcher regularly communicated with Ms. Giuffre and her "attorneys or other agents" from "early 2011" to "the present day." Ms. Giuffre received approximately $160,000 for her stories and pictures that were published by many news organizations.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Defendant's statement misrepresents history. In 2011, Ms. Giuffre was still in hiding from Epstein and Maxwell in Australia. Ms. Giuffre was not looking to sell anything or even speak with anyone about what had happened to her in her previous life from which she dramatically escaped. Journalist, Sharon Churcher, located Ms. Giuffre and impressed the importance of Ms. Giuffre standing up to those who had harmed her and speak with Federal authorities, which Ms. Giuffre did in 2011. *See* McCawley Dec. at Exhibit 31, Redacted 302 GIUFFRE001235-01246.

In addition, Churcher impressed the importance of bringing the abuse of Defendant and Epstein to public light to prevent their continued abuse of others. *See* McCawley Dec. at Exhibit 35, Giuffre003690. After much deliberation, Ms. Giuffre agreed to be interviewed by Churcher, and was compensated for sharing her story, which came at a heavy price of being publicly scrutinized.

**DEFENDANT'S PURPORTED FACTS**

52. **Ms. Giuffre drafted a 144-page purportedly autobiographical book manuscript in 2011 which she actively sought to publish**. In 2011, contemporaneous with her Churcher interviews, Ms. Giuffre drafted a book manuscript which purported to document Ms. Giuffre's experiences as a teenager in Florida, including her interactions with Epstein and Maxwell. Ms. Giuffre communicated with literary agents, ghost writers and potential independent publishers in an effort to get her book published. She generated marketing materials and circulated those along with book chapters to numerous individuals associated with publishing and the media.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

Defendant's characterization of these activities are out of context and thus misleading. In 2008, Ms. Giuffre received a Victim Notification Letter from the United States Attorney's office for the Southern District of Florida, *see* McCawley Dec. at Exhibit 30, GIUFFRE0010202, regarding her sexual victimization by Epstein. Thereafter, in 2011, she sought psychological counseling from a psychologist for the trauma she endured. Also that year, journalist Sharon Churcher sought her out, and traveled half way around the globe to interview her on painful subjects. Ms. Giuffre was interviewed by the FBI in 2011. *See* McCawley Dec. at Exhibit 31, FBI Redacted 302 GIUFFRE01235-1246. She was also getting psychological help. *See* McCawley Dec. at Exhibit 38, Lightfoot Records, GIUFFRE005431-005438. In that situation, Ms. Giuffre began to draft a fictionalized account of what happened to her. It was against this backdrop of her trauma being unearthed, her steps to seek psychological counseling for it, that she drafted this manuscript. Doing so was an act of empowerment and a way of reframing and taking control over the narrative of her past abuse that haunts her.

"Writing 'I' has been an emancipatory project for women." Perreault, Jeanne, "AUTOGRAPHY/ TRANSFORMATION/ ASYMMETRY," *Women, Autobiography, Theory A Reader edited by Sidonie Smith & Julia Watson.* Indeed, scholars have written that the act of engaging in autobiography or even accounts loosely based on autobiography, is a process of taking control of one's own narrative and one's own self: "Thus a specific recitation of identity involves the inclusion of certain identity contents and the exclusion of others; the incorporation of certain narrative itineraries and internationalities, the silencing of others; the adoption of certain autobiographical voices, the muting of others." Smith, Sidonie, PERFORMATIVITY,

AUTOBIOGRAPHICAL PRACTICE, RESISTANCE, *Women, Autobiography, Theory A Reader edited by Sidonie Smith & Julia Watson.*

Indeed, even a cursory look at the manuscript penned by Ms. Giuffre informs the reader that she is trying to put forth a more palatable and more empowering narrative to over-write that powerlessness she felt when being abused by Defendant and Epstein. While Ms. Giuffre explored trying to publish her story to empower other individuals who were subject to abuse, she ultimately decided not to publish it. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. 249:16-18; 250:19-251:3.

## DEFENDANT'S PURPORTED FACTS

53. **Ms. Giuffre's publicly filed "lurid" CVRA pleadings initiated a media frenzy and generated highly publicized litigation between her lawyers and Alan Dershowitz**. On December 30, 2014, Ms. Giuffre, through counsel, publicly filed a joinder motion that contained her "lurid allegations" about Ms. Maxwell and many others, including Alan Dershowitz, Prince Andrew, Jean-Luc Brunel. The joinder motion was followed by a "corrected" motion and two further declarations in January and February 2015, which repeated many of Ms. Giuffre's claims. These CVRA pleadings generated a media maelstrom and spawned highly publicized litigation between Ms. Giuffre's lawyers, Edwards and Cassell, and Alan Dershowitz. After Ms. Giuffre publicly alleged Mr. Dershowitz of sexual misconduct, Mr. Dershowitz vigorously defended himself in the media. He called Ms. Giuffre a liar and accused her lawyers of unethical conduct. In response, attorneys Edwards and Cassell sued Dershowitz who counterclaimed. This litigation, in turn, caused additional media attention by national and international media organizations.

## MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS

*See* Ms. Giuffre's Paragraph 7, *supra*, explaining why the allegations were necessary and appropriate for multiple reasons. Ms. Giuffre disputes Defendant's false characterization of these events, and, indeed, the media attention was caused by Defendant's issuing her defamatory press release.

**DEFENDANT'S PURPORTED FACTS**

54. **Ms. Giuffre formed non-profit Victims Refuse Silence to attract publicity and speak out on a public controversy**. In 2014, Ms. Giuffre, with the assistance of the same counsel, formed a non-profit organization, Victims Refuse Silence. According to Ms. Giuffre, the purpose of the organization is to promote Ms. Giuffre's professed cause against sex slavery. The stated goal of her organization is to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse. Ms. Giuffre attempts to promote Victims Refuse Silence at every opportunity. For example, Ms. Giuffre participated in an interview in New York with ABC to promote the charity and to get her mission out to the public.

**MS. GIUFFRE'S STATEMENT CONTROVERTING DEFENDANT'S FACTS**

Ms. Giuffre did not form the non-profit Victims Refuse Silence to "speak out on a public controversy," but instead to simply help survivors of sexual abuse and sexual trafficking. In order to provide assistance to victims, Ms. Giuffre attempted to talk about the non-profit's mission when she had the opportunity to do so. *See* www.victimsrefusesilece.org.

**MS. GIUFFRE'S STATEMENT OF UNDISPUTED FACTS**

55. Virginia Roberts was born August 9, 1983. *See* McCawley Dec. at Exhibit 51, Driver's License GIUFFRE009209.

56. Virginia Roberts turned 18 on August 9, 2001.

57. In 2000, Virginia's father Sky Roberts worked at the Mar-a-Lago. *See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. at 72, 74.

58. Sky Roberts got Virginia a job at Mar-a-Lago in 2000, either months before or just after Virginia's 17th birthday. *See* McCawley Dec. at Exhibit 17, Sky Roberts Dep. Tr. at 72, 74; Giuffre Dep. Tr. at 25:19-25:21; 28:10-28:12.

59. The only year in which Virginia was employed at Mar-a-Lago was 2000. *See* McCawley Dec. at Exhibit 49, MAR-A-LAGO 0173, 0176.

60.     Virginia worked at Mar-a-Lago as a spa bathroom attendant.  *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 61:9-61:24; Austrich Dep. Tr. at 100:3-12.

61.     Virginia was not a masseuse at Mar-a-Lago as she had no massage experience. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 111:12-111:21; 116:19-117:12; Austrich Dep. Tr. at 34-35, 100-101, 127-128; Figueroa Dep. Tr. at 82:10-15; 168:24-169:1; Sky Roberts Dep. Tr. at 80:7-19; 84:18 -85:1.

62.     Maxwell approached Virginia at Mar-a-Lago, and recruited her to come to Jeffrey Epstein's house.  *See* McCawley Dec. at Exhibits 1, 5, and 17, Giuffre Dep. Tr. at 111:12-111:21; 116:19-117:12; Alessi Dep. Tr. at 94:24-95:2; Sky Roberts Dep. Tr. at 80:7-19; 84:18 -85:1.

63.     At the time Maxwell recruited Virginia to Jeffrey Epstein's house, Virginia was either 16 or 17 years old, depending on whether this occurred just before or just after Virginia's birthday.  *See* McCawley Dec. at Exhibit 49, MAR-A-LAGO 0173, 0176.

64.     Virginia followed Maxwell's instructions and reported to Jeffrey Epstein's house on the night of the day when Maxwell approached Virginia at Mar-a-Lago.  *See* McCawley Dec. at Exhibits 5 and 18, Giuffre Dep. Tr. at 117:20-118:1; Alessi Dep. Tr. at  96-98; GIUFFRE000102-103 at p. 48-49.

65.     Maxwell told Virginia at Mar-a-Lago that Virginia could get paid for giving a massage to Jeffrey Epstein.  *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 111:12-111:21; 116:19-117:12.

66.     When Virginia arrived at Epstein's house, she was taken upstairs to Epstein's bedroom, and instructed by Maxwell and Epstein how to give Epstein a massage. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 198:20-199:3; 199:15-199:18; Epstein Dep. Tr. at 74:3-14.

67.     Epstein and Maxwell turned the massage into a sexual encounter. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 198:20-199:3; 199:15-199:18.

68.     Virginia was not a professional masseuse, and was not old enough to be a masseuse in Florida even though Maxwell testified she only hired professional masseuses. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 61:9-61:24, 111:12-111:21, 116:19-117:12; Fla. Stat. § 480.041; Maxwell Dep. Tr. at 23:21-24:9; 31:6-18; 41:7-13; 220:13-221:2; 225:23-226:20; 248:5-16; 310:6-17; 383:2-18.

69.     Maxwell and Epstein promised Virginia money and a better life in exchange for complying with their sexual demands. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 198:20-199:3; 199:15-199:18.

70.     Maxwell had sex with Virginia and other females. *See* McCawley Dec. at Exhibit 5, Giuffre Dep. Tr. at 138:17-139:16; Maxwell 07-22-2016 Dep. Tr. at 86:25-87:9; 91:15-91:21.

71.     Virginia was trafficked nationally and internationally for sexual purposes. *See* McCawley Dec. at Exhibits 5, 1, 41? GIUFFRE007055-007161 (Flight Logs); Giuffre Dep. Tr. at 193:22-194:16; 201:24; 204:24:205:5; Alessi Dep. Tr. at 104:9-104:14; Andrew Photo GIUFFRE007167; Spain Photo GIUFFRE007166.

72.     Maxwell recruited other non-professionals under the guise of being a masseuse, but in reality only recruited girls for sexual purposes. *See* McCawley Dec. at Exhibits 5, 16, 4, 1, 18 Giuffre Dep. Tr. at 198:20-199:3; Sjoberg Dep. Tr. at 13-15; Figueroa Dep. Tr. at 88:12-22; Alessi Dep. Tr. at 34; GIUFFRE000105 at 57-58; GIUFFRE000241-242 at p. 212-213.

73.     Maxwell was the boss of others whose job it was to recruit minor females for Epstein for sex, such as Sarah Kellen. *See* McCawley Dec. at Exhibit 21, Rodriguez Dep. Tr. at 26:10-26:20.

74. Maxwell was a recruiter of underage girls and other young females for Epstein for sex, and was the boss in charge of those females. *See* McCawley Dec. at Exhibits 16, 4, 21, and 1, Sjoberg Dep. Tr. 8-9, 13-15, 27; Figueroa Dep. Figueroa Dep. Tr. at 200:6-18; 228:23-229:21; Rodriguez Dep. Tr. 169:1-169:4; Alessi Dep. Tr. at 23:11-23:20; 34:19-35:3; 98:5-98:12; 104:15-104:23.

Dated: January 31, 2017                         Respectfully Submitted,

                                                                BOIES, SCHILLER & FLEXNER LLP

                                            By:  /s/ Sigrid McCawley
                                                      Sigrid McCawley (Pro Hac Vice)
                                                      Boies Schiller & Flexner LLP
                                                      401 E. Las Olas Blvd., Suite 1200
                                                      Ft. Lauderdale, FL 33301
                                                      (954) 356-0011

                                                      David Boies
                                                      Boies Schiller & Flexner LLP
                                                      333 Main Street
                                                      Armonk, NY 10504

                                                      Bradley J. Edwards (Pro Hac Vice)
                                                      FARMER, JAFFE, WEISSING,
                                                      EDWARDS, FISTOS & LEHRMAN, P.L.
                                                      425 North Andrews Avenue, Suite 2
                                                      Fort Lauderdale, Florida 33301
                                                      (954) 524-2820

                                                      Paul G. Cassell (Pro Hac Vice)
                                                      S.J. Quinney College of Law
                                                      University of Utah
                                                      383 University St.
                                                      Salt Lake City, UT 84112
                                                      (801) 585-5202[1]

---

[1] This daytime business address is provided for identification and correspondence purposes only and is not intended to imply institutional endorsement by the University of Utah for this private representation.

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on January 31, 2017, I electronically filed the foregoing

document with the Clerk of Court by using the CM/ECF system.  I also certify that the foregoing

document is being served this day on the individuals identified below via transmission of Notices

of Electronic Filing generated by CM/ECF.

> Laura A. Menninger, Esq.
> Jeffrey Pagliuca, Esq.
> HADDON, MORGAN & FOREMAN, P.C.
> 150 East 10th Avenue
> Denver, Colorado 80203
> Tel: (303) 831-7364
> Fax: (303) 832-2628
> Email: lmenninger@hmflaw.com
>          jpagliuca@hmflaw.com

> /s/ Sigrid S. McCawley
> Sigrid S. McCawley