UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

VIRGINIA GIUFFRE,

                Giuffre,               15 Civ. 7433

    -against-

                                   <u>SEALED</u>
                                   <u>OPINION</u>

GHISLAINE MAXWELL,

                Maxwell.

----------------------------------------X

A P P E A R A N C E S:

           <u>Counsel for Giuffre</u>

           BOIES, SCHILLER & FLEXNER LLP
           401 East Las Olas Boulevard, Suite 1200
           Fort Lauderdale, FL 33301
           By:   Sigrid S. McCawley, Esq.
                Meredith L. Schultz, Esq.

           <u>Counsel for Maxwell</u>

           HADDON, MORGAN AND FOREMAN, P.C.
           150 East Tenth Avenue
           Denver, CO 80203
           By:   Laura A. Menninger, Esq.
                Jeffrey S. Pagliuca, Esq.

**Sweet, D.J.**

The defendant Ghislaine Maxwell ("Maxwell" or the "Maxwell") has moved pursuant to Rule 56, Fed. R. Civ. P., for summary judgment dismissing the complaint of plaintiff Virginia L. Giuffre ("Giuffre" or the "Giuffre") alleging defamation. Upon the facts and conclusions set forth below, the motion is denied.

## I. Prior Proceedings

Since the filing of the complaint on September 21, 2015, setting forth Giuffre's claim of defamation by Maxwell, this action has been vigorously litigated, as demonstrated by the 704 docket entries as of March 8, 2017. At issue is the truth or falsity of a January 2015 statement issued by Maxwell. Discovery has proceeded, a joint pretrial order has been filed, and the action is set for trial on May 15, 2017.

The instant motion was heard and marked fully submitted on February 16, 2017.

2

## II.  The Facts

The facts have been set forth in Maxwell's Memorandum
of Law in Support of Maxwell's Motion for Summary Judgment,
Southern District of New York, Local Rule 56.1; Giuffre's
Statement of Contested Facts and Giuffre's Undisputed Facts; and
Maxwell's Reply to Giuffre's Statement of Contested Facts and
Giuffre's Undisputed Facts pursuant to Local Civil Rule 56.1.
They are not in dispute except as noted below.

1.   In early 2011, Giuffre, in two British tabloid
interviews, made numerous false and defamatory allegations
against Maxwell. In the articles, Giuffre made no direct
allegations that Maxwell was involved in any improper conduct
with Jeffrey Epstein ("Epstein"), who had pleaded guilty in 2007
to procuring a minor for prostitution. Nonetheless, Giuffre
suggested that Maxwell worked with Epstein and may have known
about the crime for which he was convicted.

Giuffre has denied that the allegations she made
against Maxwell were false and defamatory. She noted that she
did give an interview to journalist, Sharon Churcher
("Churcher"), in which she described Maxwell's role as someone

3

who recruited or facilitated the recruitment of young females for Epstein, that she was interviewed by the FBI in 2011, and that she discussed Maxwell's involvement in the sexual abuse.

2.   In the articles, Giuffre alleged she had sex with Prince Andrew, "a well-known businessman," a "world-renowned scientist," a "respected liberal politician," and a "foreign head of state."

Giuffre did not contest this statement but noted it is irrelevant.

3.   In response to the allegations, Maxwell's British attorney, working with Ross Gow ("Gow"), Maxwell's public relations representative, issued a statement on March 9, 2011, denying "the various allegations about [Maxwell] that have appeared recently in the media. These allegations are all entirely false."

Giuffre has denied that Maxwell's British attorney, Philip Barden ("Barden"), "issued a statement," noting that it appears to have the contact "Gow" and a reference to Devonshire Solicitors.

4.   The March 9, 2011 statement read in full:

<u>Statement on Behalf of Ghislaine Maxwell</u>

By Devonshires Solicitors, PRNE Wednesday, March 9, 2011

London, March 10, 2011 - Ghislaine Maxwell denies the various allegations about her that have appeared recently in the media. *These allegations are all entirely false.*

It is unacceptable that letters sent by Maxwell's legal representatives to certain newspapers pointing out the truth and asking for the allegations to be withdrawn have simply been ignored.

In the circumstances, *Maxwell is now proceeding to take legal action against those newspapers.*

"I understand newspapers need stories to sell copies. It is well known that certain newspapers live by the adage, "why let the truth get in the way of a good story." However, *the allegations made against me are abhorrent and entirely untrue* and I ask that they stop," said Ghislaine Maxwell.

"A number of newspapers have shown a complete lack of accuracy in their reporting of this story and a failure to carry out the most elementary investigation or any real due diligence. I am now taking action to clear my name," she said.

Media contact:

Ross Gow
Acuity Reputation
Tel: +44-203-008-7790
Mob: +44-7778-755-251
Email: ross@acuityreputation.com
Media contact: Ross Gow, Acuity Reputation, Tel: +44-203-008-7790,

Mob: +44-7778-755-251, Email: ross at
acuityreputation.com

Giuffre has noted it is unclear if the original
included the italics that are inserted above.

5.    In 2008, two alleged victims of Epstein brought
an action under the Crime Victims' Rights Act (the "CVRA
Action") against the United States Government purporting to
challenge Epstein's plea agreement. They alleged the Government
violated their CVRA rights by entering into the agreement.

6.    Giuffre moved to join the CVRA Action on December
30, 2014, claiming she, too, had her CVRA rights violated by the
Government. On January 1, 2015, Giuffre filed a "corrected"
joinder motion. *See Jane Doe 1 and Jane Doe 2 v. United States*,
No. 9:08-cv-80736-KAM, Docket No. 280 (S.D. Fla. Jan. 2, 2015)
("CVRA Joinder Mot."). Giuffre's joinder motion in this
unrelated action included gratuitous and "lurid" accusations.

Giuffre has denied the final sentence fragment.

7.    The issue presented in the joinder motion was
narrow: whether Giuffre should be permitted to join the CVRA

6

Action as a party under Federal Rule of Civil Procedure 21, specifically, whether she was a "known victim[] of Mr. Epstein and the Government owed them CVRA duties." *Jane Doe 1 and Jane Doe 2 v. United States*, No. 9:08-cv-80736-KAM, Docket No. 324 (S.D. Fla. Apr. 7, 2015) ("CVRA Mot. Op.") at 5. Yet, "the bulk of the [motion] consists of copious factual details that [Ms. Giuffre] and [her co-movant] 'would prove . . . if allowed to join.'" *Id.* Giuffre gratuitously included provocative and "lurid details" of her alleged sexual activities as an alleged victim of sexual trafficking.

Giuffre has denied that the issues presented in her joinder motion were narrow and has noted that the issues presented by the joinder motion and related pleadings were multiple and complex, requiring numerous details about Giuffre's sexual abuse and the listing of the perpetrators of her abuse. In a pleading explaining why the motion was filed, *see Jane Doe 1 and Jane Doe 2 v. United States*, No. 9:08-cv-80736-KAM, Docket No. 291 at 18-26 & n.17 (S.D. Fla. Jan. 21, 2015), Giuffre's lawyers specifically listed nine separate reasons why Jane Doe 3's allegations that Alan Dershowitz ("Dershowitz") had sexually abused her were relevant to the case and appropriately included in the relevant filings. Additionally, Giuffre states that Judge

Marra's ruling concluded that certain allegations were not necessary "at this juncture in the proceedings," adding that "Jane Doe 3 is free to reassert these factual details through proper evidentiary proof, should Petitioners demonstrate a good faith basis for believing that such details are pertinent to a matter presented for the Court's consideration." CVRA Mot. Op. at 5-6. Giuffre notes that the CVRA litigation continues and no trial has been held as of the filing of this motion so that the extent to which these factual details will be used at trial has not yet been determined. *See* Docket Sheet, *Jane Doe 1 and Jane Doe 2 v. United States*, No. 9:08-cv-80736-KAM.

8.    At the time they filed the motion, Giuffre and her lawyers knew that the media had been following the Epstein criminal case and the CVRA Action. While they deliberately filed the motion without disclosing Giuffre's name, claiming the need for privacy and secrecy, they made no attempt to file the motion under seal. Quite the contrary, they filed the motion publicly.

Giuffre has noted her denial as set forth to Statement 7 above.

9.    As the district court noted in ruling on the joinder motion, Giuffre "name[d] several individuals, and she offers details about the type of sex acts performed and where they took place." CVRA Mot. Op. at 5. The court ruled that "these lurid details are unnecessary," explaining that "[t]he factual details regarding whom and where the Jane Does engaged in sexual activities are immaterial and impertinent . . . , especially considering that these details involve nonparties who are not related to the respondent Government." *Id.* Accordingly, "[t]hese unnecessary details shall be stricken." *Id.* The court then struck all Giuffre's factual allegations relating to her alleged sexual activities and her allegations of misconduct by non-parties. *Id.* at 6. The court said the striking of the "lurid details" was a sanction for Giuffre's improper inclusion of them in the motion. *Id.* at 7.

Giuffre has noted her denial as set forth in Statement 7 above.

10.    The district court in the CVRA Action found not only that the "lurid details" were unnecessary but also that the joinder motion itself was "entirely unnecessary." *Id.* at 7. Giuffre and her lawyers knew the motion with all its "lurid

9

details" was unnecessary because the motion itself recognized that she would be able to participate as a fact witness to achieve the same result she sought as a party. The court denied Giuffre's joinder motion. *Id.* at 10.

Giuffre has noted her denial as set forth in Statement 7 above.

11. One of the non-parties Giuffre "named" repeatedly in the joinder motion was Maxwell. According to the "lurid details" of Giuffre included in the motion, Maxwell personally was involved in a "sexual abuse and sex trafficking scheme" created by Epstein:

- Maxwell "approached" Giuffre in 1999 when Giuffre was "fifteen years old" to recruit her into the scheme.

- Maxwell was "one of the main women" Epstein used to "procure under-aged girls for sexual activities."

- Maxwell was a "primary co-conspirator" with Epstein in his scheme.

- She "persuaded" Giuffre to go to Epstein's mansion "in a fashion very similar to the manner in which Epstein and his other co-conspirators coerced dozens of other children."

- At the mansion, when Giuffre began giving Epstein a massage, he and Ms. Maxwell "turned it into a sexual encounter."

- Epstein "with the assistance of" Maxwell "converted [Giuffre] into . . . a 'sex slave.'" *Id.* Giuffre was a "sex slave" from "about 1999 through 2002."

- Maxwell also was a "co-conspirator in Epstein's sexual abuse."

- Maxwell "appreciated the immunity" she acquired under Epstein's plea agreement, because the immunity protected her from prosecution "for the crimes she committed in Florida."

- Maxwell "participat[ed] in the sexual abuse of [Giuffre] and others."

- Maxwell "took numerous sexually explicit pictures of underage girls involved in sexual activities, including [Giuffre]." *Id.* She shared the photos with Epstein.

- As part of her "role in Epstein's sexual abuse ring," Maxwell "connect[ed]" Epstein with "powerful individuals" so that Epstein could traffic Giuffre to these persons.

- Giuffre was "forced to have sexual relations" with Prince Andrew in "[Maxwell's] apartment" in London. Maxwell "facilitated" Giuffre's sex with Prince Andrew "by acting as a 'madame' for Epstein."

- Maxwell "assist[ed] in internationally trafficking" Giuffre and "numerous other young girls for sexual purposes."

- Giuffre was "forced" to watch Epstein, Maxwell and others "engage in illegal sexual acts with dozens of underage girls."

*See* CVRA Joinder Mot.

11

Giuffre has denied the reference to "lurid details" and has noted her denial as set forth in Statements 6 and 7 above and that the testimony from numerous witnesses has corroborated the statements Giuffre made in her joinder motion:

- Johanna Sjoberg ("Sjoberg") May 18, 2016 Dep. Tr. at 8-9, 13, 33-35, 142-143.

- Anthony Figueroa ("Figueroa") June 24, 2016 Dep. Tr. Vol. 1 at 96-97 and 103.

- Rinaldo Rizzo ("Rizzo") June 10, 2016 Dep. Tr. at 52-60.

- Lynn Miller's May 24, 2016 Dep. Tr. at 115.

- Joseph Recarey's June 21, 2016 Dep. Tr. at 29-30.

- David Rodgers' June 3, 2016 Dep. Tr. at 18, 34-36.

- Excerpted Rodgers Dep. Ex. 1 at flight #s 1433-1434, 1444-1446, 1464-1470, 1478-1480, 1490-1491, 1506, 1525-1526, 1528, 1570, and 1589.

- NadiaMarcinkova ("Marcinkova") Dep. Tr. at 10:18-21; 12:11-15; etc.

- Sarah Kellen ("Kellen") Dep. Tr. at 15:13-18; 20:12-16; etc.

- Epstein Dep. Tr. at 116:10-15; 117:18-118:10; etc.

- Juan Alessi ("Alessi") Dep. Tr. At 28, 52-54.

- U.S. Attorney Victim Notification Letter GIUFFRE002216-002218.

- July 2001 New York Presbyterian Hospital Records GIUFFRE003258-003290.

- Judith Lightfoot psychological records GIUFFRE005431-005438.

- Message Pad evidencing Maxwell arranging to have underage girls and young women come to Epstein's home GIUFFRE001386-001571.

- "Black Book" in which Maxwell and other household staff maintained a roster of underage girls including ██████████, ██████████, and ██████████, who were minors at the time the Palm Beach Police's Investigation of Jeffrey Epstein GIUFFRE001573-00669.

13

- Sex Slave books Epstein ordered from
  Amazon.com at GIUFFRE006581.

- The folder Maxwell sent to Thailand with
  Giuffre bearing Maxwell's phone number
  GIUFFRE003191-003192.

- The Palm Beach Police Report showing that
  Epstein used women and girls to collect
  underage girls for his abuse GIUFFRE005614-
  005700.

- Epstein's Flight Logs showing that Maxwell
  flew with Giuffre 23 times GIUFFRE007055-
  007161.


12.   In the joinder motion, Giuffre also alleged she
was "forced" to have sex with Dershowitz, "model scout" Jean Luc
Brunel, and "many other powerful men, including numerous
prominent American politicians, powerful business executives,
foreign presidents, a well-known Prime Minister, and other world
leaders." CVRA Joinder Mot. at 5-6.


Giuffre has noted her denial as set forth in
Statements 7 and 11 above.


14

13.   Giuffre said after serving for four years as a "sex slave," she "managed to escape to a foreign country and hide out from Epstein and his co-conspirators for years." *Id.* at 3.

Giuffre has admitted making this statement and has noted since discovered evidence that indicates she was mistaken on the exact timeframe of her abuse and was with Maxwell and Epstein from the years 2000–2002.

14.   Giuffre suggested the Government was part of Epstein's "conspiracy" when it "secretly" negotiated a non-prosecution agreement ("NPA") with Epstein precluding federal prosecution of Epstein and his "co-conspirators." *Id.* at 6. The Government's secrecy, Giuffre alleged, was motivated by its fear that Giuffre would raise "powerful objections" to the agreement that would have "shed tremendous public light" on Epstein and other powerful individuals. *Id.* at 6–7.

Giuffre has denied that she suggested that the Government was part of Epstein's conspiracy to commit sex offenses and has noted that the CVRA Action deals with whether the Government failed in their responsibilities to the victims

15

to inform the victims that the Government was working out an NPA, that the Government did fail to so inform the victims, and that it intentionally did not inform the victims because the expected serious objection from many of the victims might prevent the Government from finalizing the NPA with Epstein.

15. The other "Jane Doe" who joined Giuffre's motion who alleged she was sexually abused on "many occasions" by Epstein was unable to corroborate any of Giuffre's allegations.

Giuffre has denied the statement and noted that the other Jane Doe could corroborate many of Giuffre's allegations based on a similar pattern of abuse by Epstein that she suffered, that she did not know Giuffre, and further has noted ███████████████ who was deposed in this case, and who was a minor, corroborates the same pattern of abuse.

16. In her multiple and lengthy consensual interviews with Churcher three years earlier, Giuffre told Churcher of virtually none of the details she described in the joinder motion.

16

Giuffre has denied the statement and noted that absence of any citation or evidence on this point and that the statement here is knowingly false based on the articles and Giuffre's deposition.

17. As Giuffre and her lawyers expected, before Judge Marra in the CVRA Action could strike the "lurid details" of Giuffre's allegations in the joinder motion, members of the media obtained copies of the motion.

Giuffre has denied the statement as set forth in Statement 7 above.

18. At the direction of Barden, on January 2, 2015, Gow sent to numerous representatives of British media organizations an email containing "a quotable statement on behalf of Maxwell" (the "Press Release"). The email was sent to more than six and probably fewer than 30 media representatives. It was not sent to non-media representatives.

Giuffre has denied that "[a]t Mr. Barden's direction, on January [2], 2015, Gow sent to numerous representatives of British media organizations an email containing 'a quotable

statement on behalf of Maxwell'" and has noted that Gow produced

an email exchange he had with Maxwell in which Maxwell directs

Gow to send the Press Release as follows:

---

From: G Maxwell <GMax1@ellmax.com>
Date: Fri, 2 Jan 2015 20:14:53 +0000
To: Ross Gow<ross@acuityreputation.com>
Cc: Philip Barden<philip.barden@devonshires.co.uk>
Subject: FW: URGENT - this is the statement

Jane Doe 3 is Virginia Roberts so not a new individual.

The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue.

The original allegations are not new and have been fully responded to and shown to
be untrue

Each time the story is re told it changes with new salacious details about public
figures and world leaders and now it is alleged by Ms Roberts that Alan Derschwitz is
involved in having sexual relations with her, which he denies

Ms Roberts claims are obvious lies and should be treated as such and not publicised
as news, as they are defamatory.

---

Giuffre has further noted that chronologically, this

email comes at the end of various other email exchanges between

Maxwell and Gow that discuss issuing a press release and that

the subject line of this email that Maxwell wrote to Gow states

"URGENT - this is the statement," thereby instructing Gow to

release this statement to the press. Additionally, Giuffre notes

that shortly after Maxwell sent this email to Gow directing him

to release the Press Release, Gow distributed it to multiple

media outlets, and that no email has been produced in which

18

Barden directed Gow to issue this press release. At his deposition, Gow authenticated this email and confirmed that Maxwell authorized the statement.

Giuffre has noted that the email and Gow's testimony establish that Maxwell, not Barden, directed and "command[ed]" Gow to publish the defamatory statement and the first sentence of the statement is false and the second sentence – "This email was sent to more than 6 and probably less than 30 media representatives" – omits the fact that not only did Gow admit to emailing the statement to the press, but he also read it to over 30 media representatives over the phone. Giuffre has denied the statement.

19. Among the media representatives who received the Press Release were Martin Robinson of the Daily Mail, P. Peachey of The Independent, Nick Sommerlad of The Mirror, David Brown of The Times, Nick Always and Jo-Anne Pugh of the BBC, and David Mercer of the Press Association. These representatives were selected based on their request after the joinder motion was filed—for a response from Maxwell to Giuffre's allegations in the motion.

Giuffre has denied the second sentence and has noted there is no record evidence that Gow (or anyone else) "selected" journalists "for a response," or that there was any selection process and that Gow testified that anyone who inquired received a reference to the Press Release.

20.    The email to the media members read:

To Whom It May Concern,

Please find attached a quotable statement on behalf of Maxwell.

No further communication will be provided by her on this matter.

Thanks for your understanding.

Best Ross
Ross Gow
ACUITY Reputation

Jane Doe 3 is Virginia Roberts—so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue.

Each time the story is re told [sic] it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts [sic] that Alan Derschowitz [sic] is involved in having sexual relations with her, which he denies.

Ms. Roberts claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory.

Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims.

Giuffre has noted that the body text of the email that was sent to news media was cropped and the headings and metadata were omitted and has further noted the image of the email set forth below.

21

From: <ross@acuityreputation.com>
Date: 2 January 2015 at 20:38
Subject: Ghislaine Maxwell
To: Rossacuity Gow <ross@acuityreputation.com>
bcc: martin.robinson@mailonline.co.uk,
P.Peachey@independent.co.uk,
nick.sommerlad@mirror.co.uk,
david.brown@thetimes.co.uk,
nick.alway@bbc.co.uk,
jo-anne.pugh@bbc.co.uk

To Whom It May Concern,
Please find attached a quotable statement on behalf of Ms Maxwell.

No further communication will be provided by her on this matter.
Thanks for your understanding.
Best
Ross

Ross Gow
ACUITY Reputation

Jane Doe 3 is Virginia Roberts - so not a new individual. The allegations made by Victoria
Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have
been fully responded to and shown to be untrue.

Each time the story is re told it changes with new salacious details about public figures and
world leaders and now it is alleged by Ms Roberts that Alan Dershowitz is involved in having
sexual relations with her, which he denies.

Ms Roberts claims are obvious lies and should be treated as such and not publicised as news, as
they are defamatory.

Ghislaine Maxwell's original response to the lies and defamatory claims remains the same.
Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British
press and elsewhere and reserves her right to seek redress at the repetition of such old
defamatory claims.

Sent from my BlackBerry® wireless device

21.    Barden, who prepared the Press Release, did not

intend it as a traditional press release solely to disseminate

information to the media, and he intentionally did not pass it

through a public relations firm, such as Gow's firm, Acuity

Reputation.

Giuffre has denied the statement and has noted that
the Barden Declaration should not be considered. She has further
noted that there is no evidence to support any assertion of
Barden's intent and that Maxwell gave the statement to Gow with
instructions to publish it. Giuffre also has denied that the
statement did not pass "through a public relations firm, such as
Gow's firm, Acuity Reputation" and has noted that record
documentary evidence and testimony establish that this statement
was disseminated through Gow's firm, Acuity Reputation.

22.   The Press Release served two purposes. First,
Barden intended that it mitigate the harm to Maxwell's
reputation from the press's republication of Giuffre's false
allegations. He believed these ends could be accomplished by
suggesting to the media that, among other things, they should
subject Giuffre's allegations to inquiry and scrutiny. For
example, he noted in the statement that Giuffre's allegations
changed dramatically over time, suggesting that they are
"obvious lies" and therefore should not be "publicized as news."

Giuffre has denied this statement and any statement of
Barden's intent and that there was any "republication" by the

23

press as a matter of law as the press did not "republish" the press statement under New York law and that the allegations in the statement are "false," and cites to the evidence set forth in Statement 11 above.

Giuffre has further disputed that the harm to Maxwell's reputation could be mitigated by the media's inquiry into and scrutiny of Giuffre's allegations, because a deeper inquiry would only reveal additional evidence corroborating Giuffre's allegations, and has noted that the record does not establish who drafted the Press Release, and that it was ultimately Maxwell who "noted" anything because it is her statement and that she directed that it be sent to the media and public.

Giuffre has also disputed that her allegations have changed over time, "dramatically" or otherwise, that the Press Release "suggest[ed]" that her allegations are "obvious lies," because the Press Release affirmatively stated that her allegations are "obvious lies" there is no subtlety, suggestion, or statement of opinion here.

23.   Barden intended the January 2015 statement to be "a shot across the bow" of the media, which he believed had been unduly eager to publish Giuffre's allegations without conducting any inquiry of their own. Accordingly, in the statement he repeatedly noted that Giuffre's allegations were "defamatory." In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Maxwell considered the publication of Giuffre's obviously false allegations and the legal indefensibility of their own conduct.

Giuffre has denied this statement and the statement that Barden repeatedly noted that Giuffre's allegations were "defamatory" as he did not "note" anything in the statement, nor does Maxwell cite to any record evidence that he did.

Giuffre further denies the sentence, "In this sense, the statement was intended as a cease and desist letter to the media-recipients, letting the media-recipients understand the seriousness with which Maxwell considered the publication of Giuffre's obviously false allegations and the legal indefensibility of their own conduct," as there is no record

25

evidence in support of this claim, and Maxwell has not cited any.

24. Consistent with his purposes as described by Maxwell, Gow's emails prefaced the statement with the following language: "Please find attached a quotable statement on behalf of Maxwell." The statement was intended to be a single, one-time only, comprehensive response, quoted in full, to Giuffre's December 30, 2014, allegations that would give the media Maxwell's response. The purpose of the prefatory statement was to inform the media-recipients of this intent.

Giuffre has disputed the statement and any statement relating to Barden's "purposes," as explained above, and has noted that Gow repeatedly issued this statement via email and over the phone for months on end and that Maxwell instructed them to publish it by telling them it was "quotable," and hired a press agent to distribute it to the press with the intent for the press to publish the Press Release.

25. Giuffre has engaged in numerous activities to bring attention to herself, to the prosecution and punishment of

wealthy individuals such as Epstein, and to her claimed interest of bringing light to the rights of victims of sexual abuse.

Giuffre has denied that she engaged in activities to bring attention to herself but has noted that she has taken action to aid in the prosecution of her abusers, and she seeks to bring light to the rights of victims of sexual abuse.

26. Giuffre created an organization, Victims Refuse Silence, Inc., a Florida corporation, directly related to her alleged experience as a victim of sexual abuse.

27. The "goal" of Victims Refuse Silence "was, and continues to be, to help survivors surmount the shame, silence, and intimidation typically experienced by victims of sexual abuse." Toward this end, Giuffre has "dedicated her professional life to helping victims of sex trafficking."

28. Giuffre repeatedly has sought out media organizations to discuss her alleged experience as a victim of sexual abuse.

Giuffre has denied the statement and noted that she was approached by numerous media outlets and refused to speak to most of them, that media organizations sought her out and she did not seek them out.

29. Giuffre has written the manuscript of a book she has been trying to publish detailing her alleged experience as a victim of sexual abuse and of sex trafficking in Epstein's alleged "sex scheme."

Giuffre has stated that this mischaracterizes these activities, that it was against a backdrop of seeking psychological counseling that she drafted the manuscript as an "act of empowerment" and "a way of reframing and taking control over the narrative." Pl.'s Opp'n at 60. Giuffre notes that she ultimately decided not to publish the manuscript. *See* Giuffre Dep. Tr. 249:16-18; 250:19-251:3.

30. Giuffre was required by Interrogatory No. 6 to identify any false statements attributed to Maxwell that were "published globally, including within the Southern District of New York," as Giuffre alleged in Paragraph 9 of Count One of her complaint. In response, Giuffre identified the Press Release and

nine instances in which various news media published portions of the Press Release in news articles or broadcast stories.

Giuffre has denied this statement. There is no "republication" as a matter of law and Maxwell possesses the knowledge as to where the defamatory statements were published and Giuffre has noted that she has provided a sampling of Maxwell's defamatory statements published by the news media and that Maxwell caused her statement to be published in an enormous number of media outlets.

| Date | Nature | Publishing Entity | Statement/URL |
|------|--------|-------------------|---------------|
| January 2, 2015 | Internet | Ross Gow | Jane Doe 3 is Virginia Roberts - so not a new individual. The allegations made by Victoria Roberts against Ghislaine Maxwell are untrue. The original allegations are not new and have been fully responded to and shown to be untrue. Each time the story is re told it changes with new salacious details about public figures and world leaders and now it is alleged by Ms. Roberts that Alan Dershowitz is involved in having sexual relations with her, which he denies. Ms. Roberts's claims are obvious lies and should be treated as such and not publicized as news, as they are defamatory. Ghislaine Maxwell's original response to the lies and defamatory claims remains the same. Maxwell strongly denies allegations of an unsavoury nature, which have appeared in the British press and elsewhere and reserves her right to seek redress at the repetition of such old defamatory claims. |
| January 2, 2015 | Internet | Bolton News | http://www.theboltonnews.co.uk/news/national/11700192 Palace_denies_Andrew_sex_case_claim/ |
| January 3, 2015 | Internet | Telegraph | http://www.telegraph.co.uk/news/uknews/theroyalfamily/11323872/Prince-Andrew-denies-having-relations-with-sex-slave-girl.html |
| January 3, 2015 | Internet | Daily Mail | http://www.dailymail.co.uk/news/article-2895366/Prince-Andrew-lobbied-government-easy-Jeffrey-Epstein-Palace-denies-claims-royal-tried-use-influence-help-billionaire-paedophile-2008-police-probe.html |
| January 3, 2015 | Internet | Huffington Post | http://www.huffingtonpost.co.uk/2015/01/03/duke-of-york-sex-abuse-claims_n_6409508.html |

| January 4, 2015 | Internet | Express | http://www.express.co.uk/news/world/550085/Ghislaine-Maxwell-Jeffrey-Epstein-not-madam-paedophile-Florida-court-case-Prince-Andrew |
| January 4, 2015 | Internet | Jewish News Online | http://www.jewishnews.co.uk/dershowitz-nothing-prince-andrews-sex-scandal/ |
| January 5, 2015 | Internet/Broadcast | NY Daily News | http://www.nydailynews.com/news/world/alleged-madame-accused-supplying-prince-andrew-article-1.2065505 |
| January 5, 2015 | Internet/Broadcast | AOL UK | http://www.aol.co.uk/video/ghislaine-maxwell-declines-to-comment-on-prince-andrew-allegations-518587500/ |

Two newest articles
[1] https://www.thesun.co.uk/archives/news/6754/prince-andrews-pal-ghislaine-groped-teen-girls/
[2] http://www.mirror.co.uk/news/uk-news/prince-andrews-pal-ghislaine-maxwell-5081971

31.  In none of the nine instances was there any publication of the entire Press Release.

Giuffre has noted extensive evidence of the mass distribution of Maxwell's defamatory statement to over 66 million viewers as stated by her expert witness James Jansen ("Jansen").

32.  Maxwell and her agents exercised no control or authority over any media organization, including the media identified in Giuffre's response to Interrogatory No. 6, in connection with the media's publication of portions of the Press Release

Giuffre has disputed this statement and noted it is completely devoid of record evidence and that the record establishes that Maxwell hired Gow because his position allowed him to influence the press to publish her defamatory statement, Dep. Tr. at 13:9-16; 15:18-16:3; 109:12-22; 110:16-21; 111:3-7, and that Maxwell caused her statement to be published by numerous major news organizations with wide readership all over the globe.

31

33.   Eight years after Epstein's guilty plea in
Florida, Giuffre brought this action, repeating many of the
allegations she made in her CVRA joinder motion.

Giuffre has noted that the defamation cause of action
against Maxwell did not accrue until Maxwell defamed her in
January of 2015.

34.   The complaint alleged that the January 2015
statement "contained the following deliberate falsehoods":

    (a)   That Giuffre's sworn allegations "against
          Ghislaine Maxwell are untrue."

    (b)   That the allegations have been "shown to be
          untrue."

    (c)   That Giuffre's "claims are obvious lies."

35.   Giuffre lived independently from her parents with
her fiancé long before meeting Epstein or Maxwell. After leaving
the Growing Together drug rehabilitation facility in 1999,
Giuffre moved in with the family of a fellow patient. There she

met, and became engaged to, her friend's brother, James Michael
Austrich ("Austrich"). She and Austrich thereafter rented an
apartment in the Ft. Lauderdale area with another friend and
both worked at various jobs in that area. Later, they stayed
briefly with Giuffre's parents in the Palm Beach/Loxahatchee,
Florida area before Austrich rented an apartment for the couple
on Bent Oak Drive in Royal Palm Beach. Although Giuffre agreed
to marry Austrich, she never had any intention of doing so.

Giuffre has denied that she voluntarily lived
independently from her parents with her fiancé; she states that
she was a troubled minor child who was not realistically engaged
prior to meeting Maxwell and Epstein, as she was not of legal
age to marry. She confirms she had no intention of marrying
Austrich.

36.  Giuffre re-enrolled in high school from June 21,
2000 until March 7, 2002. After finishing the 9th grade school
year at Forest Hills High School on June 9, 1999, Giuffre re-
enrolled at Wellington Adult High School on June 21, 2000, again
on August 16, 2000 and on August 14, 2001. On September 20,
2001, Giuffre then enrolled at Royal Palm Beach High School. A
few weeks later, on October 12, 2001, she matriculated at

33

Survivors Charter School. Survivor's Charter School was an alternative school designed to assist students who had been unsuccessful at more traditional schools. Giuffre remained enrolled at Survivor's Charter School until March 7, 2002. She was present 56 days and absent 13 days during her time there. Giuffre never received her high school diploma or GED. The school day at Survivor's Charter School lasted from morning until early afternoon.

Giuffre has denied the statement and has noted that Giuffre's school transcripts indicate "NO COURSES TAKEN" for the 1999-2000 and 2000-2001 school years and that her attempt to work and resume school at Survivor's Charter School as a 10th grader in the 2001-2002 school year was limited to a portion of the school year, spanning fewer than six months from October 2001 to March 7, 2002. She states that she attempted to get away from Epstein's abuse and that the records indicate that Giuffre's attendance was poor, with 69 days present and 32 days absent out of a required 180 day school year. She was not enrolled at the end of the school year. Her presence on flights with Epstein, verified by Epstein's pilot on flight logs, and an abundance of witness testimony corroborate her story that she was flying domestic and internationally with Epstein at least 32

times between December 11, 2000 to July 28, 2001 and June 21,
2002 to August 21, 2002.

37.    During the year 2000, Giuffre worked numerous
jobs. In 2000, while living with her fiancé, Giuffre held five
different jobs: at Aviculture Breeding and Research Center,
Southeast Employee Management Company, The Club at Mar-a-Lago,
Oasis Outsourcing, and Neiman Marcus. Her taxable earnings that
year totaled nearly $9,000. Giuffre cannot now recall either the
Southeast Employee Management Company or the Oasis Outsourcing
jobs.

Giuffre has disputed the statement and has noted that
while she held various jobs in 2000, Social Security
Administration records do not show the exact dates of employment
(month and day) because they do not need this information to
figure Social Security benefits. She states that neither
Southeast Employee Management Company nor Oasis Outsourcing were
her employers. She states that she worked at Taco Bell, as well
as a pet store, but that neither of these are listed on her
Social Security Administration records because they were most
likely paid through payroll companies. She subsequently worked
at Mar-a-Lago. She also volunteered at Aviculture Breeding and

Research Center, where they eventually put her on the payroll but paid her very little.

38.   Giuffre's employment at The Mar-a-Lago spa began in fall 2000. Giuffre's father, Sky Roberts ("Roberts"), was hired as a maintenance worker at The Mar-a-Lago Club in Palm Beach, Florida, beginning on April 11, 2000. Roberts worked there year-round for approximately 3 years. After working there for a period of time, Roberts became acquainted with the head of the spa area and recommended Giuffre for a job there. Mar-a-Lago closes every Mother's Day and reopens on November 1. Most employees at Mar-a-Lago, including all employees of the spa area such as "spa attendants," are "seasonal" and work only when the club is open, *i.e.*, between November 1 and Mother's Day. Giuffre was hired as a "seasonal" spa attendant to work at the Mar-a-Lago Club in the fall of 2000 after she had turned 17.

Giuffre has disputed the statement and noted that the Mar-a-Lago Club produced 177 pages of records in response to Maxwell's subpoena which did not indicate Giuffre's actual dates of employment, nor whether she was a full-time or seasonal employee. The only significant record produced was a single,

vague chart entry indicating that Giuffre was terminated in 2000
and that Mar-a-Lago was a summer job.

39.   Giuffre represented herself as a masseuse for
Epstein. While working at the Mar-a-Lago spa and reading a
library book about massage, Giuffre met Maxwell. Giuffre
thereafter told her father that she got a job working for
Epstein as a masseuse. Giuffre's father took her to Epstein's
house on one occasion around that time, and Epstein came outside
and introduced himself to Roberts. Giuffre commenced employment
as a traveling masseuse for Epstein. Giuffre was excited about
her job as a masseuse, about traveling with him and about
meeting famous people. Giuffre represented that she was employed
as a masseuse beginning in January 2001. Giuffre never mentioned
Maxwell to Austrich. Giuffre's father never met Maxwell.

Giuffre has denied the statement and has noted that in
Florida, a person cannot work as a masseuse unless she is "at
least 18 years of age or has received a high school diploma or
high school equivalency diploma," Fla. Stat. § 480.041. She was
a minor child, under the age of 18, when she was working at Mar-
a-Lago as a spa attendant and was approached by Maxwell who told
her she could make money as a masseuse, a profession in which

37

Giuffre had no experience. She states that her father drove her
to Epstein's house, the address of which was given to her by
Maxwell, that she was led into the house and instructed by
Maxwell on how to give a massage. She states that Epstein and
Maxwell turned the massage into a sexual encounter, and offered
her money and a better life to be compliant in the sexual
demands of Maxwell and Epstein. She then began travelling with
Maxwell and Epstein on private planes and servicing people
sexually for money — working not as a legitimate masseuse, but
in a position of sexual servitude. Giuffre further noted that
Epstein's house manager, Alessi, described Maxwell's methodical
routine of how she prepared a list of places ahead of time, then
drove to each place for the purpose of recruiting girls to
massage Epstein. Alessi stated that on multiple occasions he
drove Maxwell to pre-planned places while she recruited girls
for massage, and that he witnessed Giuffre at Epstein's house on
the very same day that he witnessed Maxwell recruit Giuffre from
Mar-a-Lago. Giuffre further noted Sjoberg's testimony that she
was similarly recruited.

40.  In spring 2001, while living with Austrich,
Giuffre lied to and cheated on him with Figueroa, her high
school boyfriend. Giuffre and Austrich thereafter broke up, and

Figueroa moved into the Bent Oak apartment with Giuffre. When
Austrich returned to the Bent Oak apartment to check on his pets
and retrieve his belongings, Figueroa punched Austrich in the
face. Figueroa and Giuffre fled the scene before police arrived.
Figueroa was then a convicted felon and a drug abuser on
probation for possession of a controlled substance.

Giuffre has objected to the statement as irrelevant
and unrelated to the allegations made in Giuffre's complaint
against Maxwell and the alleged information should be excluded
by multiple rules of evidence, and has been contested by
Giuffre.

41. Giuffre freely and voluntarily contacted the
police to come to her aid in 2001 and 2002 but never reported to
them that she was Epstein's "sex slave." In August 2001 at age
17, while living in the same apartment, Giuffre and Figueroa
hosted a party with a number of guests. During the party,
according to Giuffre, someone entered Giuffre's room and stole
$500 from her shirt pocket. Giuffre contacted the police. She
met and spoke with police officers regarding the incident and
filed a report. She did not disclose to the officer that she was
a "sex slave." A second time, in June 2002, Giuffre contacted

39

the police to report that her former landlord had left her
belongings by the roadside and had lit her mattress on fire.
Again, Giuffre met and spoke with the law enforcement officers
but did not complain that she was the victim of any sexual
trafficking or abuse or that she was then being held as a "sex
slave."

Giuffre has objected to the statement as misleading
and irrelevant and further noted that she was fearful of Maxwell
and Epstein, and, accordingly, she would not have reported her
abusers and noted that she knew that Epstein had control over
the Palm Beach Police.

42. From August 2001 until September 2002, Epstein
and Maxwell were almost entirely absent from Florida on
documented travel unaccompanied by Giuffre. Flight logs
maintained by Dave Rodgers ("Rodgers"), Epstein's private pilot,
evidence the substantial number of trips away from Florida that
Epstein and Maxwell took, unaccompanied by Giuffre, between
August 2001 and September 2002. Rodgers maintained a log of all
flights on which Epstein and Maxwell traveled with him. Epstein
additionally traveled with another pilot who did not keep such
logs and he also occasionally traveled via commercial flights.

For substantially all of thirteen months of the twenty-two month period from November 2000 to September 2002, Epstein was traveling outside of Florida unaccompanied by Giuffre. During this same period of time, Giuffre was employed at various jobs, enrolled in school, and living with her boyfriend.

Giuffre has disputed this statement and noted the flight logs produced in this matter provide substantive evidence of Giuffre's travel while in the control of Maxwell and Epstein, but are incomplete as Giuffre also was flown by Maxwell on commercial flights. The flight logs and pilot testimony clearly prove that Giuffre was flying domestic and internationally with Epstein at least 32 times between December 11, 2000 to July 28, 2001 and June 21, 2002 to August 21, 2002. Maxwell has acknowledged the flight logs are incomplete and that there were several pilots and co-pilots that flew Epstein and Maxwell (*e.g.*, Rodgers, Lawrence "Larry" Visoski, Bill Hammond, Pete Rathgeb, Gary Roxburgh, and Bill Murphy) in multiple aircrafts and that only Rodgers produced flight records. Giuffre states that Maxwell has also acknowledged that many of the girls recruited by Maxwell routinely traveled on commercial flights for the purposes of providing massages to Epstein or guests at Epstein's New York, New Mexico, or U.S. Virgin Island homes.

41

Giuffre has further noted that her passport application, travel records, and witness testimony demonstrate flight logs are incomplete, that she also flew commercially while she worked for Maxwell and Epstein. Her passport application, for example, listed travel plans to London, and subsequent flight logs listed Giuffre traveling to London with Maxwell, Epstein, and others. Giuffre has cited the evidence she contends establish her travel with Epstein and Maxwell, including massage training in Thailand.

43. Giuffre and Figueroa shared a '93 white Pontiac in 2001 and 2002. Giuffre freely traveled around the Palm Beach area in that vehicle. In August 2002, Giuffre acquired a Dodge Dakota pickup truck from her father. Figueroa used that vehicle in a series of crimes before and after Giuffre left for Thailand.

Giuffre has denied the statement and has noted that she purchased a car from the $10,000 payment she received from Epstein after she was forced to have sex with Prince Andrew in London at Maxwell's home.

44. Giuffre held a number of jobs in 2001 and 2002. During 2001 and 2002, Giuffre was gainfully employed at several jobs. She worked as a waitress at Mannino's Restaurant, at TGIFriday's restaurant ("CCI of Royal Palm Inc."), and at Roadhouse Grill. She also was employed at Courtyard Animal Hospital ("Marc Pinkwasser DVM").

Giuffre has denied the statement and noted that in 2001 and 2002 she attempted to go back to school to earn her GED, and tried unsuccessfully to hold down waitressing jobs. She earned $212.00 as a waitress working "briefly" at Mannino's Restaurant and, in 2002, earned $403.64 working at the TGIFriday's restaurant ("CCI of Royal Palm Beach") for a "short time period." She earned about $1,247.90 at Roadhouse Grill until about March 2002, and at the Courtyard Animal Hospital ("Marc Pinkwasser DVM") she received payroll checks for weeks ending April 22, 2002 to June 4, 2002, earning a total of $1,561.75. Not long after she lost her job at the Courtyard Animal Hospital, she was traveling with Maxwell to the Bahamas, Santa Fe, New Mexico, and New York.

45. Giuffre traveled to Thailand in September 2002 to receive formal training as a masseuse. Figueroa drove her to the

43

airport. While there, she initially contacted Figueroa frequently, incurring a phone bill of $4,000. She then met Robert Giuffre while in Thailand and decided to marry him. She thereafter ceased all contact with Figueroa from October 2002 until two days before Figueroa's deposition in this matter in May 2016.

Giuffre admitted traveling to Thailand to receive massage training in September 2002 but noted that she was given an assignment from Maxwell and Epstein that she had to recruit another underage girl from Thailand, and bring that young girl back to Epstein. Giuffre stated that she was expected to return to Epstein and Maxwell upon completion of her massage training and assignment, and that instead she escaped to Australia where she remained in hiding from Maxwell and Epstein for several years.

46. Detective Joseph Recarey ("Recarey") investigated Epstein and failed to uncover any evidence that Maxwell was involved in sexual abuse of minors, sexual trafficking or production or possession of child pornography. Recarey served as the lead detective from the Palm Beach Police Department charged with investigating Epstein. That investigation commenced in

2005. Recarey worked only on the Epstein case for an entire year. He reviewed previous officers' reports and interviews, conducted numerous interviews of witnesses and alleged victims himself, reviewed surveillance footage of the Epstein home, participated in and had knowledge of the search warrant executed on the Epstein home, and testified regarding the case before the Florida state grand jury against Epstein.

Recarey's investigation revealed that not one of the alleged Epstein victims ever mentioned Maxwell's name and she was never considered a suspect by the Government. None of Epstein's alleged victims said they had seen Maxwell at Epstein's house, nor said they had been "recruited by her," nor paid any money by her, nor told what to wear or how to act by her. Indeed, none of Epstein's alleged victims ever reported to the Government they had met or spoken to Maxwell. Maxwell was not seen coming or going from the house during the law enforcement surveillance of Epstein's home. The arrest warrant did not mention Maxwell and her name was never mentioned before the grand jury. No property belonging to Maxwell, including "sex toys" or "child pornography," was seized from Epstein's home during execution of the search warrant. Recarey, when asked to describe "everything that you believe you know about Ghislaine

Maxwell's sexual trafficking conduct," replied, "I don't." He confirmed he has no knowledge about Maxwell sexually trafficking anybody. Recarey also has no knowledge of Giuffre's conduct that is subject of this lawsuit.

Giuffre has denied the statement and noted that Recarey wanted to speak to Maxwell, but she did not return his calls and he concluded that Maxwell's role was to procure girls for Epstein. Giuffre further noted that in the execution of the search warrant, stationary was found in the home bearing Maxwell's name, and notes were written by house staff to Maxwell and message pads uncovered in trash pulls revealing numerous calls left at the house for Maxwell, indicating she was staying in the house during the days when Epstein was engaging in illegal sex acts with minors. Giuffre further noted that a walk through video taken during the execution of the search warrant revealed photos of topless females at the home, including a photograph of Maxwell naked hanging in the home. Alfredo Rodriguez ("Rodriguez"), the house butler from 2004 through 2005, a time period that included daily sexual abuse of underage females, testified that Maxwell kept a list of the local girls who were giving massages at her desk, and that Maxwell kept nude photos of girls on her computer. Giuffre states that Recarey

46

testified that when the search warrant was executed, the house had been sanitized and the computers removed from the home.

Giuffre states that the co-conspirator who maintained direct contact with the many underage victims was Kellen, whose sole responsibility was to schedule underage girls to visit Epstein for sex and reported directly to Maxwell. Figueroa testified that Maxwell personally requested that he find and bring girls to Epstein for sex once Giuffre had escaped, and that when he brought the girls Maxwell interacted with them, that Maxwell was "the boss" and that she knew everything that was going on.

47.  No nude photograph of Giuffre was displayed in Epstein's home. Epstein's housekeeper, Alessi, "never saw any photographs of Virginia Roberts [Giuffre] in Epstein's house." Recarey entered Epstein's home in 2002 to install security cameras to catch a thief and did not observe any "child pornography" within the home, including on Epstein's desk in his office.

Giuffre has denied this statement and noted that Maxwell had pornography on her computer, that there was a

collage of nude photos in Epstein's closet, that the collage was taken into evidence by Recarey, who testified to that fact in his deposition, that Rizzo, a visitor to the home on numerous occasions, was reprimanded by Maxwell for looking at the nude photos, and that the search warrant revealed photographs of nudity displayed, including a photograph of Maxwell herself in the nude. Sjorberg testified that Maxwell bought her a camera for the specific purpose of her taking nude photos of herself and Giuffre has testified that there was a nude photograph of her at the house.

48.   Giuffre drafted a "journal" describing individuals to whom she claims she was sexually trafficked as well as her memories and thoughts about her experiences with Epstein. In 2013, she and her husband created a bonfire in her backyard in Florida and burned the journal together with other documents in her possession. Giuffre also kept a "dream journal" regarding her thoughts and memories that she possessed in January 2016. To date, Giuffre cannot locate the "dream journal."

49.   Giuffre publicly peddled her story beginning in 2011. Giuffre granted journalist Churcher extensive interviews

that resulted in seven widely distributed articles from March 2011 through January 2015. Churcher regularly communicated with Giuffre and her "attorneys or other agents" from "early 2011" to "the present day." Giuffre received approximately $160,000 for her stories and pictures that were published by many news organizations.

Giuffre has denied this statement in part and admitted it in part, noting that in 2011, Giuffre was still in hiding from Epstein and Maxwell in Australia and not looking to sell anything or even speak with anyone about what had happened to her. Churcher located Giuffre and impressed the importance of Giuffre standing up to those who had harmed her and speaking with federal authorities. Giuffre did so in 2011, bringing the abuse of Maxwell and Epstein to public light to prevent their continued abuse of others. Giuffre agreed to be interviewed by Churcher and was compensated for sharing her story, which came at the heavy price of being publicly scrutinized.

50. Giuffre drafted a 144-page purportedly autobiographical book manuscript in 2011 which she actively sought to publish. In 2011, contemporaneous with her Churcher interviews, Giuffre drafted a book manuscript which purported to

document Giuffre's experiences as a teenager in Florida,
including her interactions with Epstein and Maxwell. Giuffre
communicated with literary agents, ghost writers, and potential
independent publishers in an effort to get her book published.
She generated marketing materials and circulated those along
with book chapters to numerous individuals associated with
publishing and the media.

Giuffre has denied the statement in part and admitted
it in part, stating that she received a Victim Notification
Letter from the United States Attorney's office for the Southern
District of Florida regarding her sexual victimization by
Epstein, that in 2011 she sought psychological counseling from a
psychologist for the trauma she endured, and that also that year
Churcher sought her out and interviewed her. Giuffre was
interviewed by the FBI in 2011. Giuffre has noted that she began
to draft a fictionalized account of what happened to her as an
act of empowerment and a way of reframing and taking control
over the narrative of her past abuse that haunts her and, while
she explored trying to publish her story to empower other
individuals who were subject to abuse, she ultimately decided
not to publish it.

51.   The CVRA joinder motion filed by Giuffre
generated a media maelstrom and spawned highly publicized
litigation between Giuffre's lawyers — Bradley Edwards
("Edwards") and Paul Cassell ("Cassell") — and Dershowitz. After
Giuffre publicly accused Dershowitz of sexual misconduct,
Dershowitz vigorously defended himself in the media. He called
Giuffre a liar and accused her lawyers of unethical conduct. In
response, Edwards and Cassell sued Dershowitz, who
counterclaimed. This litigation, in turn, caused additional
media attention by national and international media
organization.

Giuffre has denied the statement as set forth in
Statement 7.

52.   Giuffre formed non-profit Victims Refuse Silence
to attract publicity and speak out on a public controversy. In
2014, Giuffre, with the assistance of the same counsel, formed a
non-profit organization, Victims Refuse Silence. According to
Giuffre, the purpose of the organization is to promote Giuffre's
professed cause against sex slavery. The stated goal of her
organization is to help survivors surmount the shame, silence,
and intimidation typically experienced by victims of sexual

abuse. Giuffre attempts to promote Victims Refuse Silence at every opportunity. For example, Giuffre participated in an interview in New York with ABC to promote the charity and to get her mission out to the public.

Giuffre has denied that she formed the non-profit Victims Refuse Silence to "speak out on a public controversy," and noted she sought to help survivors of sexual abuse and sexual trafficking and in order to provide assistance to victims, she attempted to talk about the non-profit's mission when she had the opportunity to do so.

## III.  The Applicable Standard

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Id.* The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).

While the moving party bears the initial burden of showing that no genuine issue of material fact exists, *Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005), in cases where the non-moving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "It is ordinarily sufficient for the movant to point

to a lack of evidence . . . . on an essential element of the non-
movant's claim . . . . . [T]he nonmoving party must [then] come
forward with admissible evidence sufficient to raise a genuine
issue of fact for trial . . . . ." *Jaramillo v. Weyerhaeuser Co.*,
536 F.3d 140, 145 (2d Cir. 2008) (internal citations omitted);
*see also Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d
14, 18 (2d Cir. 1995) ("Once the moving party has made a
properly supported showing sufficient to suggest the absence of
any genuine issue as to a material fact, the nonmoving party ...
must come forward with evidence that would be sufficient to
support a jury verdict in his favor").

## IV.    The Motion for Summary Judgment on Republication Grounds is
Denied

Maxwell has moved for summary judgment dismissing
Giuffre's complaint on the grounds that Maxwell is not liable
for the republication of her Press Release by the media. Because
as a matter of law the issuer of a press release is responsible
for its publication, the motion is denied.

In New York, liability for a republication "must be
based on real authority to influence the final product." *Davis*

*v. Costa-Gavras*, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984); *see also Hoffman v. Landers*, 146 A.D.2d 744, 747 (N.Y. App. Div. 2d Dep't 1989) ("One who makes a defamatory statement is not responsible for its recommunication without his authority or request by another over whom he has no control."). Where a defendant "had no actual part in composing or publishing," he cannot be held liable "without disregarding the settled rule of law that no man is bound for the tortious act of another over whom he has not a master's power of control." *Davis*, 580 F. Supp. at 1096 (internal quotation marks and citation omitted). The New York Court of Appeals summarized New York's republication liability standard in *Geraci v. Probst*, 938 N.E.2d 917 (N.Y. 2010), stating that

> one who . . . prints and publishes a libel[] is not responsible for its voluntary and unjustifiable repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured, and that such repetition cannot be considered in law a necessary, natural and probable consequence of the original slander or libel.

938 N.E.2d at 921 (internal quotation marks and citation omitted). Thus, "conclusive evidence of lack of actual authority [is] sufficiently dispositive that the [court] 'ha[s] no option but to dismiss the case . . . .'" *Davis*, 580 F. Supp. at 1096

55

(quoting *Rinaldi v. Viking Penguin, Inc.*, 420 N.E.2d 377, 382
(N.Y. 1981)).

However, New York law assigns liability to individuals
for the media's publication of press releases. New York
appellate courts have held that an individual is liable for the
media publishing that individual's defamatory press release. *See*
*Levy v. Smith*, 132 A.D.3d 961, 962–63 (N.Y. App. Div. 2d Dep't
2015) ("Generally, [o]ne who makes a defamatory statement is not
responsible for its recommunication without his authority or
request by another over whom he has no control . . . . Here,
however, . . . the appellant intended and authorized the
republication of the allegedly defamatory content of the press
releases in the news articles."); *see also* RESTATEMENT (SECOND) OF
TORTS § 576 (1977) ("The publication of a libel or slander is a
legal cause of any special harm resulting from its repetition by
a third person if . . . the repetition was authorized or
intended by the original defamer, or . . . the repetition was
reasonably to be expected.")

The facts as set forth above establish that Maxwell
approved the Press Release. The Press Release was sent to
between six and 30 media representatives by Gow as an employee

of Acuity Reputation, the public relations firm hired by
Maxwell. The initial sentence of the Press Release – "Please
find attached a quotable statement on behalf of Maxwell" –
communicates Maxwell's authorization for the media recipients of
the Press Release to publish it. *See Nat'l Puerto Rican Day
Parade, Inc. v. Casa Pubs., Inc.*, 79 A.D.3d 592, 595 (N.Y. App.
Div. 1st Dep't 2010) (affirming the refusal to dismiss
defamation counts against a defendant who "submitted an open
letter that was published in [a] newspaper, and that [the
defendant] paid to have the open letter published," finding that
the defendant "authorized [the newspaper] to recommunicate his
statements.").

Maxwell has cited *Geraci v. Probst* in support of her
position, but *Geraci* is distinguishable from the instant action.
In *Geraci*, the defendant sent a letter to the Board of Fire
Commissioners, and, more than three years later, a newspaper
published the letter. The court held that the defendant was not
liable for that belated publication, "made years later without
his knowledge or participation." 938 N.E.2d at 919. Here, unlike
in *Geraci*, the Press Release was not published "without [her]
authority or request," but rather with Maxwell's authority and

by her express request. Gow's testimony establishes Maxwell's
authority and control over the Press Release:

> Q. When you sent that email were you acting pursuant to
> Ms. Maxwell's retention of your services?
>
> A. Yes, I was
>
> ***
>
> Q. The subject line does have "FW" which to me indicates
> it's a forward. Do you know where the rest of this
> email chain is?
>
> A. My understanding of this is: It was a holiday in the
> UK, but Mr. Barden was not necessarily accessible at
> some point in time, so this had been sent to him
> originally by Ms. Maxwell, and because he was
> unavailable, she forwarded it to me for immediate
> action. I therefore respond, "Okay, Ghislaine, I'll go
> with this."
>
> It is my understanding that this is the agreed
> statement because the subject of the second one is
> "Urgent, this is the statement" so I take that as an
> instruction to send it out, as a positive command:
> "This is the statement."

Maxwell also cites *Davis v. Costa-Gavras*, involving a
libel claim against an author who wrote a book about a military
coup in Chile. 580 F. Supp. at 1085. Years after the author
published the book, a third-party publishing house republished
the book in paperback form and a third-party filmmaker released
a movie based on the book. The book author did not actually
participate in the republications, though he was aware of the

projects. The court held that the author of the book could not be held liable for the republications, explaining that a "party who is 'innocent of all complicity' in the publication of a libel cannot be held accountable." 580 F. Supp. at 1094 (internal citations omitted). The court further noted that "active participation in implementing the republication resurrects the liability." *Id.* Likewise, in *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557 (1980), also cited by Maxwell, the court held that reporters of a series of articles on narcotics trade "cannot be held personally liable for injuries arising from [the] subsequent republication in book form absent a showing that they approved or participated in some other manner in the activities of the third-party republisher." *Id.* at 559-560. However, the court explicitly noted that this result was required because "the record [wa]s barren of any concrete evidence of the reporters' involvement in the republication of the newspaper series." *Id.* at 540.

Here, there is evidence in the record that Maxwell "actively participated" in influencing the media to publish the Press Release, *Davis*, 580 F. Supp. at 1094, and "approved" of and sought the publication of the press release, *Karaduman*, 416 N.E.2d at 560. Maxwell retained a public relations media

specialist. The Press Release was sent by Maxwell's express
request. Gow's testimony about the process leading up to the
dissemination of the Press Release indicates that Maxwell did,
indeed, "authorize or intend" for the media recipients to
publish the statement. Because there are sufficient facts to
demonstrate Maxwell's authority and control over the publication
of the Press Release, Maxwell's liability for the Press
Release's publication survives the motion for summary judgment.

Maxwell has additionally asserted that subjecting her
to liability for republication is "particularly unfair" because
excerpts of the Press Release, rather than the whole statement,
were published. Def.'s Reply at 9. Maxwell cites to *Rand v. New
York Times Co.*, 75 A.D.2d 417 (N.Y. App. Div. 1st Dep't 1980),
in which a newspaper paraphrased the defendant's opinion,
essentially "excis[ing] the opinion from the context in which it
was given." *Id.* at 424. No similar alteration, sanitization,
hyperbolizing, or paraphrasing of Maxwell's statements has been
established here. Nor does the record establish that any
statements of Maxwell's were taken out of context; rather, they
were directly quoted, accurately and unchanged. The publication
of Maxwell's statement that Giuffre's claims are "obvious lies"

does not distort or misrepresent the message Maxwell intended to convey to the public with the Press Release.

Because the purpose of the issuance of the Press Release was publication, Maxwell is liable for its content and the motion for summary judgment on the grounds of non-liability for republication is denied.

## V.   The Motion for Summary Judgment to Dismiss the Defamation Claim on the Ground of Substantial Truth is Denied

Maxwell has asserted that the Press Release is substantially true and that the defamation claim should therefore be dismissed. *See* Def.'s Br. at 39. Whether or not Giuffre lied about Maxwell's involvement in the events that Giuffre has alleged took place is the intensely contested factual issue that is the foundation of this action. Accordingly, summary judgment is not appropriate. See *Mitre Sports Intern. Ltd. v. Home Box Office, Inc.*, 22 F. Supp. 3d 240, 255 (S.D.N.Y. 2014) (denying summary judgment because it would require the Court to decide disputed facts to determine whether the statement at issue was substantially true); *Da Silva v. Time Inc.*, 908 F. Supp. 184, 187 (S.D.N.Y. 1995) (denying motion for summary judgment because there was a genuine issue of

material fact as to whether defamatory photo and caption were true).

Under New York law, "truth is an absolute, unqualified defense to a civil defamation action" and "'substantial truth' suffices to defeat a charge of libel." Jewell v. NYP Holdings, Inc., 23 F. Supp. 2d 348, 366 (S.D.N.Y. 1998) (internal quotation marks and citations omitted). A statement is substantially true if the statement would not "have a different effect on the mind of the reader from that which the pleaded truth would have produced." Id. (quoting Fleckenstein v. Friedman, 193 N.E. 537, 538 (N.Y. 1934)). Thus, "it is not necessary to demonstrate complete accuracy to defeat a charge of libel. It is only necessary that the gist or substance of the challenged statements be true." Printers II, Inc. v. Professionals Publishing, Inc., 784 F.2d 141, 146 (2d Cir. 1986); see also Korkala v. W.W. Norton & Co., 618 F.Supp. 152, 155 (S.D.N.Y. 1985) ("Slight inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.") (internal quotation marks and citation omitted); Sharon v. Time, Inc., 609 F.Supp. 1291, 1294 (S.D.N.Y. 1984) ("Defendant is permitted to prove the substantial truth of this statement by establishing any other proposition that has the

same 'gist' or 'sting' as the original libel, that is, the same effect on the mind of the reader.").

The Honorable Loretta A. Preska has noted that cases addressing whether a statement is substantially true "fall along a broad spectrum." *Jewell*, 23 F. Supp. at 367. There are cases in which a statement is non-actionable because it is completely true. *See, e.g., Carter*, 233 A.D.2d 473, 474 (N.Y. App. Div. 2d Dep't 1996) (claim that defendant committed libel by informing the authorities that plaintiff was endorsing checks made payable to the defendant and depositing them in plaintiff's account held non-actionable where plaintiff had in fact endorsed checks made payable to the defendant). There are cases where "one struggles to identify any area of ambiguity as to truth." *Jewell*, 23 F. Supp. at 368; *see, e.g., Miller v. Journal-News*, 211 A.D.2d 626, 627 (N.Y. App. Div. 2d Dep't 1995) (statement that plaintiff was "suspended" substantially true where plaintiff was placed on "administrative leave"). There are cases where the line between the statement and the admitted truth is more tenuous, but the overall "gist" cannot be said to be substantially different. *See, e.g., Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302-03 (2d Cir. 1986) (holding that statement which implied that plaintiff was then currently an adulterer was substantially true

63

where plaintiff had ceased being an adulterer but had "unabashedly committed adultery" for thirteen of seventeen years). Finally, there are "those cases in which a defendant simply asks too much in asserting that a statement is substantially true because the difference between the two is plainly substantial." *Jewell*, 23 F. Supp. at 368. For example, the court in *Da Silva*, 908 F. Supp. at 186–87, held that a photograph of plaintiff which identified her as a prostitute was not substantially true where the plaintiff had been a prostitute for some six years but was not at the time of publication.

After reviewing this spectrum of cases, the facts upon which Maxwell bases her argument are insufficient to allow this Court to find substantial truth as a matter of law. A material dispute of fact exists as to the "admitted truth" or the "reality" in this case. Maxwell has cited to various facts to counter Giuffre's claims, such as Giuffre's high school enrollment, short-term jobs, and lack of record on private flight logs during some of the relevant time period, as evidence that Maxwell and Epstein did not abuse Giuffre. The details and significance of the facts offered are highly contested, and therefore cannot establish the "substantial truth" of the Press Release. "[R]easonable jurors could conclude that the statements

64

. . . are not substantially true." *Boehner v. Heise*, 734 F.
Supp. 2d 389, 399 (S.D.N.Y. 2010).

The motion for summary judgment to dismiss the
defamation on the ground of substantial truth is denied as not
having been established by undisputed material facts.

## VI.   The Defamation Claim is Not Barred by New York Law

Maxwell has moved to dismiss the complaint on the
ground that the Press Release is opinion and protected by the
pre-litigation privilege under New York law. Because New York
law does not support Maxwell's position, the motion for summary
judgment based on the characterization of the Press Release as
opinion and as protected by a pre-litigation privilege is
denied.

### 1.   *The Press Release is Not Opinion.*

As previously held, Maxwell's statement that Giuffre's
claims of sexual assault are lies is not an expression of
opinion:

65

First, statements that Giuffre's claims 'against
[Maxwell] are untrue,' have been 'shown to be
untrue,' and are 'obvious lies' have a specific
and readily understood factual meaning: that
Giuffre is not telling the truth about her
history of sexual abuse and [Maxwell]'s role, and
that some verifiable investigation has occurred
and come to a definitive conclusion proving that
fact. Second, these statements (as they
themselves allege), are capable of being proven
true or false, and therefore constitute
actionable fact and not opinion. Third, in their
full context, while [Maxwell]'s statements have
the effect of generally denying Giuffre's story,
they also clearly constitute fact to the reader.

*Giuffre v. Maxwell*, 165 F. Supp. 3d 147, 152 (S.D.N.Y. 2016).

This Court further concluded that

[Giuffre] cannot be making claims shown to be
untrue that are obvious lies without being a
liar. Furthermore, to suggest an individual is
not telling the truth about her history of having
been sexually assaulted as a minor constitutes
more than a general denial, it alleges something
deeply disturbing about the character of an
individual willing to be publicly dishonest about
such a reprehensible crime. [Maxwell]'s
statements clearly imply that the denials are
based on facts separate and contradictory to
those that [Giuffre] has alleged.

*Id.*

Maxwell argues that the "context" of the entire

statement "tested against the understanding of the average

reader" should be that of a press release as a whole being read

only by journalists. Def.'s Br. at 22 (quoting *Aronson v.*

*Wiersma*, 483 N.E.2d 1138, 1139 (1985)). However, the ultimate

66

audience for a press release is the public. The motion to
dismiss opinion clearly addressed this issue:

> Sexual assault of a minor is a clear-cut issue;
> either transgression occurred or it did not.
> Either Maxwell was involved or she was not. The
> issue is not a matter of opinion, and there
> cannot be differing understandings of the same
> facts that justify diametrically opposed opinion
> as to whether Maxwell was involved in Giuffre's
> abuse as Giuffre has claimed. Either Giuffre is
> telling the truth about her story and Maxwell's
> involvement, or Maxwell is telling the truth and
> she was not involved in the trafficking and
> ultimate abuse of Giuffre.

*Giuffre*, 165 F. Supp. at 152.

Maxwell has urged that these conclusions at the motion
to dismiss stage should be revisited and revised when
considering the summary judgment motion since the standard for
deciding a Rule 12(b)(6) motion is different from the standard
for deciding a Rule 56 motion. In deciding a 12(b)(6) motion,
the court must accept as true the factual allegations and draw
all inferences in the plaintiff's favor; a plaintiff need only
state a claim that is "plausible on its face." *Id.* at 149
(internal quotation marks and citation omitted). In contrast,
for a Rule 56 motion, the plaintiff defending the motion may not
"rest on [the] allegations" in her complaint. *Anderson*, 477 U.S.
at 249.

In deciding its motion to dismiss opinion, the Court relied on *Davis v. Boeheim*, 22 N.E.3d 999 (2014), and held that the three allegedly defamatory statements in the Press Release have a specific and readily understood factual meaning, are capable of being proven true or false, and "clearly constitute fact to the reader." *Giuffre*, 165 F. Supp. at 152. The Court determined that "[t]he dispositive inquiry" for purposes of deciding whether an allegedly defamatory statement is fact or nonactionable opinion is whether "a reasonable reader could have concluded that the statements were conveying facts about the plaintiff." *Id.* at 151 (internal quotation marks and citation omitted). To answer that inquiry, three factors enumerated in *Davis* were applied. *See id.* These three factors are the same as the four factors in *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270 (N.Y. 1991); the difference is that the *Davis* court collapsed the *Immuno AG's* third and fourth factors into one. *See Davis*, 22 N.E.3d at 1005. "[T]he critical aspect of the inquiry, as articulated in the third factor set forth above, is to view the statements in context." *Jewell*, 23 F. Supp. 2d at 377. This contextual analysis "proceeds on two levels, the 'broader social setting' of the statements, as well as their 'immediate context.'" *Id.* (citing *Immuno*, 567 N.E.2d at 1280).

Maxwell acknowledges that the Court properly applied *Davis* at the motion to dismiss stage, but argues that the third factor, especially, benefits from the evidence presented in the motion for summary judgment. *See* Def.'s Br. at 32. In other words, Maxwell argues that "the Court did not have the 'full context'" of the Press Release or the "broader social context and surrounding circumstances of the statement." *Id.* At the motion to dismiss stage, the text of the Press Release had not yet been produced, nor had there been production of emails or deposition testimony regarding the Press Release.

The developed record necessitates the same conclusion as at the motion to dismiss stage. The context and surrounding circumstances remain the same. The publication was intended by Maxwell to reach the average reader, not simply the reporters, Barden's intent, a factual issue in contest, notwithstanding. The issue of truth or falsity is a factual determination, not a matter of opinion. *See Giuffre*, 165 F. Supp. 3d at 152 ("[S]tatements that Giuffre's claims 'against [Maxwell] are untrue,' have been 'shown to be untrue,' and are 'obvious lies' have a specific and readily understood factual meaning.").

69

2.    *The Pre-Litigation Privilege is Inapplicable.*

Maxwell has contended that the pre-litigation privilege as enunciated in *Front, Inc. v. Khalil*, 28 N.E.3d 15, 16 (N.Y. 2015), applies. *See* Def.'s Br. at 33.

"A privileged communication is one which, but for the occasion on which it is uttered, would be defamatory and actionable." *Park Knoll Assocs. v. Schmidt*, 451 N.E.2d 182, 184 (N.Y. 1983). "[I]t is well-settled that statements made in the course of litigation are entitled to absolute privilege." *Front*, 28 N.E.3d at 18. The privilege that protects statements made in the course of litigation "can extend to preliminary or investigative stages of the process, particularly where compelling public interests are at stake." *Rosenberg v. MetLife, Inc.*, 866 N.E.3d 439, 443 (N.Y. 2007). In *Front*, the New York Court of Appeals ruled that the privilege for "statements made by attorneys prior to the commencement of litigation" is qualified rather than absolute. *Id.* at 16. Specifically, the Court held that an attorney's statements made before litigation has commenced are privileged if (1) the attorney has "a good faith basis to anticipate litigation" and (2) the statements are "pertinent to that anticipated litigation." *Id.* at 20.

70

The anticipated litigation, according to the Press
Release, was "redress at the repetition of such old defamatory
claims." *See* Press Release. According to Barden, Maxwell's
lawyer, he participated in the preparation of the Press Release,
the purpose of the Press Release was to dissuade the media from
publishing Giuffre's allegations, and the implication of the
Press Release was that any redress sought by Maxwell would be
against the media. Giuffre has disputed Barden's claim that the
Press Release was his own statement.

Certain of the cases cited by Maxwell in support of
the privilege can be distinguished, according to Giuffre, in
that they involve communications to or from parties to the
ultimate litigation. *See, e.g., Kirk v. Heppt*, 532 F. Supp. 2d
586, 593 (S.D.N.Y. 2008) (the communication at issue was made by
an attorney's client to the attorney's malpractice carrier
concerning the client's justiciable controversy against the
attorney over which the clients actually sued); *Black v. Green
Harbour Homeowners' Ass'n, Inc.*, 19 A.D.3d 962, 963 (N.Y. App.
Div. 3d Dep't 2005) (privilege applied to a letter sent by a
home owner's association board of directors to the association's
members informing them of the status of litigation to which the

association was a party). Giuffre contends that "there was no statement made by anyone before the commencement of litigation because litigation never commenced." *See* Pl.'s Opp'n at 42.

Here, the communication at issue was sent to members of the media, and no litigation took place between Maxwell and the media recipients of the Press Release.

However, the pre-litigation privilege is not limited to statements between parties and their lawyers. "While the communications at issue in *Front* were among lawyers and potential parties, the New York Court of Appeals did not explicitly require the recipient of the challenged statements to be a lawyer or potential party." *Feist v. Paxfire, Inc.*, No. 11 CIV. 5436 (LGS), 2017 WL 177652, at *5 (S.D.N.Y. Jan. 17, 2017); *see Front*, 28 N.E.3d at 16–17. The Second Circuit "summarily rejected this interpretation when it applied *Front* to an attorney's communications to the press." *See Tacopina v. O'Keeffe*, 645 F. App'x 7, 8 (2d Cir. 2016) ("Even crediting [the plaintiff]'s allegation that [the attorney] shared the affidavit with the Daily News before filing it in court, Tacopina has still not sustained his burden of showing that the statements were not pertinent to a good faith anticipated litigation.").

Though a statement made to a non-party may be privileged, the pre-litigation privilege does not apply here because the Press Release cannot be considered a "statement[] made by [an] attorney." *Front*, 28 N.E.3d at 16. Whether Maxwell's attorney, Barden, had a hand in drafting the Press Release, and the extent to which he may have been involved, is a disputed issue of fact. The record evidence establishes that, regardless, the Press Release is properly attributable to Maxwell. Maxwell retained a public relations firm and sent her representative there, Gow, a forwarded email with the statements that were to be used in the Press Release. Maxwell instructed Gow to send it, as he testified in his deposition. While Maxwell herself did not disseminate the email to the media recipients, neither did Barden. The statement was sent out by Gow.

Additionally, the alleged defamatory statements in the Press Release were attributed to Maxwell, and not to her attorney or his agents. The email stated that the Press Release was a "statement on behalf of" Maxwell and notified the media recipients that "[n]o further communication will be provided by her [Maxwell] on this matter." There is no evidence in the email

that the Press Release was anything near an attorney's

statement; Barden was not even copied on the email.


The pre-litigation privilege is intended to protect

attorneys from defamations claims "so that those discharging a

public function may speak freely to zealously represent their

clients without fear of reprisal or financial hazard." *Id.* at

18. Where the statement cannot be attributed to an attorney,

there is no justification for protecting it by privilege.


In addition, as this Court concluded in denying

Maxwell's motion to dismiss, "[t]here is no qualified privilege

under New York law when such statements are spoken with malice,

knowledge of their falsity, or reckless disregard for their

truth." *Giuffre*, 165 F. Supp. 3d at 155 (internal quotation

marks and citation omitted). It is Giuffre's contention that

Maxwell knew the statements were false because she engaged in

and facilitated the sexual abuse of Giuffre. Therefore,

according to Giuffre, they were not made in good faith

anticipation of litigation, and instead were made for the

inappropriate purpose of "bully[ing]," "harass]ment]," and

"intimid[ation]." *See Front*, 28 N.E.3d at 19 (2015). According

to Giuffre, there is ample record evidence that Maxwell acted

with malice in issuing the Press Release, thereby making the pre-litigation privilege inapplicable.

Because of the existence of triable issues of material fact rather than opinion and because the pre-litigation privilege is inapplicable, the motion for summary judgment is denied.

## VII.   Conclusion

For the reasons set forth above, the motion for summary judgment is denied.

The parties are directed to jointly file a proposed redacted version of this Opinion consistent with the Protective Order or notify the Court that none are necessary within one week of the date of receipt of this Opinion.

It is so ordered.

New York, NY
March 22, 2017

ROBERT W. SWEET
U.S.D.J.